1  David S. Kupetz (CA Bar No. 125062)
      *dkupetz@sulmeyerlaw.com*
2  Asa S. Hami (CA Bar No. 210728)
      *ahami@sulmeyerlaw.com*
3  Steven F. Werth (CA Bar No. 205434)
      *swerth@sulmeyerlaw.com*
4  **Sulmeyer**Kupetz
   A Professional Corporation
5  333 South Hope Street, Thirty-Fifth Floor
   Los Angeles, California  90071-1406
6  Telephone: 213.626.2311

7  Attorneys for Debtor and Debtor in Possession
   Shiekh Shoes, LLC

8

## UNITED STATES BANKRUPTCY COURT

9

## CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

10

| | |
|---|---|
| In re | Case No. 2:17-bk-24626-VZ |
| SHIEKH SHOES LLC,<br>a California limited liability company,<br><br>Debtor. | Chapter 11<br><br>**DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS:**<br><br>**(1) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364;**<br>**(2) AUTHORIZING THE DEBTOR'S LIMITED USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363;**<br>**(3) GRANTING ADEQUATE PROTECTION TO PREPETITION SENIOR LENDER PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364;**<br>**(4) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001; AND**<br>**(5) GRANTING RELATED RELIEF;**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Declarations filed of Shiekh S. Ellahi and Gerry Seli filed separately]<br><br>Date:    TO BE DETERMINED<br>Time:   TO BE DETERMINED<br>Place:    Courtroom 1368<br>             255 East Temple Street<br>             Los Angeles, CA  90012 |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  **TO THE HONORABLE VINCENT P. ZURZOLO, UNITED STATES**

2  **BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE,**

3  **SECURED CREDITORS, THE DEBTOR'S TWENTY LARGEST UNSECURED**

4  **CREDITORS, AND OTHER PARTIES IN INTEREST:**

5  **EMERGENCY MOTION**

6  Shiekh Shoes, LLC, a California limited liability company, debtor and debtor in possession

7  in the above-captioned case (the "Debtor"), hereby moves (the "Motion"), on an emergency basis,

8  pursuant to Local Bankruptcy Rules ("LBR") 2081-1(a)(9), 4001-2, and 9075-1, Federal Rule of

9  Bankruptcy Procedure, and sections 105(a), 361, 362, 363, and 364 of the Bankruptcy Code, for:

10  (1) the entry of an interim order (the "Interim Order") and a final order (the "Final

11  Order"):[1]

12  (a) authorizing the Debtor to obtain senior secured post-petition financing in an

13  aggregate principal amount not to exceed $16,000,000 (the "Postpetition Facility" or "DIP

14  Facility"), pursuant to section 364 of the Bankruptcy Code, from State Bank and Trust Company

15  (as successor by merger to Alostar Bank of Commerce, the "Postpetition Lender"), pursuant to the

16  terms of the Interim Order and that certain Senior Secured, Super-Priority Debtor-In-Possession

17  Loan and Security Agreement, dated as of December 1, 2017, by and between the Debtor and the

18  Postpetition Lender in substantially the form attached hereto as Exhibit A (as the same may be

19  amended, restated, supplemented or otherwise modified from time to time, the "Postpetition Loan

20  Agreement");[2]

21  (b) authorizing the Debtor to execute, deliver, and enter into the Postpetition Loan

22  Agreement and other Postpetition Loan Documents and to perform such other and further acts as

23  may be required in connection with the Postpetition Loan Documents;

24  _____

25  [1] The proposed form of Interim Order is attached hereto as Exhibit B.  The term "Interim Order" is more
particularly defined in Section 1, paragraph 1.1 to the Postpetition Loan Agreement and is used in such

26  manner in the present Motion.

27  [2] Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the
Postpetition Loan Agreement.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

2613187

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    (c) granting security interests, liens, and superpriority claims (including a

2    superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens

3    pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant

4    to section 364(d) of the Bankruptcy Code) to the Postpetition Lender to secure all obligations of

5    the Debtor under and with respect to the Postpetition Facility, subject to the payment of certain

6    fees and claims as set forth paragraph 13 to the proposed Interim Order (collectively, the "Carve-

7    Out");

8    (d) authorizing the Debtor's limited use of Cash Collateral (as defined in paragraph

9    E to the proposed Interim Order attached hereto as Exhibit B), solely on the terms and conditions

10    set forth in the Interim Order and in the Postpetition Loan Documents;

11    (e) granting adequate protection to State Bank and Trust Company (as successor by

12    merger to AloStar Bank of Commerce, the "Prepetition Senior Lender") and the Prepetition

13    Second Lien Lenders (defined below), whose liens and security interests are being primed by the

14    Postpetition Facility;

15    (f) modifying the automatic stay under section 362 of the Bankruptcy Code to the

16    extent necessary to implement, effectuate, and perform under the terms and provisions of the

17    Postpetition Loan Documents and the Interim Order; and

18    (g) providing that all parties-in-interest, including, without limitation, any official

19    committee of unsecured creditors appointed in this case (the "Creditors' Committee") will have a

20    period of the earlier of (i) sixty (60) days following the date of the appointment of the Creditors'

21    Committee, and (ii) seventy-five days after the Petition Date (defined below as November 29,

22    2017), to file an appropriate complaint to challenge the stipulations and admission in Paragraph

23    D(a) to the Interim Order, absent which all parties will be deemed to the extent, validity, and

24    priority of the claims under the Debtor's prepetition facility  with the Prepetition Senior Lender

25    under the Prepetition Senior Loan Documents (the "Prepetition Facility") and the security interests

26    securing the Prepetition Facility;

27    (2) requesting, pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure

28    ("FRBP") and applicable Local Bankruptcy Rules of this Court, that an emergency interim hearing

2613187

1    (the "<u>Interim Hearing</u>") on the Motion be held to consider entry of the Interim Order, which

2    authorizes the Debtor to borrow under the Postpetition Loan Documents up to an aggregate

3    principal amount not to exceed $16,000,000;

4        (3) finding that adequate notice of the Motion (specified below) has been provided;

5        (4) finding that any credit extended and loans made to, Cash Collateral used by, and

6    adequate protection provided by the Debtor are in "good faith" pursuant to section 364(e) of the

7    Bankruptcy Code;

8        (5) requesting, pursuant to FRBP 4001(b)(2) and 4001(c)(2), and applicable Local

9    Bankruptcy Rules of this Court, that this Court (i) schedule a final hearing (the "<u>Final Hearing</u>")

10   on the Motion to consider entry of the Final Order authorizing the balance of the borrowings and

11   letter of credit issuances under the Postpetition Loan Documents on a final basis, and (ii) approve

12   notice procedures with respect thereto

13       (6) waiving any applicable stay, including under FRBP 4001(b) and (c), and providing for

14   the immediate effectiveness of the Interim Order; and

15       (7) granting related relief.[3]

16                    **<u>NEED FOR RELIEF ON EMERGENCY BASIS</u>**

17       On November 29, 2017 (the "<u>Petition Date</u>"), the Debtor commenced the above-captioned

18   bankruptcy case.  The Debtor is a retailer of shoes, apparel, and accessories.  As of the Petition

19   Date, the Debtor operates 124 retail locations in California, Nevada, Arizona, Texas, New Mexico,

20   Oregon, Washington, Illinois, Michigan, and Tennessee.  The Debtor also generates significant

21   revenue through online sales.  The Debtor started selling online in 2009, and currently operates

22   websites under the domain names ShiekhShoes.com, Shiekh.com, Karmaloop.com,

23   TiltedSole.com, and FBRKclothing.com.

24   _____

25   [3] A more detailed description of the relief sought is set forth in the form of Interim Order.  Any description
of the terms of the Postpetition Facility set forth in the foregoing recitation of relief sought is for
26   informational purposes only.  If there are any inconsistencies between such description and the terms of the
Postpetition Facility (including the terms in the Interim Order and the Postpetition Loan Documents), the
27   terms in the Interim Order and Postpetition Loan Documents control.

28

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

2613187

1   The Debtor's operations have not been profitable in recent years.  The Debtor commenced

2   this reorganization case in order to pursue implementation of a restructuring of its operations,

3   leases, and debt.  The Debtor believes that a successful overall reorganization would maximize the

4   value of the bankruptcy estate (the "Estate"), provide for payment to unsecured creditors, and

5   allow the Debtor to emerge from chapter 11 with a reorganized and viable ongoing business.

6   However, a successful restructuring may likely require cooperation of certain stakeholders in the

7   Debtor, including the Debtor's senior secured creditor, certain suppliers, and landlords.

8   In order to protect the interests of the Estate, the Debtor also is exploring other alternatives

9   that may be implemented in the event that a restructuring through a reorganization plan is

10   determined not to be a viable approach, including liquidation options that might, if necessary, be

11   utilized to maximize the value of the Estate.

12   In any event, the Debtor intends, subject to court approval, to conduct inventory

13   clearance/store closing sales (with the assistance of an outside consultant expert at conducting

14   such sales) at 31 of its stores through the holiday season.  These are the stores the Debtor has

15   determined, as of this time, need to be closed, following the inventory clearance sales, under any

16   scenario.  The Debtor believes that under any scenario such inventory clearance sales will advance

17   the goal of maximizing the value of the Estate and benefit creditors.  It may become necessary for

18   additional stores to be closed, but as of now 31 of the Debtor's stores have been identified for

19   closures.

20   As discussed in more detail below, the Debtor has an immediate and critical need to obtain

21   post-petition financing under the Postpetition Facility and to use Cash Collateral in order to,

22   among other things, finance the ordinary costs of its operations, make payroll, and satisfy other

23   working capital and operational needs.  The Debtor's access to sufficient working capital and

24   liquidity through the incurrence of post-petition financing under the Postpetition Facility and the

25   use of Cash Collateral under the terms of the Interim Order is vital to the preservation and

26   maintenance of the value of the Estate.  Consequently, without access to the Postpetition Facility

27   and the use of Cash Collateral, to the extent authorized pursuant to the Interim Order, the Debtor

28   and its Estate would suffer immediate and irreparable harm.

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

4

2613187

1    The use of Cash Collateral alone would be insufficient to meet the Debtor's post-petition

2    liquidity needs.  Given the Debtor's current financial condition and capital structure, the Debtor is

3    unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and

4    503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii)

5    adequate credit secured by (x) a senior lien on unencumbered assets of its estate under section

6    364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets under section

7    364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the

8    Bankruptcy Code, from sources other than the Postpetition Lender on terms more favorable than

9    the terms of the Postpetition Facility.  The only source of secured credit available to the Debtor,

10   other than the use of Cash Collateral, is the Postpetition Facility.  The Debtor requires both

11   additional financing under the Postpetition Facility and the use of Cash Collateral under the terms

12   of the Postpetition Loan Documents and Interim Order in order to satisfy its post-petition liquidity

13   needs.  After considering all of its alternatives, the Debtor has concluded, in an exercise of its

14   sound business judgment, that the financing to be provided by the Postpetition Lender pursuant to

15   the terms of the Interim Order and the Postpetition Loan Documents represents the best financing

16   presently available to the Debtor.

17   The Postpetition Lender has indicated a willingness to provide the Debtor with certain

18   financing commitments, but solely on the terms and conditions set forth in the Interim Order and

19   in the Postpetition Loan Documents.  Moreover, the lender (with whom the Debtor has its senior

20   prepetition credit facility) has taken the position that the Debtor may not use any cash after the

21   filing of this case until an order authorizing the Postpetition Facility is entered.

22   As a result of the foregoing, an interim order approving the Postpetition Facility and other

23   forms of related relief identified above, on an expedited basis, followed by a final order, is

24   necessary to avoid immediate and irreparable harm to the Debtor.  Absent an immediate hearing

25   and entry of an order granting this Motion, the Debtor would be unable to fund continuing

26   business operations, which, in turn, would significantly jeopardize the Debtor's prospects for a

27   successful reorganization and/or its efforts to maximize the value of the Estate for the benefit of

28   creditors.

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

5

2613187

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

## SUMMARY OF KEY TERMS OF THE POSTPETITION FACILITY

The Debtor provides the following information regarding key terms of the Postpetition Facility:[4]

- **Borrower:**  Shiekh Shoes, LLC (the Debtor, and sometimes referred to as "Borrower").

- **Limited Recourse Guarantors:**  Shiekh Ellahi and Anjum Shiekh ("Real Estate Owners").

- **Lender:**  State Bank and Trust Company, as successor by merger to AloStar Bank of Commerce.

- **DIP Facility:**  $16,000,000 (the "Line Cap") debtor in possession revolving credit facility.

- **Borrowing Limits:**   Loans under the DIP Facility may not, as of any date of determination, exceed the least of: (1) the Line Cap minus the Carve-Out Amount minus the outstanding obligations under the prepetition revolving credit facility; (2) the Borrowing Base minus the Carve-Out Amount minus the outstanding obligations under the Prepetition Facility, and (3) the applicable amount that may be borrowed under the Approved Budget.  A copy of the Approved Budget will be filed with the Court before the Interim Hearing.

- **Borrowing Base:**  An amount equal to (1) the lesser of 60% of the value of Eligible Inventory and 85% of the NOLV of Eligible Inventory, minus (2) the Availability Reserve to be calculated in a manner that is generally consistent with the calculation of the Borrowing Base under the Prepetition Facility.

- **Use of Proceeds:**  To (a) finance transaction fees, expenses, costs and expenditures set forth in the Approved Budget,[5] and (b) pay fees and expenses associated with the DIP Facility.

---

[4] The following is only a summary of the key terms.  Parties are directed to the Postpetition Loan Agreement and the Interim Order for actual and complete terms of the Postpetition Facility.  In the event of any inconsistency between this summary (or any other summary or description in this Motion) and the Interim Order or Postpetition Loan Agreement, the terms in the latter documents control.

[5] A recently updated budget currently remains subject to approval of the Postpetition Lender.  The Debtor (footnote continued)

6

2613187

- **Fees And Interest:** (a) Non-default interest rate equal to the Wall Street Journal U.S. prime rate plus 5.0% per annum; (b) Default margin of 2.0% per annum; (c) Closing fee of 1.0% of the Line Cap; (d) Unused line fee of 0.50%; and (e) $2,000 monthly monitoring fee.

- **Term:** February 27, 2018.

- **Collections And Bank Accounts:**

(a) All collections (including store collections, credit card collections and collections from the contemplated liquidation of certain stores by Gordon Brothers) will be swept daily to Lender for application, first, to obligations under the Prepetition Facility, and then, to the DIP Facility.

(b) Borrower will be required to close all local collection accounts by December 1, 2017, and have all other bank accounts used in its business that are currently in the name of Shiekh Ellahi transferred to Borrower by December 1, 2017.

- **Approved Budget And Reporting:**

(a) Borrower will be required to be in "Substantial Compliance" at all times with a budget that is approved by Lender prior to closing (the "Approved Budget").

(b) "Substantial Compliance" will be defined in the definitive loan documents, but will generally mean that (1) aggregate total outstandings under the Prepetition Facility and DIP facility do not exceed the applicable budgeted aggregate total outstandings amount from the Approved Budget by more than $1,250,000, (2) Availability is not more than $1,250,000 less than the applicable budgeted Availability amount from the Approved Budget, and (3) the sum of any variances under clauses (1) and (2) as of any date does not exceed $1,750,000.

(c) Borrower will be required to provide updated cash flow projections and variance reports on a weekly basis.

- **Collateral:** Priming lien on all of Borrower's prepetition and postpetition assets, junior only to permitted senior security interests that were valid and perfected as of the petition

---

will file the Approved Budget before the hearing on this Motion.

2613187

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    date.

2    • **Real Estate And Cash Collateral:**

3    (a) As additional security for Borrower's obligations to Lender, the Real Estate Owners

4    will grant Lender a third priority deed of trust (junior only to the existing Bank of America deed of

5    trust and the existing deed of trust in favor of Lender for the Prepetition Facility) on the Santa

6    Monica, California residential real estate.

7    (b) The Real Estate Owners will be required to post $10,000,000 of cash collateral with

8    Lender by January 5, 2018 as additional security for Borrower's obligations to Lender, at which

9    time Lender would release the lien of the deeds of trust in its favor with respect to the Santa

10    Monica, California residential real estate.

11    (c) The definitive loan documents will contain certain milestones relating to the

12    monetization of the Santa Monica, California residential real estate that is contemplated by the

13    Real Estate Owners, including a requirement that an acceptable sale or financing commitment

14    letter be in place by December 18, 2017.

15    (d) The Real Estate Owners will also deliver a limited recourse guaranty of Borrower's

16    obligations to Lender, under which recourse shall be limited to the collateral pledged by the Real

17    Estate Owners and any "bad acts".

18    • **Other Material Provisions of DIP Order:**

19    (a) Stipulation by Borrower - Borrower to stipulate as to the extent, validity, and

20    priority of the claims under the Prepetition Facility and the security interests securing the

21    Prepetition Facility.

22    (b) Super-Priority Claim - Lender will have a super-priority claim to be paid ahead of

23    all other administrative expense claims.

24    (c) Adequate Protection - The Prepetition Facility will receive adequate protection in

25    the form of replacement liens on all assets, a super-priority claim, adequate protection payments,

26    and preservation of liens until the Prepetition Facility is paid in full.

27    (d) No Surcharge of Collateral - Borrower will not be permitted to surcharge the

28    collateral under section 506(c) of the Bankruptcy Code to pay for any costs of the bankruptcy

8

2613187

1    estate.

2        (e) <u>No Marshalling or Other Equitable Claims</u> – Lender will not be subject to any

3    claims of marshalling or other equitable claims with respect to the collateral.

4        (f) <u>Challenge Period</u> - All other parties will be deemed to have stipulated to the extent,

5    validity, and priority of the claims under the Prepetition Facility and the security interests securing

6    the Prepetition Facility unless they file a claim within 75 days of the filing of the bankruptcy

7    cases.

8        (g) <u>Carve-Out</u> - Provision of a $325,000 carve-out (the "<u>Carve-Out Amount</u>") from the

9    collateral for the payment of Borrower's and any committee's professionals fees that are incurred

10    before the termination of the DIP Facility.  *See* Interim Order, ¶ 13.

11        (h) <u>Waiver</u> - Court approval of waiver of all claims by Borrower against Lender, and,

12    subject to the expiration of a challenge period, a waiver from all other parties.

13    • **Conditions Precedent:**

14        (a) <u>Bankruptcy Orders</u> – The entry of an interim DIP financing order and other first day

15    orders that are acceptable to Lender in all respects, including as to bank accounts and cash

16    management, the contemplated liquidation of certain stores by Gordon Brothers, and a critical

17    vendor arrangement with Nike.

18        (b) <u>Loan and Collateral Documents</u> – The execution and delivery of a debtor in

19    possession loan and security agreement and other loan and collateral documents that are

20    acceptable to Lender, including a deed of trust, limited recourse guaranty and other documents

21    from the Real Estate Owners.

22        Additional information regarding the DIP Facility is set forth in Section III to the

23    accompanying memorandum of points and authorities.  In addition, the mandatory LBR Form F

24    4001-2.STMT.FINANCE for DIP financing motions, identifying the relevant page and paragraph

25    numbers in the Postpetition Loan Agreement and the Interim Order, is attached hereto as <u>Exhibit</u>

26    <u>C</u>.

27                    **<u>EXHIBITS</u>**

28    Attached hereto are the following: (A) <u>Exhibit A</u>: The form of Postpetition Loan

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

9

1   Agreement; (B) <u>Exhibit B</u>:  The form of Interim Order; and (C) <u>Exhibit C</u>: The required LBR

2   Form F 4001-2.STMT.FINANCE required by LBR 4001-2(a).

3        In addition, attached to the separately-filed Appendix of Exhibits to this Motion (the "<u>DIP</u>

4   <u>Financing Appendix</u>") are the following: (A) <u>Exhibit A</u>: The Prepetition Senior Loan Agreement;

5   (B) <u>Exhibit B</u>: The prepetition Revolver Note; (C) <u>Exhibit C</u>:  The UCC-1 Financing Statement;

6   and (D) <u>Exhibit D</u>:  The Intercreditor Agreement.

7   <u>**NOTICE OF THE MOTION**</u>

8        In order to provide maximum notice of this Motion, the Debtor has or intends to provide

9   notice of this Motion by telephone, overnight mail, e-mail, facsimile, or hand delivery on the

10  following parties and/or to their counsel: (i) the Office of the United States Trustee (the "<u>UST</u>");

11  (ii) the Debtor's 20 largest unsecured creditors; (iii) counsel to the Postpetition Lender and

12  Prepetition Senior Lender; (iv) all other known parties with liens of record on assets of the Debtor

13  as of the Petition Date; (v) all financial institutions at which the Debtor maintains deposit

14  accounts; (vi) the landlords for all non-residential real properties occupied by the Debtor as of the

15  Petition Date; (vii) the local office for the Internal Revenue Service; (viii) all other parties required

16  to receive notice pursuant to Bankruptcy Rules 2002, 4001, or 9014 or requesting to receive notice

17  prior to the date hereof; and (ix) any other party this Court orders be provided with notice of this

18  Motion (collectively, the "<u>Notice Parties</u>").

19       This Motion is based upon these moving papers and exhibits hereto, the Approved Budget

20  to be submitted prior to the hearing on the Motion, the accompanying memorandum of points and

21  authorities, the concurrently-filed omnibus declaration of Shiekh S. Ellahi (the "<u>Ellahi</u>

22  <u>Declaration</u>"), the declaration of Gerry Seli (the "<u>Seli Declaration</u>"), the concurrently-filed DIP

23  Financing Appendix, the record in this case, the arguments and representations of counsel, and any

24  other evidence or argument that may be presented prior to or at the hearing on this Motion.

25       **WHEREFORE**, the Debtor respectfully requests that this Court: (1) grant the Motion on

26  an interim basis and final basis; (2) provide the relief requested in the Motion on an interim basis

27  and as more particularly described in the Interim Order (<u>Exhibit B</u> hereto); (3) enter the proposed

28  form of Interim Order (<u>Exhibit B</u> hereto); (4) schedule a Final Hearing on the Motion to consider

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

2613187

1    entry of a Final Order granting the relief requested in the Motion on a final basis; and (5) provide

2    such other and further relief as is proper.

3    Dated: November 29, 2017                    **Sulmeyer**Kupetz
                                                 A Professional Corporation
4

5

6                                                By:    */s/ David S. Kupetz*
                                                        David S. Kupetz
7                                                       Attorneys for Shiekh Shoes, LLC
                                                        Debtor and Debtor in Possession
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

2613187

# TABLE OF CONTENTS

**Page**

I.  JURISDICTION ...........................................................................................................1

II. FACTS .......................................................................................................................1

   A.  The Debtor, Its Management, And Summary of Its Business Operations ................1

   B.  Recent Financial Results .....................................................................................3

   C.  The Debtor's Cash Management ...........................................................................4

   D.  The Debtor's Retail Store Locations And Related Leases ......................................5

   E.  The Debtor's Online Platforms .............................................................................6

   F.  The Debtor's Assets ............................................................................................7

   G.  The Debtor's Debt Structure ...............................................................................7

      1.  Secured Debt ............................................................................................7

         a.  The Prepetition Senior Lender ........................................................8

         b.  Comvest ......................................................................................9

         c.  Intercreditor Agreement ..............................................................10

      2.  Unsecured Debt .....................................................................................10

         a.  Nike ...........................................................................................10

         b.  Other Unsecured Debt .................................................................11

         c.  Ellahi Loans to The Debtor ..........................................................11

   H.  The Debtor's Equity Interests ............................................................................12

   I.  The Debtor's Employees ....................................................................................12

   J.  Factors Precipitating Chapter 11 Filing ..............................................................12

   K.  The Debtor's Restructuring Goals/Maximizing The Value of The Estate ..............13

III. THE DIP FACILITY ...................................................................................................14

   A.  The Debtor's Need For Post-Petition Financing ..................................................14

   B.  Summary of DIP Facility And Related Protections ...............................................15

   C.  Inability to Obtain Financing on More Favorable Terms .......................................15

   D.  Good Faith Finding ...........................................................................................17

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

| | | | |
|---|---|---|---|
| | E. | Adequate Protection ........................................................................ | 17 |
| IV. | | THE COURT SHOULD AUTHORIZE THE DIP FACILITY AND THE DEBTOR'S LIMITED USE OF CASH COLLATERAL ................................ | 19 |
| | A. | The Debtor Should be Authorized to Obtain The DIP Facility From The Postpetition Lender And Use Cash Collateral to Maintain The Debtor's Business And Maintain And Preserve The Value of The Debtor's Assets | 19 |
| | B. | The Court Should Authorize The Granting of Postpetition Liens And Other Protections to The Postpetition Lender Required Under The Postpetition Loan Agreement ......................................................................... | 22 |
| | | 1. Standard ..................................................................... | 22 |
| | | 2. The Debtor is Unable to Obtain Unsecured Credit or Secured Credit on a Junior Lien Basis ...................................... | 22 |
| | | 3. The Terms of The DIP Facility Are Fair, Reasonable, And Adequate | 23 |
| | | 4. The Prepetition Secured Parties Are Adequately Protected ................ | 24 |
| | |    a. Standard ............................................................. | 24 |
| | |    b. The Prepetition Senior Lender Consents to The DIP Facility And Use of Cash Collateral ......................... | 25 |
| | |    c. The Prepetition Secured Parties' Interests Will be Adequately Protected by a Substantial Equity Cushion ............. | 25 |
| | |    d. The Secured Parties' Interest in Their Collateral Will be Adequately Protected Because The DIP Facility Will Preserve The Going Concern Value of Their Collateral ................ | 26 |
| | |    e. The Debtor Proposed to Grant Appropriate Replacement Liens ................................................................. | 27 |
| | | 5. The DIP Facility is Necessary And Proper ............................. | 28 |
| V. | | THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE ................ | 29 |
| VI. | | CONCLUSION ........................................................................... | 30 |

ii

2613187

1

# **TABLE OF AUTHORITIES**

2

**Page**

3

## **CASES**

4

*In re 495 Cent. Park Ave. Corp.*,
 136 B.R. 626 (Bankr. S.D.N.Y. 1992) ................................................................ 25

*In re A&B Hearing & Air Conditioning, Inc.*,
 48 B.R. 401 (Bankr. M.D. Fla. 1985) ............................................................... 27

*In re Alyucan Interstate Corp.*,
 12 B.R. 803 (Bankr. D. Utah 1981) .................................................................. 28

*In re Ames Dept. Stores*,
 115 B.R. 34 (Bankr. S.D.N.Y. 1990) ................................................. 20, 23, 28, 29

*In re Aqua Assoc.*,
 123 B.R. 192 (Bankr. E.D.Pa. 1991) ............................................................ 22, 25

*In re Beker Ind. Corp.*,
 58 B.R. 725 (Bankr. S.D.N.Y. 1986) ............................................................... 25

*In re C.B.G. Ltd.*,
 150 B.R. 570 (Bankr. M.D.Pa. 1992) ............................................................... 22

*In re Crouse Group, Inc.*,
 71 B.R. 544 (Bankr. E.D.Pa. 1987) ................................................................ 22

*In re Defender Drug Stores*,
 126 B.R. 76 (Bankr. D. Ariz. 1991), *aff'd* 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) ........ 21

*In re Dynaco Corp.*,
 162 B.R. 389 (Bankr. D. N.H. 1993) ............................................................... 27

*In re Ellingsen MacLean Oil Co.*,
 834 F.2d 599 (6th Cir. 1987) ...................................................................... 21

*In re Heatron, Inc.*,
 6 B.R. 493 (Bankr. W.D. Mo. 1980) ................................................................. 27

*In re Hoffman*,
 51 B.R. 42 (Bankr. W.D. Ark. 1985) ............................................................... 27

*In re Hubbard Power & Light*,
 202 B.R. 680 (Bankr. E.D.N.Y. 1996) .............................................................. 25

*In re McGowan*,
 6 B.R. 241 (Bankr. E.D. Pa. 1980) ................................................................ 25

*In re Photo Promotion Associates, Inc.*,
 87 B.R. 835 (Bankr. S.D.N.Y. 1988), *aff'd*, 881 F.2d 6 (2d. Cir. 1989) .................... 20

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

2613187

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

*In re Pine Lake Village Apartment Co.*,
    16 B.R. 750 (Bankr. S.D.N.Y. 1981) ...................................................................... 27

*In re Planned System, Inc.*,
    78 B.R. 852 (Bankr. S.D. Ohio 1987) ...................................................................... 24

*In re Simasko Production Co.*,
    47 B.R. 444 (D. Colo. 1985) ...................................................................... 19

*In re Snowshoe Co.*,
    789 F.2d 1085 (4th Cir. 1986) ...................................................................... 22

*In re Stein*,
    19 B.R. 458 (Bankr. E.D. Pa. 1982) ...................................................................... 27

*In re T.M. Sweeney & Sons LTL Services, Inc.*,
    131 B.R. 984 (Bankr.N.D.Ill.1991) ...................................................................... 20

*Pistole v. Mellor (In re Mellor)*,
    734 F.2d 1396 (9th Cir. 1984) ...................................................................... 25

*Richmond Leasing Co. v. Capital Bank N.A.*,
    762 F.2d 1303 (5th Cir. 1985) ...................................................................... 29

*United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
    484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988) .............................................. 27, 28

## STATUTES

11 U.S.C.
    § 361 ...................................................................... 1, 24, 27, 28

11 U.S.C.
    § 362 ...................................................................... 1, 18

11 U.S.C.
    § 363 ...................................................................... 1, 19, 27

11 U.S.C.
    § 364 ...................................................................... passim

11 U.S.C.
    § 105 ...................................................................... 1

11 U.S.C.
    § 1107(a) ...................................................................... 19

11 U.S.C.
    § 361(1) ...................................................................... 24

11 U.S.C.
    § 361(2) ...................................................................... 18, 24, 27

2613187

11 U.S.C.
    § 363(c)(1) ........................................................................................................... 19

11 U.S.C.
    § 363(c)(2) ...................................................................................................... 18, 19

11 U.S.C.
    § 363(e) ............................................................................................................... 18

11 U.S.C.
    § 364(a) ............................................................................................................... 22

11 U.S.C.
    § 364(b) ......................................................................................................... 16, 22

11 U.S.C.
    § 364(c) .................................................................................................. 19, 20, 21

11 U.S.C.
    § 364(c)(1) ..................................................................................................... 16, 17

11 U.S.C.
    § 364(c)(2) ..................................................................................................... 16, 17

11 U.S.C.
    § 364(c)(3) ..................................................................................................... 16, 17

11 U.S.C.
    § 364(d) ......................................................................................................... 17, 20

11 U.S.C.
    § 364(d)(1) ..................................................................................................... 16, 20

11 U.S.C.
    § 364(d)(1)(B) ............................................................................................... 24, 25

11 U.S.C.
    § 364(e) ......................................................................................................... 17, 24

11 U.S.C.
    § 503(b)(1) .......................................................................................................... 16

11 U.S.C.
    § 506(a)(1) .......................................................................................................... 28

11 U.S.C.
    § 507(b) ............................................................................................................... 18

28 U.S.C.
    § 1334 .................................................................................................................. 1

28 U.S.C.
    § 1408 .................................................................................................................. 1

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

v

2613187

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28 U.S.C.
   § 1409 .................................................................................................................... 1

28 U.S.C.
   § 157(b) .................................................................................................................. 1

28 U.S.C.
   § 157(b)(2) ............................................................................................................. 1


**RULES**

Fed. R. Bankr. P.
   Rule 2002 ............................................................................................................... 1

Fed. R. Bankr. P.
   Rule 4001 ............................................................................................................... 1

Fed. R. Bankr. P.
   Rule 6004 ............................................................................................................. 29

Fed. R. Bankr. P.
   Rule 9014 ............................................................................................................... 1

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

2613187

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

## MEMORANDUM OF POINTS AND AUTHORITIES[1]

The Debtor hereby submits the following memorandum of points and authorities in support of the Motion.

### I.

### JURISDICTION

This Court has jurisdiction over this chapter 11 case (the "Chapter 11 Case") and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure.  Venue of the Chapter 11 Case in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### II.

### FACTS[2]

**A.    The Debtor, Its Management, And Summary of Its Business Operations**

On November 29, 2017, the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its affairs as a debtor in possession in this case.

The Debtor is a retailer of footwear, apparel, and accessories, with its corporate headquarters in Ontario, California.  Founded in 1991 with its first store in Hayward, California, the Debtor currently operates 124 specialty retail stores across ten states (California, Arizona, Nevada, Texas, Washington, Oregon, New Mexico, Illinois, Michigan, and Tennessee), as well as websites ShiekhShoes.com, Shiekh.com, Karmaloop.com, TiltedSole.com, and FBRKclothing.com.  The Shiekh Shoes business segment of the Debtor focuses on serving the urban subculture inspired by hip-hop, fashion, entertainment, and sports.  It offers a wide selection

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the motion to which this memorandum of points and authorities is appended.

[2] Additional facts and information is set forth in the concurrently-filed Ellahi Declaration.

2613187

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  of premium shoes and apparel, as well as its own private line of women's footwear and the newly

2  launched FBRK line of men's apparel.

3       The Debtor's fashion forward retailer, Eilatan and TiltedSole.com, focus on selling higher-

4  end and highly unique shoes and apparel catering to the young fashionista or trendy consumer

5  looking for an edge.  Currently there is only one Eilatan store located in the Beverly Center Mall

6  in west Los Angeles, and three Tilted Sole shoe stores located in Canoga Park, California, Irvine,

7  California, and Tukwila, Washington.

8       The Debtor's Karmaloop business segment (Karmaloop.com) is a leading edge "e-tailer"

9  featuring the latest and greatest in contemporary fashion.  Founded in 1999 and acquired by the

10  Debtor in March of 2016, Karmaloop is ahead of the curve and prides itself on exposing

11  consumers to new brands and trends on its linked e-commerce sites karmaloop.com, plndr.com,

12  and kazbah.com.  Additional information regarding each of the Debtor's online platforms is set

13  forth in the Ellahi Declaration.

14       The Debtor is a California limited liability company formed on or about January 14, 2014.

15  Prior to the Debtor's formation, Ellahi operated the company as a sole proprietorship doing

16  business as Shiekh Shoes.  The Debtor currently has three members: (1) Shiekh S. Ellahi, who

17  holds a 99% interest in the Debtor; (2) Amir Shiekh, a minority member holding a 0.5% interest in

18  the Debtor (who is Ellahi's nephew); and (3) Abdul Haleem ("Haleem"), another minority

19  member holding a 0.5% interest in the Debtor (who also is Ellahi's nephew).  Ellahi is the

20  Debtor's founder, Chief Executive Officer and sole Managing Member.

21       The Debtor's store locations are grouped into seven geographic regions, each managed by

22  a dedicated district manager.  Operations at the store level typically consist of one Store Manager,

23  one Assistant Manager, one "Third-Key" Manager (responsible for opening and closing the store

24  when the Store Manager and Assistant Manager are not present, takes on other manager functions

25  as well), along with sales associates, stockroom attendants, and cashiers.  In July 2014, the Debtor

26  hired its first President, Matthew Fine, who came aboard after over a decade with Nike and

27  immediately set to work on assembling his team to lead the Shiekh Shoes store remodel initiative

28  then-recently issued to the Debtor by Nike (discussed below).

2

**B.** **Recent Financial Results**

For fiscal year ended December 31, 2016, the Debtor generated revenues of approximately $175,200,000. This reflected an increase of approximately $16,700,000, or 10.5%, from the approximately $158,000,000 the Debtor generated in fiscal year ended December 31, 2015. The revenue increase between fiscal year 2015 and fiscal year 2016 is largely attributable to an increase in e-commerce revenue, which the Debtor began in earnest to develop in 2015.

For the 12-month period ending May 31, 2017, the Debtor generated revenues of approximately $173,000,000. Allocated between the various store locations, approximate revenues generated for this 12-month period are as follows:

| Location | Revenue | Average Store Revenue | Store Count |
|---|---|---|---|
| CA (S) | $63,822,683 | $1,160,412 | 55 |
| CA (N) | $48,106,237 | $1,603,541 | 30 |
| TX | $13,783,406 | $1,253,037 | 11 |
| NV | $6,520,793 | $1,304,159 | 5 |
| WA | $7,139,459 | $1,189,910 | 6 |
| AZ | $6,108,766 | $610,877 | 10 |
| Other | $6,068,655 | $758,582 | 8[3] |
| **Total** | **$151,549,999** | **$1,212,400** | **125** |

For this period, e-commerce sales generated approximately $19,189,026.[4]

The revenues generated for this 12-month period reflects a decrease of approximately $2.1 million, or 1.2%, compared to the approximately $175,200,000 generated in fiscal year 2016. This decrease is primarily attributable to lower sales in core stores of approximately $3,000,000

---

[3] This represents stores in Oregon (2), New Mexico (2), Illinois (2), Tennessee (1), and Michigan (1).

[4] An additional approximate $2,313,731 was generated from six stores that were closed in 2016 and three stores closed in 2017. These closed stores include four stores closed in California, two in Arizona, two in Texas, and one in Illinois.

3

2613187

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  and closed stores (primarily in Michigan and Illinois) of $3,000,000, offset partially by increased

2  sales in e-commerce of approximately $2,300,000 and new stores of $1,700,000.

3      On a product category basis, this revenue decrease is primarily attributable to a decrease in

4  the sale of men's shoes (Nike and Brand Jordan) of $3,000,000, kid's shoes of $1,500,000,

5  women's shoes of $300,000, and accessories of $300,000, offset partially by an increase in apparel

6  revenue of approximately $1,600,000 and e-commerce revenue of approximately $1,500,000.

7      In the Debtor's financial statements, revenue from retail stores and costs of sales are

8  recognized at the point of sale when the product is delivered to customers.  Internet sales revenue

9  and cost of sales are recognized upon shipment of the product to the customer.  Sales revenue

10  includes sales of merchandise, net of returns and any promotional discounts given to the customer,

11  and exclude sales taxes.  The Debtor also sells gift cards to its customers, which do not have

12  expiration dates, and recognizes revenue when the gift cards are redeemed by the cardholders.

13  Unredeemed gift cards are recorded as a current liability.

14  **C.    The Debtor's Cash Management**

15      The Debtor utilizes accounts with the Prepetition Senior Lender, Bank of America

16  ("BOFA"), and Cathay Bank.  A list of the accounts the Debtor utilizes at these various banking

17  institutions (collectively, the "Debtor Accounts"), together with the approximate balance for each

18  account, is attached as Exhibit "1" to the concurrently-filed motion to authorize the Debtor's

19  maintenance of its cash management system (the "Cash Management Motion").  *See also*, Ellahi

20  Declaration for additional information regarding the Debtor Accounts.  As of at or about the

21  Petition Date, the Debtor's cash account balances were in the aggregate of approximately

22  $4,881,357.14 (as more specifically identified in Exhibit "1" to the Cash Management Motion).

23  Further, some of the Debtor's cash is maintained in restricted accounts.

24      The Debtor's pre-petition cash management system is generally described in the Cash

25  Management Motion.  However, as also discussed in that motion, consistent with the Postpetition

26  Facility and related Postpeition Loan Agreement, the Debtor intends to modify its cash

27

28

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

4

2613187

management system in the following manner (the "DIP Financing Cash Management Modifications"):[5]

- Whereas the Debtor's deposit accounts currently are held in Ellahi's individual name, the Debtor shall transfer all such accounts to the Debtor's name (or, if necessary to effectuate such transfer, close the current accounts and reopen them in the Debtor's name) by no later than December 1, 2017;

- Whereas the Debtor's credit card receipts currently are swept into an account maintained with the Prepetition Senior Lender on a daily basis, the Debtor will alter its cash management system such that the Debtor will maintain a single account with the Postpetition Lender into which all of the Debtor's collections will be swept on a daily basis for the Postpetition Lender (the "Sweep Account") for application, first, to obligations under the pre-petition revolver credit facility with the Prepetition Senior Lender, and, then, to the Postpetition Facility; and

- Whereas the Debtor currently maintains multiple deposit accounts with BOFA, the Debtor shall consolidate its bank account structure such that it maintains a single deposit account for collections by no later than December 1, 2017.[6]

## D.    The Debtor's Retail Store Locations And Related Leases

As of the Petition Date, the Debtor operates 124 specialty retail stores across ten states. All of the Debtor's locations are leased. Attached to the Ellahi Declaration as Exhibit "1" is a list of the Debtor's current leased locations. The store leases expire at various dates through January 31, 2028. There are five leases that currently are on a month-to-month basis, and eight active leases with lease payments based upon a percentage of revenue (rather a fixed monthly sum).

The majority of the leases are with independent third parties. Six of the leases (relating to store numbers 11, 60, 88, 95, 98, and 139) are with Ellahi as lessor, and two other leases (relating

---

[5] The following is a summary of the modifications to the cash management system. The actual and more specific terms and conditions regarding the Debtor's cash management system as required by, and laid out in, the Postpetition Loan Documents, as well as the Interim Order, control.

[6] The Debtor already began the process to implement the DIP Financing Cash Management Modifications pre-petition.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

2613187

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  to store numbers 103 and 403) are with D&S LP as lessor.  Ellahi is a member of D&S.

2        As explained above, prior to the Debtor's formation, Ellahi operated the Debtor as a sole

3  proprietorship.  During that time, Ellahi personally entered into a number of leases with various

4  landlords.  In January 2014, when the Debtor was formed, Ellahi transferred all assets of this sole

5  proprietorship to the newly-formed Shiekh Shoes, LLC.  This included all the leases Ellahi had

6  entered into prior to the formation of the Debtor.

7        As set forth in the Debtor's separately-filed motion to authorize store closing sales and

8  approval of a related agreement with Gordon Brothers Retail Partners, LLC ("Gordon Brothers"),

9  the Debtor intends to conduct store closing/inventory liquidation sales at 31 retail locations (the

10  "Store Closing Sales").  The Debtor has determined that those 31 stores should be closed after

11  conducting these sales.  The Debtor anticipates that the Store Closing Sales will be completed in

12  January 2018.

13  **E.        The Debtor's Online Platforms**

14        Shiekh Shoes started selling online in 2009, and currently operates four websites under the

15  domain names Karmaloop (which includes linked e-commerce sites karmaloop.com, plndr.com,

16  and kazbah.com), TiltedSole.com, ShiekhShoes.com, Shiekh.com, and FBRKclothing.com.

17        The Debtor acquired certain assets of Karmaloop identified more particularly in, and

18  pursuant to the terms of, that certain "Asset Acquisition And Contribution Agreement" (the

19  "Karmaloop Asset Purchase Agreement"), dated March 15, 2016, by and among the Debtor (as

20  buyer), Karmaloop (as seller), and, for limited purposes, Ellahi, Comvest Karmaloop Holdings,

21  LLC ("Comvest Holdings"), and CapX Fund IV, LP ("CapX") (the "Karmaloop Acquisition").[7]

22  The Karmaloop Acquisition closed on March 17, 2016.

23        As consideration for its acquisition of the Karmaloop assets, the Debtor agreed to issue to

24  Karmaloop, preferred membership interests in the Debtor with a $10,000,000 priority liquidation

25  preference (the "Karmaloop Preferred Interests") and warrants to acquire, in the aggregate, a 4%

26  _____

27  [7] Comvest Holdings and CapX were identified as the owners of Karmaloop.

28

2613187

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   membership interest in the Debtor.

2        As more particularly set forth in that certain "Investor Rights Agreement" ("Karmaloop

3   Investor Agreement") entered in conjunction with the Karmaloop Acquisition, the Karmaloop

4   Preferred Interests were mandatorily redeemable by the Debtor within one year from the close of

5   the Karmaloop Acquisition for $10,000,000, and, if unpaid, converted to a secured term loan

6   (discussed below).

7        Karmaloop's main area of focus is streetwear branding with the majority of sales in men's

8   and women's closing.  Karmaloop also offers accessories and footwear product lines.  As of May

9   2017, revenues from Karmaloop represent approximately 61% of the Debtor's total ecommerce

10  revenues.  A brief description of the other online platforms is included in the Ellahi Declaration.

11  **F.      The Debtor's Assets**

12       The Debtor's primary assets include: (1) inventory, which, as of at or about the Petition

13  Date, had a current retail value in the aggregate of approximately $65,918,224.35 (with an original

14  retail value of approximately $80,987,971.96) and cost value of approximately $35,113,347.33;

15  (2) fixtures, furniture, and equipment with an aggregate estimated book value of approximately

16  $11,311,083 (as of October 2017); and (3) trademarks and various intellectual properties with an

17  estimated value of approximately $250,000.  In addition, as more specifically set forth in Exhibit

18  "1" to the Cash Management Motion, the Debtor's cash account balances as of about the Petition

19  Date, were in the aggregate of approximately $4,881,357.14.  Further, some of the Debtor's cash

20  is maintained in restricted accounts.

21  **G.      The Debtor's Debt Structure**

22       **1.      Secured Debt**

23       As of at or about the Petition Date, the Debtor has secured debt in the aggregate amount of

24  approximately $17,169,546.65 held by two parties, the Prepetition Senior Lender and Comvest

25  Capital II, L.P., as administrative agent and collateral agent for itself and certain other lenders

26  (collectively, "Comvest" and, together with the Prepetition Senior Lender, the "Prepetition

27

28

2613187

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1  Secured Parties").[8]

2          a.      **The Prepetition Senior Lender**

3          Pursuant to that certain Loan and Security Agreement, dated as of March 17, 2017 (as

4  amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Senior

5  Loan Agreement"), among the Debtor and the Prepetition Senior Lender, the Prepetition Senior

6  Lender agreed to extend loans to, issue letters of credit for, and provide services and other credit

7  accommodations to, the Debtor.  The Prepetition Senior Loan Agreement, along with any other

8  agreements and documents executed or delivered in connection therewith, including, without

9  limitation, the "Loan Documents" as defined therein, are collectively referred to herein as the

10  "Prepetition Senior Loan Documents" (as the same may be amended, restated, supplemented or

11  otherwise modified from time to time).  True and correct copies of the core Prepetition Senior

12  Loan Documents are attached to the concurrently-filed DIP Financing Appendix.[9]

13          Pursuant to the Prepetition Senior Loan Agreement, the Security Documents (as defined in

14  the Prepetition Senior Loan Agreement), and all other Prepetition Senior Loan Documents that

15  purport to create a Lien (as defined in the Prepetition Senior Loan Agreement) in favor of

16  Prepetition Senior Lender (as such documents are amended, restated, supplemented or otherwise

17  modified from time to time, the "Prepetition Senior Security Documents"), the Debtor granted to

18  the Prepetition Senior Lender, to secure the Prepetition Senior Obligations, a first priority security

19  interest in and continuing lien (the "Prepetition Senior Liens") on substantially all of the Debtor's

20  assets and property, and all proceeds, products, accessions, rents and profits thereof, in each case

21  whether then owned or existing or thereafter acquired or arising.  All collateral granted or pledged

22  by the Debtor pursuant to any Prepetition Senior Security Document or any other Prepetition

23

24  _____

    [8] Comvest's claim is disputed in its entirety as discussed below.

25
    [9] All obligations of the Debtor arising under, or in connection with, the Prepetition Senior Loan Agreement
26  (including, without limitation, the "Obligations" and "Bank Product Obligations", each as defined therein),
    any other Prepetition Senior Loan Document, and/or any agreement evidencing any Bank Products (as
27  defined in the Prepetition Senior Loan Agreement) shall collectively be referred to herein as the
    "Prepetition Senior Obligations."

28

2613187

Senior Loan Document, including, without limitation, the "Collateral" as defined in the Prepetition

Senior Loan Agreement, and all pre-petition and post-petition proceeds thereof shall collectively

be referred to herein as the "Prepetition Senior Collateral".  In addition, the Prepetition Senior

Lender holds a second priority deed of trust on real property at 609 Palisades Beach Road, Santa

Monica, CA 90402, that Ellahi owns.

As of at or about the Petition Date, (i) the Debtor was indebted to the Prepetition Senior

Lender pursuant to the Prepetition Senior Loan Documents, in the aggregate principal amount of

approximately $7,169,546.65 in respect of loans made and letters of credit issued by the

Prepetition Senior Lender, plus all accrued and hereafter accruing and unpaid interest thereon and

any additional fees and expenses (including any attorneys', accountants', appraisers' and financial

advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Senior Loan

Documents) now or hereafter due under the Prepetition Senior Loan Agreement and the other

Prepetition Senior Loan Documents, and (ii) as noted above, the value of the Prepetition Senior

Collateral exceeded the amount of Prepetition Senior Obligations.

### b.    Comvest

On March 17, 2017 (one year after close of the Karmaloop Acquisition), the Debtor (as

borrower), Karmaloop (as lender), and Comvest Capital II, L.P. (as administrative and collateral

agent for itself and Karmaloop) entered that certain "Credit Agreement" (the "Prepetition Second

Lien Credit Agreement"), pursuant to which the Prepetition Second Lien Lenders agreed to extend

a term loan to the Debtor in an aggregate principal amount of $10,000,000.  The Prepetition

Second Lien Credit Agreement was entered for the purpose of converting the Karmaloop Preferred

Interests from equity to the secured term loan that is the subject of the Prepetition Second Lien

Credit Agreement (the "Prepetition Second Lien Term Loan").  No consideration was received by

the Debtor at the time of the conversion of this equity to secured debt.

The Prepetition Second Lien Term Loan is payable in equal monthly installments of

$166,666.00 beginning March 18, 2018, with the final installment on the outstanding balance due

March 17, 2022.  The Prepetition Second Lien Term Loan bears regular interest at 5.0% per

annum, and default interest at an additional 3.0%.  Comvest asserts that the Prepetition Second

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

9

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   Lien Term Loan is secured by a second priority lien on (as more particularly set forth in a

2   "Collateral Agreement" between the Debtor and Comvest) substantially all of the Debtor's assets.

3   As of the Petition Date, the Debtor believes the asserted claim of Comvest under the

4   Prepetition Second Lien Term Loan is $10,000,000.  However, for the reasons set forth in the

5   Ellahi Declaration, the Debtor disputes the Comvest claim in its entirety.  Further, the Debtor is

6   evaluating the avoidability of Comvest's security interest.

7   **c.**     **Intercreditor Agreement**

8   On March 17, 2017, the Prepetition Senior Lender and Comvest entered into that certain

9   "Intercreditor Agreement" (the "<u>Intercreditor Agreement</u>"), pursuant to which the parties confirm

10   their relative priority of their respective liens and security interests in the Debtor's assets.

11   The Intercreditor Agreement dictates the parties respective rights and obligations in the

12   event of a bankruptcy filing by the Debtor.  For example, in the event the Prepetition Senior

13   Lender consents to the Debtor's use of cash collateral or procuring of DIP financing, subject to

14   certain conditions set forth in the Intercreditor Agreement, Comvest is obligated to similarly

15   consent to use of cash collateral or not oppose the DIP financing.  The Intercreditor Agreement

16   also includes certain requirements and obligations as between the Prepetition Senior Lender and

17   Comvest regarding the appropriate forms of adequate protection.  A true and correct copy of the

18   Intercreditor Agreement is attached to the DIP Financing Appendix as Exhibit "D".

19   **2.**     **Unsecured Debt**

20   **a.**     **Nike**

21   Nike holds the largest unsecured claim against the Debtor.  As of the Petition Date, the

22   Debtor believes Nike asserts a general unsecured claim in the sum of approximately

23   $16,040,021.01 on account of products and goods supplied to the Debtor.

24   Nike's products (Nike and Jordan brands) account for more than 60% of the Debtor's gross

25   revenues.  As such, the Debtor has expended considerable resources over the years in order to

26   maintain its relationship with Nike, including constructing specially-branded space in each of its

27   stores for Nike product, developing special marketing campaigns and launch events, providing

28   dedicated training of store managers and sales associates on all Nike product, as well as executing

2613187

1  on Nike's biggest initiative to date requiring the remodeling all the Debtor's Shiekh Shoes stores

2  beginning in 2015.

3      For approximately 25 years, Nike shipped product to the Debtor on credit (like most

4  vendors), which the Debtor paid down monthly. Nike historically has required me to personally

5  guarantee credit it extended to the Company. My personal guarantee was permitted to expire,

6  however, when I contributed my personal funds to substantially pay down the Nike line at the end

7  of 2016. Nike continues to be the Debtor's biggest unsecured creditor with approximately

8  $16,040,021 outstanding on invoices, approximately half of which is currently past due.

9      In recent years, given the importance of Nike product to the Debtor's overall business

10  model, the Debtor invested substantial funds to remodel stores in a manner geared towards the

11  marketing and sale of Nike premium product. This has already been done at 61 of the Debtor's

12  stores at a cost, as indicated above, of approximately $30 million.

13      Nike has refused to ship product to the Debtor even on a cash in advance payment basis.

14  Prior to the commencement of the Debtor's chapter 11 case, the Debtor and its counsel

15  participated in discussions and negotiations with Nike and its counsel with the goal of obtaining

16  Nike's commitment to resume shipping. The Debtor and Nike reached an agreement, pursuant to

17  which, among other terms, the Debtor will pay down Nike's pre-petition debt as a critical vendor

18  and Nike will resume shipping product to the Debtor on a cash-in-advance basis (the "<u>Nike</u>

19  <u>Agreement</u>"). The Nike Agreement is the subject of a concurrently-filed motion (the "<u>Nike</u>

20  <u>Critical Vendor Motion</u>").

21                 **b.**    **<u>Other Unsecured Debt</u>**

22      Including Nike, as of at or about the Petition Date, the Debtor's top 20 general unsecured

23  creditors hold claims in the aggregate of approximately $23,071,878.70 owed to various trade

24  vendors, suppliers, and other parties (although certain claims of which are disputed, contingent,

25  and unliquidated).

26                 **c.**    **<u>Ellahi Loans to The Debtor</u>**

27      In the past three years, Ellahi has made a loan to the Debtor, along with various capital

28  contributions. In order to fund Nike's store remodel initiative, Ellahi extended a $15 million

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

11

2613187

1  unsecured credit facility to the Debtor in January 2015.  Additionally, Ellahi has made

2  approximately $15 million in capital contributions to cover various expenses of the Debtor in the

3  last three years alone.

4  **H.    The Debtor's Equity Interests**

5      The Debtor's original and current members and equity interest holders are Ellahi (99%),

6  Amir Shiekh (0.5%), and Haleem (0.5%).  Ellahi is the Debtor's Founder, Chief Executive

7  Officer, and sole Managing Member.

8  **I.    The Debtor's Employees**

9      As of the Petition Date, the Debtor has approximately 1,743 employees.  For salaried and

10  hourly employees, payday is every other Friday covering the prior two weeks.  The most recent

11  payday was November 24, 2017, with the next payday set for December 8, 2017.  The average

12  amount the Debtor needs for any given payroll period is approximately $1,655,000 (wages only

13  and not including benefits or employer taxes).  The Debtor also offers its full-time employees

14  various employee health plans, including, for example, medical, vision, and dental insurance.

15      A more detailed discussion of the Debtor's employee wage obligations, employee benefits,

16  and other related information is included in the concurrently-filed "first day" motion to authorize

17  payment of certain pre-petition wages and maintenance of employee benefit programs.

18  **J.    Factors Precipitating Chapter 11 Filing**

19      In early 2012, the Debtor was looking for opportunities to expand its business into the

20  Midwest.  At the time, Sportsland, Inc., was operating a franchised chain of 45 Athlete's Foot

21  stores, principally located in the metropolitan areas of Chicago and Detroit.  The franchisor,

22  however, had recently lost its biggest and most profitable supplier, Nike.  Initially, the Debtor

23  considered acquiring all 45 stores, but as negotiations progressed only 34 of the most promising

24  locations were acquired.  Once the acquisition was final in late 2012, the Debtor began directing

25  significant resources to transitioning the 34 new stores, during which time I continued to work on

26  solidifying approval from Nike's Midwest team.

27      Unfortunately, by the end of 2014, as construction was nearing completion, Nike's

28  Midwest team refused to support the expansion.  The Debtor immediately pivoted and began

12

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    developing a store-closure plan to get out of the Midwest.  And as of today, only four of the

2    original 34 Midwest stores remain in operation.

3        By early 2018, the Debtor hopes to complete the closure of all of its Midwest stores.  The

4    financial repercussions of the failed entry into the Midwest marketplace, coupled with declining

5    store revenues due to the rise of e-commerce, has made it increasingly difficult for the Debtor to

6    turn a profit in recent years.

7        In early 2015, to ensure it retained its most critical vendor, the Debtor commenced store

8    remodels according to various Nike designs and specifications.  Those store remodels initially

9    were funded by a $15 million loan I provided to the Debtor.  As mentioned above, to date, the

10   Debtor has remodeled 61 stores at a cost of approximately $30 million, with the hope that the

11   return on its investment would be realized in years to come.

12       In October 2017, Nike finance indicated the line of credit extended to the Debtor needed to

13   be paid down significantly and relegated the Debtor to pre-pay all orders before being shipped.

14   Subsequently, Nike has declined to ship new product to the Debtor, except pursuant to the Nike

15   Agreement.

16        The above challenges described above and, in the general retail environment, have

17   negatively impacted the Debtor's profitability.

18   **K.**    **The Debtor's Restructuring Goals/Maximizing The Value of The Estate**

19       The Debtor's operations have not been profitable in recent years.  The Debtor commenced

20   this reorganization case in order to pursue implementation of a restructuring of its operations,

21   leases, and debt.  The Debtor believes that a successful overall reorganization would maximize the

22   value of the Estate, provide for payment to unsecured creditors, and allow the Debtor to emerge

23   from chapter 11 with a reorganized and viable ongoing business.  However, a successful

24   restructuring may likely require cooperation of certain stakeholders in the Debtor, including the

25   Debtor's senior secured creditor, certain suppliers, and landlords.  And a successful reorganization

26   that would maintain the Debtor's current business model and without a significant alteration in the

27   Debtor's operations will require the cooperation of Nike.

28       In order to protect the interests of the Estate, the Debtor also is exploring other alternatives

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

2613187

1    that may be implemented in the event that a restructuring through a reorganization plan is

2    determined not to be a viable approach, including liquidation options that might, if necessary, be

3    utilized to maximize the value of the Estate.

4        In any event, the Debtor intends, subject to court approval, to conduct the Store Closing

5    Sales (with the assistance of Gordon Brothers, an outside consultant expert at conducting such

6    sales) at 31 of its stores through the holiday season.  These are the stores the Debtor has

7    determined, as of this time, need to be closed, following the inventory clearance sales, under any

8    scenario.  The Debtor believes that under any scenario such inventory clearance sales will advance

9    the goal of maximizing the value of the Estate and benefit creditors.  It may become necessary for

10    additional stores to be closed, but as of now, 31 of the stores have been identified for closure.

**III.**

**THE DIP FACILITY**

**A.    The Debtor's Need For Post-Petition Financing**

14        Due to the Debtor's current financial condition, the Debtor requires funding to maintain its

15    business and preserve the value of its assets and to otherwise operate its business.  The need for

16    financing at this time is particularly important given the current holiday season and the need to

17    purchase product to ensure sufficient inventory exists to fulfill customer orders placed online and

18    to offer customers who patronize the Debtor's retail stores during this season, and while the

19    Debtor pursues the Store Closing Sales with respect to the 31 stores set to begin promptly.

20        The Debtor also requires the DIP Facility to fund its immediate purchase of essential Nike

21    product.  As discussed in more detail in the Nike Critical Vendor Motion, Nike product is

22    extremely important to the Debtor's current business model and the need for this product is critical

23    to the Debtor's business, in general, and for this holiday season, in particular.  Pursuant to the

24    Nike Agreement, Nike agreed to resume shipping premium product to the Debtor, but only on a

25    cash-in-advance basis, concurrent pay down of Nike's pre-petition debt, and otherwise pursuant to

26    the terms of the Nike Agreement.  This agreement requires the Debtor to tender to Nike

27    $4,000,000 for every $3,000,000 in product it purchases (with $1,000,000 of the $4,000,000 going

28    to pay down Nike's pre-petition debt).  This product is essential to the Debtor's current business,

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

14

2613187

1   maintenance of its going concern value, and overall profitability, especially given the Debtor's

2   significant investment in aligning its stores and business model with the Nike brand.

3        In short, the Debtor's use of Cash Collateral alone would be insufficient to meet the

4   Debtor's post-petition liquidity needs.  Rather, the Debtor needs the DIP Facility to pay, in the

5   ordinary course, among others, its employees, landlords, shippers, vendors, utility providers, and

6   other suppliers of goods, and to otherwise sustain operations.

7   **B.     Summary of DIP Facility And Related Protections**

8        In light of the foregoing, the Postpetition Lender agreed to provide the Debtor with the DIP

9   Facility of up to $16.0 million pursuant to the Postpetition Loan Agreement (<u>Exhibit A</u> hereto), to

10  be used as set forth in and in accordance with, the Approved Budget (to be submitted prior to the

11  hearing on the Motion.

12       Based on the Approved Budget, which sets forth the Debtor's projected cash receipts and

13  cash disbursements for the 13-week period following the Petition Date, the Debtor believes that

14  the DIP Facility will provide it with sufficient funds to maintain operations for such period, as

15  well as until the Debtor is able to conclude the Store Closing Sales and make it through the

16  holiday season.

17       The terms and conditions of the DIP Facility are set forth in detail in the Postpetition Loan

18  Agreement and the Interim Order (<u>Exhibit B</u>).  A summary of its key terms are set forth above in

19  the Motion in the Section titled "Summary of Key Terms of The Postpetition Facility."  In

20  addition, the mandatory LBR form for DIP financing motions, identifying the relevant page and

21  paragraph numbers, is attached hereto as <u>Exhibit C</u>.

22  **C.     Inability to Obtain Financing on More Favorable Terms**

23       In the lead up to the filing of this case, the Debtor and the Postpetition Lender engaged in

24  intensive discussions and negotiations regarding the Debtor's cash position, financial condition,

25  cash needs, and the Debtor's overall need for financing.  At various points during this process, the

26  negotiations and potential financing arrangements fell through, with the Prepetition Senior Lender

27  freezing the Debtor's line of credit and precluding it from accessing much-needed cash.

28       With the holiday season then fast-approaching, the Debtor in need of cash, among other

15

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

2613187

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    things, to purchase Nike product in advance of Thanksgiving, and, at the time, no post-petition

2    financing arrangement acceptable to the Debtor reached with the Postpetition Lender, the Debtor

3    reached out to other potential lenders and considered other potential alternative funding sources.

4    The Debtor was unable to obtain sufficient interim or long-term financing from sources other than

5    the Postpetition Lender on terms and subject to conditions more favorable than under the

6    Postpetition Loan Agreement, or that the Debtor believes realistically could close within the

7    necessary expedited timeframe or that provided sufficient availability of funds.

8    Based on the Debtor's attempt to locate alternative financing, other potential funding

9    options from other parties offered very high interest rates and fees, did not have sufficient

10    availability of funds (and potentially during the period when payments to Nike under the Nike

11    Agreement would be most concentrated), and included long lists of conditions precedent and open

12    items that likely would drag the process out beyond an acceptable period of time to meet the

13    Debtor's cash needs during the holiday season.  In addition, the Intercreditor Agreement between

14    the Prepetition Senior Lender and Comvest potentially posed difficult hurdles to the Debtor's

15    ability to obtain funding from sources other than the Postpetition Lender.  For example, the

16    Intercreditor Agreement appears to include rights of first refusal in favor of Comvest and other

17    potential hold-up rights by Comvest that could preclude the Debtor's ability to close any financing

18    transaction with another lender.

19    Given the Debtor's current financial condition and capital structure, the Debtor is unable to

20    obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the

21    Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit

22    secured by (x) a senior lien on unencumbered assets of its estate under section 364(c)(2) of the

23    Bankruptcy Code and (y) a junior lien on encumbered assets under section 364(c)(3) of the

24    Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code, from

25    sources other than the Postpetition Lender on terms more favorable than the terms of the

26    Postpetition Facility.

27    The only source of secured credit available to the Debtor, other than the use of Cash

28    Collateral, is the Postpetition Facility.  The Debtor requires both additional financing under the

2613187

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  Postpetition Facility and the use of Cash Collateral in order to satisfy its post-petition liquidity

2  needs.  After considering all of its alternatives, the Debtor has concluded, in an exercise of its

3  sound business judgment, that the financing to be provided by the Postpetition Lender pursuant to

4  the terms of the Interim Order and the Postpetition Loan Documents represents the best financing

5  presently available to the Debtor.

6       The Postpetition Lender has indicated a willingness to provide the Debtor with certain

7  financing commitments, but solely on the terms and conditions set forth in the Interim Order and

8  in the Postpetition Loan Documents.  In other words, among other terms set forth in such

9  documents, the Debtor was unable to obtain credit from the Postpetition Lender without providing

10  it with various protections, including the granting of security interests, liens, and superpriority

11  claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the

12  Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code (the

13  "<u>Postpetition Liens</u>"), and priming liens pursuant to section 364(d) of the Bankruptcy Code) to the

14  Postpetition Lender to secure all obligations of the Debtor under and with respect to the

15  Postpetition Facility.

16       After considering all of its alternatives, the Debtor has concluded, in an exercise of its

17  sound business judgment, that the financing to be provided by the Postpetition Lender represents

18  the best financing presently available to the Debtor.

19  **D.**     **<u>Good Faith Finding</u>**

20       In addition, the terms of the Postpetition Facility are the result of intensive, arms-length

21  negotiations between the Debtor and the Postpetition Lender, together with their respective

22  experienced and sophisticated counsel and financial consultants.  Thus, any credit extended, loans

23  made, and other financial accommodations extended to the Debtor by the DIP Lender have been

24  extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e)

25  of the Bankruptcy Code.

26  **E.**     **<u>Adequate Protection</u>**

27       The Prepetition Senior Lender consents to the priming of its liens by the Postpetition

28  Liens.  Such consent is limited to the Postpetition Facility, with the Prepetition Senior Lender as

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    the Postpetition Lender, and shall not, and shall not be deemed to extend to any other post-petition

2    financing or to any modified version of this Postpetition Facility.

3    Aside from the Prepetition Senior Lender's limited consent, the Debtor believes each of

4    the Prepetition Senior Lender and Comvest are adequately protected as follows:  First, given the

5    value of the Debtor's inventory and other collateral, the Prepetition Secured Parties' are secured

6    by a significant equity cushion, ranging from, at least, approximately 72% for the Prepetition

7    Senior Lender to approximately 44% for Comvest (using the cost value of the Debtor's inventory

8    alone).

9    Second, the Debtor's ongoing business operations will adequately protect and preserve the

10   value of the Prepetition Secured Parties' collateral.  The DIP Facility and limited use of Cash

11   Collateral will permit the Debtor to continue operating its business, which, in turn, will preserve

12   and protect the Debtor's going concern value, preserve jobs for over 1,700 employees, and will

13   otherwise preserve and protect the parties' interests.

14   In addition to the foregoing, with respect to the Prepetition Senior Lender, the Debtor

15   proposes to grant it: (1) replacement liens pursuant to sections 361(2), 362, 363(c)(2), and 363(e)

16   of the Bankruptcy Code (the "Adequate Protection Senior Liens"), subordinate only to the Carve-

17   Out, the Postpetition Liens, and the Prior Liens (*see, e.g.*, Interim Order, ¶ 17; Postpetition Loan

18   Agreement, ¶ 2.1(a)); (2) an allowed super-priority administrative expense claim (the "Adequate

19   Protection Senior Claim") against the Debtor and its Estate pursuant to section 507(b) of the

20   Bankruptcy Code, subordinate only to the Carve-Out and the Super-Priority Claim; and (3) and

21   adequate protection payments as set forth in the Postpetition Loan Agreement and the Interim

22   Order (the "Adequate Protection Payments").  The Adequate Protection Senior Liens and

23   Adequate Protection Senior Claim shall secure the payment of the Prepetition Senior Obligations

24   in an amount equal to any diminution in the value of the Prepetition Senior Lender's interests in

25   the Prepetition Senior Collateral from and after the Petition Date.

26   With respect to Comvest, the Debtor proposes to grant Comvest replacement liens on the

27   Debtor's inventory, fixtures, furniture, equipment, accounts receivable and the proceeds thereof

28   generated or acquired by the Debtor after the Petition Date if and to the extent that: (i) its pre-

2613187

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    petition security interest is valid, enforceable, properly perfected, and unavoidable; and (ii) the

2    DIP Facility and the liens accorded to the Postpetition Lender under section 364 result in any

3    diminution in the value of Comvest's interest in its collateral.  In addition, Comvest shall have an

4    allowed superpriority administrative expense claim, albeit junior to the Adequate Protection

5    Senior Claim.  *See, e.g.*, Interim Order, ¶ 18.

6                                                                 **IV.**

7            **THE COURT SHOULD AUTHORIZE THE DIP FACILITY AND THE DEBTOR'S**

8                            **LIMITED USE OF CASH COLLATERAL**

9    **A.        The Debtor Should be Authorized to Obtain The DIP Facility From The Postpetition**

10             **Lender And Use Cash Collateral to Maintain The Debtor's Business And Maintain**

11             **And Preserve The Value of The Debtor's Assets**

12           Section 363 of the Bankruptcy Code governs the Debtor's use of property of its estate.

13   Section 363(c)(1) provides in pertinent part that:

14           If the business of the debtor is authorized to be operated under section . . . 1108 . . .
         and unless the court orders otherwise, the trustee may enter into transactions,
15       including the sale or lease of property of the estate, in the ordinary course of
         business, without notice or a hearing, and may use property of the estate in the
16       ordinary course of business without notice or a hearing.

17   11 U.S.C. § 363(c)(1).  A debtor in possession has all the rights and powers of a trustee with

18   respect to property of the estate, including the right to use property of the estate in compliance

19   with section 363 of the Code.  *See* 11 U.S.C. § 1107(a).  Section § 363(c)(2) establishes a special

20   requirement with respect to "cash collateral," by providing that the trustee or debtor in possession

21   may not use, sell or lease "cash collateral" under subsection (c)(1) unless (i) such entity that has an

22   interest in such collateral consents, or (ii) the court, after notice and a hearing, authorizes such use,

23   sale or lease.

24           Pursuant to Section 364(c), a debtor may, in the exercise of its business judgment, incur

25   secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the

26   best interest of the estate.  *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo.

27   1985) (authorizing interim financing agreement where debtor's business  judgment indicated

28   financing was necessary and reasonable for benefit of estate); *In re Ames Dept. Stores*, 115 B.R.

                                                                 19

2613187

34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties").

Section 364(c) provides, in pertinent part, that:

If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title:

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

Section 364(d)(1) governs the incurrence of senior secured debt or "priming" loans. Pursuant to Section 364(d)(1):

the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien only if—

(1) the trustee is unable to obtain such credit otherwise; and

(2) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).  Section 364 is structured with an escalating series of inducements which a debtor in possession may offer to attract credit during the post-petition period.  *In re Photo Promotion Associates, Inc.*, 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), *aff'd*, 881 F.2d 6 (2d. Cir. 1989).  Where a trustee or debtor in possession cannot otherwise obtain unsecured post-petition credit, such credit may be obtained under certain carefully proscribed conditions.  *In re T.M. Sweeney & Sons LTL Services, Inc.*, 131 B.R. 984, 989 (Bankr.N.D.Ill.1991).  For example, if creditors are unwilling to extend unsecured credit to a debtor in possession, further inducements are offered, with court approval after notice and a hearing, including, without limitation, liens equal to or senior to existing liens on encumbered property in accordance with 11 U.S.C. § 364(d). *In re Photo Promotion Associates, Inc.*, 87 B.R. at 839.

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

20

2613187

1    Section 364(c) also enumerates certain incentives that a court may grant to post-petition

2    lenders.  However, the list set forth in section 364(c) is not exhaustive.  Courts have frequently

3    authorized the use of inducements not specified in the statute.  *See, e.g.*, *In re Ellingsen MacLean*

4    *Oil Co.*, 834 F.2d 599 (6th Cir. 1987) (affirming financing order which prohibited any challenges

5    to the validity of already existing liens); *In re Defender Drug Stores*, 126 B.R. 76 (Bankr. D. Ariz.

6    1991) (authorizing enhancement fee to post-petition lender), *aff'd* 145 B.R. 312, 316 (B.A.P. 9th

7    Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized postpetition financial arrangements

8    containing lender incentives beyond the explicit priorities and liens specified in section 364").

9    As discussed above, shortly before the Petition Date, given the Debtor's financial

10   condition, the Prepetition Senior Lender froze the Debtor's Prepetition Revolver.  This was

11   particularly problematic given that, aside from the usual operational costs, the Debtor needed

12   additional cash to purchase sufficient inventory and to otherwise properly prepare for the then fast-

13   approaching, and now ongoing, holiday shopping season critical to the Debtor's business and

14   overall profitability.

15   In addition, as reflected in the cash flow projections in the Budget, the Debtor's cash

16   collateral alone would be insufficient to fund post-petition operations, especially considering the

17   administrative costs related thereto.  Additional financing is necessary to proceed with operations

18   pending the holiday season, the Store Closing Sales, to preserve the Debtor as a going concern,

19   protect and maximize the value of the estate, and to ensure a successful reorganization.

20   Subject to the approval of the Court, and in order to obtain the necessary DIP Facility, the

21   Debtor has agreed to provide the Postpetition Lender with various protections including perfected

22   priming liens, superpriority administrative claims, and other protection identified in the

23   Postpetition Loan Agreement.  Under the present circumstances of this case, the DIP Facility

24   provides the Debtor with critically necessary emergency funding, without which the Debtor would

25   be unable to reorganize its affairs and emerge as a reorganized debtor, but instead would be forced

26   to liquidate.  For these and all other reasons discussed above, the Debtor believes that granting the

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

21

2613187

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    Postpetition Lender Postpetition Liens (as well as the other protections being provided under the

2    DIP Credit Agreement) is warranted, appropriate, and necessary.[10]

3    **B.**    **The Court Should Authorize The Granting of Postpetition Liens And Other**

4        **Protections to The Postpetition Lender Required Under The Postpetition Loan**

5        **Agreement**

6        **1.    Standard**

7        Two factors courts consider in determining whether to authorize post-petition financing

8    which contemplates the granting of a security interest in favor of the lender are: (1) whether the

9    debtor is unable to obtain unsecured credit per section 364(b), *i.e.*, by allowing a lender only an

10   administrative claim per section 364(b); and (2) whether the terms of the transaction are fair,

11   reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

12   *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987).  *See also*, *In re Aqua Assoc.*,

13   123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).  In addition to the foregoing, a debtor in possession

14   seeking subordination of liens to new financing must establish adequate protection of the liens to

15   be subordinated to the new financing.  *In re C.B.G. Ltd.*, 150 B.R. 570, 571 (Bankr. M.D.Pa.

16   1992).  The Debtor submits that all of these standards are satisfied in this case.

17       **2.    The Debtor is Unable to Obtain Unsecured Credit or Secured Credit on a**

18          **Junior Lien Basis**

19       In satisfying the standards of Section 364, a debtor need not seek credit from every

20   available source, but should make a reasonable effort to seek other sources of credit available

21   under § 364(a) and (b).  *See, e.g.*, *In re Snowshoe Co*., 789 F.2d 1085, 1088 (4th Cir. 1986)

22   (trustee had demonstrated by good faith effort that credit was not available without senior lien by

23   unsuccessfully contacting other financial institutions in immediate geographic area; "the statute

24   imposes no duty to seek credit from every possible lender before concluding that such credit is

25   _____

26   [10] The Debtor's use of Cash Collateral is limited to the daily sweep of all collections to the Sweep Account
     as required under the DIP Facility.  As a result, for all the reasons under which the DIP Facility should be
27   approved, this limited use of Cash Collateral should also be approved.

28

2613187

1  unavailable"); *Ames, supra*, 115 B.R. at 40 (finding that debtors demonstrated the unavailability of

2  unsecured financing where debtors approached four lending institutions).

3      To date, the best post-petition financing commitment that has been provided to the Debtor

4  is the one offered by the Postpetition Lender.  In the lead up to the very important holiday

5  shopping season, the Debtor engaged in extensive negotiations with Postpetition Lender for post-

6  petition financing and, concurrently, diligently sought additional financing from alternate sources

7  before the Debtor's bankruptcy filing.  None of the sources of funding were willing to provide

8  junior financing.

9      Moreover, given the secured positions of each of the Prepetition Senior Lender and

10  Comvest, and the combined amounts of their secured debt, it was not realistic for any lender to be

11  willing to provide the Debtor with unsecured financing or even secured financing on a junior lien

12  basis.  As discussed above, the Debtor received a proposal from an alternate source.  However,

13  that proposal was not on more favorable terms than the current proposed DIP Facility, would not

14  have been on an unsecured, administrative, or junior secured basis, but rather secured by a senior

15  priming lien against the Debtor's assets, and simply was not feasible given various contingencies

16  and related issues and the exigencies of the Debtor's cash position.

17      Fortunately, the Postpetition Lender offered to provide the Debtor with post-petition

18  secured financing, but solely on the terms and conditions set forth in the Postpetition Loan

19  Agreement.  Moreover, the terms and conditions set forth in the Postpetition Loan Agreement

20  have been negotiated extensively, in good faith and at arms' length, by the parties, each

21  represented by competent counsel and with the advice of experienced financial consultants.

22      After considering all of their alternatives, the Debtor has concluded, in an exercise of its

23  sound business judgment, that the DIP Facility represents the best financing presently available to

24  the Debtor.

25      **3.    The Terms of The DIP Facility Are Fair, Reasonable, And Adequate**

26      The Debtors submit that the terms of the proposed DIP Facility are fair, reasonable, and

27  adequate.  As noted above, the terms and conditions set forth in the Postpetition Llian Agreement

28  were negotiated extensively, in good faith and at arms' length, by the parties and their respective

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

2613187

1    counsel and advisors.  The  Postpetition Lender is well aware of the fact that the Debtor would

2    have very little chance of avoiding liquidation if not for the DIP Facility.  The Postpetition Lender

3    has agreed to provide the DIP Facility to the Debtor in an effort to assist the Debtor in preserving

4    the going-concern value of the Debtor's business and to facilitate the successful consummation of

5    the Store Closing Sales and eventual reorganization.

6    The Debtor believes that the benefits afforded to the Debtor by the DIP Facility justify the

7    protections being afforded under the terms of the Postpetition Loan Agreement.  The DIP Facility

8    offers the Debtor its best and, likely, only opportunity to maintain and preserve the value of its

9    assets while pursuing the Store Closing Sales and restructuring of its debts to emerge a healthy

10    reorganized debtor, which will benefit of all creditors and parties in interest in this case.

11    Based on the foregoing, the Debtor believes that (1) the terms and conditions of the

12    proposed DIP Facility are fair and reasonable, reflect the Debtor's exercise of prudent business

13    judgment in light of the current circumstances and are supported by reasonably equivalent value

14    and fair consideration, (2) the DIP Facility has been negotiated in good faith and at arm's length

15    by the parties, and (3) any credit extended, loans made and other financial accommodations

16    extended to the Debtors by the DIP Lender have been extended, issued or made, as the case may

17    be, in "good faith" within the meaning of Section 364(e).

18    **4.**      **The Prepetition Secured Parties Are Adequately Protected**

19    **a.**      **Standard**

20    The proposed priming liens are authorized by the Bankruptcy Code, even absent consent of

21    other existing lien holders.  Section 364(d)(1)(B) of the Bankruptcy Code requires the furnishing

22    of adequate protection in favor of lien holders which assert an interest in collateral.  *See* 11 U.S.C.

23    § 364(d)(1)(B).  Although section 364 does not specifically define the term "adequate protection,"

24    section 361 of the Bankruptcy Code requires that adequate protection be furnished to the extent a

25    debtor's "use, sale, lease or grant results in a decrease in the value of such entity's interest in such

26    property."  11 U.S.C. § 361(1), (2).  Stated succinctly, adequate protection protects a secured

27    creditor against a decrease in the value of its collateral.  *See e.g.*, *In re Planned System, Inc.*, 78

28    B.R. 852, 861-62 (Bankr. S.D. Ohio 1987).

24

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

2613187

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1    This standard applies equally with respect to "priming" financing under section

2    364(d)(1)(B).  *See, e.g.*, *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996)

3    ("The goal of adequate protection for purposes of the provision entitling a debtor to obtain

4    financing secured by liens senior to all other interests is to safeguard the secured creditor from

5    diminution in the value of its interests."); *In re Aqua Assoc.*, 123 B.R. 192, 196 (Bankr. E.D. Pa.

6    1991); *In re Beker Ind. Corp.*, 58 B.R. 725, 741-42 (Bankr. S.D.N.Y. 1986).  The Court has broad

7    discretion to determine whether adequate protection is furnished.  *See, e.g.*, *In re 495 Cent. Park*

8    *Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992).

9    The Debtor satisfies this requirement to authorize the DIP Facility.

10           **b.**     **The Prepetition Senior Lender Consents to The DIP Facility And Use**

11                   **of Cash Collateral**

12    As discussed above, the Prepetition Senior Lender has provided its limited consent to the

13    priming of its liens by the Postpetition Liens.

14           **c.**     **The Prepetition Secured Parties' Interests Will be Adequately**

15                   **Protected by a Substantial Equity Cushion**

16    The Ninth Circuit Court of Appeals has held that an equity cushion alone can provide

17    adequate protection, stating:

18           Although the existence of the equity cushion is a method of adequate protection is
             not specifically mentioned in § 361, it is the classic form of protection for a secured
19           debt justifying restraining of lien enforcement by a bankruptcy court…. In fact, it
             has been held that the existence of an equity cushion, standing alone, can provide
20           adequate protection…. A sufficient equity cushion has been found to exist
             although not a single mortgage payment had been made.

21
22    *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 (9th Cir. 1984) (citation omitted).  The Ninth

23    Circuit defined the term "equity cushion" as "the value in the property, above the amount owed to

24    the creditor with a secured claim, that will shield that interest from loss due to any decrease in the

25    value in the property during the time the automatic stay in effect."  *Id.* at 1400 n.2.  An equity

26    cushion of 10% or greater has been found sufficient to provide a lienholder with adequate protection.

27    *See Id.* at 1401 (citing *In re McGowan*, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding that a 10%

28    equity cushion constitutes adequate protection).

25

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    In the instant case, Comvest is adequately protected by an appropriate equity cushion. As

2    discussed above, Comvest asserts a junior claim in the amount of approximately $10,000,000.

3    With assets against which Comvest asserts a second priority lien valued at approximately

4    $35,000,000 (using the approximate cost value of the Debtor's inventory alone), after considering

5    the claim of the Prepetition Senior Lender of approximately $9.5 million, Comvest is protected by

6    an approximate equity cushion of, at least, 44%. Needless to say, the Prepetition Senior Lender

7    also is protected by a sufficient equity cushion (at least, approximately 72%).

8          **d.    The Secured Parties' Interest in Their Collateral Will be Adequately**

9               **Protected Because The DIP Facility Will Preserve The Going Concern**

10              **Value of Their Collateral**

11    It must be emphasized that the value of the Debtor's assets is primarily the value of its

12    inventory, and its equipment, in addition to the good will associated with the Debtor's business.

13    The Debtor's ability to maximize the value of these assets is inextricably tied to maintaining the

14    going concern value of the Debtor's business.

15    If the Debtor does not have access to cash, it may be forced to shut down operations and

16    the Debtor's assets would be liquidated to the detriment of unsecured creditors and equity holders

17    of the Debtor and secured creditors. The Debtor is a retail business, and without continuity of its

18    operations, and an uninterrupted delivery of inventory to stores, the Debtor could face a significant

19    customer defection, which would have immediate and devastating effect upon the Debtor's future

20    revenues and opportunity to maximize the value of the Estate. The Debtor's Cash Collateral alone

21    is not sufficient to continue operating, especially in a manner that takes full advantage of the

22    current critical holiday season. Rather, the Debtor could only survive with access to the cash to be

23    provided through the DIP Facility. Accordingly, the DIP Facility will preserve and protect the

24    value of the Prepetition Secured Parties' collateral generally and enhance and maximize the

25    potential recovery for all creditors.

26    It is well established that a bankruptcy court, where possible, should resolve issues

27    presented in favor of reorganization rather than to force a liquidation because the business cannot

28    use cash or other property to operate. *See, e.g.*, *In re Dynaco Corp.*, 162 B.R. 389 (Bankr. D. N.H.

2613187

1    1993); *In re Hoffman*, 51 B.R. 42 (Bankr. W.D. Ark. 1985); *In re A&B Hearing & Air*

2    *Conditioning, Inc.*, 48 B.R. 401 (Bankr. M.D. Fla. 1985); *In re Heatron, Inc.*, 6 B.R. 493 (Bankr.

3    W.D. Mo. 1980).  Applying this principal in the context of adequate protection for the use of cash

4    collateral, courts have frequently allowed a debtor to use cash collateral in circumstances where

5    such use would enhance or preserve the debtor's reorganization value.  Thus, for example, in *In re*

6    *Stein*, 19 B.R. 458 (Bankr. E.D. Pa. 1982), the court allowed a debtor to use cash collateral where

7    the bank was undersecured and had no cushion for protection.  The court in *Stein* found that the

8    use of cash collateral was necessary to the continued operations of the debtor and "the creditor's

9    secured position can only be enhanced by the continued operation of the [debtor's business]."  *Id.*

10   at 460.  *See also*, *In re Pine Lake Village Apartment Co.*, 16 B.R. 750 (Bankr. S.D.N.Y. 1981)

11   (marginally secured creditor adequately protected by lien in post-petition property acquired by

12   debtor; debtor can use cash collateral "in the normal course of their business").

13          Here, adequate protection of the Prepetition Secured Parties' interests is present in this case

14   since the proposed use of the DIP Facility and Cash Collateral will preserve and protect the value

15   of the Debtor's business and the parties' collateral.

16                    **e.        The Debtor Proposed to Grant Appropriate Replacement Liens**

17          Section 361 of the Bankruptcy Code identifies the following as a proper form of adequate

18   protection:

19               [P]roviding  . . . an additional or replacement lien to the extent that such . . . use . . .
                 results in a decrease in the value of such entity's interest in such property[.]
20
     11 U.S.C. § 361(2).
21
            Neither section 361 nor any other provision of the Bankruptcy Code defines the nature and
22
     extent of "interest in property" of which a secured creditor is entitled to adequate protection under
23
     section 363.  However, the statute plainly provides that a qualifying interest demands protection
24
     only to the extent that the use of the creditor's collateral will result in a decrease in "the value of
25
     such entity's interest in such property."  *United Savings Ass'n of Texas v. Timbers of Inwood*
26
     *Forest Assocs., Ltd.*, 484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988).
27
            *Timbers* teaches that a secured creditor is entitled to "adequate protection" only against the
28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

27

2613187

1  diminution in value of the collateral securing its allowed secured claim.  Where the value of the

2  collateral is *not* diminishing by a debtor's use, sale, or lease, it follows that their respective

3  interests in cash collateral (if any) is adequately protected.  As an initial matter, here, as explained

4  above, the proposed DIP Facility will enhance the value of the Debtor's business and Comvest's

5  collateral.

6      Moreover, separate and independent of any question of diminution in value, a secured

7  creditor has no right to preservation of the equity cushion in its collateral.  The Supreme Court in

8  *Timbers* determined that the property interest the Debtor must adequately protect is the lien that

9  secures the creditor's claim.  *See Timbers*, 484 U.S. at 371.  Further, the value of the lien may not

10  exceed the allowed amount of the secured claim.  *See* 11 U.S.C. § 506(a)(1).  Accordingly, the

11  property interest of an oversecured creditor that the Debtor must adequately protect, namely the

12  lien value, is the allowed amount of the secured claim and does not include the equity cushion.

13      In *In re Alyucan Interstate Corp.*, 12 B.R. 803 (Bankr. D. Utah 1981), the court ruled that

14  an equity cushion is not a requirement of adequate protection because a secured creditor is only

15  entitled to protection against a decline in the value of its lien.  The existence of an equity cushion

16  (the value of the property above the lien) is not a necessary component of adequate protection.

17  The court reasoned that section 361 speaks not in terms of preserving equity, but in terms of

18  compensating for any "decrease in the value of [an] interest in property."  *Id.* at 803.  The

19  Supreme Court's decision in *Timbers* confirms this interpretation of section 361.

20      As discussed above, the Debtor proposed to grant each of the Prepetition Secured Parties

21  respective replacement liens on cash, inventory, fixtures, furniture, equipment, and accounts

22  receivable and the proceeds thereof acquired post-petition, to the extent that: (i) its pre-petition

23  security interest is valid, enforceable, properly perfected, and unavoidable, and (ii) as necessary to

24  protect them from any diminution in the value of their collateral as a result of the grant of the DIP

25  Liens under section 364 and use of any Cash Collateral.

26      **5.    The DIP Facility is Necessary And Proper**

27      While in determining whether to approve such a transaction, a Court is authorized to act in

28  its informed discretion (*In re Ames Department Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y.

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

28

2613187

1    1990)), the Court should give broad deference to the business decision of a chapter 11 debtor,

2    particularly with respect to a debtor's business judgment regarding the need for and proposed use

3    of funds.  *See Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

4    As the Court noted in *In re Ames Dept. Stores Inc.*, *supra*, "the court's discretion under section

5    364 is to be utilized on the grounds that permit the reasonable business judgment [of the Debtor]

6    to be exercised . . ."  *In re Ames Department Stores, Inc.*, 115 B.R. at 40.

7        There is little dispute that, without substantial post-petition financing, the Debtor likely

8    would be unable to purchase the necessary product to take advantage of the increased holiday

9    season sales, otherwise operate its business for much longer, or reorganize and emerge a healthy

10   going concern.  Instead, the Debtor would be forced to commence a liquidation.  There can also be

11   no question that such a result would cause the Debtor, its estate and its creditors immediate and

12   irreparable harm.

13       In contrast, the proposed DIP Facility affords the Debtor the ability to maintain the going-

14   concern value of its business, realize increased profitability during the holiday season, and

15   successfully reorganize.  The Debtor has therefore concluded that obtaining the DIP Facility is

16   critically important to maximizing the recovery for creditors, and is therefore in the best interests

17   of the Debtor's estate.

18                                           **V.**

19               **THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE**

20       For the reasons noted herein, the Debtor will suffer immediate and irreparable harm if the

21   Debtor is not able to pay the expenses set forth in the Approved Budget, pending a final hearing

22   on the Motion.  The Debtor requires the terms of the Interim Order to become immediately

23   effective to ensure that the Debtor will be able to obtain the proposed DIP Facility to pay such

24   critical expenses.  Based on the foregoing, the Debtor requests that any applicable stay, including

25   the stay provided under FRBP 6004, be waived to allow the Interim Order to become immediately

26   effective.

27   / / /

28   / / /

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

2613187

29

1

## VI.

## <u>CONCLUSION</u>

Based upon all of the foregoing, the Court grant the Motion.

Dated:  November 29, 2017          **Sulmeyer**Kupetz
A Professional Corporation


By: */s/ David S. Kupetz*
David S. Kupetz
Asa S. Hami
Steven F. Werth
Attorneys for Shiekh Shoes, LLC
Debtor and Debtor in Possession

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

2613187

# EXHIBIT A

## SENIOR SECURED, SUPER PRIORITY DEBTOR IN POSSESSION
## LOAN AND SECURITY AGREEMENT

THIS SENIOR SECURED, SUPER PRIORITY DEBTOR IN POSSESSION LOAN AND SECURITY AGREEMENT (together with all schedules, riders and exhibits annexed hereto from time to time, this "Agreement") is entered into this 1st day of December, 2017, between **STATE BANK AND TRUST COMPANY**, a Georgia banking corporation, as successor by merger to AloStar Bank of Commerce ("Lender"), and **SHIEKH SHOES, LLC**, a California limited liability company ("Borrower").  All schedules, riders and exhibits annexed hereto are incorporated herein and made a part hereof.

WHEREAS, on November 29, 2017 (the "Petition Date"), Borrower commenced Chapter 11 Case No. [_____] (the "Chapter 11 Case"), by filing a voluntary petition for reorganization under the Bankruptcy Code (as defined below), with the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Bankruptcy Court").  Borrower continues to operate its business and manage its properties as debtor and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, Lender provided financing to Borrower pursuant to that certain Loan and Security Agreement, dated as of March 17, 2017 between Borrower and Lender (as amended, modified or supplemented through the Petition Date, the "Prepetition Senior Loan Agreement"),;

WHEREAS, Borrower has requested that Lender provide a senior secured, super priority revolving credit facility to Borrower of up to $16,000,000 in the aggregate to fund the working capital requirements of Borrower during the pendency of the Chapter 11 Case and to fund other corporate needs and expenses;

WHEREAS, Lender is willing to make certain Postpetition (as defined below) loans and other extensions of credit to Borrower of up to such amount upon the terms and conditions set forth herein; and

WHEREAS, Borrower has agreed to secure all of the Obligations (as defined below) under the Loan Documents (as defined below) by granting to Lender a security interest in and lien upon all or substantially all of its existing and after-acquired assets.

NOW, THEREFORE, for good and valuable consideration, the parties hereto, intending to be bound hereby, agree as follows:

**SECTION 1.    DEFINITIONS**

1.1    **Defined Terms**. When used in this Agreement or in any schedule or rider hereto, the following terms shall have the following meanings (terms defined in the singular to have the same meaning when used in the plural and *vice versa*):

"Advisor" means KGI Advisors, or any other financial advisor reasonably acceptable to Lender.

"Affiliate" means a Person (a) which directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, another Person; (b) which beneficially owns or holds 10% or more of any class of the Equity Interests of a Person; or (c) 10% or more of the Equity Interests with power to vote of which is beneficially owned or held by another Person or a Subsidiary of another Person.  For purposes hereof, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of any Equity Interest, by contract or otherwise.

"Anti-Corruption Laws" means all laws, rules and regulations of any jurisdiction applicable to Borrower or any of its Subsidiaries from time to time concerning or relating to bribery or corruption.

"Anti-Terrorism Laws" means any laws relating to terrorism or money laundering, including Executive Order No. 13224 and the USA PATRIOT ACT.

"Applicable Variable Rate" shall have the meaning given to it in Item 8(a) of the Terms Schedule.

"Approved Budget" has the meaning specified in the Interim Order.

"Authorized Officer" means each Senior Officer, each person identified in Item 2 of the Terms Schedule (if any), and each other person designated in writing by Borrower to Lender as an authorized officer to make requests for Loans or other extensions of credit hereunder.

"Availability" means, on any date, the amount that Borrower is entitled to borrow as Revolver Loans on such date, such amount being the difference derived when the Total Outstandings (including any amounts that Lender may have paid for the account of Borrower pursuant to any of the Loan Documents and that have not been reimbursed by Borrower) on such date are subtracted from the Borrowing Base on such date.  If the Total Outstandings are equal to or greater than the Borrowing Base, then there shall be no Availability.

"Availability Block" means $4,000,000.

"Availability Reserve" means, on any date of determination thereof, an amount equal to the sum of the following (without duplication):  (a) the Gordon Brothers Reserve; (b) the Inventory Reserve; (c) the aggregate amount of past due rent, fees or other charges owing at such time by any Obligor to any landlord of any premises where any of the Collateral is located or to any processor, repairman, mechanic or other Person who is in possession of any Collateral or has asserted or is able to assert any Lien or claim thereto; provided, that, no reserve shall be applicable as to past due rent owing to any landlord with respect to Prepetition periods; (d) any amounts which any Obligor is obligated to pay pursuant to the provisions of any of the Loan Documents that Lender elects to pay for the account of such Obligor in accordance with authority contained in any of the Loan Documents; (e) the amount of any outstanding Bank Product Obligations owing to Lender or any Affiliate of Lender; (f) any fees, costs, and/or expenses in connection with the Chapter 11 Case (other than the Carve-Out Amount); and (g) such additional reserves, in such amounts and with respect to such matters (including, without limitation, sales tax obligations), as Lender in its reasonable credit judgment may elect to impose from time to time.

"Bank Products" means any one or more of the following types of products, services or facilities extended to Borrower by Lender or any Affiliate of Lender (whether or not in reliance on Lender's

- 2 -

agreement to indemnify such Affiliate):  (i) commercial credit or debit cards; (ii) merchant card services; (iii) cash management services for operating, collections, payroll and trust accounts of Borrower that are provided by Lender or any of its Affiliates, including automatic clearinghouse services, controlled disbursement services, electronic funds transfer services, information reporting services, lockbox services, stop payment services and wire transfer services; (iv) products consisting of interest rate protection agreements, foreign currency exchange agreements, forward contracts, currency swap agreements, commodity price protection agreements for other interest or currency exchange rate or commodity price hedging arrangements; (v) equipment leasing arrangements between Borrower and Lender or any Affiliate of Lender; and (vi)  such other banking products or services provided by Lender or any Affiliate of Lender as may be requested by Borrower, other than Letters of Credit.

"Bank Product Obligations" means all indebtedness or other obligations arising out of or relating in any way to Bank Products.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" has the meaning set forth in the recitals to this Agreement.

"Bankruptcy Default" means the occurrence of any of the following in connection with the Chapter 11 Case:

(a)    the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by Borrower in the Chapter 11 Case: (i) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement without the prior written consent of Lender; (ii) to grant any Lien other than Permitted Liens upon or affecting any Collateral; (iii) except as provided in the DIP Order, to use cash collateral of Lender under Section 363(c) of the Bankruptcy Code without the prior written consent of Lender; or (iv) any other action or actions adverse to either (A) Lender or its rights and remedies hereunder or its interest in the Collateral or (B) Prepetition Senior Lender or its rights and remedies under the Prepetition Senior Loan Documents or its interest in its collateral;

(b)    the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by Borrower, or the entry of an order in the Chapter 11 Case confirming such plan or approving such disclosure statement, (i) to which Lender and Prepetition Senior Lender do not consent in writing or otherwise agree to the treatment of their respective claims and (ii) that fails to provide for the Full Payment of all Obligations and the Full Payment (as defined in the Prepetition Senior Loan Agreement) of all Prepetition Senior Obligations on the effective date of such plan;

(c)    the entry of an order in the Chapter 11 Case confirming a plan of reorganization that does not contain a provision for the Full Payment of all Obligations and the Full Payment (as defined in the Prepetition Senior Loan Agreement) of all Prepetition Senior Obligations on or before the effective date of such plan or plans;

(d)    the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the DIP Order without the written consent of Lender (or Borrower applies for, consents to, or acquiesces in, any such relief) or the filing by Borrower of a motion for reconsideration with respect to the DIP Order;

- 3 -

(e)      the Final Order, in form and substance acceptable to Lender and Prepetition Senior Lender, is not entered immediately following the expiration of the Interim Order;

(f)      the Final Order, in form and substance acceptable to Lender and Prepetition Senior Lender, is not entered on or before the date that is thirty (30) days after the entry of the Interim Order;

(g)      the payment of, or application for authority to pay, any Prepetition or Postpetition claim without Lender's prior written consent unless otherwise expressly permitted under this Agreement;

(h)      the Bankruptcy Court or any other court of competent jurisdiction enters an order or judgment allowing, imposing, surcharging or assessing any claim, cost or expense against Lender or Prepetition Senior Lender or against any of their respective collateral (or Borrower applies for, consents to, or acquiesces in, any such relief), whether pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(i)      the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of Borrower (or Borrower applies for, consents to, or acquiesces in, any such relief);

(j)      the sale, without Lender's and Prepetition Senior Lender's consent, of all or substantially all of Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, whether through one transaction or a series of transactions, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for the  Full Payment of all Obligations and the Full Payment (as defined in the Prepetition Senior Loan Agreement) of all Prepetition Senior Obligations;

(k)      the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code (or Borrower applies for, consents to, or acquiesces in, any such relief);

(l)      the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (ii) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case is with respect to any portion of the Collateral having a value, individually or in the aggregate, in excess of $25,000 or which would otherwise have a Material Adverse Effect;

(m)      the commencement of a suit or action against Lender or Prepetition Senior Lender by or on behalf of Borrower or any other Obligor;

(n)      the entry of any order in any suit or action against Lender or Prepetition Senior Lender that asserts or seeks by or on behalf of Borrower, the Environmental Protection Agency, any state environmental protection or health and safety agency, any Committee or any other party in interest in the Chapter 11 Case, (i) awarding any claim, stay, injunctive relief or other damages against Lender or Prepetition Senior Lender; or (ii) granting or awarding any legal or equitable remedy that would have the effect of subordinating any or all of the Obligations or Liens of Lender under the Loan Documents or the DIP Order, or Prepetition Senior Lender under the Prepetition Senior Loan Documents or the DIP Order, to any other claim;

- 4 -

(o)      the entry of an order in the Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents or on account of the Prepetition Senior Obligations owing under the Prepetition Senior Loan Agreement or Prepetition Senior Loan Documents (or Borrower applies for, consents to, or acquiesces in, any such relief);

(p)      the breach of and/or failure of Borrower to perform any of its obligations under the DIP Order;

(q)      the Bankruptcy Court or any other court of competent jurisdiction enters an order or judgment, or Borrower applies for, consents to, or acquiesces in, the entry of such order or judgment, in the Chapter 11 Case modifying, limiting, subordinating or avoiding (i) the priority of any Obligations or Prepetition Senior Obligations or (ii) the perfection, priority or validity of any Lien securing the Obligations or Prepetition Senior Obligations;

(r)      any "first day" or other order entered in the Bankruptcy Case shall cease to be in full force and effect or shall have been reversed, modified, amended, subject to a pending appeal, stayed or vacated (other than by the Final Order) absent the prior written consent of Lender;

(s)      the rejection of any lease of real property (other than with respect to any Designated Store), whether by the filing of a motion or other pleading with the Bankruptcy Court seeking to reject any such lease, or by Borrower's failure to file a motion or other pleading with the Bankruptcy Court seeking authority to assume any lease of real property within the timeframe set forth in Section 365 of the Bankruptcy Code (after giving effect to any extensions thereof approved by the Bankruptcy Court), without Lender's prior written consent; and

(t)      the entry of an order in the Chapter 11 Case granting any other super priority administrative claim or Lien (other than the Carve-Out) equal or superior to that granted to Lender or Prepetition Senior Lender hereunder or under the DIP Order (or Borrower applies for, consents to, or acquiesces in, any such relief).

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Case.

"Borrower's Books" means all of Borrower's books and records relating to its existence, governance, assets, liabilities or financial condition or any of the Collateral, including minute books; ledgers and records indicating, summarizing or evidencing Borrower's assets or liabilities; all information relating to Borrower's business operations; and all computer records, programs, discs or tape files, printouts, runs, and other information prepared or stored electronically, including the equipment or any website or third party storage provider containing or hosting such information.

"Borrowing Base" means, on any date of determination thereof, an amount equal to the lesser of:

(a)      the Maximum Revolver Facility Amount on such date, minus the Availability Reserve on such date, minus the Carve-Out Amount on such date; and

ATL 22501749v1

EXHIBIT A   -   35

(b)      the Inventory Formula Amount on such date, <u>minus</u> the Availability Block, <u>minus</u> the Availability Reserve on such date, <u>minus</u> the Carve-Out Amount on such date.

"<u>Borrowing Base Certificate</u>" means a certificate, substantially in the form requested by Lender, with appropriate insertions, to be submitted to Lender by Borrower pursuant to this Agreement and certified as true and correct by a Senior Officer (which certificate may be submitted electronically subject to the limitations set forth in **Section 11.1(c)**.

"<u>Business Day</u>" means any day of the week, excluding Saturdays, Sundays, each day that is a legal holiday under the laws of the State of Georgia and each day on which Lender is otherwise closed for transacting business with the public.

"<u>California DOT</u>" means that certain Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of the Closing Date executed by the Real Estate Owners in favor of the trustee thereunder for the benefit of Lender with respect to the California Real Estate.

"<u>California Real Estate</u>" means the residential real estate owned by the Real Estate Owners as of the Closing Date that is located at 609 Palisades Beach Road, Santa Monica, California.

"<u>Capital Expenditures</u>" means all liabilities incurred or expenditures made by Borrower or any of its Subsidiaries for the acquisition of fixed assets, or any improvements, substitutions or additions thereto with a useful life of more than one year.

"<u>Carve-Out</u>" has the meaning provided in the DIP Order.

"<u>Carve-Out Amount</u>" has the meaning provided in the DIP Order.

"<u>Change in Law</u>" means (i) the adoption of any applicable law, rule or regulation after the date of this Agreement, (ii) any change in any applicable law, rule or regulation, or any change in the interpretation, implementation or application thereof, by any governmental authority after the date of this Agreement, or (iii) compliance by Lender with any request, guideline or directive (whether or not having the force of law) of any governmental authority made or issued after the date of this Agreement; provided that for purposes of this Agreement, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"<u>Change of Control</u>" means (a) the occurrence of any event (whether in one or more transactions) which results in a transfer of Control of Borrower to a Person who is not an original owner of Equity Interests in Borrower on the Closing Date or (b) any merger or consolidation of or with Borrower or sale of all or substantially all of the property of Borrower.  For purposes of this definition, "Control of Borrower" shall mean the power, direct or indirect, (i) to vote 25% or more of the Equity Interests having ordinary voting power for the election of directors or managing agents of Borrower or (ii) to direct or cause the direction of the management and the policies of Borrower by contract or otherwise.

"Chapter 11 Case" has the meaning set forth in the recitals to this Agreement.

"Closing Date" means the date on which the initial Loan is funded hereunder.

"Collateral" means all of the property and interests in property described in **Section 4.1** of this Agreement, all property described in any of the Security Documents as security for the payment or performance of any of the Obligations, and all other property and interests in property that now or hereafter secure (or are intended to secure) the payment or performance of any of the Obligations.

"Collection Account" means the Deposit Account maintained by Borrower at Lender to which collections, deposits and other payments on or with respect to the Collateral are to be made pursuant to the terms hereof and in respect of which only Lender shall have access to withdraw or otherwise direct the disposition of the funds on deposit therein.

"Commitment Termination Date" means the date that is the sooner to occur of (i) the last day of the Term, (ii) the Commitment Termination Date (as defined in the DIP Order), or (iii) the date on which the Commitments are terminated pursuant to **Section 3.2**.

"Commitments" means all commitments and other undertakings of Lender in this Agreement to make Loans or other extensions of credit to or for the benefit of Borrower in accordance with the terms of this Agreement and of the other Loan Documents.

"Committees" means, collectively, any official committee of unsecured creditors and any other committee formed, appointed, or approved in the Chapter 11 Case and each of such Committees shall be referred to herein as a "Committee".

"Compliance Certificate" means a Compliance Certificate, in the form of Exhibit B attached hereto to Lender, with appropriate insertions, to be submitted to Lender by Borrower pursuant to this Agreement and certified as true and correct by a Senior Officer.

"Comvest" means Comvest Capital IV, L.P.

"Comvest Agent" means Comvest, in its capacity as agent under the Comvest Loan Agreement.

"Comvest Intercreditor Agreement" means that certain Intercreditor Agreement dated as of the Prepetition Closing Date among Borrower, Lender, and Comvest Agent.

"Comvest Lenders" means the lenders from time to time party to the Comvest Loan Agreement.

"Comvest Liens" means the Liens granted to Comvest Agent in the Collateral (as defined in the Comvest Intercreditor Agreement), but only to the extent that the applicable Obligor has granted a Lien in favor of Lender pursuant to the Loan Documents and the Comvest Intercreditor Agreement is effective at all times with respect to such Collateral and Liens.

"Comvest Loan Agreement" means that certain Credit Agreement dated as of the Prepetition Closing Date among Borrower, the Comvest Lenders and Comvest Agent, as amended, subject to the restrictions contained herein and in the Comvest Intercreditor Agreement, after the Prepetition Closing Date.

- 7 -

"Comvest Loan Documents" means the Loan Documents as defined in the Comvest Loan Agreement.

"Comvest Loans" means (a) Debt in a maximum principal amount of $11,000,000 outstanding under the Comvest Loan Agreement, and (b) Debt arising under Section 1.7 of the Comvest Warrant (as in effect on the Closing Date) as a result of the "put" of the shares subject thereto based on reaching the "Initial Put Date" of March 18, 2019, provided such Debt under this clause (b) shall be governed by the Comvest Loan Agreement and the interest rate, maturity date and amortization schedule applicable thereto shall be as set forth in Section 1(c) of the Investor Rights Agreement (subject to changes to the terms of such Debt that are permitted under the Intercreditor Agreement), in each case as the amount of such Debt is reduced by any payments or prepayments thereof.

"Comvest Warrant" means that Warrant to Purchase Common Membership Interests, dated March 18, 2016, issued by Borrower to Karmaloop, LLC with respect to up to 4% of the Equity Interest in Borrower on a fully diluted basis.

"Credit Card Processor" shall have the meaning given to it in **Section 2.7(b)**.

"Credit Card Processor Notification" means, with respect to any Credit Card Processor, a written notification, in form and substance reasonably satisfactory to Lender, executed by Borrower, pursuant to which, among other things, Borrower notifies such Credit Card Processor to make all payments due to Borrower to the Collection Account.

"Credit Support" means any guaranty, indemnity, security or other assurance of payment or performance provided by Lender to induce a Person to extend credit to or for the benefit of any Obligor, including the issuance of any Letter of Credit by such Person for the account of any Obligor.

"Debt" means, as applied to a Person, without duplication:  (a) all items which in accordance with GAAP would be included in determining total liabilities as shown on the liability side of a balance sheet of such Person as of the date as of which Debt is to be determined, including capitalized lease obligations; (b) all contingent obligations of such Person; (c) all reimbursement obligations in connection with letters of credit issued for the account of such Person; and (d) in the case of Borrower (without duplication), the Obligations.  The Debt of a Person shall include any recourse Debt of any partnership or joint venture in which such Person is a general partner or joint venturer.

"Default" means an event or condition the occurrence of which would, with the lapse of time or the giving of notice, or both, become an Event of Default.

"Deposit Account Control Agreement" means a deposit account control agreement among Borrower, Lender and the financial institution named therein, pursuant to which Lender shall have obtained "control" (as contemplated by Section 9-104 of the UCC) of the Deposit Account subject thereto.

"Designated Stores" means Borrower's stores listed on Exhibit D attached hereto.

"Designated Stores Liquidation Agreement" means the agreement between Gordon Brothers and Borrower with respect to the liquidation of the Inventory and other assets located at the Designated Stores, which agreement shall be subject to the approval of Lender and the Bankruptcy Court.

- 8 -

"DIP Order" means the Interim Order or the Final Order, whichever is in effect as of the relevant date in question.

"Disbursement Account" means any Deposit Account maintained by Borrower with a financial institution for the purpose of receiving and disbursing the proceeds of Loans made pursuant hereto.

"Disclosure Schedule" means the Disclosure Schedule annexed hereto.

"Distribution" means, in respect of any entity, (i) any payment of dividends or other distributions on Equity Interests of the entity (except distributions consisting of such Equity Interests) and (ii) any purchase, redemption or other acquisition or retirement for value of any Equity Interests of the entity or an Affiliate of the entity unless made contemporaneously from the net proceeds of the sale of Equity Interests.

"Dollars" and the sign "$" means lawful money of the United States of America.

"Eligible Inventory" means Inventory which is owned by Borrower (other than packaging or shipping materials, labels, samples, display items, bags, replacement parts and manufacturing supplies) and which Lender, in its reasonable credit judgment, deems to be Eligible Inventory.  Without limiting the generality of the foregoing, no Inventory shall be Eligible Inventory unless: (a) it is finished goods; (b) it is owned by Borrower and it is not held by Borrower on consignment from or subject to any guaranteed sale, sale-or-return, sale-on-approval or repurchase agreement with any supplier; (c) it is in good, new and saleable condition and is not damaged, defective, shopworn or otherwise unfit for sale; (d) it is not slow-moving, obsolete or unmerchantable and is not goods returned to Borrower by or repossessed from an Account Debtor; (e) it meets all standards imposed by any governmental authority and does not constitute hazardous materials under any Environmental Law to the extent such goods can be transported or sold only with licenses or permits that are not readily available; (f) it conforms in all respects to the warranties and representations set forth in this Agreement and is fully insured in the manner required by this Agreement; (g) it is at all times subject to Lender's duly perfected, first priority security interest and no other Lien other than Permitted Liens in favor of Comvest Agent; (h) it is in Borrower's possession and control at a location in compliance with this Agreement, is not in transit (other than between Borrower's stores and from Borrower's distribution center to its stores) or outside the continental United States, and is not consigned to any Person; (i) it is not the subject of a negotiable warehouse receipt or other negotiable document; (j) it has not been sold or leased and Borrower has not received any deposit or downpayment in respect thereof in anticipation of a sale; and (k) it is not subject to any license or other arrangement that restricts Borrower's or Lender's right to dispose of such Inventory unless Lender has received an appropriate Lien Waiver.  For avoidance of doubt, Gordon Brothers Inventory shall not constitute Eligible Inventory.

"Environmental Laws" means all federal, state, local and foreign laws, rules, regulations, codes, ordinances, orders and consent decrees (together with all programs, permits and guidance documents promulgated by regulatory agencies, to the extent having the force of law), now or hereafter in effect, that relate to public health (but excluding occupational safety and health, to the extent regulated by OSHA) or the protection or pollution of the environment, whether now or hereafter in effect, including the Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Clean Water Act, the Clean Air Act, the Toxic Substances Act, and the Resource Conservation and Recovery Act.

ATL 22501749v1

"Equity Interest" means the interest of (a) a shareholder in a corporation, (b) a partner (whether general or limited) in a partnership (whether general, limited or limited liability), (c) a member in a limited liability company, or (d) any other Person having any other form of equity security or ownership interest.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Event of Default" means the occurrence of any one of the events set forth in **Section 10.**

"Exchange Act" is the Securities Exchange Act of 1934 and the regulations promulgated thereunder, as amended and in effect.

"Executive Order No. 13224" means executive order no. 13224 effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Fees" means all fees payable pursuant to **Section 2.4(a)**.

"Final Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless Lender waives such requirement), together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Lender, which, among other matters but not by way of limitation, authorizes Borrower to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of Lender's claims.

"Fiscal Year" means the fiscal year of Borrower and its Subsidiaries for accounting and tax purposes, which is described in the Disclosure Schedule.

"Full Payment" means the full, final and indefeasible payment in full of all of the Obligations (or, in the case of any contingent Obligations, such as Letters of Credit, the cash collateralization of such contingent Obligations in a manner satisfactory to Lender and to the extent of 105% of the liquidated or estimated amount of such contingent Obligations); termination of the Commitments; and release by each Obligor (and by any representative of creditors of such Obligor in any Insolvency Proceeding of such Obligor) of any claims that such Obligor has or asserts to have against Lender or any of its Affiliates; provided, that, in any such case, the deadline set forth in the DIP Order for any Person to file a complaint or adversary proceeding challenging the amount, extent, validity, or enforceability of the Prepetition Senior Obligations, or the perfection or priority of the Prepetition Senior Liens, or otherwise asserting any claims or causes of action on behalf of Borrower's estates against Lender relating to the Prepetition Senior Obligations, has expired and any such complaint or adversary proceeding has been resolved.

"GAAP" means generally accepted accounting principles in the United States of America in effect from time to time.

"Gordon Brothers" means Gordon Brothers Retail Partners, LLC.

"Gordon Brothers Collections" means all payments and collections received directly or indirectly with respect to the sale of Gordon Brothers Inventory.

"Gordon Brothers Inventory" means all "Additional Consultant Goods" as defined in the Designated Stores Liquidation Agreement.

"Gordon Brothers Reserve" means such reserves as may be established from time to time by Lender in its reasonable credit judgment with respect to the Designated Stores Liquidation Agreement and the transactions contemplated thereby, including, without limitation, with respect to Gordon Brothers Collections that are received directly or indirectly by Borrower and Lender (whether in the Master Account, the Collection Account or otherwise).

"Governing Rate" shall have the meaning given to it in **Section 2.3(a)**.

"Guarantor" means individually, and "Guarantors" means collectively, each Person who at any time guarantees the payment or performance of any Obligations, including the Real Estate Owners, and each Person listed on Item 5 of the Terms Schedule as a Guarantor.

"Guaranty" means each guaranty agreement at any time executed by a Guarantor with respect to any of the Obligations (including the Real Estate Owners Guaranty).

"Indemnitees" means Lender, each Affiliate of Lender, and all officers, directors, employees and agents (including legal counsel) of Lender and each Affiliate of Lender.

"Indemnified Claim" means any and all claims, demands, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, awards, remedial response costs, expenses or disbursements of any kind or nature whatsoever (including reasonable attorneys', accountants', consultants' or paralegals' fees and expenses), whether arising under or in connection with any of the Loan Documents, any applicable law (including any Environmental Laws) or otherwise, that may now or hereafter be suffered or incurred by any Indemnitee and whether suffered or incurred in or as a result of any investigation, litigation, arbitration or other judicial or non-judicial proceedings or any appeals related thereto.

"Insolvency Proceeding" means any action, case or proceeding commenced by or against a Person under any state, federal or foreign law, or any agreement of such Person, for (a) the entry of an order for relief under any chapter of the Bankruptcy Code or other insolvency or debt adjustment law (whether state, federal or foreign), (b) the appointment of a receiver (or administrative receiver), trustee, liquidator administrator, conservator or other custodian for such Person or any part of its property, (c) an assignment or trust mortgage for the benefit of creditors of such Person, or (d) the liquidation, dissolution or winding up of the affairs of such Person.

"Intellectual Property" means all intellectual and similar property of a Person, including inventions, designs, patents, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases; all embodiments or fixations thereof and all related documentation, applications, registrations and franchises; all licenses or other rights to use any of the foregoing; and all books and records relating to the foregoing.

- 11 -

"Interim Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extension, modifications, and amendments thereto, in form and substance satisfactory to Lender which, among other matters but not by way of limitation, authorizes, on an interim basis, Borrower to execute and perform under the terms of this Agreement and the other Loan Documents, substantially in the form of Exhibit C.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

"Inventory Formula Amount" means, on any date of determination thereof, an amount equal to the lesser of (a) the percentage set forth in Item 6(a) of the Terms Schedule (or such lesser percentage as Lender may in its reasonable credit judgment determine from time to time) of the Value of Eligible Inventory on such date or (b) the percentage set forth in Item 6(b) of the Terms Schedule (or such lesser percentage as Lender may in its reasonable credit judgment determine from time to time) of the NOLV of Eligible Inventory on such date.

"Inventory Reserve" means such reserves as may be established from time to time by Lender in its reasonable credit judgment to reflect changes in the salability of any Eligible Inventory in the Ordinary Course of Business or such other factors as may negatively impact the value of any Eligible Inventory.  Without limiting the generality of the foregoing, such reserves may include reserves based on obsolescence, seasonality, theft or other shrinkage, imbalance, change in composition or mix, markdowns, outlet store Inventory, recall Inventory, back orders Inventory, and gift cards.

"Investor Rights Agreement" means that certain Investor Rights Agreement dated as of March 15, 2016 among Borrower, Shiekh Ellahi, Karmaloop, LLC, Comvest Karmaloop Holdings, LLC and CapX Fund IV, LP, as in effect on the Prepetition Closing Date.

"Lender Expenses" means all of the following: (a) Taxes and insurance premiums required to be paid by Borrower under this Agreement or any of the other Loan Documents which are paid or advanced by Lender; (b) filing, recording, publication and search fees paid or incurred by Lender, including all recording taxes and indebtedness taxes; (c) the costs, fees (including reasonable attorneys' fees, paralegals' fees and financial advisors' fees) and expenses incurred by Lender (i) to inspect, copy, audit or examine Borrower or any of Borrower's Books or inspect, verify, count or appraise any Collateral; (ii) to correct any Default or enforce any provision of any of the Loan Documents, whether or not litigation is commenced; (iii) in gaining possession of, maintaining, handling, preserving, insuring, storing, shipping, preparing for sale, advertising for sale, selling or foreclosing a Lien upon any of the Collateral, whether or not a sale is consummated; (iv) in collecting any Accounts or Payment Intangibles or recovering any of the Obligations; (v) in structuring, drafting, reviewing, analyzing, implementing or preparing any of the Loan Documents, any amendment, modification or waiver of this Agreement or any of the other Loan Documents, the Approved Budget, and any financial or collateral reports or forecasts; (vi)  in defending the validity, priority or enforceability of Lender's Liens; and (vii) in monitoring or seeking any relief in the Bankruptcy Case or any other any Insolvency Proceeding involving an Obligor; and (d) all other costs and expenses incurred by Lender and described in **Section 2.4(b)**.

"Letter of Credit" means a letter of credit issued by Lender or an Affiliate of Lender or by another Person in reliance (in whole or in part) upon Credit Support provided by Lender.

- 12 -

"Lien" means any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on common law, statute or contract.   The term "Lien" shall also include reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases and other title exceptions and encumbrances affecting property.  For the purpose hereof, Borrower shall be deemed to be the owner of any property which it has acquired or holds subject to a conditional sale agreement or other arrangement pursuant to which title to the property has been retained by or vested in some other Person for security purposes.

"Lien Waiver" means an agreement, in form and substance satisfactory to Lender, by which (a) for any Collateral located on leased premises, the lessor waives or subordinates any Lien it may have on the Collateral, and agrees to permit Lender to enter upon the premises and remove the Collateral or to use the premises to store or dispose of the Collateral; (b) for any Collateral held by a warehouseman, processor, shipper, customs broker or freight forwarder, such Person waives or subordinates any Lien it may have on the Collateral, agrees to hold any Documents in its possession relating to the Collateral as agent for Lender, and agrees to deliver the Collateral to Lender upon request; (c) for any Collateral held by a repairman, mechanic or bailee, such Person acknowledges Lender's Lien, waives or subordinates any Lien it may have on the Collateral, and agrees to deliver the Collateral to Lender upon request; and (d) for any Collateral subject to a licensor's Intellectual Property rights, the licensor grants to Lender the right, vis-à-vis such licensor, to enforce Lender's Liens with respect to the Collateral, including the right to dispose of it with the benefit of the Intellectual Property, whether or not a default exists under any applicable license.

"Loan" means an advance of money made by Lender to Borrower pursuant to the terms of this Agreement, including any Rider.

"Loan Documents" means, collectively, this Agreement (including any Rider hereto), the DIP Order, each Note, the Security Documents, Lien Waivers, and any other agreements entered into between Lender and any Obligor in connection with this Agreement or to evidence or govern the terms of any of the Obligations, including letter of credit agreements, mortgages, deeds of trust, guaranties, assignments, pledge agreements, subordination agreements, agreements relating to Bank Products, and any and all other documents, agreements, certificates and instruments executed and/or delivered by any Obligor pursuant hereto or in connection herewith.

"Local Bankruptcy Rules" means the local bankruptcy rules of the Bankruptcy Court as the same may from time to time be in effect and applicable to the Chapter 11 Case.

"Local Collection Account" shall have the meaning assigned thereto in **Section 2.7(a)**.

"Margin Stock" shall have the meaning ascribed to it in Regulation U of the Board of Governors of the Federal Reserve System.

"Master Account" means the Deposit Account maintained by Borrower with Bank of America for the purpose of receiving collections from Borrower's stores.

"Material Adverse Effect" means the effect of any event, condition, action, omission or circumstance, which, alone or when taken together with other events, conditions, actions, omissions or circumstances occurring or existing concurrently therewith, (a) has, or with the passage of time could be reasonably expected to have, a material adverse effect upon the business, operations, properties,

- 13 -

prospects or condition (financial or otherwise) of any Obligor; (b) has or could be reasonably expected to have any material adverse effect upon the validity or enforceability of this Agreement or any of the other Loan Documents; (c) has any material adverse effect upon the value of the whole or any material part of the Collateral, the Liens of Lender with respect to the Collateral or the priority of any such Liens; (d) materially impairs the ability of any Obligor to perform its obligations under this Agreement or any of the other Loan Documents, including repayment of any of the Obligations when due; or (e) materially impairs the ability of Lender to enforce or collect the Obligations or realize upon any of the Collateral in accordance with the Loan Documents or applicable law.

"Material Agreement" means any agreement, instrument or arrangement to which Borrower or any Subsidiary is a party for which default in the performance, observance or fulfillment of any of the material obligations, covenants or conditions contained therein could reasonably be expected to have a Material Adverse Effect.

"Maximum Revolver Facility Amount" means an amount equal to the amount shown on Item 7 of the Terms Schedule.

"Money Borrowed" means, as applied to any Obligor, without duplication:  (a) Debt arising from the lending of money by any other Person to such Obligor; (b) Debt, whether or not in any such case arising from the lending of money by another Person to such Obligor, (i) which is represented by notes payable or drafts accepted that evidence extensions of credit, (ii) which constitutes obligations evidenced by bonds, debentures, notes or similar instruments, or (iii) upon which interest charges are customarily paid (other than accounts payable) or that was issued or assumed as full or partial payment for property; (c) Debt under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP; (d) reimbursement obligations with respect to letters of credit or guarantees relating thereto; and (e) Debt of such Obligor under any guaranty of obligations that would constitute Debt for Money Borrowed under clauses (a) through (d) hereof, if owed directly by such Obligor.

"Multiemployer Plan" shall have the meaning set forth in Section 4001(a)(3) of ERISA.

"NOLV" means, as to any property, the expected dollar amount to be realized at an orderly negotiated sale of such property, net of operating expenses, liquidation expenses, and commissions, as determined by Lender from time to time based on the most recent Qualified Appraisal of such property.

"Note" means a promissory note executed by Borrower at Lender's request to evidence any of the Obligations, including the Revolver Note.

"Obligations" means all Debts, liabilities, obligations, covenants, and duties at any time or times owing by Borrower to Lender of any kind and description, whether incurred pursuant to or evidenced by any of the Loan Documents or pursuant to any other agreement between Lender and Borrower or otherwise, and whether direct or indirect, absolute or contingent, due or to become due, or joint or several, including the principal of and interest on the Loans, all Bank Product Obligations, all Fees, all obligations of Borrower under any indemnification of Lender, all obligations of Borrower to reimburse Lender in connection with any Letter of Credit or bankers acceptances, all obligations of Borrower to reimburse Lender for any Credit Support, and all Lender Expenses.  Without limiting the generality of the foregoing, the term "Obligations" shall include all Debts, liabilities and obligations incurred by Borrower to Lender in the Bankruptcy Case and any interest, fees or other charges accrued in the Bankruptcy

- 14 -

Case, whether or not any such interest, fees or other charges are recoverable from Borrower or its estate under 11 U.S.C. §506.

"Obligor" means Borrower, each Guarantor, and each other Person that is at any time liable for the payment of the whole or any part of the Obligations or that has granted in favor of Lender a Lien upon any of such Person's assets to secure payment of any of the Obligations.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Ordinary Course of Business" means, with respect to any transaction involving any Person, the ordinary course of such Person's business, as conducted by such Person in accordance with past practices and undertaken by such Person in good faith and not for the purpose of evading any covenant or restriction in any Loan Document.

"Organic Documents" means, with respect to any entity, its charter, certificate or articles of incorporation, bylaws, articles of organization, limited liability agreement, operating agreement, members agreement, shareholders agreement, partnership agreement, certificate of partnership, certificate of formation, voting trust, or similar agreement or instrument governing the formation or operation of such Person.

"OSHA" means the Occupational Safety and Hazard Act of 1970.

"Overadvance" shall have the meaning given to it in **Section 2.1(c)**.

"Permitted Asset Disposition" means a sale, lease, license, consignment or other transfer or disposition of assets (real or personal, tangible or intangible) of Borrower, including a disposition of property of Borrower in connection with a sale-leaseback transaction or synthetic lease, in each case only if such disposition (a) consists of the sale of Inventory of Borrower in the Ordinary Course of Business; (b) is a disposition of Equipment permitted by **Section 5.4(b)**; (c) is a Permitted Designated Store Liquidation; or (d) arises solely from a termination or rejection of a lease with respect to any Designated Store.

"Permitted Lien" means any of the following: (a) Liens at any time granted in favor of Lender; (b) Liens for Taxes (excluding any Lien imposed pursuant to the provisions of ERISA) not yet due or being Properly Contested; (c) statutory Liens (excluding any Lien for Taxes) arising in the Ordinary Course of Business of Borrower or a Subsidiary, but only if and for so long as payment in respect of such Liens is not at the time required or the Debt secured by any such Liens is being Properly Contested and such Liens do not materially detract from the value of the property of Borrower or such Subsidiary and do not materially impair the use thereof in the operation of Borrower's or such Subsidiary's business; (d) the Prepetition Senior Liens; (e) normal and customary rights of setoff upon deposits of cash in favor of banks and other depository institutions and Liens of a collecting bank arising under the UCC on payment items in the course of collections; and (f) the Comvest Liens.

"Permitted Purchase Money Debt" means Purchase Money Debt of Borrower that is unsecured or secured only by a Purchase Money Lien, not to exceed the applicable amount (if any) set forth in the Approved Budget, in the aggregate at any time and subject to the limitations set forth in Item 16 of the Terms Schedule.

- 15 -

"Permitted Real Estate Liens" means (a) the first priority Lien in favor of Bank of America, so long as the maximum amount of indebtedness (including, without limitation, principal, interest, fees and expenses) secured thereby does not at any time exceed $3,800,000, (b) the second priority Lien in favor of the Prepetition Senior Lender, (c) easements, zoning restrictions, rights-of-way and similar encumbrances on the California Real Estate imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the California Real Estate or interfere with the use of the California Real Estate as a residence, and (d) Liens for ad valorem real property taxes and assessments, not yet due and payable, or which are being Properly Contested.

"Permitted Senior Lien" means any Prior Lien (as defined in the DIP Order), and valid, enforceable, and non-avoidable Lien that was perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code), which is not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and which is senior in priority to the Prepetition Senior Liens under applicable law and after giving effect to any subordination or inter-creditor agreements; provided that this definition shall exclude the Liens of Lender arising under the Prepetition Senior Loan Documents and of Comvest Agent and the Comvest Lenders, all of which Liens shall be subordinate to the Liens securing the Obligations.

"Permitted Designated Store Liquidations" means the sale and disposition by Gordon Brothers of Inventory and other assets located at the Designated Stores in accordance with the terms of the Designated Stores Liquidation Agreement.

"Person" means an individual, partnership, corporation, limited liability company, limited liability partnership, joint stock company, land trust, business trust, or unincorporated organization, or a governmental authority.

"Petition Date" has the meaning set forth in the recitals to this Agreement.

"Plan" means an employee pension benefit plan that is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Internal Revenue Code and that is either (a) maintained by Borrower for employees or (b) maintained pursuant to a collective bargaining agreement or any other arrangement under which more than one employer makes contributions and to which Borrower is then making or accruing an obligation to make contributions or has within the preceding 5 years made or accrued such contributions.

"Postpetition" means the time period beginning immediately upon the filing of the Chapter 11 Case.

"Prepetition" means the time period ending immediately prior to the filing of the Chapter 11 Case.

"Prepetition Closing Date" means the "Closing Date" under and as defined in the Prepetition Senior Loan Agreement.

"Prepetition Senior Lender" means Lender, in its capacity as "Lender" under the Prepetition Senior Loan Agreement.

- 16 -

"Prepetition Senior Letters of Credit" means all Letters of Credit issued under and as defined in the Prepetition Senior Loan Agreement.

"Prepetition Senior Liens" means all Liens in Collateral granted in favor of Prepetition Senior Lender under the Prepetition Senior Loan Documents as security for the Prepetition Senior Obligations.

"Prepetition Senior Loan Agreement" has the meaning set forth in the recitals to this Agreement.

"Prepetition Senior Loan Documents" means the Prepetition Senior Loan Agreement, along with any other agreements and documents executed or delivered in connection therewith, including, without limitation, the "Loan Documents" as defined therein.

"Prepetition Senior Obligations" means all obligations arising under the Prepetition Senior Loan Agreement (including, without limitation, the "Obligations" as defined therein) or any other Prepetition Senior Loan Document.

"Properly Contested" means, in the case of any Debt of an Obligor (including any Taxes) that is not paid as and when due or payable by reason of such Obligor's bona fide dispute concerning its liability to pay same or concerning the amount thereof, (a) such Debt is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (b) such Obligor has established appropriate reserves as shall be required in conformity with GAAP; (c) the non-payment of such Debt will not have a Material Adverse Effect and will not result in a forfeiture or sale of any assets of such Obligor; (d) no Lien is imposed upon any of such Obligor's assets with respect to such Debt unless such Lien is at all times junior and subordinate in priority to the Liens in favor of Lender (except only with respect to property taxes that have priority as a matter of applicable state law) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (e) if the Debt results from, or is determined by the entry, rendition or issuance against an Obligor or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is at all times stayed pending a timely appeal or other judicial review; and (f) if such contest is abandoned, settled or determined adversely (in whole or in part) to such Obligor, such Obligor forthwith pays such Debt and all penalties, interest and other amounts due in connection therewith.

"Purchase Money Debt" means Debt (including capitalized lease obligations and excluding the Obligations) for payment of any of the purchase price of fixed assets and Debt (including capitalized lease obligations and excluding the Obligations) incurred within 10 days before or after acquisition of any fixed assets for the purpose of financing such purchase price.

"Purchase Money Lien" means a Lien that secures Purchase Money Debt and that encumbers only the fixed assets acquired with such Purchase Money Debt and that constitutes a capital lease or a purchase money security interest under the UCC.

"Qualified Appraisal" means an appraisal conducted in a manner and with such scope and using such methods as are acceptable to Lender by an appraiser selected by, or acceptable to, Lender, the results of which are acceptable to Lender in all respects.

"Real Estate Milestones" means the following milestones and conditions (each of which shall, individually, be a "Real Estate Milestone"):

- 17 -

(a)     on or before December 5, 2017, Borrower or the Real Estate Owners shall deliver to Lender a bring-down title report with respect to the California Real Estate, such bring-down title report shall (i) be issued by the same law firm or title agency that issued the Real Estate Title Report, (ii) evidence that the California Real Estate is not subject to any Liens other than Lender's Lien and Permitted Real Estate Liens, and (iii) otherwise be in form and substance acceptable to Lender;

(b)     on or before December 20, 2017, the Real Estate Owners shall deliver to Lender a binding commitment letter (subject only to conditions precedent that are acceptable to Lender), from a lender or purchaser that is acceptable to Lender, with respect to a loan to be made to the Real Estate Owners based on the security of the California Real Estate, or a purchase of the California Real Estate, which loan or purchase will result in the payment of net cash proceeds to the Real Estate Owners in an amount not less than the sum of (i) the amount that will be required to be paid to Bank of America to satisfy the first priority Lien in favor of Bank of America on the California Real Estate, plus (ii) the Real Estate Cash Collateral amount, plus (iii) the amount of all other Permitted Real Estate Liens that will need to be satisfied in connection with such loan or purchase; and

(c)     on or before January 5, 2018, the Real Estate Owners shall deliver to Lender, from the consummation of the loan or purchase transaction described above, the Real Estate Owners Cash Collateral, together with the duly executed Real Estate Owners Cash Collateral Documents, which Real Estate Cash Collateral shall be subject to the first priority Lien of Lender and no other Liens.

"Real Estate Milestones Default" means: (a) the failure of Borrower, any Real Estate Owner or any other Person to satisfy any Real Estate Milestone by the applicable deadline set forth in the definition of "Real Estate Milestones"; or (b) if, at any time after the satisfaction of the Real Estate Milestone set forth in clause (b) of the definition of "Real Estate Milestones", (i) any Real Estate Owner breaches or fails to satisfy in a timely manner any condition, representation or requirement set forth in such commitment letter; (ii) Lender determines that the Real Estate Owners shall not be able to satisfy in a timely manner any condition, representation or requirement set forth in such commitment letter; (iii) any Real Estate Owner takes any action to terminate such commitment letter; or (iv) the lender or purchaser that issued the commitment letter described therein takes any action to terminate such commitment letter or impose any additional condition to the loan or purchase contemplated thereby.

"Real Estate Owners" means Shiekh Ellahi and Anjum Shiekh.

"Real Estate Owners Cash Collateral" means cash (or cash equivalents acceptable to Lender in its discretion) in an amount of $10,000,000 that is delivered by the Real Estate Owners to Lender as security for the Real Estate Owners Guaranty, together with all interest and other income earned (if any) on such cash (or cash equivalents).

"Real Estate Owners Cash Collateral Documents" means all such security agreements, pledge agreements, control agreements, and other agreements, documents, instruments and legal opinions as Lender may require with respect to the Real Estate Owners Cash Collateral and the granting to Lender of a first priority Lien therein, in each case in form and substance acceptable to Lender.

"Real Estate Owners Guaranty" means the limited recourse guaranty, in form and substance acceptable to Lender, executed by the Real Estate Owners with respect to the Obligations and the California Real Estate (and, after the release of the California Real Estate in connection with the satisfaction of all of the Real Estate Milestones, the Real Estate Cash Collateral).

- 18 -

"Real Estate Title Report" means a title report with respect to the California Real Estate that (i) is issued by a law firm or title agent that is acceptable to Lender, (ii) evidences that the California Real Estate is not subject to any Liens other than Lender's Lien and Permitted Real Estate Liens, and (iii) is otherwise in form and substance acceptable to Lender.

"Revolver Loans" shall have the meaning given to it it in **Section 2.1(a)**.

"Revolver Note" means the Revolver Note to be executed by Borrower in favor of Lender in the form of Exhibit A attached hereto, which shall be in the face amount of the Maximum Revolver Facility Amount and which shall evidence all Revolver Loans made by Lender to Borrower pursuant to this Agreement.

"Rider" means any Rider to this Agreement from time to time.

"Sanctioned Country" means, at any time, a country, region or territory that is, or whose government is, the subject or target of any Sanctions.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union or any EU member state, (b) any Person located, organized, incorporated or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

"Sanctions" means economic or financial sanctions or trade embargoes administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"Schedules" means the Terms Schedule and the Disclosure Schedule.

"SEC" shall mean the Securities and Exchange Commission, any successor thereto, and any analogous governmental authority.

"Security Documents" means each instrument or agreement now or at any time hereafter securing or assuring payment of the whole or any part of the Obligations, including this Agreement, the California DOT, the Real Estate Owners Cash Collateral Documents, the Real Estate Owners Guaranty, and each Deposit Account Control Agreement.

"Senior Officer" means, on any date, any person occupying any of the following positions with Borrower: the chairman of the board of directors, president, chief executive officer, chief financial officer, treasurer or secretary of Borrower.

"Solvent" means, as to any Person, such Person (a) owns property whose fair salable value is greater than the amount required to pay all of such Person's debts (including contingent, subordinated, unmatured and unliquidated liabilities), (b) owns property whose present fair salable value (as defined below) is greater than the probable total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities) of such Person as they become absolute and matured, (c) is able to pay all of its debts as such debts mature, (d) has capital that is not unreasonably small for its business and is sufficient to carry on its business and transactions and all business and transactions in which it is about

- 19 -

to engage, (e) is not "insolvent" within the meaning of Section 101(32) of the Bankruptcy Code, and (f) has not incurred (by way of assumption or otherwise) any obligations or liabilities (contingent or otherwise) under any of the Loan Documents, or made any conveyance pursuant to or in connection therewith, with actual intent to hinder, delay or defraud either present or future creditors of such Person or any of its Subsidiaries.  As used herein, the term "fair salable value" of a Person's assets means the amount that may be realized within a reasonable time, either through collection or sale of such assets at the regular market value, based upon the amount that could be obtained for such assets within such period by a capable and diligent seller from an interested buyer who is willing (but is under no compulsion) to purchase under ordinary selling conditions.

"Subordinated Debt" means all of the indebtedness owed by Borrower to any Person the repayment of which is subordinated to the repayment of the Obligations pursuant to the terms of a debt subordination agreement approved by Lender in its discretion.

"Subsidiary" means any Person in which 50% or more of all Equity Interests (or 50% of all Equity Interests having a power to vote) is owned, directly or indirectly, by Borrower, one or more other Subsidiaries of Borrower or Borrower and one or more other Subsidiaries.

"Substantial Compliance" means that: (a)the amount (if any) by which the Total Outstandings as of Friday of each week exceed the "Total Line of Credit Balance" amount set forth in the Approved Budget for such week (any such excess amount, the "Total Outstandings Excess Amount") is not greater than $1,250,000; (b)the amount (if any) by which Availability as of Friday of each week is less than the "Availability" amount set forth in the Approved Budget for such week (any such shortfall amount, the "Availability Shortfall Amount") is not greater than $1,250,000; and (c) the sum of the Total Outstandings Excess Amount plus the Availability Shortfall Amount as of Friday of each week is not greater than $1,750,000.

"Taxes" means any present or future taxes, levies, imposts, duties, fees, assessments, deductions, withholdings or other charges of whatever nature, including income, receipts, excise, property, sales, use, transfer, license, payroll, withholding, social security and franchise taxes now or hereafter imposed or levied by the United States or any other governmental authority and all interest, penalties, additions to tax and similar liabilities with respect thereto, but excluding, in the case of Lender, taxes imposed on or measured by the net income or overall gross receipts of Lender.

"Terms Schedule" means the Terms Schedule annexed hereto.

"Total Outstandings" means, as of any date of determination, the sum of (a) all Prepetition Senior  Obligations, plus (b) the aggregate outstanding amount of Loans and Letters of Credit.

"UCC" means the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of Georgia from time to time or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such state.

"Upstream Payment" means a Distribution by a Subsidiary of Borrower to Borrower.

- 20 -

"USA PATRIOT ACT" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

"Value" means, with reference to the value of Eligible Inventory, value determined by Lender on the basis of the lower of cost or market of such Eligible Inventory, calculated on a first-in, first-out basis in accordance with GAAP.

1.2    **Other Terms Defined in this Agreement**.    The following terms are defined in the applicable provisions of this Agreement:

| | |
|---|---|
| Default Rate | **Section 2.3** |
| Governing Rate | **Section 2.3(a)** |
| Loan Account | **Section 2.8** |
| Overadvance | **Section 2.1(c)** |
| Revolver Loan | **Section 2.1(a)** |
| Term | **Section 3.1** |

1.3    **UCC Terms**.    All other capitalized terms contained in this Agreement and not otherwise defined herein shall have, when the context so indicates, the meanings provided for by the UCC to the extent the same are used or defined therein.    Without limiting the generality of the foregoing, the following terms shall have the meaning ascribed to them in the UCC: Accessions, Account, Chattel Paper, Commercial Tort Claim, Deposit Account, Document, Electronic Chattel Paper, Equipment, Fixtures, Goods, General Intangible, Instrument, Inventory, Investment Property, Letter-of-Credit Right, Payment Intangible, Proceeds, Products, Securities, Securities Account, Software, and Supporting Obligations.

1.4    **Accounting Terms**.    Unless otherwise specified herein, all terms of an accounting nature used in this Agreement shall be interpreted, all accounting determinations under this Agreement shall be made, and all financial statements required to be delivered under this Agreement shall be prepared in accordance with GAAP, applied on a basis consistent with the most recent audited financial statements of Borrower and its Subsidiaries delivered to Lender prior to the Closing Date and using the same method for inventory valuation as used in such audited financial statements, except for any changes required by GAAP.

1.5    **Certain Matters of Construction**.    The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.    Any pronoun used shall be deemed to cover all genders.    The section titles and list of exhibits appear as a matter of convenience only and shall not affect the interpretation of this Agreement.    All references to statutes shall include all amendments of same and implementing regulations and any amendments of same and any successor statutes and regulations; to any instrument, agreement or other documents (including any of the Loan Documents) shall include all modifications and supplements thereto and all restatements, extensions or renewals thereof to the extent such modifications, supplements, restatements, extensions or renewals of any such documents are permitted by the terms thereof and not prohibited by the terms of this Agreement; to any Person (including Borrower or Lender) shall mean and include the successors and permitted assigns of such Person; to "including" and "include" shall be understood to mean "including, without limitation"; or to the time of day shall mean the time of day on the day in question in Atlanta, Georgia, unless otherwise expressly provided in this Agreement.    A Default or an Event of Default shall be deemed to exist at all

- 21 -

times during the period commencing on the date that such Default or Event of Default first occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing.  All calculations of value shall be in Dollars, all Loans shall be funded in Dollars and all Obligations shall be repaid in Dollars.  Whenever in any provision of this Agreement Lender is authorized to take or decline to take any action (including making any determination) in the exercise of its "discretion," such provision shall be understood to mean that Lender may take or refrain to take such action in its sole and absolute discretion.  Whenever the phrase "to the best of Borrower's knowledge" or words of similar import relating to the knowledge or the awareness of Borrower are used in this Agreement or other Loan Documents, such phrase shall mean and refer to (i) the actual knowledge of a Senior Officer of Borrower or (ii) the knowledge that a Senior Officer would have obtained if he had engaged in good faith and diligent performance of his duties, including the making of such reasonably specific inquiries as may be necessary of the officers, employees or agents of Borrower and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates.

1.6    **Super Priority Nature of Obligations**.

(a)    The priority of Lender's claims against, and Liens on and in the Collateral of, Borrower shall be as set forth in the DIP Order.

(b)    All Obligations shall constitute administrative expenses of Borrower in the Chapter 11 Case, with administrative priority and senior secured status under Sections 364(c) and 364(d) of the Bankruptcy Code.  Subject to the Carve-Out, such administrative claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of Borrower, Borrower's estate, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code.  The Liens granted to Lender on and in the Collateral of Borrower, and the priorities accorded to the Obligations, shall have the priority and senior secured status afforded by Sections 364(c) and 364(d)(l) of the Bankruptcy Code (all as more fully set forth in the DIP Order) senior to all claims and interests other than the Carve-Out and Permitted Senior Liens.

(c)    Lender's Liens on and in the Collateral of Borrower and Lender's administrative claims under Sections 364(c)(l) and 364(d) of the Bankruptcy Code afforded the Obligations shall also have priority over any claims arising under Section 506(c) of the Bankruptcy Code subject and subordinate only to the Carve-Out and Permitted Senior Liens.  Except as set forth herein or in the DIP Order, no other claim having a priority superior or pari passu to that granted to Lender by the DIP Order shall be granted or approved while any Obligations under this Agreement remain outstanding.  Except for the Carve-Out, no costs or expenses of administration shall be imposed against Lender or any of its Collateral or against Prepetition Senior Lender under the Prepetition Senior Loan Agreement or its Collateral (as defined in the Prepetition Senior Loan Agreement) under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and Borrower hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105, 506(c) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Lender or against Prepetition Senior Lender under the Prepetition Senior Loan Agreement.

- 22 -

1.7    **Payment of the Obligations**.  Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Lender shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

1.8    **No Discharge; Survival of Claims**.  Borrower agrees that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in the Chapter 11 Case (and Borrower pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the superpriority administrative claim granted to Lender pursuant to the DIP Order and described in **Section 1.6** and the Liens granted to Lender pursuant to the Interim Order and Final Order and described in **Section 1.6** shall not be affected in any manner by the entry of an order confirming a plan of reorganization in the Chapter 11 Case.

1.9    **Waiver of Priming Rights**.  Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations and Prepetition Senior Obligations shall be outstanding, without limiting any terms or conditions of the DIP Order, Borrower hereby irrevocably waives any right, (a) to grant or impose, or request that the Bankruptcy Court grant or impose, under section 364 of the Bankruptcy Code or otherwise, Liens on or security interests in any of the collateral securing the Obligations or Prepetition Senior Obligations, which are pari passu with, equal to or superior to the Liens and security interests held by Lender or Prepetition Senior Lender, (b) to grant or impose, or request that the Bankruptcy Court grant or impose, under section 364 of the Bankruptcy Code or otherwise, claims or expenses against Borrower, which are pari passu with, equal to or superior to the Obligations or adequate protection claims of Prepetition Senior Lender, and (c) to use, or to request that the Bankruptcy Court authorize the use of, Cash Collateral (as defined in the DIP Order) or proceeds of Loans, except for such consensual uses expressly provided under the DIP Order .

**SECTION 2.    LOANS AND TERMS OF REPAYMENT**

2.1    **Revolver Loans**.

(a)    Subject to all of the terms and conditions in this Agreement and the DIP Order, Lender agrees to make advances to Borrower (each a "Revolver Loan") on any Business Day during the period from the Closing Date through the Business Day before the last day of the Term, not to exceed in aggregate principal amount outstanding at any time the Maximum Revolver Facility Amount, which Revolver Loans may be repaid and reborrowed in accordance with the provisions of this Agreement; provided, however, that Lender shall have no obligation to honor any request for a Revolver Loan (i) on or after the Commitment Termination Date, (ii) if at the time of the proposed funding thereof the Total Outstandings (together with the amount of any Revolver Loans for which a request is pending) exceeds, or would exceed after the funding of such Revolver Loan, the Borrowing Base, or (iii) if, upon giving effect to the amount of any Revolver Loans and Letters of Credit for which a request is pending, Borrower would not be in Substantial Compliance with the Approved Budget.  The proceeds of Revolver Loans shall be used by Borrower solely for one or more of the following purposes: (A) to make adequate protection payments with respect to the Prepetition Senior Obligations in accordance with the DIP Order; (B) to pay the Fees and transaction expenses associated with the closing of the transaction described herein; (C) to pay any of the Obligations in accordance with this Agreement; and (D) to make expenditures for other lawful purposes of Borrower to the extent such expenditures are consistent with the terms and conditions of the DIP Order and are not

- 23 -

prohibited by this Agreement or applicable law.  In no event may any Revolver Loan proceeds be used to purchase or to carry, or to reduce, retire or refinance any Debt incurred to purchase or carry, any Margin Stock or for any related purpose that violates the provisions of Regulations T, U or X of the Board of Governors of the Federal Reserve System.  Borrower will not request any Loan or Letter of Credit, and Borrower and its Subsidiaries will not use, and its and their respective directors, officers, employees and agents will not use, the proceeds of any Loan or Letter of Credit (1) in the furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (2) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, to the extent such activities, businesses or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States or in an European Union member state, (3) in any manner that would result in the violation of any Sanctions applicable to any party hereto. Except as provided in the DIP Order, no part of the proceeds of the Revolver Loans made to Borrower hereunder or Letters of Credit issued hereunder may be utilized by Borrower to finance in any way any professional fees, disbursements, costs or expenses incurred in connection with asserting, investigating, or preparing for any claims or causes of action against Prepetition Senior Lender under the Prepetition Senior Loan Agreement or the other Prepetition Senior Loan Documents or any of their counsel or advisors (including advisors to their counsel) and/or investigating, challenging or raising any defenses to the Prepetition Senior Obligations or any Liens under or in connection with the Prepetition Senior Loan Agreement or any Prepetition Senior Loan Document.  The Revolver Loans made by Lender and interest accruing thereon shall be evidenced by the records of Lender (including the Loan Account) and by the Revolver Note. The Revolver Loans shall bear interest as set forth in **Section 2.3**.

(b)     Whenever Borrower desires to obtain funding of a Revolver Loan hereunder, Borrower shall give Lender prior written notice (or telephonic notice promptly confirmed in writing) of such borrowing request, which shall be in such form as may be required by Lender (and which notice may be given electronically subject to the limitations set forth in **Section 11.1(c)** provided that an email containing a PDF copy of such notice shall be sufficient) and signed by a Senior Officer.  Such notice of borrowing shall be given by Borrower no later than 2:00 p.m. on the Business Day of the requested borrowing at the office designated by Lender from time to time, and notices received by Lender after 2:00 p.m. shall be deemed received on the next Business Day. Each such notice of borrowing (or telephonic notice thereof) shall be irrevocable and shall specify (A) the principal amount of the borrowing, (B) the date of borrowing (which shall be a Business Day), and (C) the account of Borrower to which the proceeds of such borrowing are to be disbursed.  Unless payment is otherwise timely made by Borrower, the becoming due of any amount required to be paid with respect to any of the Obligations (including any interest thereon) shall be deemed irrevocably to be a request (without any requirement for the submission of a notice of borrowing) for a Revolver Loan on the due date of and in an aggregate amount required to pay such Obligations and the proceeds of such Revolver Loan may be disbursed by way of direct payment of the relevant Obligations; provided, however, that Lender shall have no obligation to honor any deemed request for a Revolver Loan on or after the Commitment Termination Date, when an Overadvance exists or would result from such funding or when any applicable condition precedent set forth in **Section 6** hereof is not satisfied, but Lender may do so in its discretion and without regard to the existence of, and without being deemed to have waived, any Default or Event of Default and

- 24 -

regardless of whether such Revolver Loan is funded on or after the Commitment Termination Date.

(c)     If the unpaid balance of Revolver Loans outstanding at any time should cause the Total Outstandings to exceed the Borrowing Base at such time or any other applicable limit set forth in this Agreement or the DIP Order (such excess referred to as an "Overadvance"), such Revolver Loans shall nevertheless constitute Obligations that are secured by all of the Collateral and entitled to all the benefits of the Loan Documents.  All Overadvances shall be payable **on demand** and shall bear interest as provided in **Section 2.3** of this Agreement.

(d)     Borrower irrevocably authorizes Lender to disburse the proceeds of each Revolver Loan requested, or deemed to be requested, pursuant to **Section 2.1(b)**, as follows: (i) the proceeds of each Revolver Loan requested by Borrower shall be disbursed by Lender in immediately available funds, in the case of the initial borrowing, in accordance with the terms of the written disbursement letter from Borrower, and in the case of each subsequent borrowing, by wire transfer to the Disbursement Account or such other bank account as may be agreed upon by Borrower and Lender from time to time; and (ii) the proceeds of each Revolver Loan deemed requested by Borrower shall be disbursed by Lender by way of direct payment of the relevant Obligation.

2.2     **Payments**.  (a) All payments with respect to any of the Obligations shall be made to Lender on the date when due, in immediately available funds, without any offset or counterclaim. Except where evidenced by a Note or other instrument issued or made by Borrower to Lender or its order specifically containing payment provisions that are in conflict with this **Section 2.2** (in which event the conflicting provisions of said Note or other instrument shall govern and control), the Obligations shall be due and payable as follows:

(i)     Principal payable on account of the Loans shall be payable by Borrower to Lender immediately upon the earliest of (A) the receipt by Lender or Borrower of any proceeds of Inventory and Accounts arising therefrom, to the extent of such proceeds, (B) the receipt by Lender or Borrower of any proceeds of any Collateral other than Inventory and Accounts arising therefrom, to the extent of such proceeds, (C) the occurrence of an Event of Default in consequence of which the maturity and payment of the Obligations is accelerated, and (D) the Commitment Termination Date; provided, however, that if an Overadvance shall exist at any time, Borrower shall, **on demand**, repay the Obligations in accordance with **Section 2.1(c)** to the extent necessary to eliminate the Overadvance.

(ii)     Interest accrued on the principal balance of the Loans shall be due and payable on each of (A) the first day of each month, computed through the last day of the preceding month; (B) the occurrence of an Event of Default in consequence of which the maturity and payment of the Obligations is accelerated; and (C) the Commitment Termination Date.

(iii)     The balance of the Obligations requiring the payment of money, if any, shall be payable by Borrower to Lender as and when provided in the Loan

- 25 -

Documents, or, if the date of payment is otherwise not specified in the Loan Documents, **on demand**.

(b)        Whenever any payment of any of the Obligations shall be due on a day that is not a Business Day, the date for payment thereof shall be extended to the next succeeding Business Day and, if the day for any payment of principal is extended by operation of law or otherwise, interest thereon shall be payable for such extended period of time.

(c)        To the extent that Borrower makes a payment to Lender, or Lender receives payment from the proceeds of any Collateral or exercises its right of setoff, and such payment or the proceeds of such Collateral or setoff (or any part thereof) are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other Person, then to the extent of any loss of Lender, the Obligations or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment or proceeds have not been made or received and any such enforcement or setoff had not occurred.  The provisions hereof shall survive the Commitment Termination Date and Full Payment of the Obligations.

2.3      **Interest Rates**.

(a)        Except where otherwise provided in a Note or other instrument issued or made by Borrower to Lender or its order specifically containing interest rate provisions that are in conflict with this **Section 2.3** (in which event the conflicting provisions of said Note or other instrument shall govern and control), the principal balance of Revolver Loans and other Obligations outstanding from time to time shall bear interest from the respective dates such principal amounts are advanced or incurred until paid at the Governing Rate.  "Governing Rate" means, on any date, a rate per annum equal to the greater of (i) the minimum interest rate floor set forth in Item 8(c) of the Terms Schedule and (ii) the sum of (A) the Applicable Variable Rate in effect on such date plus (B) the interest margin set forth in Item 8(b) of the Terms Schedule. The Applicable Variable Rate shall be adjusted daily, with each change to the Applicable Variable Rate, with any adjustments to be effective as of the opening of business on the day that any change in the Applicable Variable Rate becomes effective.  Upon and after the occurrence of an Event of Default and during the continuation thereof, the principal balance of the Obligations shall, at the election of Lender and without the necessity of declaring the Obligations immediately due and payable and without the necessity of providing any prior notice to Borrower, bear with interest at the rate (the "Default Rate") equal to the lesser of (i) the Governing Rate in effect from time to time plus the default margin set forth in Item 8(d) of the Terms Schedule and (ii) the highest rate allowed by applicable law. The amount of any Overadvance shall bear interest at the Default Rate.   All interest chargeable under this Agreement shall be computed on the basis of the actual number of days elapsed in a year of 360 days.

(b)        The Applicable Variable Rate on the date hereof is the per annum rate set forth in Item 8(e) of the Terms Schedule, and therefore the rate of interest in effect hereunder with respect to Revolver Loans and other Obligations that bear interest at the Governing Rate, expressed in simple interest terms as of the date hereof, is the per annum rate set forth in Item 8(f) of the Terms Schedule.

- 26 -

2.4    **Fees and Reimbursement of Expenses**.

(a)    Borrower shall pay to Lender the Fees set forth in <u>Item 9(a) of the Terms Schedule</u> and shall reimburse Lender for all reasonable costs and expenses incurred in connection with examinations of Borrower's Books and appraisals of the Collateral and such other matters as Lender shall deem reasonable and appropriate, as set forth in <u>Item 9(b) of the Terms Schedule.</u>

(b)    If, at any time or times regardless of whether or not any Event of Default then exists, Lender incurs legal, consulting, advising or accounting expenses or any other costs or out-of-pocket expenses in connection with the loan transaction described herein or any of the transactions contemplated by the DIP Order, including fees and expenses incurred in connection with: (i) the negotiation and preparation of any amendment of or modification of this Agreement or any of the other Loan Documents or documents evidencing or otherwise relating to any workout, restructuring or forbearance with respect to any Loan Documents or any Obligations; (ii) the administration of this Agreement or any of the Loan Documents and the transactions contemplated hereby and thereby; (iii) any litigation, contest, dispute, suit, proceeding (including the Bankruptcy Case and any other Insolvency Proceeding) or action (whether instituted by Lender, Borrower or any other Person) in any way relating to the Collateral, this Agreement or any or the other Loan Documents or Borrower; or (iv) any attempt to enforce any rights of Lender against Borrower or any other Person which may be obligated to Lender by virtue of this Agreement or any of the other Loan Documents, including any Obligor; or (v) any consultations regarding any Loan Documents or preparation thereof, or financing extended thereunder; then all such legal, consulting, advising and accounting expenses, other reasonable costs and out-of-pocket expenses of Lender shall be charged to Borrower, shall be Obligations secured by all of the Collateral, shall be payable to Lender on demand, and shall bear interest from the date such demand is made until paid in full at the rate applicable to Revolver Loans from time to time.

(c)    All Fees shall be fully earned by Lender when due and payable and, except as otherwise set forth herein or required by applicable law, shall not be subject to rebate, refund or proration.  All Fees provided for in this **Section 2.4** are and shall be deemed to be for compensation for services and are not, and shall not be deemed to be, interest or any other charge for the use, forbearance or detention of money.

2.5    **Maximum Interest**.  Regardless of any provision contained in this Agreement or any other Loan Document, in no contingency or event whatsoever shall the aggregate of all amounts that are contracted for, charged or received by Lender pursuant to the terms of this Agreement or any other Loan Document and that are deemed interest under applicable law exceed the highest rate permissible under any applicable law, which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. No agreements, conditions, provisions or stipulations contained in any of the Loan Documents or the exercise by Lender of the right to accelerate the payment or the maturity of all or any portion of the Obligations or the exercise of any option whatsoever contained in any of the Loan Documents, or the prepayment by Borrower of any of the Obligations, or the occurrence of any contingency whatsoever, shall entitle Lender to charge or receive, in any event, interest or charges, amounts, premiums or fees deemed interest by applicable law (such interest, charges, amounts, premiums and fees referred to collectively as "<u>Interest</u>") in excess of the maximum rate allowable under

- 27 -

applicable law and in no event shall any Obligor be obligated to pay Interest exceeding such maximum rate, and all agreements, conditions, or stipulations, if any, which may in any event or contingency whatsoever operate to bind, obligate or compel any Obligor to pay Interest exceeding the maximum rate allowable under applicable law shall be without binding force or effect, at law or in equity, to the extent only of the excess of Interest over such maximum rate. If any Interest is charged or received in excess of the maximum rate allowable under applicable law ("Excess"), Borrower acknowledges and stipulates that any such charge or receipt shall be the result of an accident and bona fide error, and such Excess, to the extent received, shall be applied first to reduce the principal Obligations and the balance, if any, returned to Borrower, it being the intent of the parties hereto not to enter into a usurious or other illegal relationship. The right to accelerate the maturity of the Obligations does not include the right to accelerate any interest that has not otherwise accrued on the date of such acceleration, and Lender does not intend to collect any unearned interest in the event of any such acceleration. For the purpose of determining whether or not any Excess has been contracted for, charged or received by Lender, all Interest at any time contracted for, charged or received from Borrower in connection with any of the Loan Documents shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread in equal parts throughout the full term of the Obligations. The provisions of this Section shall be deemed to be incorporated into every Loan Document (whether or not any provision of this Section is referred to therein).

2.6    **Borrowing Base Certificate; Authorizations**.

(a)    Borrower shall deliver to Lender a fully completed Borrowing Base Certificate certified by a Senior Officer of Borrower as being true and correct, together with a perpetual Inventory report in form and detail acceptable to Lender, (1) by 1:00 p.m. on each Business Day (prepared as of the end of the preceding Business Day), (2) within two Business Days after the end of each calendar week (prepared as of the last day of such week), and (3) within 20 days after each fiscal month end (prepared as of the last day of such fiscal month). Concurrent with the delivery of each daily Borrowing Base Certificate, Borrower shall deliver a report in form and detail acceptable to Lender as to all Gordon Brothers Collections received by Borrower and Lender (whether received in the Master Account, the Collection Account or otherwise) since the delivery of the prior Borrowing Base Certificate. Concurrent with the delivery of the Borrowing Base Certificate with respect to each calendar week and fiscal month end, Borrower shall provide a written report to Lender of aggregate returns in excess of a level determined by Lender, claims and other deductions, together with sales and other reports and supporting information relating to the Inventory, as required by Lender. Lender shall have the right to review and adjust any calculations made in a Borrowing Base Certificate (i) to reflect Lender's estimate of declines in value of any of the Collateral described therein and (ii) to the extent that such calculation is not in accordance with this Agreement or does not accurately reflect the amount of the Availability Reserve. In no event shall the Borrowing Base on any date be deemed to exceed the amount of the Borrowing Base shown on the Borrowing Base Certificate last received by Lender prior to such date, as such Borrowing Base Certificate may be adjusted from time to time by Lender as authorized herein. If Borrower fails to deliver to Lender the Borrowing Base Certificate on the date when due, then notwithstanding any of the provisions contained in **Section 2.1** or in any other Loan Document to the contrary, Lender may suspend honoring any requests for Revolver Loans until a current Borrowing Base Certificate is delivered to Lender. Borrower and Lender agree that the Borrowing Base Certificate and other information required to be delivered to Lender pursuant to this Section 2.6 may be delivered

- 28 -

electronically utilizing Lender's "Stucky Netlink" system or any other electronic transmission system approved by Lender, and any such information delivered electronically shall be deemed to be delivered with the certification set forth on Item 19 of the Terms Schedule.

(b)      Lender is hereby authorized to make Loans and other extensions of credit under this Agreement based on telecopied, electronically communicated (subject to the limitations set forth in **Section 11.1(c)**) or other instructions and transaction reports received from any individual believed to be an Authorized Officer of Borrower, or, at the discretion of Lender, if such extensions of credit are necessary to satisfy any Obligations that are past due.  Although Lender shall make a reasonable effort to determine the individual's identity, Lender shall not be responsible for determining the authenticity of any such telecopied or electronically communicated instructions (subject to the limitations set forth in **Section 11.1(c)**) and Lender may act on the instructions of any individual whom Lender believes to be an Authorized Officer.

2.7      **Collections**.  Subject to the terms and conditions of the DIP Order, Borrower shall cause all payments and collections with respect to Accounts and sales of Inventory to be made as follows:

(a)      Store Collections and Master Account.  Borrower shall (i) cause all cash, checks, drafts and other payment items received directly from customers at each of Borrower's stores (including, without limitation, each of the Designated Stores) to be deposited within one Business Day of receipt to the Master Account (or directly to the Collection Account), and (ii) on each Business Day, cause all immediately available funds in in the Master Account to be transferred by wire transfer to the Collection Account; provided, that, until December 1, 2017, Borrower may continue to deposit cash, checks, drafts and other payment items received directly from customers at each of Borrower's stores to Borrower's existing local Deposit Accounts maintained with Bank of America (each, a "Local Collection Account") so long as, on each Business Day, all immediately available funds in in each Local Collection Account shall be transferred by wire transfer to the Collection Account.

(b)      Credit Card and General Collections.  Borrower shall (i) direct each credit card processor or similar service provider (any such processor or service provider herein referred to as a "Credit Card Processor") to directly remit any amounts payable by such Credit Card Processor to Borrower to the Collection Account, (ii) if required by Lender, deliver to Lender, with respect to each Credit Card Processor, a duly executed Credit Card Processor Notification and evidence of the delivery thereof to the applicable Credit Card Processor, and (iii) except as set forth in **Section 2.7(a)** above, (A) request in writing and otherwise take such reasonable steps to ensure that all other Account Debtors forward all payments on or with respect to Accounts directly to the Collection Account, and (B) deposit or cause to be deposited promptly, and in any event no later than the first Business Day after the date of receipt thereof, all cash, checks, drafts and other payment items relating to or constituting payments made in respect of any and all Collateral (whether or not otherwise delivered pursuant to such collection arrangements) into the Collection Account.

(c)      Lender's Rights in Collections.  (i) Lender shall have the right, at any time after the occurrence and during the continuance of an Event of Default, to contact directly any or all Account Debtors and Credit Card Processors to ensure that payments on or with respect to Accounts and other Collateral are directed to Lender or to the Collection Account; (ii) to expedite collection, Borrower shall endeavor in the first instance to make collection of its Accounts for Lender; (iii) all payment items received by Borrower with respect to the Accounts and other Collateral shall be held by Borrower, as trustee of an express trust, for Lender's benefit and shall not be commingled with Borrower's other

- 29 -

funds and shall be remitted to the Master Account in accordance with **Section 2.7(a)** above or deposited promptly by Borrower to the Collection Account in accordance with **Section 2.7(b)** above; (iv) all such payment items shall be the exclusive property of Lender upon the earlier of the receipt thereof by Lender or by Borrower; and (v) Borrower hereby grants to Lender a Lien upon all items and balances held in any lockbox or Deposit Account as security for the payment of the Obligations, in addition to and cumulative with the general security interest in all other assets of Borrower (including all Deposit Accounts) as provided elsewhere in this Agreement or any other Loan Document.

(d)     <u>Application of Collections</u>.  Subject to the terms of the DIP Order, all payments (including all prepayments) received by Lender or Prepetition Senior Lender shall be applied to the Prepetition Senior Obligations and Obligations as follows: <u>first</u> to all Prepetition Senior Obligations until Full Payment (as defined in the Prepetition Senior Loan Agreement) thereof (including, without limitation the cash collateralization (in accordance with the terms of the Prepetition Senior Loan Agreement) of the Prepetition Senior Letters of Credit through the deposit of collections and/or the making of Revolver Loans to Prepetition Senior Lender), and <u>second</u>, to the Obligations until Full Payment thereof.  Lender shall be entitled to apply immediately to the Obligations any wire transfer, check or other item of payment received by Lender, but interest shall continue accruing on the amount of such wire transfer, check or other payment item for the number of collection days set forth in <u>Item 11 of the Terms Schedule</u> after the date that the proceeds of such wire transfer, check or other payment item become good, collected funds.

2.8     **Loan Account; Account Stated**.  Lender shall maintain in accordance with its usual and customary practices an account or accounts (collectively, the "<u>Loan Account</u>") evidencing the Loans, including the amount of principal and interest payable to Lender from time to time hereunder. Borrower hereby authorizes Lender, from time to time without prior notice to Borrower, to charge all interest and all other fees payable hereunder, under any of the other Loan Documents, under the Prepetition Senior Loan Agreement or under of the other Prepetition Senior Loan Documents (in each case, as and when due and payable), all costs and expenses payable hereunder, under any of the other Loan Documents, under the Prepetition Senior Loan Agreement or under of the other Prepetition Senior Loan Documents (in each case, as and when accrued or incurred), all Lender Expenses hereunder and under the Prepetition Senior Loan Agreement (as and when accrued or incurred), all Bank Product Obligations, and all fees and costs provided for in the Terms Schedule (as and when accrued or incurred), and all other payment obligations as and when due and payable under any Loan Document to the Loan Account, which amounts shall thereupon constitute Revolver Loans hereunder and, shall accrue interest at the rate then applicable to Revolver Loans. Any failure of Lender to make an entry in the Loan Account, or any error in doing so, shall not limit or otherwise affect the obligation of Borrower under the Loan Documents to pay any amount owing to Lender or under the Prepetition Senior Loan Documents to pay any amount owing to Prepetition Senior Lender.  The entries made in the Loan Account shall constitute rebuttably presumptive evidence of the information contained therein, provided that if a copy of information contained in the Loan Account is provided to Borrower or any other Obligor, or Borrower or any other Obligor inspects the Loan Account, at any time or from time to time, then the information contained in the Loan Account shall be conclusive and binding on such Person for all purposes, absent manifest error, unless such Person notifies Lender in writing within 30 days after such Person's receipt of such copy or such Person's inspection of the Loan Account of its intention to dispute the information contained therein.

- 30 -

2.9     **Application of Payments and Collections**.  Borrower irrevocably waives the right to direct the application of any and all payments and collections at any time or times hereafter received by Lender from or on behalf of Borrower, and Borrower does hereby irrevocably agree that, subject to the terms and conditions of the DIP Order, Lender shall have the continuing exclusive right to apply and reapply any and all such payments and collections received at any time or times hereafter by Lender or its agent against the Obligations and Prepetition Senior Obligations in such manner as Lender may elect in its discretion. If as the result of collections of Borrower's Accounts or other proceeds of Collateral a credit balance exists in the Loan Account, such credit balance shall not accrue interest in favor of Borrower, but shall be available to Borrower at any time or times for so long as no Default or Event of Default exists.

2.10    **All Loans to Constitute One Obligation**.  All Loans shall constitute one general obligation of Borrower and shall be secured by Lender's Liens upon all of the Collateral.

2.11    **Capital Requirements**.  If either (a) the introduction of, or any Change in Law or the interpretation thereof or (b) compliance with any guideline or request from any central bank or comparable agency or other governmental authority (whether or not having the force of law), has or would have the effect of reducing the rate of return on the capital of, or has affected or would affect the amount of capital required to be maintained by, Lender as a consequence of, or with reference to, the credit facility or commitments hereunder, below the rate which Lender or such other corporation could have achieved but for such introduction, change or compliance, then within 5 Business Days after written demand by Lender, Borrower shall pay Lender from time to time as specified by Lender additional amounts sufficient to compensate Lender or such other corporation for such reduction.  A certificate as to such amounts submitted to Borrower by Lender shall, in the absence of manifest error, be presumed to be correct and binding for all purposes.

2.12    **Increased Costs**.  If any Change in Law shall: (a) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, Lender, (b) subject Lender to any Tax with respect to any Loan or Loan Document or change the basis of taxation of payments to Lender in respect thereof, or (c) impose on Lender any other condition, cost or expense affecting any Loan or Loan Document, and the result thereof shall be to increase the cost to Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by Lender hereunder (whether of principal, interest or any other amount) then, upon request by Lender, Borrower will pay to Lender such additional amount or amounts as will compensate Lender for such additional costs incurred or reduction suffered.

2.13    **No Prepayment Penalty**.  Borrower shall have the right to prepay the Obligations under this Agreement in full at any time without the imposition of any prepayment fee or penalty; provided, that, the foregoing shall not in any manner limit or waive the prepayment or early termination fees payable under or with respect to the Prepetition Senior Loan Agreement.

**SECTION 3.    TERM AND TERMINATION**

3.1     **Term**.  All Commitments hereunder shall, subject to the satisfaction (or waiver by Lender in its discretion) of each condition set forth in **Section 6** hereof, become effective on the date of this Agreement and shall expire at the close of business on the day specified in Item 12 of the Terms Schedule (the "Term"), unless sooner terminated as provided in **Section 3.2** hereof.

- 31 -

3.2    **Termination**.  At any time that an Event of Default exists, Lender may terminate the Commitments without notice.  Upon at least 90 days prior written notice to Lender, Borrower may, at its option, terminate the Commitments; provided, however, no such termination of the Commitments by Borrower shall be effective until Full Payment of the Obligations and Full Payment (as defined in the Prepetition Senior Loan Agreement) of the Prepetition Senior Obligations.  Any notice of termination given by Borrower shall be irrevocable unless Lender otherwise agrees in writing. Borrower may elect to terminate the Commitments in their entirety only.  No section of this Agreement may be terminated by Borrower singly.

3.3    **Effect of Termination**.  On the effective date of any termination of the Commitments, all Obligations shall become immediately due and payable without notice to or demand upon Borrower and shall be paid to Lender in cash or by a wire transfer of immediately available funds.  No termination of the Commitments shall in any way affect any of Lender's rights or remedies hereunder or under any other Loan Document, any of Borrower's duties or obligations hereunder (including its obligation to pay all of the Obligations on the effective date of such termination) or any other Loan Document, or any Liens, claims or other rights held by Lender or Prepetition Senior Lender.

**SECTION 4.    CREATION OF SECURITY INTEREST**

4.1    **Grant of Security Interest**.  Without limitation of any of the provisions of the DIP Order, to secure the prompt payment and performance of all of the Obligations, Borrower hereby grants to Lender a continuing security interest in and Lien upon all personal property of Borrower, including all of the following property and interests in property of Borrower, whether now owned or existing or hereafter created, acquired or arising and wheresoever located: all Accounts; all Goods, including all Inventory and Equipment (including Fixtures); all Instruments; all Chattel Paper; all Documents (including bills of lading); all General Intangibles, including Intellectual Property, Payment Intangibles and Software; all Deposit Accounts; all Investment Property (including all Securities and Securities Accounts, but excluding any Securities that constitute Margin Stock unless otherwise expressly provided in any Security Document and, in the case of Securities in a Subsidiary organized under a law other than a state of the United States or the District of Columbia, limited to 65% of such Securities); all Letter-of-Credit Rights; all Supporting Obligations; all Commercial Tort Claims (including those that are disclosed in the Disclosure Schedule; all monies now or at any time or times hereafter in the possession or under the control of Lender; all Accessions to, substitutions for and replacements, Products and cash and non-cash Proceeds of any of the foregoing, including Proceeds of and unearned premiums with respect to insurance policies insuring any of the Collateral and claims against any Person for loss of, damage to or destruction of any of the Collateral; and all of Borrower's Books.

4.2    **Other Collateral; Setoff**.  Lender shall have, in addition to all of the Liens, rights and claims granted pursuant to the DIP Order and the Liens upon the property of Borrower described in **Section 4.1**, Liens upon all other property of Borrower and each other Person as described in the Security Documents.  All sums at any time standing to Borrower's credit balance on Lender's books and all of Borrower's property at any time in Lender's possession, or upon or in which Lender has a lien or security interest shall be security for all Obligations. In addition to and not in limitation of the above, with respect to any deposits of property of Borrower in Lender's possession or control, now or in the future, Lender shall have the right to set off all or any portion thereof, at any time, against any Obligations, even if unmatured, without prior notice or demand to Borrower.

- 32 -

4.3 **Continuation of Security Interest**. Notwithstanding termination of this Agreement or of Lender's commitments to extend Loans hereunder, until Full Payment of all Obligations, Lender shall retain its security interest in all presently owned and hereafter arising or acquired Collateral, and Borrower shall continue to immediately deliver to Lender, in kind, all collections received respecting the Accounts and other Collateral.

4.4 **Perfection of Security Interest**. Without limitation of any of the provisions of the DIP Order relating to the automatic perfection of Lender's Liens, promptly after Lender's request therefor, Borrower shall execute or cause to be executed and delivered to Lender such instruments, assignments, title certificates or other documents as are necessary under the UCC or other applicable law (including any motor vehicle certificate of title act) to perfect (or continue the perfection of) Lender's Liens upon the Collateral and shall take such other action as may be requested by Lender to give effect to or carry out the intent and purposes of this Agreement. Unless prohibited by applicable law, Borrower hereby irrevocably authorizes Lender to execute and file in any jurisdiction any financing statement or amendment thereto on Borrower's behalf, including financing statements that indicate the Collateral (i) as all assets or all personal property of Borrower or words to similar effect or (ii) as being of equal or lesser scope, or with greater or lesser detail, than as set forth in this **Section 4**. Borrower also hereby ratifies its authorization for Lender to have filed in any jurisdiction any like financing statement or amendment thereto if filed prior to the date hereof.

4.5 **Access to Borrower's Books and Computer Records**. Lender and its agents shall have the right to conduct inspections, verifications (of accounts and otherwise), appraisals, and field examinations of the Collateral and such Person's other property and books and records at any time or times hereafter, during Borrower's usual business hours, or during the usual business hours of any Obligor having control over any Collateral or the records of Borrower, and with such frequency as Lender may request from time to time, with (a) when no Default or Event of Default is in existence, reasonable notice thereof and (b) when any Default or Event of Default is in existence, no notice thereof, and Borrower shall provide Lender access to any such information stored online, together with access to any computer programs used by Borrower to compile, analyze or otherwise manipulate such information. Borrower shall pay the cost of such inspections, verifications, appraisals, and field examinations in accordance with Item 9(b) of the Terms Schedule.

4.6 **Power of Attorney**. Borrower hereby irrevocably makes, constitutes and appoints Lender (and any of Lender's officers, employees or agents designated by Lender) as Borrower's true and lawful attorney with power:

(a) To sign the name of Borrower on any of the documents described in **Section 4.4** or on any other similar documents that need to be executed, recorded and/or filed in order to perfect or continue perfected Lender's Liens upon any of the Collateral, if Borrower fails or refuses to comply, or delays in complying, with its undertakings contained in **Section 4.4**;

(b) To endorse Borrower's name on any checks, notes, acceptances, money orders, drafts or other forms of payment or security that may come into Lender's possession;

(c) To sign Borrower's name on drafts against Account Debtors, on schedules and assignments of Accounts, on notices to Account Debtors and on any invoice or bill of lading relating to any Account;

- 33 -

(d)    To do all things necessary to carry out this Agreement; and

(e)    After the occurrence of an Event of Default, to notify the post office authorities to change the address for delivery of Borrower's mail to any address designated by Lender, to receive and open all mail addressed to Borrower, and to retain all mail relating to the Collateral.

The appointment of Lender as Borrower's attorney and each and every one of Lender's rights and powers, being coupled with an interest, are irrevocable so long as any Accounts in which Lender has a security interest remain unpaid or unfinished, as the case may be, and until all of the Obligations have been fully paid and performed.  Borrower ratifies and approves all acts of the attorney.  Neither Lender nor its employees, officers, or agents shall be liable for any acts or omissions or for any error in judgment or mistake of fact or law made in good faith except for gross negligence or willful misconduct.

## SECTION 5.    COLLATERAL ADMINISTRATION

5.1    **General Provisions**.

(a)    All tangible items of Collateral, other than Inventory in transit, shall at all times be kept by Borrower at one or more of the business locations of Borrower set forth in the Disclosure Schedule and shall not be moved therefrom, without the prior written approval of Lender, except that in the absence of an Event of Default and acceleration of the maturity of the Obligations in consequence thereof, Borrower may (i) make sales or other dispositions of any Collateral to the extent not prohibited by **Section 9.2** hereof and (ii) move Inventory or Equipment or any record relating to any Collateral to a location in the United States other than those shown on the Disclosure Schedule so long as Borrower has given Lender at least 30 days prior written notice of such new location.  Notwithstanding anything to the contrary contained in this Agreement, Borrower shall not be permitted to keep, store or otherwise maintain any Collateral at any location, unless (i) Borrower is the owner or lessee of such location, or (ii) the Collateral consists of Inventory placed with a warehouseman, bailee or processor, and Lender has received from such warehouseman, bailee or processor an acceptable Lien Waiver (or, if Lender agrees in its discretion, Lender has established an Availability Reserve with respect to such warehouseman, bailee or processor).

(b)    Borrower shall maintain and pay for insurance upon all Collateral (including personal property and marine cargo coverage), wherever located, covering casualty, hazard, public liability, theft, malicious mischief, and such other risks in such amounts and with such insurance companies as are reasonably satisfactory to Lender.  The Disclosure Schedule describes all property insurance of Borrower in effect on the date hereof.  All proceeds payable under each such policy shall be payable to Lender for application to the Obligations.  Borrower shall deliver the originals or certified copies of such policies to Lender with satisfactory lender's loss payable endorsements reasonably satisfactory to Lender and shall name Lender as sole lender's loss payee, assignee or additional insured, as appropriate.  Each policy of insurance or endorsement shall contain a clause requiring the insurer to give not less than 30 days prior written notice to Lender in the event of cancellation of the policy for any reason whatsoever and a clause specifying that the interest of Lender shall not be impaired or invalidated by any act or neglect of Borrower or the owner of the property or by the occupation of the premises for purposes more hazardous than are permitted by said policy.  If Borrower fails to provide and pay

- 34 -

for such insurance, Lender may, at its option, but shall not be required to, procure the same and charge Borrower therefor.  Borrower agrees to deliver to Lender, promptly as rendered, true copies of all reports made in any reporting forms to insurance companies.  For so long as no Event of Default exists, Borrower shall have the right to settle, adjust and compromise any claim with respect to any insurance maintained by Borrower, _provided_ that all proceeds thereof are applied in the manner specified in this Agreement, and Lender agrees promptly to provide any necessary endorsement to any checks or drafts issued in payment of any such claim.  At any time that an Event of Default exists, Lender shall be authorized to settle, adjust and compromise such claims and Lender shall have all rights and remedies with respect to such policies of insurance as are provided for in this Agreement and the other Loan Documents.

(c)     All expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping any Collateral, all Taxes imposed under any applicable law on any of the Collateral or in respect of the sale thereof, and all other payments required to be made by Lender to any Person to realize upon any Collateral shall be borne and paid by Borrower.  Lender shall not be liable or responsible in any way for the safekeeping of any of the Collateral or for any loss or damage thereto (except for reasonable care in the custody thereof while any Collateral is in Lender's actual possession) or for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency, or other Person whomsoever, but the same shall be at Borrower' sole risk.

5.2     **Administration of Accounts**.

(a)     Borrower shall keep accurate and complete records of its Accounts and all payments and collections thereon and shall submit to Lender on such periodic basis as Lender shall request a sales and collections report for the preceding period, in form reasonably satisfactory to Lender.  Borrower shall also provide to Lender, on or before the second Business Day of each calendar week and the  20th day of each month end, a detailed aged trial balance of all Accounts existing as of the last day of the preceding week or month (as applicable), specifying the names, addresses, face value, dates of invoices and due dates for each Account Debtor obligated on an Account so listed ("Schedule of Accounts"), and, upon Lender's request therefor, copies of proof of delivery and a copy of all documents, including repayment histories and present status reports relating to the Accounts so scheduled and such other matters and information relating to the status of then existing Accounts as Lender shall reasonably request. Borrower shall deliver to Lender, promptly upon Lender's request, copies of invoices or invoice registers related to all of its Accounts.

(b)     If Borrower grants any discounts, allowances or credits that are not shown on the face of the invoice for the Account involved, Borrower shall report such discounts, allowances or credits, as the case may be to Lender as part of the next required Schedule of Accounts.  If any amounts due and owing in excess of $10,000 are in dispute between Borrower and any Account Debtor, or if any returns are made in excess of $25,000 with respect to any Accounts owing from an Account Debtor, Borrower shall provide Lender with written notice thereof at the time of submission of the next Schedule of Accounts, explaining in detail the reason for the dispute or return, all claims related thereto and the amount in controversy.

(c)     If an Account of Borrower includes a charge for any Taxes payable to any governmental authority, Lender is authorized, in its discretion, to pay the amount thereof to the

- 35 -

proper governmental authority for the account of Borrower and to charge Borrower therefor, <u>provided</u> that Lender shall be not liable for any Taxes that may be due by Borrower.

(d)      Whether or not a Default or an Event of Default exists, Lender shall have the right at any time, in the name of Lender, any designee of Lender or Borrower to verify the validity, amount or any other matter relating to any Accounts of Borrower by mail, telephone, telegraph or otherwise.  Borrower shall cooperate fully with Lender in an effort to facilitate and promptly conclude any such verification process.  Lender retains the right at all times that a Default or an Event of Default exists to notify Account Debtors of Borrower that Accounts have been assigned to Lender and to collect Accounts directly in its own name and to charge to Borrower the collection costs and expenses incurred by Lender, including reasonable attorneys' fees.

5.3      **Administration of Inventory**.

(a)      Borrower shall keep accurate and complete records of its Inventory (including records showing the cost thereof and daily withdrawals therefrom and additions thereto) and shall furnish Lender, on or before the second Business Day of each calendar week and the 20th day of each month, inventory reports respecting such Inventory in form and detail satisfactory to Lender as of the last day of the preceding week or month (as applicable), or at such other times as Lender may reasonably request.  Borrower shall, at its own expense, conduct a physical inventory no less frequently than annually (and on a more frequent basis if requested by Lender when an Event of Default exists) and periodic cycle counts consistent with Borrower's historical practices, shall provide reasonable written notice thereof to Lender and allow Lender or its agents to witness such physical inventory and shall provide to Lender a report based on each such physical inventory and cycle count promptly after completion thereof, together with such supporting information as Lender shall reasonably request.  Lender may participate in and observe each physical count or inventory, which participation shall be at Borrower' expense at any time that an Event of Default exists.

(b)      Borrower shall not return any of its Inventory to a supplier or vendor thereof, or any other Person, whether for cash, credit against future purchases or then existing payables, or otherwise, unless (i) such return is in the Ordinary Course of Business of Borrower and such Person; (ii) Lender consents in writing.

(c)      Borrower shall not acquire or accept any Inventory on consignment or approval (other than acquisitions of Inventory on a consignment basis in the Ordinary Course of Business, provided that the amount of consigned Inventory held by Borrower at any time shall not exceed $10,000) and will use its best efforts to insure that all Inventory that is produced in the United States of America will be produced in accordance with the Fair Labor Standards Act.  Borrower shall not sell or deliver any Inventory to any customer on approval or any other basis upon which the customer has a right to return or obligates Borrower to repurchase such Inventory.

(d)      Borrower shall produce, use, store and maintain all Inventory with all reasonable care and caution in accordance with applicable standards of any insurance and in conformity with applicable law (including the requirements of the Fair Labor Standards Act) and will maintain current rent payments (within applicable grace periods provided for in leases) at all locations at which any Inventory is maintained or stored.

- 36 -

5.4     **Administration of Equipment**.

(a)     Borrower shall keep accurate records itemizing and describing the kind, type, quality, quantity and cost of its Equipment and all dispositions made in accordance with **Section 5.4(b)**, and shall furnish Lender with a current schedule containing the foregoing information on at least an annual basis and more often if requested by Lender.  Promptly after request therefor by Lender, Borrower shall deliver to Lender all evidence of ownership, if any, of any of the Equipment.

(b)     Borrower shall not sell, lease or otherwise dispose of or transfer any of the Equipment or any part thereof, whether in a single transaction or a series of related transactions, without the prior written consent of Lender other than dispositions of Equipment with the approval of the Bankruptcy Court and Lender.

(c)     The Equipment is in good operating condition and repair, and all necessary replacements of and repairs thereto shall be made so that the value and operating efficiency of the Equipment shall be maintained and preserved, reasonable wear and tear excepted. Borrower shall ensure that the Equipment shall be mechanically and structurally sound, capable of performing the functions for which the Equipment was originally designed, in accordance with the manufacturer's published and recommended specifications.  Borrower will not permit any of the Equipment to become affixed to any real property leased to Borrower so that an interest arises therein under applicable law unless the landlord of such real property has executed a Lien Waiver in favor of and in form acceptable to Lender, and Borrower will not permit any of the Equipment to become an accession to any personal property that is subject to a Lien unless the Lien is a Permitted Lien.

**SECTION 6.     CONDITIONS PRECEDENT**

6.1     **Initial Conditions Precedent**.  Lender shall not be obligated to fund any Loan or make any other extension of credit hereunder unless each of the following conditions has been satisfied, in the sole opinion of Lender:

(a)     Borrower and each other Person that is to be a party to any Loan Document shall have executed and delivered each such Loan Document, all in form and substance satisfactory to Lender.

(b)     Borrower shall cause to be delivered to Lender the following documents, each in form and substance satisfactory to Lender:

(i)     A copy of the Organic Documents of Borrower and each Subsidiary;

(ii)     An incumbency certificate and certified resolutions of the board of directors (or other appropriate governing body) of Borrower and each other Person executing any Loan Documents, signed by a Senior Officer of Borrower or such other Person, authorizing the execution, delivery and performance of the Loan Documents;

- 37 -

(iii)     A satisfactory Borrowing Base Certificate duly completed by Borrower, together with all supporting statements, schedules and reconciliations as required by Lender;

(v)     Evidence of insurance, satisfactory to Lender and otherwise meeting the requirements of the Loan Documents; and

(viii)     All additional opinions, documents, certificates and other assurances that Lender or its counsel may require.

(c)     Lender shall have received, by virtue of UCC searches and/or other Lien searches, evidence satisfactory to it that there are no existing Liens with respect to any of the Collateral other than Permitted Liens.

(d)     Lender shall have determined, based upon its review of a current Borrowing Base Certificate submitted to it, that after giving effect to the initial Loans and any other extensions of credit to be made by Lender to Borrower (including Loans in an amount sufficient to satisfy any Debt that is secured by a Lien and is to be satisfied at closing) and the payment of all Fees to Lender as required by this Agreement and the reimbursement of all expenses pursuant to the Loan Documents, Borrower will have Availability of not less than the amount shown in Item 14 of the Terms Schedule.

(e)     Borrower shall have satisfied such additional conditions precedent as are set forth in Item 15 of the Terms Schedule.

6.2     **Ongoing Conditions Precedent**.  Lender shall not be obligated to fund any Loan or make any other extension of credit hereunder unless and until each of the following conditions is satisfied, in the sole opinion of Lender, and each request by Borrower for an extension of credit hereunder shall be deemed to be a representation that all such conditions have been satisfied:

(a)     Lender shall have received from Borrower a notice of borrowing (which notice shall include detailed information as to the proposed use of each advance for particular expenditures permitted in accordance with the Approved Budget) and such other information (including Borrowing Base Certificates) (which notice may be provided electronically subject to the limitations set forth in **Section 11.1(c)**), as Lender may request in connection with the funding of any Loan or other extension of credit.

(b)     No Default or Event of Default shall exist or be caused by the funding of the applicable Loan or other extension of credit.

(c)     All representations and warranties made by any Obligor in any of the Loan Documents, or otherwise in writing to Lender, shall be true and correct in all material respects with the same effect as though the representations and warranties have been made on and as of the date of the funding of the requested Loan or other extension of credit.

(d)     No event shall have occurred and no conditions shall exist which could reasonably be expected to have a Material Adverse Effect.

- 38 -

(e)     No Overadvance exists at the time of, or would result from funding, the proposed Loan or other extension of credit.

(f)     Borrower shall be in Substantial Compliance with the Approved Budget immediately before and immediately after (on a pro forma basis) giving effect to the proposed Loan or other extension of credit.

(g)     The DIP Order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated (other than, as to the Interim Order, by the Final Order) absent the prior written consent of Lender.

## SECTION 7.    BORROWER'S REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into this Agreement and to make Loans or otherwise extend credit as provided in any of the Loan Documents, Borrower makes the following representations and warranties, all of which shall survive the execution and delivery of the Loan Documents, and, unless otherwise expressly provided herein, such representations and warranties shall be deemed made as of the date hereof and as of the date of each request for a Loan or other extension of credit:

7.1     **Existence and Rights; Predecessors**.  Each of Borrower and its Subsidiaries is an entity as described in the Disclosure Schedule, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and as duly qualified or licensed to transact businesses in all places where the failure to be so qualified could reasonably be expected to have a Material Adverse Effect; has the right and power to enter into, and discharge all of its obligations under the Loan Documents, each of which constitutes a legal, valid and binding obligation of such Person, enforceable against it and accordance with their respective terms; and has the power, authority, rights and franchises to own its property and to carry on its business as presently conducted.  Except as provided in the Disclosure Schedule, neither Borrower nor any Subsidiary has changed its legal status or the jurisdiction in which it is organized within the 5-year period immediately preceding the date of this Agreement; and, during the 5 year period prior to the date of this Agreement, Borrower has not been a party to any merger, consolidation or acquisition of all or substantially all of the assets or equity interests of any other Person.

7.2     **Authority**.  The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower and each other Person (other than Lender) executing any Loan Document have been duly authorized by all necessary actions of such Person, and do not and will not violate any provision of law, or any writ, order or decree of any court or governmental authority or agency or any provision of the Organic Documents of such Person or any Material Agreement to which such Person is a party, and do not and will not, with the passage of time or the giving of notice, result in a breach of, or constitute a default or require any consent under, or result in the creation of any Lien (other than Lender's Lien) upon any property or assets of such Person pursuant to, any law, regulation, instrument or agreement to which any such Person is a party or by which any such Person or its properties may be subject, bound or affected.

7.3     **Litigation**.  Except as set forth in the Disclosure Schedule, there are no actions or proceedings pending, or to the knowledge of Borrower threatened, against any Obligor before any court or administrative agency, and Borrower has no knowledge or belief or any pending, threatened or imminent, governmental investigations or claims, complaints, actions or prosecutions involving

- 39 -

Borrower or any Obligor. Neither Borrower nor any Obligor is in default with respect to any order, writ, injunction, decree or demand of any court or any governmental or regulatory authority.

7.4    **Financial Condition**.  All financial statements and information relating to Borrower and its Subsidiaries which have been delivered by Borrower to Lender have been prepared in accordance with GAAP, unless otherwise stated therein, and fairly and reasonably present Borrower's and its Subsidiaries' financial condition. There has been no material adverse change in the financial condition of Borrower or any Subsidiary since the Petition Date. Borrower has no knowledge of any liabilities, contingent or otherwise, which are not reflected in such financial statements and information, and neither Borrower nor any Subsidiary has entered into any special commitments or contracts which are not reflected in such financial statements or information which may have a materially adverse effect upon Borrower's financial condition, operations or business as now conducted.

7.5    **Taxes**.  Each of Borrower and its Subsidiaries has filed all federal, state and other tax returns that are required to be filed, and have paid all Taxes shown on said returns as well as all Taxes (including withholding, FICA and ad valorem Taxes) shown on all assessments received by it to the extent that such Taxes are not being Properly Contested; and neither Borrower nor any Subsidiary is subject to any federal, state or local tax Liens and has not received any notice of deficiency or other official notice to pay any Taxes.

7.6    **Title to Assets**.  Borrower and its Subsidiaries have good title to their assets (including those shown or included in its financial statements and Borrowing Base Certificates) and the same are not subject to any Liens other than Permitted Liens.

7.7    **Material Agreements**.  Neither Borrower nor any Subsidiary is a party to any agreement or instrument adversely affecting its business, assets, operations or condition (financial or otherwise), nor is any such Person in default under any Material Agreement.

7.8    **Intellectual Property**.  Borrower possesses all necessary trademarks, trade names, copyrights, patents, patent rights and licenses to conduct its business as now operated, without any known conflict with the rights of others, including those described in the Disclosure Schedule.

7.9    **Compliance With Laws**.  Each of Borrower and its Subsidiaries has duly complied with, and its properties, business operations and leaseholds are in compliance in all material respects with, the provisions of all applicable laws, including all Environmental Laws, OSHA and the Fair Labor Standards Act.

7.10    **Business and Collateral Locations**.  Borrower's chief executive office, principal place of business, office where Borrower's tangible business records are located and all other places of business of Borrower (including places of business where any tangible items of Collateral are kept or maintained) are all correctly and completely described in the Disclosure Schedule; and except as otherwise described in the Disclosure Schedule, none of the Collateral is in the possession of any Person other than Borrower and all tangible items of the Collateral are located in, on or about the business premises of Borrower described in the Disclosure Schedule.

7.11    **Accounts and Other Payment Rights**.  Each Document, Instrument, Chattel Paper or other writing evidencing or relating to any Account or Payment Intangible of Borrower (a) is genuine and enforceable in accordance with its terms except for such limits thereon arising from bankruptcy or

- 40 -

similar laws relating to creditors' rights; (b) is not subject to any reduction or discount (other than as stated in the invoice applicable thereto and disclosed to Lender), defense, setoff, claim or counterclaim of a material nature against Borrower except as to which Borrower has notified Lender in writing; (c) is not subject to any other circumstances that would impair the validity, enforceability or amount of such Collateral except as to which Borrower has notified Lender in writing; (d) in the case of Accounts, arises from a *bona fide* sale of goods or delivery of services in the Ordinary Course of Business and in accordance with the terms and conditions of any applicable purchase contract or agreement; (e) is free of all Liens other than Permitted Liens; and (f) is for a liquidated amount maturing as stated in the applicable invoice or other document pertaining thereto.

7.12    **Deposit Accounts**.  As of the Closing Date, neither Borrower nor any of its Subsidiaries has any Deposit Accounts other than those listed in the Disclosure Schedule.

7.13    **Brokers**.  There has been no mortgage or loan broker in connection with this loan transaction, and Borrower agrees to indemnify and hold the Lender harmless from any claim of compensation payable to any mortgage or loan broker in connection with this loan transaction.

7.14    **ERISA**.  Except as otherwise set forth in the Disclosure Schedule, neither Borrower nor any of its Subsidiaries has any Plan.  No Plan established or maintained by Borrower (including any Multiemployer Plan to which Borrower contributes) which is subject to Part 3 of Subtitle B or Title I of ERISA had a material accumulated funding deficiency (as such term is defined in Section 302 of ERISA) as of the last day of the most recent fiscal year of such Plan ended prior to the date hereof, or would have had an accumulated funding deficiency (as so defined) on such day if such year were the first year of such Plan to which Part 3 of Subtitle B of Title I of ERISA applied, and no material liability to the Pension Benefit Guaranty Corporation, has been or is expected by Borrower to be, incurred with respect to any such Plan by Borrower.  Borrower is not required to contribute to and is not contributing to a Multiemployer Plan.  Borrower has no withdrawal liability to any Multiemployer Plan, nor has any reportable event referred to in Section 4043(b) of ERISA occurred that has resulted or could result in liability of Borrower; and Borrower does not have any reason to believe that any other event has occurred that has resulted or could result in liability of Borrower as set forth above.

7.15    **Labor Relations**.  Except as described in the Disclosure Schedule, neither Borrower nor any of its Subsidiaries is a party to or bound by any collective bargaining agreement, management agreement or consulting agreement.  On the date hereof, there are no material grievances, disputes or controversies with any union or any other organization of Borrower's or any Subsidiary's employees, or, to Borrower's knowledge, any threats of strikes, work stoppages or any asserted pending demands for collective bargaining by any union or organization.

7.16    **Anti-Terrorism Laws**.  Neither Borrower nor any of its Affiliates is in violation of any Anti-Terrorism Law; engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law; or is a Sanctioned Person.  Neither Borrower nor any of its Affiliates conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person or deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224.

7.17    **Not a Regulated Entity**.  Neither Borrower nor any Subsidiary is (a) an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment

company" each as defined in the Investment Company Act of 1940 or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any public utilities code or any other applicable law relating to its authority to incur Debt.

7.18    **No Insider Status**.  Borrower is not, and no Person having "control" (as that term is defined in 12 U.S.C. §375(b)(5) or in regulations promulgated pursuant thereto) of Borrower is, an "executive officer," "director," or "principal shareholder" (as those terms are defined in 12 U.S.C. §375(b) or in regulations promulgated pursuant thereto) of Lender.

7.19    **Capital Structure**.  As of the date hereof, the Disclosure Schedule sets forth (a) the correct name of each Subsidiary, its jurisdiction or organization and the percentage of its Equity Interests owned by each Person, (b) the identity of each Person owning any of the Equity Interests of Borrower and each Subsidiary, and (c) the number of authorized and issued Equity Interests (and treasury shares) of Borrower and each Subsidiary.  Borrower has good title to all of the Equity Interests it purports to own in each of its Subsidiaries, free and clear of any Lien other than Permitted Liens. Except as set forth in the Disclosure Schedule, since the date of the last audited financial statements of Borrower, Borrower has not made, or caused or obligated itself to make, any Distributions.  There are no outstanding options to purchase, or any rights or warrants to subscribe for, or any commitments or agreements to issue or sell, or any Equity Interests or obligations convertible into, or any powers of attorney relating to, Equity Interests of Borrower or any Subsidiary.  There are no outstanding agreements or instruments binding upon the holders of Borrower's Equity Interests relating to the ownership of such Equity Interests.

7.20    **Disclosure Schedule**.  All of the representations and warranties in the Disclosure Schedule are true and correct on the date of this Agreement and will remain true after the date of this Agreement; provided that Borrower may update the Disclosure Schedule from time to time by delivering written notice thereof to Lender so long as any changes set forth in any such update are not otherwise violative of this Agreement.

7.21    **Anti-Corruption Laws and Sanctions**.  Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and Borrower, its Subsidiaries and their respective directors, officers and employees and, to the knowledge of Borrower, their agents, are in compliance with Anti-Corruption Laws and applicable Sanctions.  None of (a) Borrower, any Subsidiary or any of their respective directors, officers or employees, or (b) to the knowledge of Borrower, any agent of Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facilities established hereby, is a Sanctioned Person.  No borrowing or Letter of Credit, use of proceeds or other transactions contemplated herein will violate Anti-Corruption Laws or applicable Sanctions.

7.22    **Administrative Priority; Lien Priority; DIP Order**.

(a)    The Obligations constitute an allowed administrative expense in the Chapter 11 Case, having priority in payment over all other administrative expenses and claims against Borrower now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code.

- 42 -

(b)      Pursuant to Section 364(c)(2) of the Bankruptcy Code and the DIP Order, all Obligations are secured by a perfected Lien on the Collateral, subject to no other Lien (except as provided in the DIP Order) in any of the Collateral which is not encumbered by a Prior Lien (as defined in the DIP Order).

(c)      Pursuant to Section 364(d)(1) of the Bankruptcy Code and the DIP Order, all of the Obligations are secured by (1) a perfected Lien on the Collateral which came into existence or was acquired by Borrower on or after the Petition Date, subject to no other Lien except as provided in the DIP Order, and (2) a perfected Lien on the Collateral which came into existence or was acquired by Borrower prior to the Petition Date, subject to no other Lien except as provided in the DIP Order.

(d)      On the Closing Date, the Interim Order is, and from and after the entry of the Final Order, the Final Order will be, in full force and effect, and neither the Interim Order nor the Final Order has been reversed, vacated, modified, amended or stayed, except for modifications and amendments that are reasonably acceptable to Lender and are not stayed in any respect.

7.23    **Approved Budget**.  Borrower has furnished the Approved Budget to Lender.  The Approved Budget is reasonable and was prepared on a reasonable basis and in good faith by Borrower and is based on reasonable assumptions based on the best information available to Borrower, and Borrower is not aware of any facts or information that would lead any of them to believe that the Approved Budget is incorrect or misleading in any material respect.

7.24    **Appointment of Trustee or Examiner; Liquidation**.  No order has been entered or is pending in the Chapter 11 Case (a) for the appointment of a Chapter 11 trustee, (b) for the appointment of an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Sections 1104(d) and 1106(b) of the Bankruptcy Code or (c) to convert the Chapter 11 Case to a Chapter 7 case or to dismiss the Chapter 11 Case.

7.25    **Chapter 11 Case**.  The Chapter 11 Case was commenced by the filing of a voluntary petition on the Petition Date.  The Chapter 11 Case has not been dismissed.  The motion for approval of this Agreement was proper and sufficient pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules of the Bankruptcy Court.

## SECTION 8.    AFFIRMATIVE COVENANTS

At all times prior to the Commitment Termination Date and Full Payment of all of the Obligations and the Full Payment (as defined in the Prepetition Senior Loan Agreement) of all of the Prepetition Senior Obligations, Borrower covenants that it shall, and shall cause each of its Subsidiaries to:

8.1    **Notices**.  Notify Lender, promptly after Borrower obtaining knowledge thereof, of (i) any Default or Event of Default; (ii) the commencement of any action, suit or other proceeding against, or any demand for arbitration with respect to, any Obligor; (iii) the occurrence or existence of any default (or claimed default) by an Obligor under any agreement relating to Debt for Money Borrowed; or (iv) any other event or transaction which has or could reasonably be expected to have a Material Adverse Effect.

8.2    **Rights and Facilities**.  Maintain and preserve all rights (including all rights related to Intellectual Property), franchises and other authority adequate for the conduct of its business; maintain

its properties, equipment and facilities in good order and repair; conduct its business in an orderly manner without voluntary interruption; and maintain and preserve its existence.

8.3 **Insurance**.  In addition to the insurance required by the Loan Documents with respect to the Collateral, maintain with its current insurers or with other financially sound and reputable insurers having a rating of at least A- or better by *Best's Ratings*, a publication of A.M. Best Company, (i) insurance with respect to its properties and business against such casualties and contingencies of such type (including product liability, workers' compensation, larceny, embezzlement or other criminal misappropriation insurance) and in such amounts and with such coverages, limits and deductibles as is customary in the business of Borrower or such Subsidiary (ii) marine cargo coverage, in such amounts and with such coverages, limits and deductibles as is customary in the business of Borrower or such Subsidiary, and (iii) business interruption insurance, in an amount approved by Lender.

8.4 **Visits and Inspections**.  Permit representatives of Lender from time to time, as often as may be reasonably requested, but only during normal business hours and (except when a Default or Event of Default exists) upon reasonable prior notice to Borrower to: visit and inspect properties of Borrower and each of its Subsidiaries; inspect, audit and make extracts from Borrower's and each Subsidiary's books and records; and discuss with its officers, employees and independent accountants Borrower's and each Subsidiary's business, financial conditions, business prospects and results of operations.

8.5 **Taxes; Other Charges**.  Pay and discharge all Taxes (and other charges the non-payment of which could result in a Lien on Borrower's assets) in accordance with the requirements of the Bankruptcy Code to the extent permitted under the DIP Order, and, if requested by Lender, shall provide proof of payment or, in the case of withholding or other employee taxes, deposit of payments required by applicable law.  Borrower shall, and shall cause each of its Subsidiaries to, deliver to Lender copies of all Tax returns (and amendments thereto) promptly after the filing thereof.

8.6 **Financial Statements and Other Information**.  (a) Keep adequate records and books of account with respect to its business activities in which proper entries are made in accordance with GAAP reflecting all its financial transactions; and cause to be prepared and furnished to Lender the following (all to be prepared in accordance with GAAP applied on a consistent basis):

(i) [RESERVED];

(ii) [RESERVED];

(iii) [RESERVED];

(iv) [RESERVED];

(v) [RESERVED];

(vi) together with the delivery of each monthly Borrowing Base Certificate, or more frequently if requested by Lender during any period that a Default or Event of Default exists, Borrower shall cause to be prepared and furnished to Lender a Compliance Certificate;

- 44 -

(vii)    together with the delivery of each monthly Borrowing Base Certificate, a reconciliation to the Borrowing Base Certificates previously delivered for the calendar month then ending;

(viii)    on or before Friday of each calendar week,  a 13 week cash flow forecast in form and detail acceptable to Lender;

(viii)    on or before the second Business Day of each calendar week, a report in form and detail satisfactory to Lender showing (A) sales, actual cash collections and disbursements, in each case on a weekly and cumulative basis through the immediately preceding Friday, (B) all expenditures made by Borrower, in each case on a weekly and cumulative basis through the immediately preceding Friday, (C) the Revolver Loan and Letters of Credit usage, the outstanding amount of Prepetition Senior Obligations and the Total Outstandings as of the immediately preceding Friday, (D) Availability as of the immediately preceding Friday, and (E) a comparison to the same periods in the Approved Budget; and

(ix)    on or before the second Business Day of each calendar week, a report in form and detail reasonably satisfactory to Lender which fully and accurately describes all of Borrower's administrative costs incurred but not yet paid in connection with the Chapter 11 Case which description shall include, at a minimum: (A) the date each such administrative expense was incurred, (B) the amount of each such administrative expense, and (C) the creditor's name with respect to each such administrative expense.

(b)    Promptly after the sending or filing thereof, Borrower shall also provide to Lender copies of any annual report to be filed in accordance with ERISA in connection with each Plan and such other data and information (financial and otherwise) as Lender, from time to time, may reasonably request, bearing upon or related to the Collateral or Borrower's and any of its Subsidiaries' financial condition or results of operations.

(c)    Borrower shall also provide to Lender, promptly following Lender's request, (i) a listing of all of Borrower's trade payables as of the last Business Day of such month, specifying the name of and balance due each trade creditor, (ii) a monthly detailed trade payable aging, and (iii) a monthly detailed held checks aging, each in form acceptable to Lender.

8.7    **Compliance with Laws**.  Comply with all laws relating to Borrower, the conducts of its business and the ownership and use of its Assets, including ERISA, all Environmental Laws, OSHA, the Fair Labor Standards Act and all other laws regarding the collection, payment and deposit of the Taxes, and shall obtain and keep in full force and effect any and all governmental and regulatory approvals necessary to the ownership of its properties or the conduct of its business and shall promptly report any non-compliance to Lender.

8.8    **Reimbursement for Lender Expenses**.    Upon the demand of Lender, promptly reimburse Lender for all sums expended by Lender which constitute Lender Expenses, and Borrower hereby authorizes and approves all Loans by Lender in payment of items constituting Lender Expenses.

- 45 -

8.9    **Financial Covenants**.  Comply with all of the Financial Covenants set forth in <u>Item 16 of the Terms Schedule</u>.

8.10    **After-Acquired Collateral**.  Borrower shall promptly notify Lender in writing if, after the Closing Date, any Obligor obtains any interest in any Collateral consisting of Deposit Accounts, Chattel Paper, Documents, Instruments, Intellectual Property, Investment Property or Letter-of-Credit Rights and, upon Lender's request (but without limitation of any of the provisions of the DIP Order relating to the automatic perfection of Lender's Liens), shall promptly take such actions as Lender deems appropriate to further evidence or effect Lender's duly perfected, first priority Lien upon such Collateral, including obtaining any appropriate possession, control agreement or Lien Waiver.  If any Collateral is in the possession of a third party, at Lender's request, Obligors shall obtain an acknowledgment that such third party holds the Collateral for the benefit of Lender.

8.11    **California Real Estate; Real Estate Milestones**.  Borrower: (a) shall, at all times prior to the satisfaction of all of the Real Estate Milestones, cause the California Real Estate to be subject to the California DOT, pursuant to which Lender shall have a perfected Lien in the California Real Estate that is not subject to any Liens other than Permitted Real Estate Liens; and (b) shall, and shall cause each Real Estate Owner to, (i) deliver to Lender, promptly (and in any case within two Business Days after Lender's request), all such information, agreements and other items as Lender may request from time to time in connection with the Real Estate Milestones, and (ii) notify Lender, promptly (and in any case within two Business Days) after Borrower or any Real Estate Owner obtaining knowledge thereof, of any Real Estate Milestones Default.

8.12    **Advisor**.  Borrower (a) shall cause the Advisor to be retained at all times with a scope of duties reasonably acceptable to Lender, (b) shall not reduce the scope of the Advisors' primary duties without the prior written consent of Lender, and (c) acknowledge and agree that Lender shall have access to the Advisor.

8.13    **Chapter 11 Pleadings**.  Promptly (and in any event within two days) after filing thereof, Borrower will deliver, or cause to be delivered, to Lender copies of any pleadings, motions, applications, financial information and other papers and documents filed by Borrower in the Chapter 11 Case, which papers and documents would not otherwise be served on Lender and Lender's counsel pursuant to the Bankruptcy Court's appropriate procedures.

8.14    **Committee Reports**.  Promptly (and in any event within two days) after sending thereof, Borrower will deliver, or cause to be delivered, to Lender copies of all written reports given by or on behalf of Borrower to any Committee.

8.15    **Deposit Accounts.**  No later than December 1, 2017, (a) cause all Local Collection Accounts to be closed, (b) cause all other Deposit Accounts which Borrower utilizes in connection with its business, including, without limitation, the Master Account, to be owned by, and maintained in the name of, Borrower, and (c) deliver to Lender evidence reasonably satisfactory to Lender as to the satisfaction of the foregoing requirements.

- 46 -

**SECTION 9.      NEGATIVE COVENANTS**

At all times prior to the Commitment Termination Date and Full Payment of the Obligations and the Full Payment (as defined in the Prepetition Senior Loan Agreement) of all of the Prepetition Senior Obligations, Borrower shall not and shall not permit any Subsidiary to:

9.1      **Fundamental Changes**.  Merge, reorganize, or consolidate with any Person, or liquidate, wind up its affairs or dissolve itself, in each case whether in a single transaction or in a series of related transactions; change its name or conduct business under any fictitious name except for any fictitious name shown in the Disclosure Statement; change its federal employer identification number, organizational identification number or state of organization; relocate its chief executive office or principal place of business without having first provided 30 days prior written notice to Lender; or amend, modify or otherwise change any of the terms or provisions in any of its Organic Documents, except for changes that do not affect in any way Borrower's authority to enter into and perform the Loan Documents to which it is a party, the perfection of Lender's Liens in any of the Collateral, or Borrower's authority or obligation to perform and pay the Obligations; or amend, modify or otherwise change any of the terms or provisions of any Material Agreement.

9.2      **Conduct of Business**.  Sell, lease or otherwise dispose of any of its assets (including any Collateral) other than a Permitted Asset Disposition; suspend or otherwise discontinue all or any material part of its business operations; engage in any business other than the business engaged in by it on the Closing Date and any business or activities that are substantially similar, related or incidental thereto; create, incur or suffer to exist any Lien on any of its assets other than Permitted Liens; make any loans, advances or other transfers of assets to any other Person, except sales of Inventory in the Ordinary Course of Business, any transfers of assets approved by the Bankruptcy Court and Lender, and transfers permitted by **Section 9.9**; guarantee or otherwise become in any way liable for any Debt of another Person; or create, incur, assume or suffer to exist any Debt except the Obligations, Subordinated Debt existing on the Closing Date or incurred after the Closing Date on terms acceptable to Lender, the Comvest Loans, accounts payable to trade creditors that are not aged more than 90 days from billing date or more than 30 days from the due date to the extent incurred in the Ordinary Course of Business and paid within such time period (unless the same are being Properly Contested), and Debt for accrued payroll, Taxes and other operating expenses incurred in the Ordinary Course of Business so long as payment thereof is not past due and payable unless, in the case of Taxes, such Taxes are being Properly Contested.

9.3      **Agreements with Account Debtors**.  Grant any discount, credit or allowance to any Account Debtor or accept any return of merchandise without Lender's consent, except, when no Event of Default exists, in the Ordinary Course of Business.  Lender may, after an Event of Default, settle or adjust disputes and claims directly with Account Debtors for amounts and upon terms which Lender considers advisable, and in such cases, Lender will credit Borrower's account with only the net amounts received by Lender in payment of such disputed Accounts, after deducting all Lender Expenses incurred or expended in connection therewith.

9.4      **Distributions**.  (a) Declare or make any, or (b) create or suffer to exist any encumbrance or restriction on the ability of a Subsidiary to make any Upstream Payment, except for restrictions under the Loan Documents or under applicable law.

- 47 -

ATL 22501749v1

9.5     **Subordinated Debt**.  Amend or modify any provision of any instrument or agreement evidencing or securing any Subordinated Debt; or pay any principal of or interest on any Subordinated Debt other than in accordance with the applicable subordination agreement.

9.6     **ERISA**.  Withdraw from participation in, permit the termination or partial termination of, or permit the occurrence of any other event with respect to any Plan maintained for the benefit of Borrower's employees under circumstances that could result in liability to the Pension Benefit Guaranty Corporation, or any of its successors or assigns, or to any entity which provides funds for such Plan; or withdraw from any Multiemployer Plan described in Section 4001(a)(3) of ERISA which covers Borrower's employees.

9.7     **Certain Tax and Accounting Matters**.  File or consent to the filing of any consolidated income tax return with any Person other than a Subsidiary; make any significant change in accounting treatment or reporting practices, except as may be required by GAAP; or establish a fiscal year different from the Fiscal Year.

9.8     **Subsidiaries**.  Form or acquire any Subsidiary.

9.9     **Restricted Investments**.  Make or have any Restricted Investments.  As used herein, the term "Restricted Investment" shall mean any acquisition of property by Borrower or any of its Subsidiaries in exchange for cash or other property, whether in the form of an acquisition of Equity Interests or Debt, or the purchase or acquisition by Borrower or any Subsidiary of any other property, or a loan, advance, capital contribution or subscription, except acquisitions of the following: (i) fixed assets to be used in the Ordinary Course of Business of Borrower or any Subsidiary so long as the acquisition costs thereof constitute Capital Expenditures, do not violate any financial covenant contained in this Agreement, and are permitted under the Approved Budget; (ii) Inventory to be held for sale in the Ordinary Course of Business, to the extent permitted under the Approved Budget; (iii) current assets arising from the sale of Inventory in the Ordinary Course of Business by Borrower or any Subsidiary; and (iv) marketable direct obligations issued or unconditionally guaranteed by the United States government and backed by the full faith and credit of the United States government having maturities of not more than 12 months from the date of acquisition, and domestic certificates of deposit and time deposit having maturities of not more than 12 months from the date of acquisition, to the extent they are not subject to rights of offset in favor of any Person other than Lender.

9.10     **Deposit Accounts**.

(a)     Open or maintain any Deposit Account, other than (i) Deposit Accounts (including the Collection Account) with Lender, (ii) the Master Account (which shall be subject to a Deposit Account Control Agreement at all times on and after December 1, 2017), (iii) until they are closed in accordance with **Section 8.15**, Local Collection Accounts listed in the Disclosure Schedule used exclusively in accordance with **Section 2.7**, and (iv) such other Deposit Accounts listed in the Disclosure Schedule (or opened after the Closing Date with the written consent of Lender) as shall be necessary for payroll, petty cash, local trade payables and other occasional needs of Borrower.

(b)     Open or maintain any Deposit Account that is not subject to a Deposit Account Control Agreement, other than (i) Deposit Accounts (including the Collection Account) maintained with Lender for which Lender elects not to require a Deposit Account Control Agreement, (ii) until they are closed in accordance with **Section 8.15**, Local Collection Accounts listed in the Disclosure Schedule used

exclusively in accordance with **Section 2.7** (iii) Deposit Accounts used exclusively for payroll and other employee benefits, and (iv) other Deposit Accounts used exclusively for petty cash, local trade payables and other occasional needs of Borrower so long as the available funds in each such other Deposit Account, individually, does not exceed $10,000 at any time, and the available funds in all such other Deposit Accounts, collectively, does not exceed $50,000 at any time.

9.11    **Affiliate Transactions**.  Shall not enter into or be party to any transaction with an Affiliate of an Obligor, except (a) transactions contemplated by the Loan Documents, (b) payment of reasonable compensation to officers and employees for services actually rendered, (c) payment of customary directors' fees and indemnities, (d) transactions with Affiliates that were consummated prior to the Closing Date and fully disclosed in the Disclosure Schedule, and (e) transactions with Affiliates in the Ordinary Course of Business, upon fair and reasonable terms fully disclosed to Lender and no less favorable than would be obtained in comparable arm's length transaction with a non-Affiliate.

9.12    **Restrictions on Payment of Certain Debt**.  In addition to the restrictions contained in **Section 9.5**, make any payments (whether voluntary or mandatory, or a prepayment, redemption, retirement, defeasance or acquisition) with respect to any Money Borrowed (other than the Obligations) prior to its due date under the agreements evidencing such Debt as in effect on the Closing Date (or as amended thereafter with the prior written consent of Lender), other than as permitted by the DIP Order and the Approved Budget.

9.13    **Hedging Agreements**.  Enter into any hedging agreement, except to hedge risks arising in the Ordinary Course of Business and not for speculative purposes.

**SECTION 10.    EVENTS OF DEFAULTS; REMEDIES**

10.1    **Events of Default**.  The occurrence or existence of any one or more of the following events or conditions shall constitute an Event of Default:

(a)    Borrower shall fail to pay any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise);

(b)    Any Obligor fails or neglects to perform, keep or observe any term, provision, condition, covenant or agreement, in this Agreement, in any of the other Loan Documents, or in any other present or future agreement between Borrower and Lender;

(c)    Any representation, statement, report, or certificate made or delivered by or on behalf of Borrower or any Obligor to Lender, including any Borrowing Base Certificate or any accounts payable aging is not true and correct, in any material respect, when made or furnished;

(d)    There is a material impairment of the prospect of repayment of all or any portion of the Obligations owing to Lender or a material impairment of the value or priority of any of Lender's Liens upon the Collateral;

(e)    An Insolvency Proceeding is commenced by an Obligor (other than Borrower) or is commenced against an Obligor (other than Borrower) and is not dismissed within 30 days thereafter;

- 49 -

(f)     Borrower is enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business affairs or Borrower voluntarily ceases to continue to conduct all or any material part of its business;

(g)     One or more judgments or orders for the payment of money shall be entered against any Obligor (other than Borrower) for an amount in excess of $25,000 in aggregate for all such judgments outstanding at any time and (i) there shall have been commenced by any creditor an enforcement proceeding upon such judgment or order, (ii) there shall be any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect, or (iii) such judgment or order results in the creation or imposition of a Lien upon any of the Collateral that is not a Permitted Lien;

(h)     There shall occur any default or event of default on the part of any Obligor (other than Borrower) under any agreement, document or instrument to which such Obligor is a party or by which such Obligor or any of its properties is bound, creating or relating to (i) any Bank Product Obligations or (ii) the Comvest Loans or any other Debt (other than the Obligations) in excess of $25,000, if the payment or maturity of such Debt may be accelerated in consequence of such default or event of default or if demand for payment of such Debt may be made;

(i)     Any individual Guarantor dies;

(j)     Any Guarantor shall revoke or attempt to revoke the Guaranty signed by such Guarantor, shall repudiate or dispute such Guarantor's liability thereunder, shall be in default under the terms thereof, or shall fail to confirm in writing, promptly after receipt of Lender's written request therefor, such Guarantor's ongoing liability under the Guaranty in accordance with the terms thereof;

(k)     A Reportable Event (consisting of any of the events set forth in Section 4043(b) of ERISA) shall occur which Lender, in its reasonable discretion, shall determine constitutes grounds for the termination by the Pension Benefit Guaranty Corporation of any Plan or the appointment by the appropriate United States district court of a trustee for any Plan, or if any Plan shall be terminated or any such trustee shall be requested or appointed, or if Borrower or any other Obligor is in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan resulting from Borrower's, or such other Obligor's complete or partial withdrawal from such Multiemployer Plan;

(l)     There shall occur any event or condition that has, or could be reasonably expected to have, a Material Adverse Effect;

(m)     Any Obligor shall challenge in any action, suit or other proceeding the validity or enforceability of any of the Loan Documents, the legality or enforceability of any of the Obligations or the perfection or priority of any Lien granted to Lender, or any of the Loan Documents ceases to be in full force or effect for any reason other than a full or partial waiver or release by Lender in accordance with the terms thereof;

(n)     Any instruction or agreement regarding the Master Account, the Collection Account or any lockbox related thereto is amended or terminated without the written consent

- 50 -

of Lender, or collections of Account Debtors or Credit Card Processors are not remitted to the Master Account, the Collection Account or any lockbox related thereto in accordance with the terms of this Agreement, or all available funds are not transferred from the Master Account to the Collection Account as and when required under this Agreement;

(o)    A Change of Control shall occur;

(p)    There shall occur any event set forth in Item 17 of the Terms Schedule;

(q)    A Real Estate Milestones Default shall occur; or

(r)    A Bankruptcy Default shall occur.

10.2    **Remedies**.

(a)    If any Default or Event of Default has occurred and is continuing, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, suspend the Commitments with respect to additional Revolver Loans and/or the issuance of additional Letters of Credit, whereupon any additional Revolver Loans and additional Letters of Credit shall be made or incurred in Lender's sole discretion so long as such Default or Event of Default is continuing.  If any Default or Event of Default has occurred and is continuing, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, except as otherwise expressly provided herein, increase the rate of interest applicable to the Revolver Loans and the Letter of Credit fees to the Default Rate applicable under **Section 2.3(a)**.

(b)    Subject to the terms of the DIP Order, and without limiting Borrower's rights thereunder, if any Event of Default has occurred and is continuing, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court: (i) terminate the Commitments with respect to further Revolver Loans or the issuance of further Letters of Credit; (ii) reduce the Commitment from time to time, (iii) declare all or any portion of the Obligations, including all or any portion of any Loan to be forthwith due and payable, and direct Borrower to provide (and Borrower agrees that upon receipt of such notice Borrower will provide) cash collateral to Lender (in an amount and manner satisfactory to Lender) to be held as security for Borrower's reimbursement obligations for drawings that may subsequently occur under issued and outstanding Letters of Credit, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrower, (iv) direct Borrower or any other Obligor to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to Lender pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct Borrower or any other Obligor to assume and assign any lease or executory contract included in the Collateral to Lender's designees in accordance with and subject to Section 365 of the Bankruptcy Code), (v) enter onto the premises of Borrower or any other Obligor in connection with an orderly liquidation of the Collateral, or (vi) exercise any rights and remedies provided to Prepetition Senior Lender under the Prepetition Senior Loan Documents or at law or equity, including all remedies provided under the UCC.  Pursuant to the terms of the DIP Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to Lender to exercise its remedies under this Agreement and the Loan Documents, without further notice, application or motion to, hearing before, or order from, the Bankruptcy Court, provided, however,

- 51 -

notwithstanding anything to the contrary contained herein, Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of Borrower in the Collateral only upon (A) the prior written notice required under the DIP Order to Borrower and counsel approved by the Bankruptcy Court for any Committee and hearing by the Bankruptcy Court, and (B) the Bankruptcy Court's approval of such liquidation of, or foreclosure on, any interest of Borrower in the Collateral, in each case, to the extent and as set forth in the DIP Order.  Upon the occurrence of an Event of Default and the exercise by Lender of its rights and remedies under this Agreement, the other Loan Documents, and the DIP Order, Borrower shall assist Lender in effecting a sale or other disposition of the Collateral upon such terms as are acceptable to the Lender.

(c)      Subject to the terms of the DIP Order, upon the occurrence and during the continuation of an Event of Default, Lender may (by written notice to Borrower), in addition to any other rights or remedies provided for hereunder or under any other Loan Document or by applicable law, exercise all other rights and remedies available to Lender under the Loan Documents, under applicable law, or in equity.

(d)      Lender is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (exercisable without payment of royalty or other compensation to any Obligor or any other Person) any or all of Borrower's Intellectual Property and all Borrower's computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, and packaging materials, and any property of a similar nature, in advertising for sale, marketing, selling and collecting and in completing the manufacturing of any Collateral, and Borrower's rights under all licenses and franchise agreements shall inure to Lender's benefit.  The proceeds realized from any sale or other disposition of any Collateral shall be applied, after allowing 2 Business Days for collection, first to the Full Payment of the Prepetition Senior Obligations, next to any Lender Expenses, and then to the remainder of the Obligations in such order of application as Lender may elect in its discretion, with Borrower and each of the Obligors remaining liable for any deficiency.

10.3    **Cumulative Rights; No Waiver**.  All covenants, conditions, warranties, guaranties, indemnities and other undertakings of Borrower in the DIP Order, this Agreement or any of the other Loan Documents shall be deemed cumulative, and Lender shall have all other rights and remedies not inconsistent herewith as provided under the UCC or other applicable law.  No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Default or Event of Default on one occasion shall be deemed to be a continuing waiver or applicable to any other occasion.  No waiver or course of dealing shall be established by the failure or delay of Lender to require strict performance by Borrower with any term of the Loan Documents, or to exercise any rights or remedies with respect to the Collateral or otherwise.

**SECTION 11.    GENERAL PROVISIONS**

11.1    **Notices and Communications**.

(a)      Except as otherwise provided in **Section 2.1**, all notices, requests and other communications to or upon a party hereto shall be in writing (including facsimile transmission or similar writing) and shall be given to such party at the address or facsimile number for such party in Item 18 of the Terms Schedule or at such other address or facsimile number as such party may hereafter specify for the purpose by notice to Lender and Borrower in accordance with the provisions of this Section.

- 52 -

(b)      Except as otherwise provided in this Section, each such notice, request or other communication shall be effective (i) if given by facsimile transmission, when transmitted to the facsimile number specified herein for the noticed party and confirmation of receipt is received, (ii) if given by mail, 3 Business Days after such communication is deposited in the U.S. Mail, with first-class postage pre-paid, addressed to the noticed party at the address specified herein, (iii) if given by personal delivery, when duly delivered with receipt acknowledged in writing by the noticed party, or (iv) if given via electronic means, only at the time and to the extent provided in **Section 11.1(c)**.  In no event shall a voicemail message be effective as a notice, communication or confirmation under any of the Loan Documents.  Notwithstanding the foregoing, no notice to or upon Lender pursuant to **Sections 2.1**, **3.2** or **8.1** shall be effective until after actually received by the individual to whose attention at Lender such notice is required to be sent.  Any written notice, request or demand that is not sent in conformity with the provisions hereof shall nevertheless be effective on the date that such notice, request or demand is actually received by the individual to whose attention at the noticed party such notice, request or demand is required to be sent.

(c)      With respect to electronic communications:

(i)      Borrower authorizes Lender to extend Loans, issue Letters of Credit, effect selections of interest rates, and transfer funds to or on behalf of Borrower based on instructions sent by electronic mail.  Borrower shall confirm each such request by prompt delivery to Lender of a notice of borrowing or LC Request, if applicable, but if the foregoing differs in any material respect from the action taken by Lender, the records of Lender shall govern.

(ii)      Electronic mail and internet websites may be used for delivery of financial statements, Borrowing Base Certificates and other information required by **Section 8.6** (other than notices), administrative matters and distribution of Loan Documents for execution, pursuant to procedures approved by Lender or as otherwise determined by Lender.  Anything herein to the contrary notwithstanding, except as expressly provided **Section 11.1(c)(i)**, notices delivered by electronic mail may not be used as effective notice under the Loan Documents.

(iii)      Unless Lender otherwise requires communications sent to an electronic mail address of Lender shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail, or other written acknowledgement); provided that if such communication is not sent during the normal business hours of the recipient, such communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(iv)      Lender shall not have any liability for any loss suffered by any Obligor as a result of Lender's acting upon its understanding of electronic mail requests or instructions from a Person believed in good faith by Lender to be a Person authorized to give such requests or instructions on an Obligor's behalf.  Each Obligor shall indemnify, defend and hold harmless each Indemnitee from any claims arising from any electronic communication purportedly given by or on behalf of an Obligor.

(v)      Lender may, in its discretion and upon notice to Borrower (A) cease or suspend any actual or implied obligation it may have to act based on such electronic communications and (B) thereafter, disregard any such electronic communications.

- 53 -

11.2    **Performance of Borrower's Obligations; Sharing of Information; Publicity**.

(a)    If Borrower shall fail to discharge any covenant, duty or obligation hereunder or under any of the other Loan Documents, Lender may, in its discretion at any time or from time to time, for Borrower's account and at Borrower's expense, pay any amount or do any act required of Borrower hereunder or under any of the other Loan Documents or otherwise lawfully requested by Lender to (i) enforce any of the Loan Documents or collect any of the Obligations, (ii) preserve, protect, insure or maintain or realize upon any of the Collateral, or (iii) preserve, defend, protect or maintain the validity or priority of Lender's Liens in any of the Collateral, including the payment of any judgment against Borrower, any insurance premium, any Bank Product Obligations, any warehouse charge, any finishing or processing charge, any landlord claim, any other Lien upon or with respect to any of the Collateral (whether or not a Permitted Lien).  All payments that Lender may make under this Section and all out-of-pocket costs and expenses (including Lender's Expenses) that Lender pays or incurs in connection with any action taken by it hereunder shall be reimbursed to Lender by Borrower on demand with interest from the date such payment is made or such costs or expenses are incurred to the date of payment thereof at the Default Rate. Any payment made or other action taken by Lender under this Section shall be without prejudice to any right to assert, and without waiver of, an Event of Default hereunder and without prejudice to Lender's right to proceed thereafter as provided herein or in any of the other Loan Documents.

(b)    Borrower hereby authorizes Lender to use the name "Shiekh Shoes," together with variants of such names and related logotypes and the amount of the transaction in advertising that promotes Lender and the business transaction between Borrower and Lender. Lender will submit to the Borrower any type of written or pictorial advertisement for Borrower approval before Lender releases to the general public.  Neither Lender nor any of its subsidiaries, Affiliates, officers, employees and advertising agents shall have any liability to Borrower arising out of or related to the reasonable exercise of the rights hereby granted to Lender.

11.3    **Effectiveness, Successors and Assigns**.  This Agreement shall be binding and deemed effective when executed by Borrower and accepted by Lender in the State of Georgia, and when so accepted, shall bind and inure to the benefit of the respective successors and assigns of each of the parties; _provided_ that Borrower may not assign this Agreement or any rights hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely void. No consent to an assignment by Lender shall release Borrower from its Obligations to Lender. Lender may assign this Agreement and its rights and duties hereunder. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in, Lender's rights and benefits hereunder.

11.4    **General Indemnity; Release**.

(a)    Borrower hereby agrees to indemnify and defend the Indemnitees against and to hold the Indemnitees harmless from and against any Indemnified Claim that may be instituted or asserted against or incurred by any of the Indemnitees and that either (i) arises out of or relates to this Agreement or any of the other Loan Documents (including any transactions entered into pursuant to any of the Loan Documents, Lender's Liens upon the Collateral, or the performance by Lender of Lender's duties or the exercise of any of Lender's rights or remedies under this Agreement or any of the other

- 54 -

Loan Documents), or (ii) results from Borrower's failure to observe, perform or discharge any of Borrower's covenants or duties hereunder. Without limiting the generality of the foregoing, this indemnity shall extend to any Indemnified Claims instituted or asserted against or incurred by any of the Indemnitees by any Person under any Environmental Laws or similar laws by reason of Borrower's or any other Person's failure to comply with laws applicable to solid or hazardous waste materials or other toxic substances. Additionally, if any Taxes (excluding Taxes imposed upon or measured solely by the net income of Lender, but including any intangibles tax, stamp tax, recording tax or franchise tax) shall be payable by Lender or any Obligor on account of the execution or delivery of this Agreement, or the execution, delivery, issuance or recording of any of the other Loan Documents or any financing statement or other perfection document relating thereto, or the creation or repayment of any of the Obligations hereunder, by reason of any applicable law now or hereafter in effect, Borrower shall pay (or shall promptly reimburse Lender for the payment of) all such Taxes, including any interest and penalties thereon, and will indemnify and hold Indemnitees harmless from and against all liability in connection therewith. The foregoing indemnities shall not apply to Indemnified Claims incurred by any Indemnitee as a direct and proximate result of its own gross negligence or willful misconduct

(b)     Borrower hereby acknowledges effective upon entry of the DIP Order, that Borrower has no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of Borrower's liability to repay Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from Lender or Prepetition Senior Lender. Borrower, on behalf of its bankruptcy estate, and on behalf of all its successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through it, (collectively, the "Releasing Parties"), hereby fully, finally and forever release and discharge Lender and Prepetition Senior Lender, and all of Lender's and Prepetition Senior Lender's past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Prepetition Senior Loan Agreement, the Interim Order, the Final Order and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing .

11.5     **Section Headings; Interpretation**. Section headings and section numbers have been set forth herein for convenience only. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. This Agreement has been reviewed by all parties and shall be construed and interpreted

- 55 -

according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties hereto.

11.6   **Indulgences Not Waivers**.   Lender's failure at any time or times to require strict performance by Borrower of any provision of this Agreement or any of the other Loan Documents shall not waive, affect or otherwise diminish any right of Lender thereafter to demand strict compliance and to performance with such provision.

11.7   **Severability; Survival**.   Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.   Notwithstanding anything to the contrary contained in this Agreement or any of the other Loan Documents, the obligations of Obligors with respect to each indemnity given by it in any of the Loan Documents in favor of each Indemnitee shall survive the termination of the Commitments and the Full Payment of the Obligations.

11.8   **Modification; Entire Agreement**.   This Agreement cannot be changed or terminated orally.  This Agreement and the other Loan Documents represent the entire understanding of the parties with respect to the subject matter hereof and thereof and supersede all prior agreements, understandings, negotiations and inducements regarding the same subject matter.

11.9   **Counterparts; Facsimile Signatures**.   This Agreement and any amendments hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.   Counterparts of each of the Loan Documents may be delivered by facsimile or electronic mail and the effectiveness of each such Loan Document and signatures thereon shall, subject to applicable law, have the same force and effect as manually signed originals and shall be binding on all parties thereto.

11.10   **Governing Law**.   This Agreement shall be deemed to have been made in the State of Georgia, and shall be governed by and construed in accordance with the internal laws (without regard to conflict of law provisions) of the State of Georgia.

11.11   **Consent to Forum**.   Borrower and Lender consent to the exclusive jurisdiction of the Bankruptcy Court in any action, suit or other proceeding arising out of or relating to this Agreement or any of the other Loan Documents.  Subject to the terms of the DIP Order, nothing herein shall limit the right of Lender to bring proceedings against Borrower in the courts of any other jurisdiction where Collateral may be located.  Nothing in this Agreement shall be deemed or operate to affect the right of Lender to serve legal process in any other manner permitted by law or to preclude the enforcement by Lender of any judgment or order obtained in such forum or the taking of any action under this Agreement to enforce same in any other appropriate forum or jurisdiction.

11.12   **WAIVER OF CERTAIN RIGHTS.**

(A)   **GENERAL.**      TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWER HEREBY KNOWINGLY, INTENTIONALLY AND INTELLIGENTLY WAIVES (WITH THE BENEFIT OF ADVICE OF LEGAL COUNSEL OF ITS OWN CHOOSING): (I) THE RIGHT TO TRIAL BY JURY (WHICH LENDER HEREBY ALSO WAIVES) IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF, RELATED TO OR BASED IN ANY WAY UPON ANY OF THE LOAN DOCUMENTS, THE

- 56 -

OBLIGATIONS OR THE COLLATERAL; (II) SUBJECT TO THE TERMS OF THE DIP ORDER, PRESENTMENT, PROTEST, DEFAULT, NON-PAYMENT, MATURITY, RELEASE, COMPROMISE, SETTLEMENT, EXTENSION OR RENEWAL OF ANY OR ALL COMMERCIAL PAPER, ACCOUNTS, CONTRACT RIGHTS, DOCUMENTS, INSTRUMENTS, CHATTEL PAPER AND GUARANTIES AT ANY TIME HELD BY LENDER ON WHICH BORROWER MAY IN ANY WAY BE LIABLE AND HEREBY RATIFIES AND CONFIRMS WHATEVER LENDER MAY DO IN THIS REGARD; (III) SUBJECT TO THE TERMS OF THE DIP ORDER, NOTICE PRIOR TO TAKING POSSESSION OR CONTROL OF ANY OF THE COLLATERAL AND THE REQUIREMENT TO DEPOSIT OR POST ANY BOND OR OTHER SECURITY WHICH MIGHT OTHERWISE BE REQUIRED BY ANY COURT OR APPLICABLE LAW PRIOR TO ALLOWING LENDER TO EXERCISE ANY OF LENDER'S SELF-HELP OR JUDICIAL REMEDIES TO OBTAIN POSSESSION OF ANY OF THE COLLATERAL; (IV) THE BENEFIT OF ALL VALUATION, APPRAISEMENT AND EXEMPTION LAW; (V) ANY CLAIM AGAINST LENDER ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF ANY OF THE LOAN DOCUMENTS, ANY TRANSACTION THEREUNDER, THE ENFORCEMENT OF ANY REMEDIES BY LENDER OR THE USE OF ANY PROCEEDS OF ANY LOANS; (VI) NOTICE OF ACCEPTANCE OF THIS AGREEMENT BY LENDER; AND (VII) THE RIGHT TO ASSERT ANY CONFIDENTIAL RELATIONSHIP THAT IT MAY HAVE UNDER APPLICABLE LAW WITH ANY ACCOUNTING FIRM AND/OR SERVICE BUREAU IN CONNECTION WITH ANY INFORMATION REQUESTED BY LENDER PURSUANT TO OR IN ACCORDANCE WITH THIS AGREEMENT (AND BORROWER AGREES THAT LENDER MAY CONTACT DIRECTLY ANY SUCH ACCOUNTING FIRM AND/OR SERVICE BUREAU IN ORDER TO OBTAIN ANY SUCH INFORMATION)

(B)    CALIFORNIA JUDICIAL REFERENCE PROVISIONS.  IN THE EVENT ANY LEGAL PROCEEDING IS FILED IN A COURT OF THE STATE OF CALIFORNIA (THE "COURT") BY OR AGAINST ANY PARTY HERETO IN CONNECTION WITH ANY CLAIM AND THE WAIVER SET FORTH IN CLAUSE (A)(I) ABOVE IS NOT ENFORCEABLE IN SUCH PROCEEDING, THE PARTIES HERETO AGREE AS FOLLOWS: (I) WITH THE EXCEPTION OF THE MATTERS SPECIFIED IN SUBCLAUSE (II) BELOW, ANY CLAIM SHALL BE DETERMINED BY A GENERAL REFERENCE PROCEEDING IN ACCORDANCE WITH THE PROVISIONS OF CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 THROUGH 645.1.  THE PARTIES INTEND THIS GENERAL REFERENCE AGREEMENT TO BE SPECIFICALLY ENFORCEABLE.  VENUE FOR THE REFERENCE PROCEEDING SHALL BE IN THE COUNTY OF LOS ANGELES, CALIFORNIA.   (II) THE FOLLOWING MATTERS SHALL NOT BE SUBJECT TO A GENERAL REFERENCE PROCEEDING: (1) NON-JUDICIAL FORECLOSURE OF ANY SECURITY INTERESTS IN REAL OR PERSONAL PROPERTY, (2) EXERCISE OF SELF-HELP REMEDIES (INCLUDING SET-OFF OR RECOUPMENT), AND (3) APPOINTMENT OF A RECEIVER, AND (D) TEMPORARY, PROVISIONAL, OR ANCILLARY REMEDIES (INCLUDING WRITS OF ATTACHMENT, WRITS OF POSSESSION, TEMPORARY RESTRAINING ORDERS, OR PRELIMINARY INJUNCTIONS).  THIS AGREEMENT DOES NOT LIMIT THE RIGHT OF ANY PARTY TO EXERCISE OR OPPOSE ANY OF THE RIGHTS AND REMEDIES DESCRIBED IN CLAUSES (1) – (3) AND ANY SUCH EXERCISE OR OPPOSITION DOES NOT WAIVE THE RIGHT OF ANY PARTY TO PARTICIPATE IN A REFERENCE PROCEEDING PURSUANT TO THIS AGREEMENT WITH RESPECT TO ANY OTHER MATTER.  (III) UPON THE WRITTEN REQUEST OF ANY PARTY HERETO, THE PARTIES SHALL SELECT A SINGLE REFEREE, WHO SHALL BE A RETIRED JUDGE OR JUSTICE.  IF THE PARTIES DO NOT AGREE UPON A REFEREE WITHIN TEN DAYS OF SUCH WRITTEN REQUEST, THEN, ANY PARTY SHALL HAVE THE RIGHT TO REQUEST THE COURT TO APPOINT A REFEREE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 640(B).  THE REFEREE SHALL BE APPOINTED TO SIT WITH ALL OF THE POWERS PROVIDED BY LAW.  PENDING APPOINTMENT OF THE REFEREE, THE COURT SHALL HAVE THE POWER TO ISSUE TEMPORARY OR PROVISIONAL REMEDIES. (IV) EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE REFEREE

ATL 22501749v1

SHALL DETERMINE THE MANNER IN WHICH THE REFERENCE PROCEEDING IS CONDUCTED INCLUDING THE TIME AND PLACE OF HEARINGS, THE ORDER OF PRESENTATION OF EVIDENCE, AND ALL OTHER QUESTIONS THAT ARISE WITH RESPECT TO THE COURSE OF THE REFERENCE PROCEEDING.   ALL PROCEEDINGS AND HEARINGS CONDUCTED BEFORE THE REFEREE, EXCEPT FOR TRIAL, SHALL BE CONDUCTED WITHOUT A COURT REPORTER, EXCEPT WHEN ANY PARTY SO REQUESTS A COURT REPORTER AND A TRANSCRIPT IS ORDERED, A COURT REPORTER SHALL BE USED AND THE REFEREE SHALL BE PROVIDED A COURTESY COPY OF THE TRANSCRIPT.   THE PARTY MAKING SUCH REQUEST SHALL HAVE THE OBLIGATION TO ARRANGE FOR AND PAY THE COSTS OF THE COURT REPORTER; PROVIDED, THAT SUCH COSTS, ALONG WITH THE REFEREE'S FEES, SHALL ULTIMATELY BE BORNE BY THE PARTY WHO DOES NOT PREVAIL, AS DETERMINED BY THE REFEREE. (V) THE REFEREE MAY REQUIRE ONE OR MORE PREHEARING CONFERENCES.   THE PARTIES HERETO SHALL BE ENTITLED TO DISCOVERY, AND THE REFEREE SHALL OVERSEE DISCOVERY IN ACCORDANCE WITH THE RULES OF DISCOVERY, AND SHALL ENFORCE ALL DISCOVERY ORDERS IN THE SAME MANNER AS ANY TRIAL COURT JUDGE IN PROCEEDINGS AT LAW IN THE STATE OF CALIFORNIA.  (VI)  THE REFEREE SHALL APPLY THE RULES OF EVIDENCE APPLICABLE TO PROCEEDINGS AT LAW IN THE STATE OF CALIFORNIA AND SHALL DETERMINE ALL ISSUES IN ACCORDANCE WITH CALIFORNIA SUBSTANTIVE AND PROCEDURAL LAW.  THE REFEREE SHALL BE EMPOWERED TO ENTER EQUITABLE AS WELL AS LEGAL RELIEF AND RULE ON ANY MOTION WHICH WOULD BE AUTHORIZED IN A TRIAL, INCLUDING MOTIONS FOR DEFAULT JUDGMENT OR SUMMARY JUDGMENT.  THE REFEREE SHALL REPORT HIS OR HER DECISION, WHICH REPORT SHALL ALSO INCLUDE FINDINGS OF FACT AND CONCLUSIONS OF LAW. THE REFEREE SHALL ISSUE A DECISION AND PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE, SECTION 644, THE REFEREE'S DECISION SHALL BE ENTERED BY THE COURT AS A JUDGMENT IN THE SAME MANNER AS IF THE ACTION HAD BEEN TRIED BY THE COURT.  THE FINAL JUDGMENT OR ORDER FROM ANY APPEALABLE DECISION OR ORDER ENTERED BY THE REFEREE SHALL BE FULLY APPEALABLE AS IF IT HAS BEEN ENTERED BY THE COURT.  (VII)  THE PARTIES RECOGNIZE AND AGREE THAT ALL CLAIMS RESOLVED IN A GENERAL REFERENCE PROCEEDING PURSUANT HERETO WILL BE DECIDED BY A REFEREE AND NOT BY A JURY.  AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR OWN CHOICE, EACH PARTY HERETO KNOWINGLY AND VOLUNTARILY AND FOR THEIR MUTUAL BENEFIT AGREES THAT THIS REFERENCE PROVISION SHALL APPLY TO ANY DISPUTE BETWEEN THEM THAT ARISES OUT OF OR IS RELATED TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.

(C)   CALIFORNIA REAL PROPERTY.   BORROWER HEREBY ACKNOWLEDGES AND AFFIRMS THAT IT UNDERSTANDS THAT TO THE EXTENT THE OBLIGATIONS ARE SECURED BY REAL PROPERTY LOCATED IN CALIFORNIA, BORROWER SHALL BE LIABLE FOR THE FULL AMOUNT OF THE LIABILITY HEREUNDER NOTWITHSTANDING THE FORECLOSURE ON SUCH REAL PROPERTY BY TRUSTEE SALE OR ANY OTHER REASON IMPAIRING BORROWER'S RIGHT TO PROCEED AGAINST ANY OTHER OBLIGOR.  IN ACCORDANCE WITH SECTION 2856 OF THE CALIFORNIA CIVIL CODE OR ANY SIMILAR LAWS OF ANY OTHER APPLICABLE JURISDICTION, BORROWER HEREBY WAIVES UNTIL SUCH TIME AS THE OBLIGATIONS HAVE BEEN PAID IN FULL: (I) ALL RIGHTS OF SUBROGATION, REIMBURSEMENT, INDEMNIFICATION, AND CONTRIBUTION AND ANY OTHER RIGHTS AND DEFENSES THAT ARE OR MAY BECOME AVAILABLE TO BORROWER BY REASON OF SECTIONS 2787 TO 2855, INCLUSIVE, 2899, AND 3433 OF THE CALIFORNIA CIVIL CODE OR ANY SIMILAR LAWS OF ANY OTHER APPLICABLE JURISDICTION; (II) ALL RIGHTS AND DEFENSES THAT BORROWER MAY HAVE BECAUSE THE OBLIGATIONS ARE SECURED BY REAL PROPERTY LOCATED IN CALIFORNIA, MEANING, AMONG OTHER THINGS, THAT:  (1) LENDER MAY COLLECT FROM BORROWER WITHOUT FIRST FORECLOSING ON ANY REAL OR PERSONAL PROPERTY COLLATERAL PLEDGED BY ANY OBLIGOR, AND (2) IF LENDER

- 58 -

**FORECLOSES ON ANY REAL PROPERTY COLLATERAL PLEDGED BY ANY OBLIGOR, (Y) THE AMOUNT OF THE OBLIGATIONS MAY BE REDUCED ONLY BY THE PRICE FOR WHICH THAT COLLATERAL IS SOLD AT THE FORECLOSURE SALE, EVEN IF THE COLLATERAL IS WORTH MORE THAN THE SALE PRICE, AND (Z) LENDER MAY COLLECT FROM THE OBLIGORS EVEN IF, BY FORECLOSING ON THE REAL PROPERTY COLLATERAL, LENDER HAS DESTROYED OR IMPAIRED ANY RIGHT BORROWER MAY HAVE TO COLLECT FROM ANY OTHER OBLIGOR, IT BEING UNDERSTOOD THAT THIS IS AN UNCONDITIONAL AND IRREVOCABLE WAIVER OF ANY RIGHTS AND DEFENSES BORROWER MAY HAVE BECAUSE THE OBLIGATIONS ARE SECURED BY REAL PROPERTY (INCLUDING, WITHOUT LIMITATION, ANY RIGHTS OR DEFENSES BASED UPON SECTIONS 580A, 580D, OR 726 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE OR ANY SIMILAR LAWS OF ANY OTHER APPLICABLE JURISDICTION); AND (III) ALL RIGHTS AND DEFENSES ARISING OUT OF AN ELECTION OF REMEDIES BY LENDER, EVEN THOUGH THAT ELECTION OF REMEDIES, SUCH AS A NONJUDICIAL FORECLOSURE WITH RESPECT TO SECURITY FOR THE OBLIGATIONS, HAS DESTROYED BORROWER'S RIGHTS OF SUBROGATION AND REIMBURSEMENT AGAINST ANY OTHER OBLIGOR BY THE OPERATION OF SECTION 580D OF THE CALIFORNIA CODE OF CIVIL PROCEDURE OR ANY SIMILAR LAWS OF ANY OTHER APPLICABLE JURISDICTION OR OTHERWISE.**

11.13    **USA PATRIOT Act Notice**.  To help fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each Person who opens an account.  For purposes of this section, account shall be understood to include loan accounts.

11.14    **Credit Inquiries**.  Borrower hereby authorizes and permits Lender, at its discretion and without any obligation to do so, to respond to credit inquiries from third parties concerning Borrower or any of its Subsidiaries.

11.15    **Additional Provisions**.   Time is of the essence of this Agreement and the other Loan Documents.   No provision of this Agreement or any of the other Loan Documents shall be construed against or interpreted to the disadvantage of any party hereto by any governmental authority by reason of such party having or being deemed to have structured, drafted or dictated such provision.

11.16    **Lender as Party-in-Interest**.   Borrower hereby stipulates and agrees that Lender is and shall remain a party in interest in the Chapter 11 Case and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith.  Nothing in this Agreement or any other Loan Document shall be deemed to be a waiver of any of Lender's rights or remedies under applicable law or documentation.  Without limitation of the foregoing, Lender shall have the right to make any motion or raise any objection it deems to be in its interest (specifically including but not limited to objections to use of proceeds of the Revolver Loans, to payment of professional fees and expenses or the amount thereof, to sales or other transactions outside the ordinary course of business or to assumption or rejection of any executory contract or lease), provided that Lender will not exercise such right if the action or inaction by Borrower which is the subject of such motion or objection is expressly permitted by any covenant or provision of this Agreement.

11.17    **Waiver of Rights to Obtain Alternative Financing**.  In consideration of the Revolver Loans to be made to Borrower by Lender, Borrower hereby waives any right it may have to obtain an order by the Bankruptcy Court authorizing Borrower to obtain financing pursuant to Section 364 of the Bankruptcy Code from any Person other than Lender, unless such financing would result in payment in the Full Payment of all of the Obligations and the Full Payment (as defined in the Prepetition Senior Loan Agreement) of all Prepetition Senior Obligations.

ATL 22501749v1

11.18  **Credit Bids**.  Each of Lender and Prepetition Senior Lender shall maintain its right to credit bid its claims under this Agreement or the DIP Order, or the Prepetition Senior Loan Agreement, as applicable, pursuant to Section 363(k) of the Bankruptcy Code, and Borrower agrees that it shall not object to Lender's and Prepetition Senior Lender's right to credit bid.

11.19  **Conflict of Terms**.  If any provision in this Agreement or any other Loan Document conflicts with any provision in the DIP Order, the provision in the DIP Order shall govern and control.

[Remainder of page intentionally left blank]

- 60 -

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, to be effective on the date first set forth above.

BORROWER:

**SHIEKH SHOES, LLC**

By: _____
Name:  Shiekh Ellahi
Title:  Chief Executive Officer

Accepted in Atlanta, Georgia:

<u>LENDER</u>:

**STATE BANK AND TRUST COMPANY**


By: _____
Name: _____
Title: _____

## **DISCLOSURE SCHEDULE**

## **TO BE PROVIDED BY BORROWER**

## TERMS SCHEDULE

This **TERMS SCHEDULE** ("Terms Schedule") is made a part of and incorporated into that certain Senior Secured, Super Priority Debtor in Possession Loan and Security Agreement between **STATE BANK AND TRUST COMPANY**, a Georgia banking corporation (together with successors and assigns, "Lender"), and **SHIEKH SHOES, LLC**, a California limited liability company ("Borrower") dated December 1, 2017 (together with all schedules, Riders and exhibits annexed thereto and all amendments, restatements, supplements or other modifications with respect thereto, the "Loan Agreement").

1. **[RESERVED]**

2. **Authorized Officers**:

   In addition to the Senior Officers, each of the following persons (if none, so state):

   Shiekh Ellahi

   Jennifer Murphy

3. **Additional Specified Availability Reserves:**

   N/A

4. **Early Termination Fee; Applicable Termination Percentage**:

   N/A

5. **Guarantors**:

   N/A

6. **Inventory Formula Amount**:  The lesser of:

   (a)    60% of the Value of Eligible Inventory; or

   (b)    85**%** of the NOLV of Eligible Inventory.

7. **Maximum Revolver Facility Amount**: $16,000,000

8. **Interest Rates (§2.3)**:

   (a)    The Applicable Variable Rate shall be the Base Rate in effect from time to time.

          As used in the Loan Agreement and in this Terms Schedule, the following terms shall have the following means ascribed to them.

          "Base Rate" means, on any day, the U.S. prime rate as shown in The Wall Street Journal on such day, or, if such day is not a Business Day, on the immediately preceding Business Day.  If The Wall Street Journal for any reason ceases to publish a U.S. prime rate, then the Prime Rate shall be as published from time to time in any other publication or

reference source designated by Lender in its discretion. The prime rate is a reference rate and does not necessarily represent the best or lowest rate charged by Lender.

(b)      Interest margin: 5.00%.

(c)      [Reserved.]

(d)      Default margin:  2.00%.

(e)      Applicable Variable Rate Disclosure: [____]%.

(f)      Interest Rate Disclosure (Governing Rate): [____]%.

9.      **Fees and Expenses (§2.4)**:

(a)      Fees:  Borrower shall pay to Lender the following fees:  (i) a closing and origination fee in the amount of $160,000 to be paid concurrently with the funding of the initial Revolver Loan; (ii) an unused line fee in the amount of 0.50% per annum of the amount by which the average loan balance for any month (or portion thereof that the Agreement is in effect) is less than the Maximum Revolver Facility Amount, such fee to be paid on the first day of the following month, but if the Commitments are terminated on a day other than the first day of the month, then any such fee payable for the month in which termination shall occur shall be paid on the effective date of such termination; (iii) a non-refundable monthly monitoring fee in the amount of $2,000 per month, on the first day of each month, in arrears; and (iv) a standard wire fee for each outgoing wire made by Lender at the request of Borrower (which fee is $25 per outgoing wire as of the Closing Date).

(b)      Expenses:  Borrower shall reimburse Lender for all costs and expenses incurred by Lender (including standard fees charged by Lender's internal field examiners) in connection with (i) examinations and reviews of Borrower's Books and such other matters pertaining to the Borrower or any Collateral as Lender shall deem appropriate and shall pay to Lender the then standard amount charged by Lender per person per day ($1,000 per person per day as of the Closing Date) for each day that an employee or agent of Lender shall be engaged in an examination or review of any of Borrower's Books, plus reasonable expenses; (ii) appraisals of any Inventory or Equipment forming a part of the Collateral; (iii) legal and financial advisory/consulting fees and expenses incurred by Lender in connection with the Loan Documents, the Approved Budget and the Bankruptcy Case; (iv) the establishment of electronic collateral reporting systems performed by employees or agents of Lender; and (v) the actual charges paid or incurred by Lender if it elects to employ the services of one or more third parties to perform financial audits of Borrower, establish electronic collateral reporting of Borrower, appraise the Collateral or to assess Borrower's business valuation.

10.    **Borrowing Base Reporting Period (§2.6)**:

Daily, weekly and monthly.

2

11.    **Collection Days (§2.7):**

One Business Day

12.    **Term (§3.1)**:

February 27, 2018

13.    **Equipment Dispositions (§5.4(b)):**

N/A

14.    **Opening Availability (§6.1(g)):**

[$TBD - UNTIL CLOSING]

15.    **Other Conditions Precedent (§6.1(h)) (if none, so state)**:

(a)    The Interim Order shall contain all findings of fact and conclusions of law necessary to perfect the Liens of Lender in the Collateral in form satisfactory to Lender that such Liens constitute valid and perfected Liens, and that there are no other Liens upon any Collateral except for Permitted Liens.

(b)    The Interim Order shall have been entered by the Bankruptcy Court, and such order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated (other than by the Final Order) absent the prior written consent of Lender.

(c)    All "first day" orders with respect to the Bankruptcy Case shall be in form and substance acceptable to Lender (and shall cover all such matters as Lender may require), shall have been entered by the Bankruptcy Court, and such orders shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated (other than by the Final Order) absent the prior written consent of Lender.

(d)    Lender shall have received the Approved Budget, in form and substance (including as to scope and underlying assumptions) satisfactory to Lender, from Borrower.

(e)    Lender shall have received the duly executed California DOT, in appropriate form for recording in the applicable real estate records, together with each of the following (in each case in form and substance acceptable to Lender): (i) the duly executed Real Estate Owners Guaranty, (ii) the Real Estate Title Report, and (iii) such other certificates, documents, legal opinions, agreements and items as Lender may require in connection therewith.

3

16.     **Financial Covenant (Approved Budget) (§8.9)**:

Borrower covenants that Borrower shall be in Substantial Compliance with the Approved Budget at all times from the Closing Date until the Full Payment of the Obligations and Full Payment (as defined in the Prepetition Senior Loan Agreement) of the Prepetition Senior Obligations.

17.     **Other Events of Default (§10.1) (if none, so state):**

Any Obligor (other than Borrower) shall cease to be Solvent.

Shiekh Ellahi shall cease to be Chief Executive Officer of Borrower.

18.     **Notices (§11.1):**

If to Borrower:

Shiekh Shoes, LLC
1777 S. Vintage Ave.
Ontario, CA 91761
<u>Attention</u>: Shiekh S. Ellahi
Facsimile: (909) 937-3317

If to Lender:

State Bank and Trust Company
3630 Peachtree Road, N.E., Suite 1050
Atlanta, GA 30326
<u>Attention</u>: Shiekh Shoes Loan Administration Officer
Facsimile: (404) 365-7112

with courtesy copies to (which shall not be deemed notice):

Greenberg Traurig LLP
Terminus 200
3333 Piedmont Rd NE, Suite 2500
Atlanta, Georgia  30305
<u>Attention</u>:  David Kurzweil
Facsimile:  (678) 553-2681

4

19.   "As of the date of this Certificate, no Event of Default exists or has occurred and is continuing. Borrower acknowledges that the Loans by Lender to Borrower are based upon Lender's reliance on the information contained herein and all representations and warranties with respect to Collateral in the Loan Agreement are applicable to the Collateral included in this Certificate.  The reliance by Lender on this Certificate should not be deemed to limit the right of Lender to establish or revise criteria of eligibility or Availability Reserves or other reserves or otherwise limit, impair, or affect in any manner the rights of Lender under the Loan Agreement.  In the event of any conflict between the determination of Lender of the amount of the Loans to Borrower in accordance with the terms of the Loan Agreement and the determination by Borrower of such amounts, the determination of Lender shall govern.   All capitalized terms used in this Certificate shall have the meaning assigned to them in the Loan Agreement."

[Remainder of page intentionally left blank]

5

The undersigned have executed this Terms Schedule on and as of the date of the Loan Agreement.

BORROWER:

**SHIEKH SHOES, LLC**

By: _____
Name:  Shiekh Ellahi
Title:  Chief Executive Officer

Accepted in Atlanta, Georgia:

LENDER:

**STATE BANK AND TRUST COMPANY**


By: _____

Name: _____

Title: _____

**EXHIBIT A**

**FORM OF REVOLVER NOTE**

U.S. $16,000,000                                                                                    December 1, 2017

                                                                                                        Atlanta, Georgia

FOR VALUE RECEIVED, the undersigned, **SHIEKH SHOES, LLC**, a California limited liability company ("Borrower"), hereby promises to pay to the order of **STATE BANK AND TRUST COMPANY**, a Georgia banking corporation (herein, together with any subsequent holder hereof, called "Lender"), the principal sum of SIXTEEN MILLION AND NO/100 DOLLARS ($16,000,000) or such lesser sum as may constitute the outstanding principal amount of all Revolver Loans made pursuant to the terms of the Loan Agreement (as defined below) on the date on which such outstanding principal amounts become due and payable pursuant to **Section 2.2(a)(i)** of the Loan Agreement (as defined below), in strict accordance with the terms thereof.   Borrower likewise unconditionally promises to pay to Lender interest from and after the date hereof on the outstanding principal amount of Revolver Loans at such interest rates, payable at such times and computed in such manner as are specified in **Sections 2.2(a)(ii)** and **2.3** of the Loan Agreement and in strict accordance with the terms thereof.

This Revolver Note (this "Note") is issued pursuant to, and is the "Revolver Note" referred to in, Senior Secured, Super Priority Debtor in Possession dated of even date herewith (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), between Borrower and Lender, and Lender is and shall be entitled to all benefits thereof and of all other Loan Documents executed and delivered in connection therewith.  All capitalized terms used herein, unless otherwise defined herein, shall have the meanings ascribed to such terms under the Loan Agreement.

The entire unpaid principal balance and all accrued interest on this Note shall be due and payable immediately upon the Commitment Termination Date. All payments of principal and interest shall be made in Dollars and in immediately available funds as specified in the Loan Agreement.

Upon or after the occurrence of an Event of Default and for so long as such Event of Default exists, the principal balance and all accrued interest of this Note may be declared (or shall become) due and payable in the manner and with the effect provided in the Loan Agreement, and the unpaid principal balance hereof shall bear interest at the Default Rate as and when provided in **Section 2.3** of the Loan Agreement.  If this Note is collected by or through an attorney at law, then Borrower shall be obligated to pay, in addition to the principal balance of and accrued interest on this Note, all costs of collection, including, without limitation, reasonable attorneys' fees and court costs.

All principal amounts of Revolver Loans made by Lender to Borrower pursuant to the Loan Agreement, and all accrued and unpaid interest thereon, shall be deemed evidenced by this Note and shall continue to be owing by Borrower until paid in accordance with the terms of this Note and the Loan Agreement.

In no contingency or event whatsoever, whether by reason of advancement of the proceeds of Revolver Loans or otherwise, shall the amount paid or agreed to be paid to Lender for the use, forbearance or detention of Revolver Loans exceed the highest lawful rate permissible under any law which a court of competent jurisdiction may deem applicable hereto; and, in the event of any such

Revolver Note
*ATL 22501749v1*

payment inadvertently paid by Borrower or inadvertently received by Lender, such excess sum shall be, at Borrower's option, returned to Borrower forthwith or credited as a payment of principal, but shall not be applied to the payment of interest.  It is the intent hereof that Borrower not pay or contract to pay, and that Lender not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Borrower under applicable law.

Time is of the essence of this Note.  To the fullest extent permitted by applicable law, Borrower, for itself and its legal representatives, successors and assigns, expressly waives presentment, demand, protest, notice of dishonor, notice of non-payment, notice of maturity, notice of protest, presentment for the purpose of accelerating maturity, diligence in collection, and the benefit of any exemption or insolvency laws.

Wherever possible each provision of this Note shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or remaining provisions of this Note.  No delay or failure on the part of Lender in the exercise of any right or remedy hereunder shall operate as a waiver thereof, nor as an acquiescence in any default, nor shall any single or partial exercise by Lender of any right or remedy preclude any other right or remedy.  Lender, at its option, may enforce its rights against any Collateral securing this Note without enforcing its rights against Borrower, any Guarantor of the indebtedness evidenced hereby or any other property or indebtedness due or to become due to Borrower.  Borrower agrees that, without releasing or impairing Borrower's liability hereunder, Lender may at any time release, surrender, substitute or exchange any Collateral securing this Note and may at any time release any party primarily or secondarily liable for the indebtedness evidenced by this Note.

Borrower shall have the right to prepay this Note in full at any time without the imposition of any prepayment fee or penalty; provided, that, the foregoing shall not in any manner limit or waive the prepayment or early termination fees payable under or with respect to the Prepetition Senior Loan Agreement.

The rights of Lender and obligations of Borrower hereunder shall be construed in accordance with and governed by the laws (without giving effect to the conflict of law principles thereof) of the State of Georgia.  This Note is intended to take effect as an instrument under seal under Georgia law.

To the fullest extent permitted by applicable law, Borrower and, by its acceptance hereof, Lender, each hereby waives the right to trial by jury in any action, suit, proceeding or counterclaim of any kind arising out of, related to or based in any way upon this Note or any of the matters contemplated hereby.

[Remainder of page intentionally left blank]

2

IN WITNESS WHEREOF, Borrower has caused this Note to be executed and delivered by its duly authorized officers on the date first above written.

**SHIEKH SHOES, LLC**
("Borrower")


By: _____
Name:  Shiekh Ellahi
Title:  Chief Executive Officer

**EXHIBIT B**

**FORM OF COMPLIANCE CERTIFICATE**

[Letterhead of Borrower]

_____, 20__

State Bank and Trust Company
3630 Peachtree Road, N.E., Suite 1050
Atlanta, Georgia 30326
Attn:  Shiekh Shoes Loan Administration Officer

The undersigned, the [____] of Shiekh Shoes, LLC ("Borrower"), gives this certificate to State Bank and Trust Company, a Georgia banking corporation ("Lender"), in accordance with the requirements of Section 8.6(a)(vi) of that certain Senior Secured, Super Priority Debtor in Possession, dated November [29], 2017, between Borrower and Lender (as at any time amended, the "Loan Agreement").  Capitalized terms used in this Certificate, unless otherwise defined herein, shall have the meanings ascribed to them in the Loan Agreement.

1.      No Default or Event of Default exists on the date hereof, other than: _____ _____ [if none, so state].

Very truly yours,

_____

Title:_____

**EXHIBIT C**

**FORM OF INTERIM ORDER**

[ATTACH FORM OF INTERIM ORDER]

**EXHIBIT D**

**DESIGNATED STORES LIST**


[ATTACH LIST OF DESIGNATED STORES]

**LETTER OF CREDIT RIDER**

THIS LETTER OF CREDIT RIDER ("Rider") dated November [29], 2017, is made a part of and incorporated into that certain Senior Secured, Super Priority Debtor in Possession between **STATE BANK AND TRUST COMPANY**, a Georgia banking corporation (together with successors and assigns, "Lender"), and **SHIEKH SHOES, LLC**, a California limited liability company] ("Borrower"), dated of even date herewith (together with all schedules, Riders and exhibits annexed thereto and all amendments, restatements, supplements or other modifications with respect thereto, the "Loan Agreement").

1.    **Definitions.**  Capitalized terms contained in this Rider, unless otherwise defined herein, shall have the meanings given such terms in the Loan Agreement; and the provisions of Section 1.5 of the Loan Agreement are incorporated herein.  In addition, when used in this Rider, the following terms shall have the following meanings (terms defined in the singular to have the same meaning when used in the plural and vice versa):

"Cash Collateral" means cash that is delivered to Lender to Cash Collateralize any Obligations and all interest and other income earned (if any) on such cash; provided, that, "Cash Collateral" shall not include the Real Estate Owners Cash Collateral.

"Cash Collateral Account" means a demand deposit, money market or other account maintained with Lender and subject to Lender's Liens.

"Cash Collateralize" means the delivery of cash to Lender, as security for the payment of any LC Credit Support Obligations, in an amount equal to 105% of the aggregate LC Credit Support Obligations at the time of delivery.  Cash Collateralization has a correlative meaning.

"LC Application" means an application (whether consisting of a single or several documents) by Borrower to LC Issuer, in form and substance satisfactory to LC Issuer, for the issuance of a Letter of Credit, which application shall, among other things, provided for Borrower's reimbursement to LC Issuer for any amount paid by LC Issuer under a Letter of Credit.

"LC Conditions" means the following conditions to Lender's agreement to use its reasonable efforts to cause LC Issuer to issue a Letter of Credit: (a) each of the conditions set forth in Section 6 of the Loan Agreement is satisfied at the time of Lender's receipt of an LC Request and prompted issuance thereof; (b) Borrower has delivered to Lender, in such manner as Lender may prescribe, an LC Request and an LC Application in form and substance satisfactory to LC Issuer and Lender for the issuance of the requested Letter of Credit and such other documents as may be required pursuant to the terms thereof; (c) Lender shall have determined that, immediately after giving effect to such issuance, (i) the total LC Credit Support Obligations will not exceed the LC Subline and (ii) the Total Outstandings will not exceed the Borrowing Base at such time; (d) the expiration date of such Letter of Credit is no more than 365 days from issuance and at least 30 days prior to the effective date of termination of the Commitments, in the case of standby Letters of Credit; (e) the Letter of Credit and payments thereunder are denominated in Dollars; and (f) the purpose and form of the proposed Letter of Credit are satisfactory to Lender in its discretion.

"LC Credit Support Obligations" means, on any date, the sum (without duplication) of the following on such date:  (a) all amounts owing by Borrower for reimbursement to Lender of amounts paid by Lender under any Credit Support of a Letter of Credit; (b) the aggregate amount of all liabilities (whether or not contingent at the time in question) of Lender to an LC Issuer under any Credit Support of outstanding Letters of Credit; and (c) all Fees and other amounts owing by Borrower to Lender with respect to any Credit Support provided by Lender to an LC Issuer.

"LC Documents" means all agreements, instruments and documents executed by Borrower or any other Person in favor of and delivered to LC Issuer or Lender in connection with, or as a condition to the issuance of, a Letter of Credit, including each LC Application and LC Request.  All of the LC Documents, to the extent executed with or in favor of Lender, shall constitute "Loan Documents" (as defined in the Loan Agreement).

"LC Issuer" means any bank or other financial institution which is selected by Lender to be the issuer of a Letter of Credit and to which Lender provides a Credit Support as an inducement for such financial institution to issue such Letter of Credit.

"LC Request" means a request for issuance of a Letter of Credit, to be provided by Borrower, in form satisfactory to LC Issuer and Lender (which request may be transmitted electronically subject to the limitations set forth in **Section 11.1(c)**).

"LC Reserve" means a reserve in the aggregate amount of all LC Credit Support Obligations outstanding any time, other than any LC Credit Support Obligations that have been fully Cash Collateralized.

"LC Subline" means an amount equal to $0.

"Reimbursement Date" means, in case of Borrower's obligation to reimburse LC Issuer for any amounts paid by LC Issuer under a Letter of Credit, the date on which LC Issuer makes payment under such Letter of Credit; and in the case of Borrower's obligation to reimburse Lender for any amounts paid by Lender under any Credit Support to an LC Issuer, the date on which Lender makes payment under such Credit Support.

2. **Letters of Credit.**  Lender agrees to use its reasonable efforts to cause LC Issuer to issue Letters of Credit from time to time from the date hereof until the date that is 90 days before the last day of the Term; provided, however, that Lender shall have no obligation to request the issuance of a Letter of Credit on or after the Commitment Termination Date or if at the time of Borrower's request for a Letter of Credit, all of the LC Conditions are not satisfied as determined by Lender.  Lender's agreement to request LC Issuer to issue Letters of Credit is further subject to the following terms and conditions:

(a)    Lender's willingness to use its reasonable efforts to cause LC Issuer to issue any Letter of Credit is conditioned upon LC Issuer's receipt of an LC Request and an LC Application with respect to the requested Letter of Credit, as well as such other instruments and agreements as LC Issuer may customarily require for issuance of a Letter of Credit of similar type and amount, but Lender shall have no obligation to issue any Letter of

2

Credit and shall have no liability for LC Issuer's failure to issue or delay in issuing any Letter of Credit.

(b)    Letters of Credit may be requested by Borrower only to support obligations of Borrower incurred in the Ordinary Course of Business or for other purposes as Lender may approve from time to time in writing.  The renewal or extension of any Letter of Credit shall be treated as the issuance of a new Letter of Credit, except that delivery of a new LC Application shall be required at the discretion of Lender or LC Issuer.

(c)    Borrower assumes all risks of the acts, omissions or misuses of any Letter of Credit by the beneficiary.  In connection with any Letter of Credit, Lender shall not be responsible for the existence, character, quality, quantity, condition, packing, value or delivery of any goods purported to be represented by any Documents; any differences or variation in the character, quality, quantity, condition, packing, value or delivery of any goods from that expressed in any Documents; the form, validity, sufficiency, accuracy, genuineness or legal effect of any Documents or of any endorsements thereon; the time, place, manner or order in which shipment of goods is made; partial or incomplete shipment of, or failure to ship, any goods referred to in a Letter of Credit or any Documents; any deviation from instructions, delay, default or fraud by any shipper or other Person in connection with any goods, shipment or delivery; any breach of contract between a shipper or vendor and Borrower; errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telecopy, e-mail, telephone or otherwise; errors in interpretation of technical terms; the misapplication by a beneficiary of any Letter of Credit or the proceeds thereof; any payment by LC Issuer under a Letter of Credit that was improperly made or any consequences arising from causes beyond Lender's control, including any act or omission of a governmental authority.   Lender shall be fully subrogated to the rights and remedies of each beneficiary whose claims against Borrower are discharged with proceeds of any Letter of Credit and of each LC Issuer whose claims against Borrower are discharged pursuant to a Credit Support.

(d)    Borrower shall promptly comply with each LC Document.  An Event of Default shall occur if Borrower fails to comply with any covenant contained herein or in any LC Document or if any representation or warranty by Borrower in any LC Document is not true and correct in all material respects when made or furnished (or deemed to be made or furnished).

**3.    Reimbursement.**  If LC Issuer honors any request for payment under a Letter of Credit, Borrower shall pay to LC Issuer, on the Reimbursement Date, the amount paid under such Letter of Credit.  If Lender makes any payment to LC Issuer under any Credit Support, Borrower shall pay to Lender, on the Reimbursement Date, the amount paid by Lender under such Credit Support together with interest at the interest rate applicable to Revolver Loans from the Reimbursement Date until full payment is actually made by Borrower.  The obligation of Borrower to reimburse LC Issuer or Lender for any payment made under a Letter of Credit or Credit Support shall be absolute, unconditional, irrevocable and shall be paid without regard to any lack of validity or enforceability of any Letter of Credit or any LC Document; or the existence of any claim, setoff, defense, counterclaim or other right that Borrower may

3

have at any time against the beneficiary or the LC Issuer.  Borrower shall be deemed to have requested a Revolver Loan in an amount necessary to pay all amounts due Lender on any Reimbursement Date.

**4.** **Cash Collateral.**  If any LC Credit Support Obligations, whether or not then due or payable, shall for any reason be outstanding (a) when a Default or Event of Default exists, (b) when Availability is less than zero, (c) on or after the effective date of termination of the Commitments, or (d) within 30 days prior to the last day of the Term, then Borrower shall, forthwith, at Lender's request, Cash Collateralize all LC Credit Support Obligations (whether absolute or contingent at the time in question).  If Borrower fails to provide Cash Collateral as required herein, Lender may advance, as one or more Revolver Loans, the amount of Cash Collateral required, whether or not the Commitment Termination Date has occurred.  Without limiting the foregoing, on the Commitment Termination Date, Borrower shall comply with the terms of Section 3 of the Loan Agreement and shall either (a) Cash Collateralize all LC Credit Support Obligations (whether absolute or contingent at the time in question) or (b) cause to be issued a replacement letter of credit, to be in form and substance satisfactory to Lender and LC Issuer, for each Letter of Credit outstanding on such date, and cause each Letter of Credit to be returned to LC Issuer marked cancelled concurrently with the issuance of each replacement letter of credit.

**5.** **Availability Reserve; Maximum Revolver Facility Amount**.  The Availability Reserve on any date shall be increased by an amount equal to the LC Reserve on such date.  The Maximum Revolver Facility Amount shall not be increased by the amount of the LC Subline, and the aggregate amount of all Revolver Loans and LC Credit Support Obligations outstanding on any date shall not exceed the Maximum Revolver Facility Amount.

**6.** **Indemnification.**  In addition to any other indemnity which Borrower may have to any Indemnitee under the Loan Agreement or any of the other Loan Documents and without limiting such other indemnification provisions, Borrower agrees to indemnify and defend each of the Indemnitees and to hold each of the Indemnitees harmless from and against any and all claims, demands, liabilities, costs, actions, suits or proceedings that any one or more Indemnitees may incur or be subject to as a consequence, directly or indirectly, of (a) the issuance of, payment or failure to pay, or any performance or non-performance under any Letter of Credit or any LC Document, (b) any suit, investigation or proceeding to which any Indemnitee may become a party as a consequence, directly or indirectly, of the issuance of any Letter of Credit or Credit Support therefor or payment or failure to pay under such Letter of Credit or Credit Support, and (c) any action, suit or other proceeding to recover, set aside or reclaim any amount paid by or on behalf of Borrower, or from any proceeds of the Collateral, to or for the benefit of any Indemnitee on account of any of the LC Credit Support Obligations.  This indemnity shall survive Full Payment of the Obligations and termination of the Commitments.

**7.** **Letter of Credit Fees.**  Borrower shall pay to Lender a fee equal to the applicable interest margin for Revolver Loans set forth in Item 8(b) of the Terms Schedule multiplied by the average daily undrawn amount of all Letters of Credit issued and outstanding pursuant to the Loan Documents, which fee shall be payable monthly, in arrears, on the first day of each month.  Borrower shall pay to LC Issuer all fees, charges, costs and expenses associated with the issuance, amending, negotiating, payment, processing, transfer and administration of Letters of Credit, which fees, charges, costs and expenses shall be paid as and when incurred.  During an Event of Default, the fee payable to Lender under this Section 7 shall be increased by 2.0% per annum.

4

[Remainder of page intentionally left blank]

5

EXHIBIT A   -   111

The undersigned have executed this Letter of Credit Rider on the date first written above.

BORROWER:

**SHIEKH SHOES, LLC**


By: _____
Name:  Shiekh Ellahi
Title:  Chief Executive Officer

Accepted in Atlanta, Georgia:

<u>LENDER</u>:

**STATE BANK AND TRUST COMPANY**


By: _____
Name: _____
Title: _____

# EXHIBIT B

1  David S. Kupetz (CA Bar No. 125062)
       *dkupetz@sulmeyerlaw.com*
2  Asa S. Hami (CA Bar No. 201728)
       *ahami@sulmeyerlaw.com*
3  Steven F. Werth (CA Bar No. 205434)
       *swerth@sulmeyerlaw.com*
4  **Sulmeyer**Kupetz
   A Professional Corporation
5  333 South Hope Street, Thirty-Fifth Floor
   Los Angeles, California  90071-1406
6  Telephone: 213.626.2311

7  Attorneys for Debtor and Debtor in Possession
   Shiekh Shoes, LLC
8

9                 **UNITED STATES BANKRUPTCY COURT**

10      **CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION**

11  | In re | Case No. 2:17-bk-24626-VZ |

12  | | Chapter 11 |

13  SHIEKH SHOES, LLC,
    a California limited liability company,   | **INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION SECURED FINANCING PURSUANT TO 11 U.S.C. § 364, (II) AUTHORIZING THE DEBTOR'S LIMITED USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SENIOR LENDER PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364, AND (IV) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001** |

14  Debtor.

15

16

17

18

19                        [Relates to Dkt. No. _____]

20                        Date:
                          Time:
21                        Place:    Courtroom  1368
22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1    Upon the motion of the debtor and debtor-in-possession (the "Debtor") in the

2  above-captioned chapter 11 case (the "Chapter 11 Case"), dated November 29, 2017 (the

3  "Motion"), (a) seeking the entry of this interim order (this "Order") and a final order (the "Final

4  Order"): (i) authorizing the Debtor to obtain senior secured post-petition financing in an aggregate

5  principal amount not to exceed $16,000,000 (the "Postpetition Facility"), pursuant to section 364

6  of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), from

7  State Bank and Trust Company (the "Postpetition Lender"), pursuant to the terms of this Order

8  and that certain Senior Secured, Super-Priority Debtor-In-Possession Loan and Security

9  Agreement, dated as of December 1, 2017, by and between the Debtor and the Postpetition Lender

10  in substantially the form attached to the Motion as <u>Exhibit A</u> (as the same may be amended,

11  restated, supplemented or otherwise modified from time to time, the "Postpetition Loan

12  Agreement");[1]  (ii) authorizing the Debtor to execute, deliver and enter into the Postpetition Loan

13  Agreement and other Postpetition Loan Documents (as defined in paragraph 2 below) and to

14  perform such other and further acts as may be required in connection with the Postpetition Loan

15  Documents; (iii) granting security interests, liens, and superpriority claims (including a

16  superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens

17  pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant

18  to section 364(d) of the Bankruptcy Code) to the Postpetition Lender to secure all obligations of

19  the Debtor under and with respect to the Postpetition Facility; (iv) authorizing the Debtor's limited

20  use of Cash Collateral (as defined in paragraph E below), solely on the terms and conditions set

21  forth in this Order and in the Postpetition Loan Documents; (v) granting adequate protection to the

22  Prepetition Senior Lender and the Prepetition Second Lien Lenders (as defined in paragraph D[2]

23  below), whose liens and security interests are being primed by the Postpetition Facility, as more

24

25  [1] Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the Postpetition Loan
    Agreement.

26

27  [2] References to paragraphs of this Order and to sections and paragraphs of any other document are for the
    convenience of the parties only and for compliance with any applicable Local Bankruptcy Rules of this Court, and
    are in no way any waiver of any other applicable provisions of this Order or such document.  Such references are

28  also deemed to include and incorporate all subparts of any referenced section or paragraph.

1   fully set forth in this Order; and (vi) modifying the automatic stay imposed under section 362 of

2   the Bankruptcy Code; (b) requesting, pursuant to Rule 4001 of the Federal Rules of Bankruptcy

3   Procedure (the "Bankruptcy Rules") and the applicable Local Bankruptcy Rules of this Court, that

4   an emergency interim hearing (the "Interim Hearing") on the Motion be held before this Court to

5   consider entry of this Order, which authorizes the Debtor to borrow under the Postpetition Loan

6   Documents up to an aggregate principal amount not to exceed $16,000,000; and (c) requesting,

7   pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Bankruptcy

8   Rules of this Court, that this Court (i) schedule a final hearing (the "Final Hearing") on the Motion

9   as set forth in paragraph 37 below to consider entry of the Final Order authorizing the balance of

10  the borrowings and letter of credit issuances under the Postpetition Loan Documents on a final

11  basis, and (ii) approve notice procedures with respect thereto; and the Interim Hearing having been

12  held before this Court on December 1, 2017; and this Court having considered the Motion and all

13  pleadings related thereto, including the record made by the Debtor at the Interim Hearing; and

14  after due deliberation and consideration, and good and sufficient cause appearing therefor:

15  **THIS COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:[3]**

16      A.      <u>Commencement of Case</u>.  On November 29, 2017 (the "Petition Date"), the

17  Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy

18  Code.  The Debtor is continuing to operate its business and manage its properties as a Debtor-in-

19  possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been

20  made for the appointment of a trustee or examiner, and no creditors' committee (the "Creditors'

21  Committee") has yet been appointed in the Chapter 11 Case.

22      B.      <u>Jurisdiction; Venue</u>.  This Court has jurisdiction over the Chapter 11 Case

23  and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion

24  constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the

25  relief sought herein are sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Rules

26  2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure.  Venue of the Chapter 11

---

[3] Pursuant to Bankruptcy Rule 7052, any findings of fact contained herein that may be construed as matters of law
shall be treated as conclusions of law as if set forth below, and vice versa.

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1    Case in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2    C.    Adequate Notice.  On November 29, 2017, the Debtor filed the Motion with

3    this Court and pursuant to Bankruptcy Rules 2002, 4001 and 9014, and the Local Bankruptcy

4    Rules of this Court, the Debtor has provided notice of the Motion and the Interim Hearing by

5    electronic mail, facsimile, hand delivery or overnight delivery to the following parties and/or to

6    their counsel as indicated: (i) the Office of the United States Trustee for this District (the "U.S.

7    Trustee"); (ii) the Debtor's twenty (20) largest unsecured creditors; (iii) counsel to the Postpetition

8    Lender and Prepetition Senior Lender; (iv) all other known parties with liens of record on assets of

9    the Debtor as of the Petition Date; (v) all financial institutions at which the Debtor maintains

10    deposit accounts; (vi) the landlords for all non-residential real properties occupied by the Debtor

11    as of the Petition Date that are party to a landlord agreement with the Prepetition Senior Lender;

12    (vii) the local office for the Internal Revenue Service; and (viii) all other parties required to

13    receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting to receive notice

14    prior to the date hereof (collectively, the "Notice Parties").  Given the nature of the relief sought in

15    the Motion, this Court concludes that the foregoing notice was sufficient and adequate under the

16    circumstances and complies with the Bankruptcy Code, the Bankruptcy Rules, and any other

17    applicable law, and no further notice relating to this proceeding is necessary or required.

18    D.    Prepetition Loan Documents, Liens and Claims.

19    (a)    Without prejudice to the rights of any other party, but subject to the time

20    limitations specified in paragraph 30 of this Order, the Debtor admits, stipulates and agrees that,

21    on and as of the Petition Date, the Debtor was indebted and bound as described below:

22    Prepetition Senior Lender

23    1.    Pursuant to that certain Loan and Security Agreement, dated as of March
17, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the

24    "Prepetition Senior Loan Agreement"), among the Debtor, State Bank and Trust Company (as
successor-by-merger to Alostar Bank of Commerce, the "Prepetition Senior Lender"), the

25    Prepetition Senior Lender agreed to extend loans to, issue letters of credit for, and provide services
and other credit accommodations to, the Debtor.  The Prepetition Senior Loan Agreement, along

26    with any other agreements and documents executed or delivered in connection therewith,
including, without limitation, the "Loan Documents" as defined therein, are collectively referred

27    to herein as the "Prepetition Senior Loan Documents" (as the same may be amended, restated,
supplemented or otherwise modified from time to time).

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

2.      All obligations of the Debtor arising under, or in connection with, the Prepetition Senior Loan Agreement (including, without limitation, the "Obligations" and "Bank Product Obligations", each as defined therein), any other Prepetition Senior Loan Document, and/or any agreement evidencing any Bank Products (as defined in the Prepetition Senior Loan Agreement) shall collectively be referred to herein as the "Prepetition Senior Obligations."

3.      Pursuant to the Prepetition Senior Loan Agreement, the Security Documents (as defined in the Prepetition Senior Loan Agreement), and all other Prepetition Senior Loan Documents that purport to create a Lien (as defined in the Prepetition Senior Loan Agreement) in favor of Prepetition Senior Lender (as such documents are amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Senior Security Documents"), the Debtor granted to the Prepetition Senior Lender, to secure the Prepetition Senior Obligations, a first priority security interest and continuing lien (the "Prepetition Senior Liens") on substantially all of the Debtor's assets and property, and all proceeds, products, accessions, rents and profits thereof, in each case whether then owned or existing or thereafter acquired or arising.  All collateral granted or pledged by the Debtor pursuant to any Prepetition Senior Security Document or any other Prepetition Senior Loan Document, including, without limitation, the "Collateral" as defined in the Prepetition Senior Loan Agreement, and all pre-petition and post-petition proceeds thereof shall collectively be referred to herein as the "Prepetition Senior Collateral".

4.      (i) All Prepetition Senior Loan Documents executed and delivered by the Debtor to the Prepetition Senior Lender are valid and enforceable by the Prepetition Senior Lender against the Debtor; (ii) the Prepetition Senior Liens constitute valid, binding, enforceable and perfected first priority liens and security interests in and on the Prepetition Senior Collateral, subject only to the Prior Liens (as defined below) and are not subject to avoidance, reduction, disallowance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (iii) the Prepetition Senior Obligations constitute legal, valid and binding obligations of the Debtor, (iv) no offsets, defenses or counterclaims to the Prepetition Senior Obligations exist, (v) no portion of the Prepetition Senior Obligations, or any amounts previously paid to the Prepetition Senior Lender on account of or with respect the Prepetition Senior Obligations, are subject to avoidance, reduction, disgorgement, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (vi) each Security Document (as defined in the Prepetition Senior Loan Agreement) continues in full force and effect notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the Postpetition Lender to the Debtor pursuant to the terms of this Order or Postpetition Loan Documents.

5.      The Debtor has no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Prepetition Senior Lender with respect to the Prepetition Senior Loan Agreement or any other Prepetition Senior Loan Documents, whether arising at law or at equity, including, without limitation, any re-characterization, subordination, avoidance or other debtor claims arising under or pursuant to sections 105, 510 or 542 through 553, inclusive, of the Bankruptcy Code.

6.      As of the Petition Date, (i) the Debtor was truly and justly indebted to the Prepetition Senior Lender pursuant to the Prepetition Senior Loan Documents, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $7,169,546.65 in respect of loans made and letters of credit issued by the Prepetition Senior Lender, plus all accrued and hereafter accruing and unpaid interest thereon and any additional fees and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Senior Loan Documents) now or hereafter due under the Prepetition Senior Loan Agreement and the other Prepetition Senior Loan Documents, and (ii) the value of the Prepetition Senior Collateral exceeded the amount of Prepetition Senior Obligations.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1        (b)      Without prejudice to the rights of any party (including the Debtor), the

2  Debtor states that:

3        1.      Pursuant to that certain Credit Agreement, dated as of March 17, 2017 (as

4  amended, restated, supplemented or otherwise modified from time to time, the "Prepetition

Second Lien Credit Agreement"), among the Debtor, Comvest Capital II, L.P., as administrative

5  agent and collateral agent for itself and the Prepetition Second Lien Lenders (as defined below) (in

such capacity, the "Prepetition Second Lien Agent"), and the other lenders party thereto

6  (collectively, the "Prepetition Second Lien Lenders"), the Prepetition Second Lien Lenders agreed

to extend a term loan to the Debtor in an aggregate principal amount of $10,000,000. The

7  Prepetition Second Lien Credit Agreement, along with any other agreements and documents

executed or delivered in connection therewith, including, without limitation, the "Loan

8  Documents" as defined therein, are collectively referred to herein as the "Prepetition Second Lien

Loan Documents" (as the same may be amended, restated, supplemented or otherwise modified

9  from time to time).

10       2.      All obligations of the Debtors arising under the Prepetition Second Lien

Credit Agreement (including, without limitation, the "Obligations" as defined therein) or any other

11  Prepetition Second Lien Loan Document shall collectively be referred to herein as the "Prepetition

Second Lien Obligations."

12       3.      Pursuant to the Collateral Agreement (as defined in the Prepetition Second

Lien Credit Agreement) (as such documents are amended, restated, supplemented or otherwise

13  modified from time to time, the "Prepetition Second Lien Security Documents"), by and between

the Debtor and the Prepetition Second Lien Agent, the Debtor granted to the Prepetition Second

14  Lien Agent, for the benefit of itself and the Prepetition Second Lien Lenders, to secure the

Prepetition Second Lien Obligations, a second priority security interest in and continuing lien (the

15  "Prepetition Junior Liens") in the Prepetition Senior Collateral.

16       (c)      The Debtor irrevocably waives any right to challenge or contest the

17  Prepetition Senior Liens and the validity of the Prepetition Senior Obligations; provided that,

18  subject to paragraph 29 of this Order and the time limitations specified in paragraph 30 of this

19  Order, none of the foregoing acknowledgments or agreements by the Debtor contained in this

20  paragraph D shall be binding on any other party and shall not affect the rights of any committee,

21  Person or entity (other than the Debtor with respect to the acknowledgements and agreements set

22  forth in paragraph D(a)) with respect to their rights to assert, pursue or otherwise allege any of the

23  claims and actions described in paragraph 30 of this Order.

24       (d)      As used herein, the term "Prior Liens" means only valid, enforceable, and

25  non-avoidable liens and security interests in the Prepetition Senior Collateral that were perfected

26  prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by

27  Section 546(b) of the Bankruptcy Code), which are not subject to avoidance, reduction,

28  disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  bankruptcy law and which are senior in priority to the Prepetition Senior Liens under applicable

2  law and after giving effect to any subordination or intercreditor agreements.  For the avoidance of

3  doubt, the Prior Liens shall not include, or be deemed to include, any or all of the Prepetition

4  Senior Liens, the Adequate Protection Senior Liens (as defined in paragraph 17(a) below), the

5  Prepetition Junior Liens, and/or the Adequate Protection Junior Liens all of which liens are being

6  primed by the Postpetition Liens as set forth herein.

7         E.    <u>Cash Collateral</u>.  For purposes of this Order, the term "Cash Collateral"

8  shall mean and include all "cash collateral" as defined by section 363(a) of the Bankruptcy Code

9  and shall include and consist of, without limitation, all of the respective cash proceeds of the

10  Postpetition Collateral (as defined below in paragraph 9 of this Order) and Prepetition Senior

11  Collateral in which the Prepetition Senior Lender has an interest (including, without limitation,

12  any adequate protection lien or security interest), whether such interest existed as of the Petition

13  Date or arises thereafter pursuant to this Order, any other order of this Court, applicable law or

14  otherwise.

15         F.    <u>Exigent Circumstances</u>.  The Debtor has an immediate and critical need to

16  obtain post-petition financing under the Postpetition Facility and to use Cash Collateral in order to,

17  among other things, finance the ordinary costs of its operations, make payroll, and satisfy other

18  working capital and operational needs.  The Debtor's access to sufficient working capital and

19  liquidity through the incurrence of post-petition financing under the Postpetition Facility and the

20  use of Cash Collateral under the terms of this Order is vital to the preservation and maintenance of

21  the value of the Debtor's estate.  Consequently, without access to the Postpetition Facility and the

22  use of Cash Collateral, to the extent authorized pursuant to this Order, the Debtor and its estate

23  would suffer immediate and irreparable harm.

24         G.    <u>No Alternative Sources of Funding</u>.  The use of Cash Collateral alone

25  would be insufficient to meet the Debtor's post-petition liquidity needs.  Given the Debtor's

26  current financial condition and capital structure, the Debtor is unable to obtain (i) adequate

27  unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code

28  or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior

1   lien on unencumbered assets of its estate under section 364(c)(2) of the Bankruptcy Code and (y) a

2   junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured

3   credit under section 364(d)(1) of the Bankruptcy Code, from sources other than the Postpetition

4   Lender on terms more favorable than the terms of the Postpetition Facility.  The only source of

5   secured credit available to the Debtor, other than the use of Cash Collateral, is the Postpetition

6   Facility.  The Debtor requires both additional financing under the Postpetition Facility and the use

7   of Cash Collateral under the terms of this Order in order to satisfy its post-petition liquidity needs.

8   After considering all of its alternatives, the Debtor has concluded, in an exercise of its sound

9   business judgment, that the financing to be provided by the Postpetition Lender pursuant to the

10  terms of this Order and the Postpetition Loan Documents represents the best financing presently

11  available to the Debtor.

12          H.      Willingness of Postpetition Lender.  The Postpetition Lender has indicated a

13  willingness to provide the Debtor with certain financing commitments, but solely on the terms and

14  conditions set forth in this Order and in the Postpetition Loan Documents.

15          I.      Limited Consent.  The consent of the Prepetition Senior Lender to the

16  priming of its liens by the Postpetition Liens is limited to the Postpetition Facility presently before

17  this Court, with the Prepetition Senior Lender as the Postpetition Lender, and shall not, and shall

18  not be deemed to extend to any other post-petition financing or to any modified version of this

19  Postpetition Facility.  Furthermore, the consent of the Prepetition Senior Lender to the Debtor's

20  use of Cash Collateral and the priming of its liens by the Postpetition Liens as provided in this

21  Order does not constitute, and shall not be construed as constituting, an acknowledgment or

22  stipulation by the Prepetition Senior Lender that its interests in the Prepetition Senior Collateral

23  are adequately protected pursuant to this Order or otherwise.  Nothing in this Order, including,

24  without limitation, any of the provisions herein with respect to adequate protection, shall

25  constitute, or be deemed to constitute, a finding that the interests of the Prepetition Senior Lender

26  or any Prepetition Second Lien Lender are or will be adequately protected with respect to any non-

27  consensual use of Cash Collateral or non-consensual priming of the Prepetition Senior Liens or

28  Prepetition Junior Liens.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

J.      <u>Section 364(d) Finding</u>.  The security interests and liens granted pursuant to this Order to the Postpetition Lender, are appropriate under section 364(d) of the Bankruptcy Code because, among other things: (i) such security interests and liens do not impair the interests of any holder of a valid, perfected, prepetition security interest or lien in any property of the Debtor's estate, and/or (ii) the holders of such security interests and liens have consented (or are deemed to have consented) to the security interests and priming liens granted pursuant to this Order to the Postpetition Lender.

K.      <u>Good Cause Shown</u>.  Good cause has been shown for immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and such relief is in the best interest of the Debtor, its estate and creditors.  In particular, the authorizations granted herein for the Debtor to execute the Postpetition Loan Documents, to use the Cash Collateral, and to obtain interim financing, including on a priming lien basis, are necessary to avoid immediate and irreparable harm to the Debtor and its estate, are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

L.      <u>Section 364(e); Good Faith</u>.  The Postpetition Facility, Postpetition Loan Documents, use of Cash Collateral and provision of adequate protection contained herein have been negotiated in good faith and at arm's-length among the Debtor, the Prepetition Senior Lender and Postpetition Lender.  Accordingly, any credit extended and loans made to, Cash Collateral used by, and adequate protection provided by the Debtor pursuant to this Order shall be, and hereby are, deemed to have been extended, issued, made, used or provided, as the case may be, in "good faith" as required by, and within the meaning of, section 364(e) of the Bankruptcy Code.

Based upon the foregoing findings, stipulations, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      <u>Motion Granted</u>.  The Motion is approved on an interim basis on the terms and conditions set forth in this Order.  This Order shall become effective immediately upon its

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   entry.  To the extent any provisions in this Order conflict with any provisions of the Postpetition

2   Loan Documents, the provisions of this Order shall control and govern to the extent of such

3   conflict.  All objections to the entry of this Order have been withdrawn or overruled.

4         2.    <u>Postpetition Loan Documents</u>.  The terms and conditions of the Postpetition

5   Loan Agreement are hereby approved.  The Debtor is hereby authorized to enter into and deliver

6   the Postpetition Loan Agreement and such additional documents, instruments, notes and

7   agreements as may be reasonably required by the Postpetition Lender to implement the terms or

8   effectuate the purposes of this Order (as such additional documents, instruments, notes and

9   agreements may be amended, restated, supplemented or otherwise modified from time to time,

10  together with the Postpetition Loan Agreement, the "Postpetition Loan Documents").  The Debtor

11  is hereby authorized to borrow money and obtain letters of credit under the Postpetition Loan

12  Agreement, in accordance with the terms of this Order and the Postpetition Loan Documents.

13  Upon execution and delivery thereof by the Debtor, the Postpetition Loan Documents shall be

14  incorporated by reference as part of this Order and shall constitute valid and binding obligations of

15  the Debtor, enforceable against the Debtor (and its estate, successors and assigns) in accordance

16  with the terms thereof.  The Postpetition Lender may from time to time impose reserves against

17  Availability as Postpetition Lender deems necessary or appropriate in accordance with the

18  Postpetition Loan Agreement (or, if not specified therein, in the sole credit judgment of the

19  Postpetition Lender), including, without limitation, a reserve for the Carve-Out (as defined in

20  paragraph 13 below).

21        3.    <u>Amendments</u>.  The Debtor is hereby authorized, without further notice,

22  motion or application to, order of, or hearing before, this Court, to enter into agreements with the

23  Postpetition Lender providing for any non-material modifications to the Approved Budget (as

24  defined below) or the Postpetition Loan Agreement, or of any other modifications to the

25  Postpetition Loan Agreement necessary to conform the Postpetition Loan Agreement to this

26  Order; <u>provided</u>, <u>however</u>, that notice of any material modification or amendment to the Approved

27  Budget or the Postpetition Loan Agreement shall be provided to counsel to the Creditors'

28  Committee (if one is appointed) and counsel to the U.S. Trustee, each of whom shall have three

1    (3) days from the date of such notice within which to object in writing to such material

2    modification or amendment.  If the Creditors' Committee or the U.S. Trustee timely objects in

3    writing served on counsel for the Postpetition Lender and the Debtor to any material modification

4    or amendment to the Approved Budget or the Postpetition Loan Agreement, then such

5    modification or amendment shall only be permitted pursuant to an order of this Court.

6              4.        Permitted Use.

7              a.        Generally.  Notwithstanding anything in this Order to the contrary,

8    the Debtor may use the Cash Collateral and proceeds of the Postpetition Facility, obtain and

9    maintain Letters of Credit and pay Postpetition Obligations solely in accordance with and pursuant

10   to the financial covenants, availability formulae, and other terms and conditions set forth in the

11   Postpetition Loan Documents and this Order, including, without limitation, pursuant to the

12   Approved Budget (as defined in paragraph 8 below), but in all events only until the earliest of (i)

13   February 27, 2018, (ii) the closing of any refinancing of the Prepetition Senior Obligations and

14   Postpetition Obligations, (iii) confirmation of any chapter 11 plan in the Chapter 11 Case, (iv) the

15   conversion or dismissal of the Chapter 11 Case, (v) the appointment of a trustee or examiner in the

16   Chapter 11 Case, and (vi) at the option of the Postpetition Lender in its sole discretion, the

17   occurrence of any Event of Default under this Order and/or the Postpetition Loan Agreement (the

18   date of the earliest such occurrence, the "Commitment Termination Date").  Notwithstanding the

19   foregoing, but subject to the Maximum Amount (as defined in paragraph 7 below), if the

20   Postpetition Lender in its sole discretion advances funds or provides other extensions of credit to

21   the Debtor in excess of any financial covenants, availability formulae, or other terms and

22   conditions (or any other limitations in the Postpetition Loan Documents, including, without

23   limitation, the Approved Budget), such advances (and any other indebtedness in excess of such

24   amount) shall constitute Postpetition Obligations entitled to the rights, priorities, benefits and

25   protections of the Postpetition Loan Documents and this Order.

26              b.        No Duty to Monitor Compliance.  The Postpetition Lender and the

27   Prepetition Senior Lender may assume the Debtor will comply with this Order, the Approved

28   Budget and the Postpetition Loan Documents and shall not (i) have any obligation with respect to

the Debtor's use of Cash Collateral or the use of proceeds of the Postpetition Facility; (ii) be

obligated to ensure or monitor the Debtor's compliance with any financial covenants, formulae, or

other terms and conditions of any Postpetition Loan Document or (iii) be obligated to pay (directly

or indirectly from the Prepetition Senior Collateral or Postpetition Collateral) any expenses

incurred or authorized to be incurred pursuant to the Postpetition Loan Documents.

5.    Postpetition Obligations.  For purposes of this Order, the term "Postpetition

Obligations" shall mean all amounts owing under the Postpetition Loan Agreement and other

Postpetition Loan Documents (including, without limitation, all "Obligations" as defined in the

Postpetition Loan Agreement) and shall include the principal of, interest on, fees, costs, expenses

and other charges owing in respect of, such amounts (including, without limitation, any attorneys',

accountants', financial advisors' and other fees, costs and expenses that are chargeable or

reimbursable under the Postpetition Loan Documents), and any obligations in respect of letters of

credit or indemnity claims, in each case whether contingent or otherwise.

6.    Interest, Fees, Costs and Expenses.  The Postpetition Obligations shall bear

interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the

terms and conditions of, this Order and the Postpetition Loan Documents, in each case without

further notice, motion or application to, order of, or hearing before, this Court.  The Debtor shall

pay on demand all fees, costs, expenses and other charges payable under the terms of the

Postpetition Loan Documents, including, without limitation, all fees, costs and expenses described

in the Postpetition Loan Agreement, in each case whether or not the Postpetition Loan Agreement

and transactions contemplated therein are consummated.  All such fees, costs and expenses

incurred through and including the Closing Date (as defined in the Postpetition Loan Agreement)

shall be paid on the Closing Date, and none of such fees, costs and expenses shall be subject to

Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required

to file with respect thereto any interim or final fee application with this Court.  With respect to all

such fees, costs, and expenses incurred after the Closing Date, the Postpetition Lender shall submit

summaries of its professional fee invoices to the Debtor, the U.S. Trustee and counsel for the

Creditors' Committee (if one is appointed).  Such summary invoices may be redacted to the extent

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   necessary to delete any information subject to the attorney-client privilege, any information

2   constituting attorney work product, or any other confidential information, and the provision of

3   such summaries shall not constitute any waiver of the attorney-client privilege or of any benefits

4   of the attorney work product doctrine.  The U.S. Trustee and the Creditors' Committee may object

5   to the reasonableness of the fees, costs and expenses included in any professional fee summary

6   invoice submitted by the Postpetition Lender; provided that, (i) any portion of any such summary

7   invoice that is not the subject of any objection shall be paid immediately, and (ii) any objection

8   shall be forever waived and barred unless (A) it is filed with this Court and served on counsel to

9   the Postpetition Lender no later than ten (10) days after the objecting party's receipt of the

10  applicable professional fee summary invoice, and (B) it describes with particularity the items or

11  categories of fees, costs and expenses that are the subject of the objection and provides the specific

12  basis for the objection to each such item or category of fees, costs and expenses.  Any hearing on

13  an objection to payment of any fees, costs and expenses of the Postpetition Lender set forth in a

14  professional fee summary invoice shall be limited to the reasonableness or necessity of the

15  particular items of categories of the fees, costs and expenses which are the subject of such

16  objection.  The Debtor shall indemnify the Postpetition Lender (and other applicable parties) to the

17  extent set forth in the Postpetition Loan Documents.  All such unpaid fees, costs, expenses, and

18  charges that have not been disallowed by this Court on the basis of an objection filed by the U.S.

19  Trustee or the Creditors' Committee in accordance with the terms hereof shall constitute

20  Postpetition Obligations and shall be secured by the Postpetition Collateral as specified in this

21  Order.  Any and all fees, commissions, costs and expenses paid prior to the Petition Date by the

22  Debtor to the Postpetition Lender in connection with or with respect to the Postpetition Facility,

23  Postpetition Loan Agreement or other Postpetition Loan Documents are hereby approved in full.

24          7.      Maximum Amount.  Subject to the terms and conditions set forth in this

25  Order and in the Postpetition Loan Documents, the Debtor may use the proceeds of the

26  Postpetition Facility and the Cash Collateral solely to: (i) pay outstanding Postpetition Obligations

27  as provided in the Postpetition Loan Documents and this Order, (ii) make the adequate protection

28  payments required under this Order, and (iii) fund general corporate and working capital

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1    requirements of the Debtor constituting administrative expenses in the Chapter 11 Case, in each

2    case in accordance with the Approved Budget and the terms of the Postpetition Loan Documents.

3    The aggregate principal amount of Revolving Loans available under the Postpetition Loan

4    Agreement shall not at any time exceed $16,000,000 without further order of this Court (the

5    "Maximum Amount").

6            8.     Approved Budget.

7            a.     Generally.  Attached hereto as Exhibit A is a 13-week budget (the

8    "Initial Approved Budget") which reflects on a line-item basis the Debtor's anticipated cumulative

9    cash receipts, expenditures, "Availability", and "Total Line of Credit Balance" on a weekly basis

10   and all necessary and required cumulative expenses which the Debtor expect to incur during each

11   week of the Initial Approved Budget.  The Initial Approved Budget may be modified or

12   supplemented from time to time by additional budgets (covering any time period covered by a

13   prior budget or covering additional time periods) prepared by Debtor and approved by the

14   Postpetition Lender in its sole discretion in writing (each such additional budget, a "Supplemental

15   Approved Budget"), in each case without further notice, motion or application to, order of, or

16   hearing before, this Court (except as required by paragraph 3 above).  Whichever of the Initial

17   Approved Budget or any Supplemental Approved Budget that is in effect at any time shall

18   constitute the "Approved Budget."

19           b.     Budget Covenants.  On a weekly basis for the period from the

20   Petition Date through the last day of the week of determination, the Debtor shall comply with

21   terms of the Postpetition Loan Agreement as to the Debtor's actual "Availability" and "Total Line

22   of Credit Balance".  The Debtor shall provide to the Postpetition Lender, so as actually to be

23   received within two (2) business days following the end of each week, weekly line-by-line

24   certified variance reports for the preceding weekly period and on a cumulative basis from the

25   Petition Date to the report date, comparing actual "Availability" and "Total Line of Credit

26   Balance" to the projected "Availability" and "Total Line of Credit Balance" set forth in the

27   Approved Budget, in form and scope reasonably acceptable to the Postpetition Lender (each such

28   report, a "Variance Report").  The Debtor shall, on the second (2nd) Business Day of each week

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   from the Closing Date until the Commitment Termination Date, deliver to the Postpetition Lender

2   an updated, "rolling" 13-week budget which sets forth by line item updated projected outstanding

3   Prepetition Senior Obligations, "Availability", "Total Line of Credit Balance", receipts and

4   disbursements for the Debtor during the period commencing from the end of the previous week

5   through and including thirteen weeks thereafter; provided that the Debtor shall still be subject to

6   and be governed by the terms of the Approved Budget then in effect and the Postpetition Lender

7   and Prepetition Senior Lender shall, as applicable, have no obligation to fund to such updated

8   "rolling budget" or permit the use of Cash Collateral with respect thereto.  The Debtor shall, by no

9   later than five (5) Business Days prior to the end of the period covered by the then applicable

10   Approved Budget, cause a Supplemental Approved Budget to become effective.  The Debtor

11   acknowledges and agrees that (i) any failure of the Debtor to be in Substantial Compliance (as

12   defined in the Postpetition Loan Agreement), or (ii) other violation of the terms and condition of

13   this sub-paragraph (b) (each a "Budget Default"), shall constitute an Event of Default under this

14   Order and the Postpetition Loan Agreement.

15          9.      Postpetition Liens.  As security for the full and timely payment of the

16   Postpetition Obligations, the Postpetition Lender is hereby granted, pursuant to sections 364(c)(2),

17   364(c)(3) and 364(d)(1) of the Bankruptcy Code, valid, binding, enforceable, unavoidable and

18   fully perfected security interests, liens and mortgages (collectively, the "Postpetition Liens") in

19   and upon all pre-petition and post-petition real and personal, tangible and intangible property and

20   assets of the Debtor of any kind or nature whatsoever, wherever located, whether now existing or

21   hereafter acquired or arising, including, without limitation, all Prepetition Senior Collateral, cash

22   (including all Cash Collateral wherever held), cash equivalents, bank accounts, accounts, other

23   receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether

24   or not marketable), equipment, goods, fixtures, real property interests, intellectual property,

25   general intangibles, investment property, supporting obligations, letter of credit rights, commercial

26   tort claims, one hundred percent (100%) of the capital stock of the Debtor's direct and indirect

27   domestic and foreign subsidiaries, all inter-company notes held by the Debtor, copyrights,

28   trademarks, trade names, licenses, rights to payment including tax refund claims, and causes of

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1    action (exclusive of actions for preferences, fraudulent conveyances, and other avoidance power

2    claims under sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (the "Avoidance

3    Actions"), but, subject to entry of the Final Order, inclusive of the proceeds and recoveries from

4    the Avoidance Actions (the "Avoidance Action Proceeds")), and the Prepetition Senior Collateral,

5    and the proceeds, products, offspring, rents and profits of all of the foregoing, including insurance

6    proceeds (all of the foregoing, the "Postpetition Collateral"). Such Postpetition Liens shall not be

7    released except to the extent that Full Payment (as defined in Postpetition Loan Agreement) of the

8    Postpetition Obligations and Prepetition Senior Obligations has occurred in cash and the

9    Postpetition Lender and Prepetition Senior Lender have received a releases from the Debtor and its

10   estate in form and substance acceptable to the Postpetition Lender and Prepetition Senior Lender.

11             10.    <u>Other Priority Matters</u>. Subject to the Carve-Out, the Postpetition Liens: (a)

12   shall, pursuant to section 364(c)(2) of the Bankruptcy Code, constitute first priority security

13   interests in and liens on all Postpetition Collateral that is not otherwise subject to any Prior Lien;

14   (b) shall, pursuant to section 364(d)(1) of the Bankruptcy Code, be senior to and prime (i) the

15   Prepetition Senior Liens and any Prepetition Junior Liens, (ii) the Adequate Protection Senior

16   Liens and Adequate Protection Junior Liens (the liens described in clauses (i) and (ii) above,

17   collectively, the "Primed Liens"); and (c) shall, pursuant to section 364(c)(3) of the Bankruptcy

18   Code, be immediately junior in priority to any and all Prior Liens (other than the Primed Liens) on

19   or in the Postpetition Collateral. Other than the Carve-Out and Prior Liens, the Postpetition Liens

20   shall at all times be senior to the following (collectively, the "Subordinate Liens and Related

21   Rights"): (i) the rights of the Debtor and any successor trustee or estate representative in the

22   Chapter 11 Case or any other subsequent proceedings under the Bankruptcy Code, including,

23   without limitation, any Chapter 7 proceeding if any of the Chapter 11 Case are converted to a case

24   under Chapter 7 of the Bankruptcy Code (collectively, the "Successor Case"); (ii) any inter-

25   company claim of the Debtor or any domestic or foreign subsidiary or affiliate of the Debtor, and

26   (iii) any security interest or lien which is either (x) avoided or otherwise preserved for the benefit

27   of the Debtor's estate under section 551 or any other provision of the Bankruptcy Code, or (y)

28   junior or otherwise subordinate to the Prepetition Senior Liens. The Postpetition Liens shall be

1  deemed legal, valid, binding, enforceable, and perfected liens, not subject to subordination,

2  impairment or avoidance, for all purposes in the Chapter 11 Case and any Successor Case.  Other

3  than the Carve-Out and Prior Liens, no other liens or security interests, whether for adequate

4  protection or otherwise, shall be senior or equal to or <u>pari passu</u> with the Postpetition Liens in

5  these Chapter 11 Case or any Successor Case without the express written consent of the

6  Postpetition Lender given in accordance with the Postpetition Loan Agreement (which consent

7  may be withheld in its sole discretion).  Notwithstanding anything herein to the contrary, all

8  parties retain and reserve all their rights to dispute the validity, priority, enforceability and

9  perfection of the Prior Liens.

10         11.    <u>Super-Priority Claim</u>.  In addition to the Postpetition Liens, the Postpetition

11  Lender is hereby granted, for all Postpetition Obligations, an allowed super-priority administrative

12  expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code (the "Super-Priority Claim")

13  against the Debtor and its estate.  Except for the Carve-Out, the Super-Priority Claim shall have

14  priority over all other costs and expenses of administration of any kind (and no cost or expense of

15  administration shall be senior to, equal to, or <u>pari passu</u> with, the Super-Priority Claim), including

16  those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 363, 364, 503, 506,

17  507, 546, 726, 1113 or 1114 or any other provision of the Bankruptcy Code or otherwise.

18         12.    <u>No Reduction or Impairment</u>.  No obligation or liability owed, or payment,

19  transfer or grant of security, to Postpetition Lender under this Order or any other Postpetition Loan

20  Document shall be stayed, restrained, voidable, impaired, or recoverable under the Bankruptcy

21  Code or under any applicable law (including, without limitation, under section 502(d) or 548 of

22  the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform

23  Fraudulent Conveyance Act or similar statute or common law), or be subject to any defense,

24  reduction, setoff, recoupment or counterclaim, whether in the Chapter 11 Case or any Successor

25  Case.  Subject to paragraph 30 below, the release of claims by the Debtor against the Postpetition

26  Lender (and other applicable parties) set forth in the Postpetition Loan Agreement is hereby

27  approved.  The Postpetition Obligations, once paid by the Debtor, shall be non-refundable.

28         13.    <u>Carve-Out</u>.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

a.   <u>Generally</u>.  Notwithstanding anything to the contrary contained in this Order, the liens and claims granted to any of the Postpetition Lender or Prepetition Senior Lender in this Order, the Postpetition Loan Documents, and/or the Prepetition Senior Loan Documents shall be subject to the payment, without duplication, of the following fees and claims (collectively, the "Carve-Out"), but only to the extent that there are not sufficient, unencumbered funds in the Debtor's estate to pay such amounts and/or from any retainers held by any Retained Professionals (as defined below):

(i)   with respect to claims incurred prior to the Carve-Out Trigger Date, the claims of (x) professionals of the Debtor whose retention is approved by this Court during the Chapter 11 Case pursuant to Sections 327 and 328 of the Bankruptcy Code (the "Debtor's Professionals") for unpaid fees and expenses which were incurred on and after the Petition Date and prior to the Carve-Out Trigger Date; and (y) professionals of any statutory committees appointed in the Chapter 11 Case whose retention is approved by this Court during the Chapter 11 Case pursuant to Section 1103 of the Bankruptcy Code (the "Committee's Professionals" and together with the Debtor's Professionals, the "Retained Professionals") for unpaid fees and expenses which were incurred on and after the Petition Date and prior to the Carve-Out Trigger Date; <u>provided</u> that, in each case, such fees and expenses of the Retained Professionals (A) are ultimately allowed on a final basis by this Court under sections 330 and 331 of the Bankruptcy Code, (B) comply with the Approved Budget, (C) are not excluded from the Carve-Out under paragraph 29 of this Order, (D) as to the Debtor's Professionals, do not exceed (1) $62,500 for SulmeyerKupetz ("Debtor's Counsel") in the aggregate and $62,500 for KGI Advisors ("Debtor's Financial Advisor") in the aggregate for the period ending on, and including, the date that any Final Order is entered, and (2) $125,000 for Debtor's Counsel in the aggregate and $125,000 for Debtor's Financial Advisor in the aggregate, including both prior to and after the entry of any Final Order (for the avoidance of doubt, the amounts set forth in this subclause (D)(2) are inclusive of, and not in addition to, the amounts set forth in the foregoing subclause (D)(1)), and (E) as to the Committee's Professionals, do not exceed (1) $12,500 in the aggregate for the period ending on, and including, the date that any Final Order is entered, and (2) $25,000 in the aggregate, including prior to and after the entry of any Final Order (for the avoidance of doubt, the amount set forth in this subclause (E)(2) is inclusive of, and not in addition to, the amounts set forth in the foregoing subclause (E)(1)) (such fees and expenses, the "Pre-Carve-Out Trigger Date Expenses" and the permitted amount thereof, the "Pre-Carve-Out Trigger Date Amount");

(ii)   with respect to claims incurred on or after the Carve-Out Trigger Date, the claims of Retained Professionals for unpaid fees and expenses which were incurred on and after the Carve-Out Trigger Date; <u>provided</u> that, in each case, such fees and expenses of the Retained Professionals (A) are ultimately allowed on a final basis by this Court under sections 330 and 331 of the Bankruptcy Code, (B) are not excluded from the Carve-Out under paragraph 29 of this Order, (C) as to the Debtor's Professionals, do not exceed $20,000 for SulmeyerKupetz in the aggregate and $20,000 for KGI Advisors in the aggregate, and (D) as to the Committee's Professionals, do not exceed $10,000 in the aggregate (such fees and expenses, the "Post-Carve-Out Trigger Date Expenses" and the permitted amount thereof, the "Post-Carve-Out Trigger Date Amount" and, together with the Pre-Carve-Out Trigger Date Amount, the "Carve-Out Amount"); and

(iii)   unpaid fees payable to the United States Trustee and Clerk of the Bankruptcy Court pursuant to Section 1930 of Title 28 of the United States Code.

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1    b.    Carve-Out Trigger Date.  As used herein, the term "Carve-Out

2 Trigger Date" means the date on which the Postpetition Lender provides written notice to the

3 Debtor that the Carve-Out is invoked, which notice shall be delivered only on or after (i) the

4 occurrence and continuation of an Event of Default under the Postpetition Loan Agreement or the

5 Commitment Termination Date, and (ii) the termination of the Postpetition Lender's obligations to

6 make loans or provide other extensions of credit under the Postpetition Loan Agreement.

7    c.    Carve-Out Trigger Date Amounts.  Subject to the terms and

8 conditions of this Order and the Postpetition Loan Documents, the Debtor shall be permitted,

9 during the time period prior to the Carve-Out Trigger Date, to (i) make payments of compensation

10 and reimbursement of reasonable fees and expenses of the Committee's Professionals allowed and

11 payable under sections 327, 328, 330 and 331 of the Bankruptcy Code, as the same may be due

12 and payable in accordance with the Approved Budget, that constitute Pre-Carve-Out Trigger Date

13 Expenses and such payments shall not reduce or be deemed to reduce the Committee's

14 Professionals' portion of the Pre-Carve-Out Trigger Date Amount or the Committee's

15 Professionals' portion of the Post-Carve-Out Trigger Date Amount, and (ii) make weekly

16 advances of funds to Debtor's Counsel (which funds will be held in Debtor's Counsel's trust

17 account) (each such advance with respect to Debtor's Counsel, a "Debtor's Counsel Advance";

18 each such advance with respect to the Debtor's Financial Advisor, a "Debtor's Financial Advisor

19 Advance") for payment of compensation and reimbursement of reasonable expenses of Debtor's

20 Professionals allowed and payable under sections 327, 328, 330 and 331 of the Bankruptcy Code

21 in accordance with the Approved Budget that constitute Pre-Carve-Out Trigger Date Expenses

22 subject to the following: (A) the aggregate amount of Debtor's Counsel Advances in any week

23 will not exceed $35,000, (B) the aggregate amount of Debtor's Financial Advisor Advances in any

24 week will not exceed $35,000, (C) the Debtor's Counsel's portion of the Pre-Carve-Out Trigger

25 Date Amount will be reduced on a dollar-for-dollar basis to the extent that the aggregate amount

26 of Debtor's Counsel Advances in any week exceeds $25,000, and (D) the Debtor's Financial

27 Advisor's portion of the Pre-Carve-Out Trigger Date Amount will be reduced on a dollar-for-

28 dollar basis to the extent that the aggregate amount of Debtor's Financial Advisor Advances in any

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   week exceeds $25,000.  On and after the Carve-Out Trigger Date, the dollar amounts available to

2   be paid to each Retained Professional with respect to their respective portions of the Carve-Out

3   Amount shall be reduced, dollar-for-dollar, by the aggregate amount of payments made to such the

4   Retained Professionals on account of their respective Pre-Carve-Out Trigger Date Expenses or

5   Post-Carve-Out Trigger Date Expenses (whether from Cash Collateral, any proceeds of the

6   Postpetition Facility, or otherwise).

7              d.        <u>Reservation of Rights</u>.  Payment of any fees and expenses of the

8   Retained Professionals pursuant to the Carve-Out shall not, and shall not be deemed to, (i) reduce

9   the Debtor's obligations owed to any of the Postpetition Lender and/or the Prepetition Senior

10  Lender or (ii) subordinate, modify, alter or otherwise affect any of the liens and security interests

11  of such parties in the Postpetition Collateral or Prepetition Senior Collateral (or their respective

12  claims against the Debtor).  The Postpetition Lender and Prepetition Senior Lender shall not be

13  responsible for the direct payment or reimbursement of any fees or disbursements of any Retained

14  Professionals (or of any other Person) incurred in connection with the Chapter 11 Case or any

15  Successor Case, and nothing in this Order or otherwise shall be construed to obligate such parties

16  in any way to pay compensation to or to reimburse expenses of any Retained Professional or any

17  other Person, or to ensure that the Debtor has sufficient funds to pay such compensation or

18  reimbursement.  Nothing herein shall impair, or be construed to impair, the ability of any party to

19  object to any of the fees, expenses, reimbursement or compensation of the Retained Professionals.

20              14.       <u>Cash Collection Procedures</u>.

21              a.        <u>Generally</u>.  From and after the date of the entry of this Order, (i) all

22  collections and proceeds of any Postpetition Collateral or Prepetition Senior Collateral or services

23  provided by the Debtor and all Cash Collateral which shall at any time come into the possession,

24  custody or control of the Debtor, or to which the Debtor is now or shall become entitled at any

25  time, shall be promptly and on a daily basis deposited into bank accounts (A) owned by the Debtor

26  that are permitted to remain open after December 1, 2017 under the terms of the Postpetition Loan

27  Agreement, and (B) into which collections and proceeds of the Prepetition Senior Collateral were

28  deposited under the Prepetition Senior Loan Agreement (or in such other accounts as are

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   designated by Postpetition Lender from time to time), and (ii) all such collections and proceeds

2   shall be transferred by the Debtor to the Postpetition Lender on a daily basis and applied on a daily

3   basis, subject to the Carve-Out and any Prior Liens, against the Postpetition Obligations and

4   Prepetition Senior Obligations as provided in the Postpetition Loan Documents and this Order.

5   Each bank account into which the Debtor deposits the collections and proceeds of any Postpetition

6   Collateral shall be in the name of, and deemed to be owned by, the Debtor to the extent provided

7   in the Postpetition Loan Agreement.  The Debtor shall promptly enter into any additional

8   agreements providing for the establishment of lock boxes, blocked accounts, or similar

9   arrangements in favor of the Postpetition Lender for purposes of facilitating cash collections from

10  the Debtor in accordance with the terms of the Postpetition Loan Agreement and this Order.

11          b.      Cash Collateral Account; Application of Cash Collateral.  All funds

12  received by Prepetition Senior Lender or Postpetition Lender to Cash Collateralize any of the

13  Letters of Credit issued under (and as defined in) the Prepetition Senior Loan Agreement (each

14  such Letter of Credit, a "Prepetition Senior Letter of Credit"; such funds, "Prepetition Senior LC

15  Cash Collateral"), shall be deposited into a bank account in the name of Prepetition Senior Lender

16  (the "Prepetition Senior LC Cash Collateral Account").  Following the expiration or termination of

17  any Prepetition Senior Letter of Credit and the payment and satisfaction of all Obligations (as

18  defined in the Prepetition Senior Loan Agreement) with respect to such Prepetition Senior Letter

19  of Credit and the expiration or termination of all outstanding Prepetition Senior Letters of Credit,

20  the portion (if any) of Prepetition Senior LC Cash Collateral then held in the Prepetition Senior

21  LC Cash Collateral Account based on such expired or terminated Prepetition Senior Letter of

22  Credit (the amount of such portion to be determined in accordance with the definition of Cash

23  Collateralize set forth in the Prepetition Senior Loan Agreement) shall be applied by Postpetition

24  Lender in accordance with the terms of the Postpetition Loan Agreement and this Order.

25          15.     Non-Ordinary Course Dispositions; Credit Bid Rights.

26          a.      The Debtor shall comply in all respects with the liquidation process

27  covenants and deadlines set forth the Postpetition Loan Agreement, for which time is of the

28  essence.

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

b.      The respective rights of the Postpetition Lender and Prepetition

Senior Lender to credit bid all or any portion of the Postpetition Obligations and Prepetition

Senior Obligations (as applicable) under section 363(k) of the Bankruptcy Code and other

applicable law in connection with any proposed sale of Prepetition Senior Collateral or

Postpetition Collateral (other than the sale of Inventory in the ordinary course of the Debtor's

business), or to object to such proposed sale or other Asset Disposition, shall be preserved through

the closing of such sale or other Asset Disposition.  Any and all proceeds arising from or in

connection with any sale or lease of Postpetition Collateral or Prepetition Senior Collateral, or

other Asset Disposition, including proceeds arising from or in connection with any Asset

Disposition described in the Postpetition Loan Agreement, shall, subject to the terms of the

Postpetition Loan Documents, be immediately transferred to Postpetition Lender or Prepetition

Senior Lender (as applicable) for application to, or cash collateralization of, the Postpetition

Obligations or Prepetition Senior Obligations in accordance with the terms and conditions of the

Postpetition Loan Documents and Prepetition Senior Loan Documents (in each case, as

applicable).

16.     Landlord Agreements.  All landlord agreements to which Prepetition Senior

Lender is a party shall be deemed amended to include the Postpetition Lender as a beneficiary

thereunder, and such agreements shall thereafter be additionally enforceable by the Postpetition

Lender against, and binding upon, each landlord party thereto in accordance with, and subject to,

its respective terms and conditions until the Full Payment of the Postpetition Obligations has

occurred in cash and the Postpetition Loan Agreement shall have been terminated, after which

such agreements shall again be solely enforceable by the Prepetition Senior Lender.

17.     Adequate Protection Senior Obligations.  Until the indefeasible repayment

in full in cash of the Prepetition Senior Obligations and the expiration of the Complaint Filing

Deadline (or resolution of any complaint or adversary proceeding described in paragraph 30 of this

Order), as adequate protection for the Prepetition Senior Lender's interest in the Prepetition Senior

Collateral, the Prepetition Senior Lender is hereby granted the following:

a.      Replacement Liens.  Pursuant to sections 361(2), 362, 363(c)(2), and

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1    363(e) of the Bankruptcy Code, the Prepetition Senior Lender, is hereby granted by the Debtor

2    continuing valid, binding, enforceable and perfected, liens and security interests in and on all of

3    the Postpetition Collateral (the "Adequate Protection Senior Liens").  The Adequate Protection

4    Senior Liens shall (i) be subordinate only to: (A) the Carve-Out, (B) the Postpetition Liens, and

5    (C) the Prior Liens; and (ii) be senior and superior to the Subordinate Liens and Related Rights.

6    The Adequate Protection Senior Liens shall be deemed legal, valid, binding, enforceable, and

7    perfected liens, not subject to subordination, impairment or avoidance, for all purposes in the

8    Chapter 11 Case and any Successor Case.  Except as described in clause (i) above, no other liens

9    or security interests, whether for adequate protection or otherwise, shall be senior or equal to or

10   pari passu with the Adequate Protection Senior Liens in the Chapter 11 Case or any Successor

11   Case without the prior written consent of the Prepetition Senior Lender given in accordance with

12   the Prepetition Senior Loan Agreement (which consent may be withheld in its sole discretion).

13             b.    Adequate Protection Senior Claim.  Pursuant to section 507(b) of the

14   Bankruptcy Code, the Prepetition Senior Lender shall have an allowed super-priority

15   administrative expense claim (the "Adequate Protection Senior Claim") against the Debtor and its

16   estate.  The Adequate Protection Senior Claim shall: (i) be subordinate only to: (A) the Carve-Out,

17   and (B) the Super-Priority Claim; and (ii) be senior and superior to the Subordinate Claims and

18   Related Rights.  Except as described in clause (i) above, no cost or expense of administration

19   under any provision of the Bankruptcy Code (whether incurred in these Chapter 11 Case or any

20   Successor Case, whether for adequate protection, the lack of, or failure to provide, adequate

21   protection, or otherwise), shall be senior to, equal to, or pari passu with, the Adequate Protection

22   Senior Claim.

23             c.    Adequate Protection Payments.  As further adequate protection,

24   subject to the rights set forth in paragraph 30 hereof, and without limiting any rights of the

25   Prepetition Senior Lender under section 506(b) of the Bankruptcy Code which are hereby

26   preserved, and in consideration, and as a requirement, for obtaining the consent of the Prepetition

27   Senior Lender to the entry of this Order and the Debtor's consensual use of Cash Collateral as

28   provided herein, (i) the proceeds of any Prepetition Senior Collateral and any Postpetition

1  Collateral shall be paid to the Prepetition Senior Lender for application to the Prepetition Senior

2  Obligations until Full Payment of the Prepetition Senior Obligations has occurred, (i) Debtor shall

3  make all payments of interest as and when due under the Prepetition Senior Loan Agreement, and

4  (ii) the Debtor shall, on the Closing Date and on a monthly basis thereafter, pay or reimburse the

5  Prepetition Senior Lender for any and all of its accrued and past-due fees, costs, expenses and

6  charges payable under the Prepetition Senior Loan Documents, including without limitation, the

7  reasonable attorneys' and other fees and expenses of the Prepetition Senior Lender as provided in

8  the Prepetition Senior Loan Agreement, whether accrued prepetition or postpetition, all without

9  further notice, motion or application to, order of, or hearing before, this Court.

10             d.        <u>Adequate Protection Senior Obligations</u>.  The Adequate Protection

11  Senior Liens and Adequate Protection Senior Claim shall secure the payment of the Prepetition

12  Senior Obligations in an amount equal to any diminution in the value of the Prepetition Senior

13  Lender's interests in the Prepetition Senior Collateral from and after the Petition Date (the amount

14  of such diminution, the "Adequate Protection Senior Obligations") including, without limitation,

15  any such diminution resulting from (i) the use by the Debtor of the Prepetition Senior Collateral,

16  including, without limitation, the Cash Collateral, (ii) the imposition of the Postpetition Liens,

17  which will prime the Primed Liens, (iii) the imposition of the automatic stay pursuant to section

18  362(a) of the Bankruptcy Code, (iv) the physical deterioration, consumption, use, sale, lease,

19  disposition, shrinkage, or decline in market value of the Prepetition Senior Collateral or otherwise,

20  or (v) costs and fees incurred in connection with the Prepetition Senior Loan Documents.

21             e.        <u>Prepetition Senior Liens</u>.  None of the Prepetition Senior Liens shall

22  be released unless and until (i) the Full Payment of the Prepetition Senior Obligations has

23  occurred, (ii) the Prepetition Senior Lender has received a release of any and all claims from the

24  Debtor in form and substance acceptable to the Prepetition Senior Lender, (iii) the Complaint

25  Filing Deadline has occurred and all claims filed against any of the Prepetition Senior Lender have

26  been resolved, and (iv) the Prepetition Senior Lender has been reimbursed in full for all liability,

27  fees, costs, and expenses incurred in connection with any claims filed against any of them in

28  connection with the Prepetition Senior Loan Documents.

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

18.    <u>Adequate Protection Junior Obligations</u>.  To the extent that the Prepetition Second Lien Agent has a valid claim for diminution in the value, if any, of the Prepetition Second Lien Agent's and Prepetition Second Lien Lenders' interests in the Prepetition Senior Collateral from and after the Petition Date (the amount of such diminution, the "Adequate Protection Junior Obligations"), and subject to the rights of any party in interest (including, without limitation, the Debtor) to challenge the extent, validity, and priority of the Prepetition Second Lien Agent's and Prepetition Second Lien Lenders' and/or claims against the Debtor and/or the Prepetition Junior Liens, the Prepetition Second Lien Agent and Prepetition Second Lien Lenders are hereby granted the following:

a.    <u>Replacement Liens</u>.  Subject to the foregoing requirements set forth in this paragraph 18, pursuant to sections 361(2), 362, 363(c)(2), and 363(e) of the Bankruptcy Code, the Prepetition Second Lien Agent, for its benefit and the benefit of the Prepetition Second Lien Lenders, is hereby granted by the Debtor continuing valid, binding, enforceable and perfected, liens and security interests in and on all of the Postpetition Collateral (the "Adequate Protection Junior Liens").  The Adequate Protection Junior Liens shall be entitled to the same rights, priorities, benefits and protections granted to or conferred upon the Adequate Protection Senior Liens under this Order, except that such Adequate Protection Junior Liens shall be junior and subordinate to the Prepetition Senior Liens and the Adequate Protection Senior Liens.

b.    <u>Adequate Protection Junior Claim</u>.  Subject to the foregoing requirements set forth in this paragraph 18, pursuant to section 507(b) of the Bankruptcy Code, the Prepetition Second Lien Agent and the Prepetition Second Lien Lenders shall have an allowed super-priority administrative expense claim (the "Adequate Protection Junior Claim") against the Debtor and its estate.  The Adequate Protection Junior Claim shall be entitled to the same rights, priorities, benefits and protections granted to or conferred upon the Adequate Protection Senior Claim under this Order, except that such Adequate Protection Junior Claim shall be junior and subordinate to the Adequate Protection Senior Claim.

19.    <u>Collections</u>.  Notwithstanding anything in this Order to the contrary, any and all claims and liens of the Prepetition Senior Lender arising with respect to or in connection

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   with this Order or the Prepetition Senior Loan Documents (the "Superior Senior Obligations"),

2   including, without limitation, the Prepetition Senior Obligations, Prepetition Senior Liens,

3   Adequate Protection Senior Obligations, and Adequate Protection Senior Claim, must and shall be

4   indefeasibly paid and satisfied in full in cash and all Prepetition Senior Letters of Credit shall have

5   been Cash Collateralized (as defined in the Prepetition Senior Loan Agreement), before any

6   payment or distribution, whether pursuant to a chapter 11 plan, setoff or otherwise, may or can be

7   made to or retained by the Postpetition Lender arising with respect to or in connection with this

8   Order and/or the Postpetition Loan Documents (collectively, the "Subordinate Senior

9   Obligations").  Any payment or distribution, whether in cash, securities or other property, which

10  would otherwise, but for the terms hereof, be payable or deliverable to the Postpetition Lender in

11  respect of or in connection with any Subordinate Senior Obligations shall be paid or delivered

12  directly to the Prepetition Senior Lender (to be held and/or applied by Prepetition Senior Lender in

13  accordance with the terms of this Order and the Prepetition Senior Loan Agreement) until all

14  Superior Senior Obligations are indefeasibly paid and satisfied in full in cash and all outstanding

15  Prepetition Senior Letters of Credit have been Cash Collateralized.

16        20.    Waiver of Section 506(c) Claims.  No costs or expenses of administration or

17  other charge, lien, assessment or claim incurred on or after the Petition Date of any Person or

18  entity shall be imposed against the Postpetition Lender or the Prepetition Senior Lender, their

19  respective claims or the Prepetition Senior Collateral or Postpetition Collateral under section

20  506(c) of the Bankruptcy Code or otherwise, and the Debtor hereby irrevocably waives any and all

21  such rights, remedies and benefits under section 506(c) of the Bankruptcy Code.

22        21.    Other Waivers.  Except for the Carve-Out and Prior Liens, no claim or lien

23  having a priority superior to or pari passu with those granted pursuant to this Order to the

24  Postpetition Lender and the Prepetition Senior Lender, respectively, shall be granted or allowed

25  while any portion of the Postpetition Facility (or any refinancing thereof), the Commitments (as

26  defined in the Postpetition Loan Agreement) thereunder, the Postpetition Obligations, or the

27  Adequate Protection Senior Obligations remain outstanding.  Except as expressly permitted by the

28  Postpetition Loan Agreement, unless consented to in writing by the Postpetition Lender, no Debtor

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   shall seek entry of any further orders in its Chapter 11 Case which authorize (a) under Bankruptcy

2   Code section 363, the use of Cash Collateral; (b) the obtaining of credit or the incurring of

3   indebtedness pursuant to Bankruptcy Code sections 364(c) or 364(d), (c) the return of goods

4   pursuant to Bankruptcy Code section 546(h) to any creditor of the Debtor or to consent to any

5   creditor taking any setoff against any of such creditor's prepetition indebtedness based upon any

6   such return pursuant to Bankruptcy Code section 553 or otherwise, or (d) the granting mortgages,

7   security interests, or liens in the Postpetition Collateral to any parties other than the Postpetition

8   Lender pursuant to section 364(d) of the Bankruptcy Code or otherwise.

9              22.    Automatic Perfection.

10             a.      The Postpetition Liens and the Adequate Protection Senior Liens

11  and the Adequate Protection Junior Liens (subject to the provisions of paragraph 18 of this Order)

12  shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non-

13  avoidable and effective by operation of law as of the Petition Date without any further notice, act

14  or action of or by any Person or entity, and without the necessity of execution by the Debtor, or

15  the filing or recordation, of any financing statements, security agreements, vehicle lien

16  applications, mortgages, filings with the U.S. Patent and Trademark Office, or other documents.

17  If the Postpetition Lender or the Prepetition Lender hereafter requests that the Debtor execute and

18  deliver to it any financing statements, security agreements, collateral assignments, mortgages, or

19  other instruments and documents considered by such party to be reasonably necessary or desirable

20  to further evidence the perfection of the liens and security interests provided under this Order, then

21  the Debtor is hereby authorized and directed, at its sole cost and expense, to promptly execute and

22  deliver such financing statements, security agreements, mortgages, collateral assignments,

23  instruments, and documents, and the Postpetition Lender and Prepetition Senior Lender (as

24  applicable) are hereby authorized to file or record such documents in their respective discretion, in

25  which event all such documents shall be deemed to have been filed or recorded at the time and on

26  the date of entry of this Order, but with the priorities as set forth herein.  The Postpetition Lender

27  and the Prepetition Senior Lender may (in their respective sole discretion), but shall not be

28  required to, file a certified copy of this Order in any filing or recording office in any state, county

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1    or other jurisdiction in which the Debtor has real or personal property and such filing or recording

2    shall be accepted and shall constitute sufficient evidence of perfection of such applicable parties'

3    interests in the Postpetition Collateral at the time and on the date of entry of this Order, but with

4    the priorities as set forth herein.

5                b.        To the extent that any applicable non-bankruptcy law would

6    otherwise restrict the grant, scope, enforceability, attachment or perfection of the security interests

7    and liens authorized or created under or in connection with this Order or the Postpetition Loan

8    Documents, or otherwise would impose filing or registration requirements or fees and charges

9    with respect thereto, such law is hereby pre-empted to the maximum extent permitted by the

10   United States Constitution, the Bankruptcy Code, applicable federal law, and the judicial power of

11   the United States Bankruptcy Court; provided that the Postpetition Lender and Prepetition Senior

12   Lender may still take such steps as they wish to perfect their respective security interests and liens

13   under otherwise applicable state law without waiving the benefits of this provision of this Order.

14                23.    Default Under Other Documents.  The Postpetition Lender and the

15   Prepetition Senior Lender shall have all rights and remedies with respect to the Debtor and any

16   other rights, remedies, benefits and privileges as are set forth in this Order and the Postpetition

17   Loan Documents (as applicable).  Except as otherwise expressly provided herein, no provision

18   contained in any prepetition or postpetition agreement to which the Debtor is a party, or under

19   which the Debtor is obligated or bound, that restricts, conditions, prohibits, limits or impairs in

20   any way the Debtor from (a) granting the Postpetition Lender and the Prepetition Senior Lender

21   the postpetition security interests or liens upon any of its assets, or (b) otherwise entering into and

22   complying with all of the terms, conditions and provisions of this Order and Postpetition Loan

23   Documents, shall be unenforceable against the Debtor.

24                24.    Successors and Assigns.  The provisions of this Order and the Postpetition

25   Loan Documents shall, as applicable, be binding upon and inure to the benefit of the Postpetition

26   Lender, the Prepetition Senior Lender, the Prepetition Second Lien Agent, the Prepetition Second

27   Lien Lenders, and the Debtor and its estate, and their respective successors and assigns, including,

28   without limitation, any trustee or other fiduciary hereafter appointed as a legal representative of

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1    the Debtor or its estate, whether in this Chapter 11 Case or any Successor Case.

2          25.   <u>Survival</u>.  The provisions of this Order and any actions taken pursuant

3    thereto: (a) shall survive the entry of any order: (i) converting the Chapter 11 Case to a case under

4    chapter 7 of the Bankruptcy Code; or (ii) dismissing or closing the Chapter 11 Case; and (b) shall

5    continue in full force and effect notwithstanding the entry of any such order.

6          26.   <u>Section 364(e); Effect of Modification or Appeal</u>.  Based on the findings set

7    forth in this Order, in consideration for the financing provided under Postpetition Facility, the

8    Postpetition Lender is entitled to, and hereby are granted, the full rights, benefits, privileges and

9    protections of, and provided by, section 364(e) of the Bankruptcy Code with respect to the

10   Postpetition Obligations (and related liens, claims, rights, remedies and benefits) created or

11   authorized by this Order in the event that this Order or any authorization or approval contained

12   herein is subsequently stayed, vacated, reversed, amended or modified on appeal.  Any subsequent

13   stay, modification, reversal, amendment or vacation of this Order shall not alter, modify or affect

14   the validity, priority, perfection or enforceability of any claim, lien, or security interest of the

15   Postpetition Lender or the Prepetition Senior Lender authorized, created or granted pursuant to this

16   Order and outstanding immediately prior to the actual receipt of written notice by the Postpetition

17   Lender and Prepetition Senior Lender of the effective date of such stay, modification, reversal,

18   amendment or vacation.  Notwithstanding any such stay, modification, reversal, amendment or

19   vacation, all obligations and other financial accommodations made pursuant to this Order, all

20   Postpetition Obligations incurred and uses of Cash Collateral permitted by the Debtor pursuant

21   hereto prior to the actual receipt of written notice by the Postpetition Lender and Prepetition

22   Senior Lender of the effective date of such stay, modification, reversal, amendment or vacation,

23   shall be governed in all respects by the original provisions of this Order and the Postpetition

24   Lender and the Prepetition Senior Lender shall be entitled to all of the rights, privileges, remedies,

25   protections and benefits contained or granted in section 364(e) of the Bankruptcy Code, the

26   Postpetition Loan Documents and this Order (as applicable), including, without limitation, the

27   Postpetition Liens, Super-Priority Claims, Adequate Protection Senior Liens, and Adequate

28   Protection Senior Claims.

1

27.    <u>Modification of Automatic Stay; Other Remedies</u>.

2    a.    Subject to sub-paragraph (c) below, the automatic stay pursuant to

3 section 362 of the Bankruptcy Code is hereby lifted and vacated as to the Postpetition Lender to

4 the extent necessary to permit them to perform in accordance with, provide any notice under, and

5 exercise, enjoy and enforce its rights, benefits, privileges and remedies pursuant to this Order and

6 the other Postpetition Loan Documents, in each case without further notice, motion or application

7 to, order of, or hearing before, this Court.  Subject to sub-paragraph (c) below, regardless of any

8 change in circumstances (whether or not foreseeable), neither section 105 of the Bankruptcy Code

9 nor any other provision of the Bankruptcy Code or applicable law shall be utilized to prohibit the

10 Postpetition Lender's exercise, enjoyment and enforcement of any of such rights, benefits,

11 privileges and remedies as and to the extent provided in this Order.

12    b.    Subject to sub-paragraph (c) below, the Postpetition Lender is

13 hereby authorized and granted leave from the automatic stay under section 362 of the Bankruptcy

14 Code to do the following on and after the occurrence and continuation of an Event of Default

15 under the Postpetition Loan Agreement (or otherwise on and after the Commitment Termination

16 Date), in each case without further notice, motion or application to, order of, or hearing before,

17 this Court:

18    (i)    terminate any obligation of Postpetition Lender to make
loans or other extensions of credit under the Postpetition
19    Loan Documents or this Order;

20    (ii)    declare all Postpetition Obligations immediately due
and payable in full in cash, and require that all letters
21    of credit and other contingent obligations related
thereto, if any, to be cash collateralized or terminated
22    without liability to Postpetition Lender; and

23    (iii)    revoke the Debtor's right, if any, under this Order
and/or the other Postpetition Loan Documents to use
24    Cash Collateral.

25    c.    On and after the occurrence and continuation of an Event of Default

26 under the Postpetition Loan Agreement (or otherwise on and after the Commitment Termination

27 Date), and after obtaining Court approval upon notice and hearing, the Postpetition Lender and the

28 Prepetition Senior Lender shall be entitled to foreclose or otherwise enforce their respective liens

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   on any or all of the Postpetition Collateral and/or to exercise any other default-related rights and

2   remedies under the Postpetition Loan Documents, Prepetition Senior Loan Documents, this Order,

3   and applicable law to the extent not already permitted pursuant to sub-paragraph (b) above.  The

4   parties shall use their best efforts to schedule and attend an expedited Court hearing within three

5   (3) business days of notice of the Event of Default or Commitment Termination Date being given

6   to the Debtor.  The Debtor acknowledges and agrees, and this Court hereby orders, that the only

7   issue to be determined and decided at any Court hearing regarding such matters is whether an

8   Event of Default has occurred and is continuing under the Postpetition Loan Agreement or

9   whether the Commitment Termination Date has occurred and notice of such hearing need only be

10  given to the Debtor, any statutory committee of unsecured creditors and the U.S. Trustee.

11          28.     No Waiver of Rights.

12          a.      Generally.  Without limiting the terms and conditions of paragraphs

13  9 through 12 and 17 of this Order, none of the Postpetition Lender or Prepetition Senior Lender

14  waives, and each expressly reserves, any and all claims, causes of action, defenses, rights and

15  remedies it has or may have pursuant to any or all of the Prepetition Senior Loan Documents, the

16  Postpetition Loan Documents, any inter-creditor or subordination agreement, the Bankruptcy

17  Code and/or under applicable law against or with respect to the Debtor and any other Person or

18  entity.

19          b.      Relative Priorities.  Pursuant to section 510 of the Bankruptcy Code,

20  any inter-creditor or subordination agreement between and/or among the Prepetition Senior

21  Lender, the Debtor and any other non-Debtor party thereto, and any other applicable inter-creditor

22  or subordination provisions contained in any credit agreement, security agreement, indenture or

23  related document, remain in full force and effect and are not amended, altered or modified by the

24  terms of this Order or the Postpetition Loan Documents.

25          c.      Additional Rights Preserved.  Without limiting the generality of this

26  paragraph 28, the Postpetition Lender and Prepetition Senior Lender may, as applicable, petition

27  this Court for any such additional protection they may reasonably require with respect to the

28  Prepetition Senior Obligations, the Postpetition Obligations, or otherwise, including, without

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  limitation, their rights to request additional adequate protection of their interests in the Prepetition

2  Senior Collateral.  Except as otherwise set forth herein, entry of this Order shall not in any way

3  constitute agreement, consent, or acquiescence by the Postpetition Lender or Prepetition Senior

4  Lender to the terms of any plan of reorganization filed in the Chapter 11 Case.

5           29.     <u>Restriction on Use of Lenders' Funds</u>.  No portion of the Postpetition

6  Facility, the Postpetition Collateral, the Prepetition Senior Collateral, the Cash Collateral, or the

7  Carve-Out, and no disbursements set forth in the Approved Budget, shall be used for the payment

8  of professional fees, disbursements, costs or expenses incurred in connection with asserting any

9  claims, actions or causes of action against or adverse to the interests of any of the Postpetition

10  Lender or Prepetition Senior Lender, including, without limitation, any action challenging or

11  raising any defenses to the Postpetition Obligations, the Prepetition Senior Obligations, the

12  Postpetition Liens, or the Prepetition Senior Liens; provided, that no more than $25,000 in the

13  aggregate of the proceeds of the Postpetition Facility or the Postpetition Collateral (including Cash

14  Collateral) may be used by the Creditors' Committee (if one is formed) to investigate the

15  Prepetition Senior Obligations and the Prepetition Senior Liens.

16           30.     <u>Release of Claims Against Prepetition Senior Lender</u>.  The stipulations and

17  admissions contained in Paragraph D(a) of this Order, shall be binding on all parties in interest,

18  including, without limitation, the Creditors' Committee, unless, and solely to the extent that, (a)

19  the Creditors' Committee, or another party in interest, to the extent each has obtained Court

20  approved standing and requisite authority, and has timely filed a complaint and commenced an

21  adversary proceeding (subject to the limitations set forth in paragraph 29 of this Order)

22  challenging the amount, extent, validity, or enforceability of the Prepetition Senior Obligations, or

23  the perfection or priority of the Prepetition Senior Liens, or otherwise asserting any claims or

24  causes of action on behalf of the Debtor's estate against the Prepetition Senior Lender relating to

25  the Prepetition Senior Obligations, in each case no later than the earlier of (x) sixty (60) days after

26  the date of appointment of the Creditors' Committee or (y) seventy-five (75) days after the

27  Petition Date (such earlier date, the "Complaint Filing Deadline"), and (b) this Court rules in favor

28  of the plaintiff in any such timely and properly commenced adversary proceeding.  If no such

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   adversary proceeding is timely and properly commenced by the Complaint Filing Deadline, or to

2   the extent such adversary proceeding does not result in a final and non-appealable order of this

3   Court that is inconsistent with the acknowledgments of the Debtor contained in paragraph D(a) of

4   this Order, then, without the requirement or need to file any proof of claim with respect thereto

5   and without further notice, motion or application to, order of, or hearing before, this Court, but in

6   all cases subject paragraph 28 of this Order, the acknowledgments of the Debtor contained in

7   paragraph D(a) of this Order with respect to the Prepetition Senior Lender, Prepetition Senior

8   Loan Documents, Prepetition Senior Liens, Prepetition Senior Obligations, and Prepetition Senior

9   Collateral shall be binding, conclusive and final on the Creditors' Committee and any other

10  Person, entity or party-in-interest in the Chapter 11 Case and any Successor Case and (i) the

11  claims, liens and security interests of the Prepetition Senior Lender shall be deemed to be finally

12  allowed for all purposes in this Chapter 11 Case and any Successor Case and shall not be subject

13  to challenge by any party in interest as to validity, priority or otherwise, and (ii) the Debtor and its

14  estate shall be deemed to have forever released any and all claims or causes of action against the

15  Prepetition Senior Lender with respect to the Prepetition Senior Loan Documents, or any related

16  transactions.  Notwithstanding anything to the contrary herein, if any such adversary proceeding is

17  timely commenced, the stipulations contained in paragraph D(a) hereof shall nonetheless remain

18  binding on all parties in interest and preclusive (as provided in the second sentence of this

19  paragraph 30) except to the extent that such stipulations are expressly challenged in such

20  adversary proceeding.

21        31.   <u>No Marshaling</u>.  The Postpetition Lender and the Prepetition Senior Lender

22  shall not be subject to the equitable doctrine of "marshaling", "election of remedies" or any other

23  similar doctrine, or an "equities of the case" claim under section 552(b) of the Bankruptcy Code,

24  in each case with respect to any of its respective interests in the Postpetition Collateral and

25  Prepetition Senior Collateral.

26        32.   <u>No Liability to Third Parties</u>.  In making decisions to advance loans to the

27  Debtor, in administering any loans, in permitting the Debtor to use Cash Collateral, in approving

28  any budget or in taking any actions permitted by this Order or the Postpetition Loan Documents,

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  as applicable, the Postpetition Lender and the Prepetition Senior Lender shall not (i) be deemed to

2  be in control of the operations of the Debtor or to be acting as a "controlling person," "responsible

3  person" or "owner or operator" with respect to the operation or management of the Debtor, and/or

4  (ii) owe any fiduciary duty to the Debtor, its creditors or its estate, and its relationship with the

5  Debtor shall not constitute or be deemed to constitute a joint venture or partnership with the

6  Debtor.

7  　　　　33.　　Insurance.  To the extent that Prepetition Senior Lender is listed as loss

8  payee under the Debtor's insurance policies, Postpetition Lender is also deemed to be the loss

9  payee under the Debtor's insurance policies and shall act in that capacity and distribute any

10  proceeds recovered or received in respect of any such insurance policies in accordance with the

11  terms and conditions of this Order and the Postpetition Loan Documents.

12  　　　　34.　　Payments Held in Trust.  Except as expressly permitted in this Order or the

13  Postpetition Loan Documents, in the event that any person or entity receives any payment on

14  account of a security interest in Collateral, receives any Collateral or any proceeds of Collateral or

15  receives any other payment with respect thereto from any source prior to the indefeasible payment

16  in full in cash of all Prepetition Senior Obligations and Postpetition Obligations, and termination

17  of the Postpetition Facility in accordance with the Postpetition Loan Documents, such person or

18  entity shall be deemed to have received, and shall hold, any such payment or proceeds of

19  Collateral in trust for the benefit of the Postpetition Lender and Prepetition Senior Lender and

20  shall immediately turn over such proceeds to the Postpetition Lender for application to the

21  Postpetition Obligations or the Prepetition Senior Lender for application to the Prepetition Senior

22  Obligations, or as otherwise instructed by the Court, for application in accordance with the

23  Postpetition Loan Documents and this Order.

24  　　　　35.　　Additional Defaults.  In addition and without limitation of the Events of

25  Default set forth in and defined in the Postpetition Loan Documents, this Order, or any Final

26  Order, it shall be a default hereunder (and constitute an "Event of Default" under the Postpetition

27  Loan Agreement and this Order) if (a) an order is entered dismissing or converting the Chapter 11

28  Case under section 1112 of the Bankruptcy Code or appointing a Chapter 11 trustee or an

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   examiner with expanded powers, (b) a sale of substantially all assets is proposed by the Debtor

2   without the written consent of the Postpetition Lender and Prepetition Senior Lender that would

3   not indefeasibly pay the Prepetition Senior Obligations and Postpetition Obligations in full in

4   cash, (c) any other motion is filed by the Debtor for any relief directly or indirectly affecting the

5   Postpetition Collateral in a material manner unless all Prepetition Senior Obligations and

6   Postpetition Obligations have been indefeasibly paid in final, in full, in cash, and completely

7   satisfied upon consummation of the transaction contemplated thereby and such motion is

8   otherwise approved of in writing by the Postpetition Lender, (d) the Debtor fails to comply with

9   any of the terms of, or its covenants under, this Order, the Approved Budget (subject to all

10  applicable variances), or any stipulation or representation by the Debtor stated herein is false or

11  misleading, (e) the occurrence of any Real Estate Milestone Default (as defined in the Postpetition

12  Loan Agreement), including without limitation, the Debtor's failure to comply with any Real

13  Estate Milestone (as defined in the Postpetition Loan Agreement), (f) on or before December 1,

14  2017, the Debtor fails to do any of the following: (i) to cause all Local Collection Accounts (as

15  defined in the Postpetition Loan Agreement) to be closed, (ii) to cause all other Deposit Accounts

16  (as defined in the Postpetition Loan Agreement) which the Debtor uses in connection with its

17  business, including, without limitation, the Master Account (defined in the Postpetition Loan

18  Agreement), to be owned by and maintained in the name of, the Debtor, (iii) to deliver to the

19  Postpetition Lender evidence reasonably satisfactory to the Postpetition Lender as to the

20  satisfaction of the requirements set forth in the foregoing subclauses (i) and (ii), or (iv) to cause

21  the Master Account to be subject to a Deposit Account Control Agreement (defined in the

22  Postpetition Loan Agreement), or (g) at the option of the Postpetition Lender in its sole discretion,

23  the occurrence of any Event of Default under the Postpetition Loan Agreement.  Any order for

24  dismissal or conversion shall be automatically deemed to preserve the rights of the Postpetition

25  Lender and Prepetition Senior Lender under this Order.  No order providing for the sale of

26  substantially all of the assets of the Debtor under section 363 of the Bankruptcy Code shall be

27  entered by the Court unless, upon the closing of such transaction, all liens securing the

28  Postpetition Obligations and Prepetition Senior Obligations (in their respective priority) are

1    transferred to the proceeds of such sale and such proceeds or are applied to permanently and

2    indefeasibly repay the Postpetition Obligations and Prepetition Senior Obligations, as applicable,

3    in full, in cash.  If an order dismissing any of these Chapter 11 Case under section 305 or 1112 of

4    the Bankruptcy Code or otherwise is at any time entered, (i) the claims, security interests, liens

5    and claims granted to or for the benefit of the Postpetition Lender and Prepetition Senior Lender

6    pursuant to this Order shall continue in full force and effect and shall maintain their priorities as

7    provided in this Order, as applicable, until all Postpetition Obligations and Prepetition Senior

8    Obligations shall have been paid and satisfied in full (and that such claims and liens, shall,

9    notwithstanding such dismissal, remain binding on all parties in interest) and (ii) this Court shall

10    retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such claims and

11    liens.

12            36.    <u>Proofs of Claim</u>.  None of the Prepetition Senior Lender or the Postpetition

13    Lender will be required to file proofs of claim or requests for approval of administrative expenses

14    in any of the Chapter 11 Case or any Successor Case, and the provisions of this Order relating to

15    the amount of the Prepetition Senior Obligations and the Postpetition Obligations shall constitute

16    timely filed proofs of claim and/or administrative expense requests in each of the Chapter 11 Case.

17    Notwithstanding the foregoing, Prepetition Senior Lender shall be authorized (but not required) to

18    file a proof of claim against the Debtor (the "Master Proof of Claim") on account of its prepetition

19    claims arising under the Prepetition Senior Loan Documents, and the Prepetition Senior Lender

20    shall not be required to file a verified statement pursuant to Bankruptcy Rule 2019.  If the

21    Prepetition Senior Lender so files a Master Proof of Claim against the Debtor, the Prepetition

22    Senior Lender, and each of its successors and assigns, shall be deemed to have filed a proof of

23    claim in the aggregate amount set forth therein in the Chapter 11 Case and any Successor Case.

24    The Prepetition Senior Lender shall further be authorized to amend its Master Proof of Claim from

25    time to time.  The provisions set forth in this Paragraph and any Master Proof of Claim filed

26    pursuant to the terms hereof are intended solely for the purpose of administrative convenience and

27    shall not affect the substantive rights of any party in interest or their respective successors in

28    interest.

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

EXHIBIT B   -   149

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

37. <u>Critical Vendors</u>.  To the extent that critical vendor status is conferred upon any entity in this Chapter 11 Case, whether by motion filed by the Debtor or otherwise, (a) such entity's claims shall be deemed to be subordinate to the Prepetition Senior Obligations, the Postpetition Obligations, and the Adequate Protection Senior Obligations regardless of whether such entity executes a subordination agreement in favor of the Prepetition Senior Lender and Postpetition Lender, and (b) the Debtor may not make any payment to such entity that would cause a Budget Default on a pro forma basis after giving effect to such payment.

38. <u>Final Hearing; Procedure for Objections to and Entry of Final Order</u>.  The Motion is set for a Final Hearing before this Court at [___] [A.M./P.M.] Pacific time on December [__], 2017, at which time any party in interest may present any timely filed objections to the entry of the Final Order, which order shall be in form and substance acceptable to the Postpetition Lender in its sole discretion.  The Debtor shall, in accordance with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules of this Court, promptly serve a notice of the Final Hearing and entry of this Order, together with a copy of this Order, by electronic mail, facsimile, hand delivery or overnight delivery to the Notice Parties and Creditors' Committee (once appointed) or its counsel.  Such notice shall state that objections to the entry of the Final Order shall be in writing and shall be filed with the United States Bankruptcy Court for the Central District of California (Los Angeles Division) by no later than 4:00 P.M. (Prevailing Pacific time) on December [__], 2017 (the "Objection Deadline"), which objections shall be served so that the same are actually received by the Objection Deadline by: (i) David S. Kupetz, Esq., Asa S. Hami, Esq., and Steven F. Werth, Esq., SulmeyerKupetz, a Professional Corporation, 333 South Hope Street, Thirty-Fifth Floor, Los Angeles, California  90071-1406, fax 213-629-4520, dkupetz@sulmeyerlaw.com, ahami@sulmeyerlaw.com, and swerth@sulmeyerlaw.com, (counsel to the Debtor), (ii) David B. Kurzweil, Esq. and John Dyer, Esq., Greenberg Traurig, LLP, Terminus 200, 3333 Piedmont Road, N.E., Suite 2500, Atlanta, Georgia 30305, fax 678-553-2681 and 678-553-2236, Kurzweild@gtlaw.com and Dyerj@gtlaw.com (counsel to the Postpetition Lender & Prepetition Senior Lender); and (iii) [_____] (the office of the United States Trustee).  Any objections by creditors or other parties-in-interest to any of the provisions of the

1   Final Order shall be deemed forever waived and barred unless timely filed and served in

2   accordance with this paragraph.

3                                           ###

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

EXHIBIT B   -   151

# EXHIBIT C

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| David S. Kupetz (CA Bar No. 125062)<br> dkupetz@sulmeyerlaw.com<br>Asa S. Hami (CA Bar No. 210728)<br> ahami@sulmeyerlaw.com<br>Steven F. Werth (CA Bar No. 205434)<br> swerth@sulmeyerlaw.com<br>SulmeyerKupetz, APC<br>333 South Hope Street, 35th Floor<br>Los Angeles, California  90071<br>Telephone 213.626.2311<br>Facsimile  213.629.4520 | |
| ☐ *Individual appearing without attorney*<br>☒ *Attorney for:*  Shiekh Shoes, LLC, Debtor and Debtor In Possession | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| In re:<br><br>SHIEKH SHOES, LLC,<br>a California limited liability company,<br><br><br><br><br>                                                    Debtor(s). | CASE NO.: 2:17-bk-24626-VZ<br>CHAPTER: 11<br><br>**STATEMENT REGARDING<br>CASH COLLATERAL OR<br>DEBTOR IN POSSESSION FINANCING<br>[FRBP 4001; LBR 4001-2]**<br><br>DATE:<br>TIME:<br>COURTROOM:  1368<br>ADDRESS: |

Secured party(ies): State Bank and Trust Company; Comvest Capital II, L.P. (as Administrative and Collateral Agent for Itself and other Landlords); Toyota Motor Company

The Debtor has requested the approval of either (1) a motion for use of cash collateral, or postpetition financing, or both, or (2) through a separately-filed motion, a stipulation providing for the use of cash collateral, or postpetition financing, or both. The proposed form of order on the motion or the stipulation contains the following provisions or findings of fact:

| Disclosures Tracking FRBP 4001(c)(1)(B)(i) through (xi) and (d)(1)(B) | Page No.: | Line No. (if applicable) |
|---|---|---|
| ☒   (i): "[A] grant of priority or a lien on property of the estate under § 364(c) or (d)" | 16-18 (Order, ¶¶ 9-11) | |
| ☒   (ii): "[T]he providing of adequate protection or priority for a claim that arose before the commencement of this case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim" | 24-27 (Order, ¶¶ 17-18)<br><br>23-24 (Agmt, ¶ 2.1(a)) | |

2616642.1

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| | | | |
|---|---|---|---|
| *Continued from page 1* | | | |
| | ☐ Cross-collateralization, *i.e.,* clauses that secure prepetition debt by postpetition assets in which the secured party would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law | | |
| | ☒ Roll-up, *i.e.,* provisions deeming prepetition debt to be postpetition debt or using postpetition loans from a prepetition secured party to pay part or all of that secured party's prepetition debt, other than as provided in § 552(b) | | |
| | ☒ Grant a replacement lien in an amount in excess of the dollar amount of the lien on cash collateral as of the petition date | | |
| ☒ | (iii): "[A] determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim" | 4-5 (Order, ¶ D(a))<br><br>35-36 (Order, ¶ 30) | |
| ☒ | (iv): "[A] waiver or modification of Code provisions or applicable rules relating to the automatic stay"<br><br>☒ Automatic relief from the automatic stay upon occurrence of certain events. | 32-33 (Order, ¶ 27)<br><br>51-52 (Agmt, ¶ 10.2) | |
| ☐ | (v): "[A] waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request authority to obtain credit under § 364" | | |
| ☐ | (vi): "[T]he establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order" | | |
| ☒ | (vii): "[A] waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other<br><br>enforcement of the lien" | 29-30 (Order, ¶ 22)<br><br>33 (Agmt, ¶ 4.4)<br><br>46 (Agmt, ¶ 8.10) | |
| ☒ | (viii): "[A] release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action" | 4-5 (Order, ¶ D(a))<br><br>35 (Order, ¶ 30)<br><br>36 (Order, ¶ 31)<br><br>22 (Agmt, ¶¶ 1.8, 1.9) | |

2616642.1

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| | | |
|---|---|---|
| ☒ | (ix): "[T]he indemnification of any entity" | 14 (Order, ¶ 6)<br><br>54-55 (Agmt, ¶ 11.4) |
| ☒ | (x): "[A] release, waiver, or limitation of any right under § 506(c)"<br><br>☐ The granting of any lien on any claim or cause of action arising under § 506(c) | 28 (Order, ¶ 20)<br><br>22 (Agmt, ¶ 1.6(c)) |
| ☒ | (xi): "The granting of any lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a)" | 16-17 (Order, ¶ 9) |

| | **Additional Disclosures Required by LBR 4001-2** | **Page No.:** | **Line No.** (if applicable) |
|---|---|---|---|
| ☒ | With respect to a professional fee carve out, disparate treatment for professionals retained by a creditors' committee from that provided for the professionals retained by the debtor * | 19-22 (Order, ¶ 13) | |
| ☒ | Pay down prepetition principal owed to a creditor | 21-22 (Order, ¶ 14)<br><br>25-26 (Order, ¶ 17.c.)<br><br>23-24 (Agmt, ¶ 2.1(a))<br><br>29-30 (Agmt, ¶ 2.7) | |
| ☐ | Findings of fact on matters extraneous to the approval process | | |

| | | |
|---|---|---|
| November 29, 2017 | David S. Kupetz | /s/ David S. Kupetz |
| *Date* | *Printed Name* | *Signature* |

\* The interim order provides for a carve-out and budgeted payments for each of the Debtor professionals and committee professionals, but with higher amounts for the Debtor professionals.

2616642.1

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*December 2015*                    Page 2          EXHIBIT C  -  154          **F 4001-2.STMT.FINANCE**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

A true and correct copy of the foregoing document entitled: **STATEMENTREGARDING CASH COLLATERAL OR DEBTOR IN POSSESSION FINANCING [FRBP 4001; LBR 4001-2]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On *(date)* _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On *(date)* _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on *(date)* _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____   _____   _____
*Date*                   *Printed Name*                                      *Signature*

AG\ 2616642.1
This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.