1  David S. Kupetz (CA Bar No. 125062)
     *dkupetz@sulmeyerlaw.com*
2  Asa S. Hami (CA Bar No. 210728)
     *ahami@sulmeyerlaw.com*
3  Steven F. Werth (CA Bar No. 205434)
     *swerth@sulmeyerlaw.com*
4  **Sulmeyer**Kupetz
   A Professional Corporation
5  333 South Hope Street, Thirty-Fifth Floor
6  Los Angeles, California  90071-1406
   Telephone: 213.626.2311
7  Facsimile: 213.629.4520

8  Attorneys for Shiekh Shoes, LLC
   Debtor and Debtor in Possession
9

10            **UNITED STATES BANKRUPTCY COURT**

11      **CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION**

12  In re                              | Case No.  2:17-bk-24626-VZ

13  SHIEKH SHOES, LLC,                 | Chapter 11
    a California limited liability company,

14                                     | **OMNIBUS DECLARATION OF SHIEKH
                                        S. ELLAHI IN SUPPORT OF DEBTOR'S
15            Debtor.                    "FIRST-DAY" MOTIONS**

16                                     | DATE   :   November 30, 2017
    Tax ID:  47-1479918                  TIME   :   2:15 p.m.
17                                       PLACE  :   U.S. Bankruptcy Court
                                                    Courtroom 1368
18                                                  255 E. Temple St.
                                                    Los Angeles, CA  90012
19

20

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1       I, Shiekh S. Ellahi, declare:

2               **PRELIMINARY STATEMENTS**

3       1.    I have personal knowledge of the facts stated herein.  I can testify that said facts are

4   true and correct.

5       2.    I am the founder, Managing Member, and Chief Executive Officer of Shiekh

6   Shoes, LLC, a California limited liability company (the "Debtor").

7       3.    I founded the Debtor's business in 1991.

8       4.    The Debtor commenced the above-captioned reorganization case by filing a

9   voluntary chapter 11 petition on November 29, 2017 (the "Petition Date").  The Debtor continues

10  to manage and operate its business as a debtor in possession.  No trustee or creditors' committee

11  has been appointed in the Debtor's chapter 11 case.

12      5.    To minimize the adverse effects of the commencement of the Debtor's chapter 11

13  case, while at the same time preserving value for the benefit of stakeholders, the Debtor has filed a

14  number of motions requesting various forms of "first day" relief (collectively, the "First Day

15  Motions").

16      6.    I submit this Declaration in support of the First Day Motions.  The various forms of

17  relief requested in the First Day Motions are necessary to maximize the value of the Debtor's

18  estate (the "Estate") and allow the Debtor to sustain its current business operations in chapter 11

19  while it pursues a reorganization and/or other approaches, as necessary, to maximize the value of

20  the Estate.

21      7.    I am familiar with the contents of each of the First Day Motions (including the

22  exhibits and other attachments to such motions and related papers) and, to the best of my

23  knowledge, after reasonable inquiry, believe that the relief sought in each of the First Day

24  Motions:  (a) will enable the Debtor to avoid damaging disruption to its operations and sustain its

25  operations while in chapter 11; (b) is critical to the Debtor's ability to maximize the value of its

26  Estate; and (c) best serves the interests of the Estate and creditors.  Further, it is my belief that the

27  relief sought in the First Day Motions is, in each case, narrowly tailored and necessary to achieve

28  the goals identified above.

# BACKGROUND

## Brief History and Description of Debtor's Business

8.     The Debtor is a retailer of footwear, apparel, and accessories.  The Debtor's business includes the Shiekh Shoes, Eilatan, TiltedSole and Karmaloop segments.

9.     Founded in 1991 with its first store in Hayward, California, the Debtor currently operates 124 specialty retail stores across ten states (California, Arizona, Nevada, Texas, Washington, Oregon, New Mexico, Illinois, Michigan, and Tennessee), as well as websites under the domain names ShiekhShoes.com, Shiekh.com, Karmaloop.com, TiltedSole.com, and FBRKclothing.com.

10.     The Shiekh Shoes business segment of the Debtor focuses on serving the urban subculture inspired by hip-hop, fashion, entertainment, and sports.  It offers a wide selection of premium shoes and apparel, as well as its own private line of women's footwear and the newly launched FBRK line of men's apparel.

11.     The Debtor's fashion forward retailer, Eilatan and TiltedSole.com, focus on selling higher-end and highly unique shoes and apparel catering to the young fashionista or trendy consumer looking for an edge.  Currently there is only one Eilatan store located in the Beverly Center Mall in west Los Angeles, and three Tilted Sole shoe stores located in Canoga Park, California, Irvine, California, and Tukwila, Washington.

12.     The Debtor's Karmaloop business segment (Karmaloop.com) is a leading edge "e-tailer" featuring the latest and greatest in contemporary fashion.  Founded in 1999 and acquired by the Debtor in March of 2016, Karmaloop is ahead of the curve and prides itself on exposing consumers to new brands and trends on its linked e-commerce sites karmaloop.com, plndr.com, and kazbah.com.  Additional information regarding each of the Debtor's online platforms is set forth below.

13.     The Debtor is a California limited liability company formed on or about January 14, 2014.  Prior to the Debtor's formation, I owned and operated the Company as a sole proprietorship doing business as Shiekh Shoes.  The Debtor currently has three members:  (a) I hold a 99% interest in the Debtor; (b) Amir Shiekh (who is my nephew), holds a 0.5% interest in

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  the Debtor; and (c) Abdul Haleem (who is also my nephew), holds a 0.5% interest in the Debtor.

2  **Management Team**

3      14.    I have led the Debtor throughout its growth and continue to direct its day-to-day

4  operations, with the assistance of my two nephews, Senior Vice Presidents Abdul Haleem and

5  Amir Shiekh.

6      15.    The Debtor's store locations are grouped into seven geographic regions, each

7  managed by a dedicated district manager.  Operations at the store level typically consist of one

8  Store Manager, one Assistant Manager, one "Third-Key" Manager (responsible for opening and

9  closing the store when the Store Manager and Assistant Manager are not present, takes on other

10  manager functions as well), along with sales associates, stockroom attendants, and cashiers.

11      16.    In July 2014, the Debtor hired its first President, Matthew Fine, who came aboard

12  after over a decade with Nike and immediately set to work on assembling his team to lead the

13  Shiekh Shoes store remodel initiative then recently issued to the Debtor by Nike (discussed

14  below).  And although the new store designs were provided to the Debtor by Nike's executive

15  team, it was Mr. Fine's understanding of how to execute on that vision that contributed to the

16  remodel of 61 of the Debtor's stores to date to meet Nike's requirements at a cost of

17  approximately $30 million.

18  **Company's Financing History**

19      17.    The Debtor is a privately held company, wholly owned and controlled by me and

20  my two nephews, Mr. Abdul Haleem and Mr. Amir Shiekh.  The Debtor's operations have

21  historically been financed through capital contributions and personal loans that I have made, as

22  well as traditional bank loans.

23      18.    In March 2017, the Debtor opened a three-year $20 million revolving credit facility

24  with State Bank and Trust Company, as successor by merger to Alostar Bank of Commerce

25  ("State Bank" or "Alostar"), which I understand is a state banking institution incorporated or

26  otherwise organized under the laws of the State of Alabama.  I also extended a $15 million

27  unsecured line of credit to the Debtor in January, 2015.

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**Recent Financial Results**

19.    For fiscal year ended December 31, 2016, the Debtor generated revenues of approximately $175,200,000.  This reflected an increase of approximately $16,700,000, or 10.5%, from the approximately $158,000,000 the Debtor generated in fiscal year ended December 31, 2015.  The revenue increase between fiscal year 2015 and fiscal year 2016 is largely attributable to an increase in e-commerce revenue, which the Debtor began in earnest to develop in 2015.

20.    For the 12-month period ending May 31, 2017, the Debtor generated revenues of approximately $173,000,000.  Allocated between the various store locations, approximate revenues generated for this 12-month period are as follows:

| Location | Revenue | Average Store Revenue | Store Count |
|---|---|---|---|
| CA (S) | $63,822,683 | $1,160,412 | 55 |
| CA (N) | $48,106,237 | $1,603,541 | 30 |
| TX | $13,783,406 | $1,253,037 | 11 |
| NV | $6,520,793 | $1,304,159 | 5 |
| WA | $7,139,459 | $1,189,910 | 6 |
| AZ | $6,108,766 | $610,877 | 10 |
| Other | $6,068,655 | $758,582 | 8[1] |
| **Total** | **$151,549,999** | **$1,212,400** | **125** |

21.    For this period, e-commerce sales generated approximately $19,189,026.[2]

22.    The revenues generated for this 12-month period reflects a decrease of approximately $2.1 million, or 1.2%, compared to the approximately $175,200,000 generated in fiscal year 2016.  This decrease is primarily attributable to lower sales in core stores of

[1] This represents stores in Oregon (2), New Mexico (2), Illinois (2), Tennessee (1), and Michigan (1).

[2] An additional approximate $2,313,731 was generated from six stores that were closed in 2016 and three stores closed in 2017.  These closed stores include four stores closed in California, two in Arizona, two in Texas, and one in Illinois.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

2611572

1    approximately $3,000,000 and closed stores (primarily in Michigan and Illinois) of $3,000,000,

2    offset partially by increased sales in e-commerce of approximately $2,300,000 and new stores of

3    $1,700,000.

4          23.      On a product category basis, this revenue decrease is primarily attributable to a

5    decrease in the sale of men's shoes (Nike and Brand Jordan) of $3,000,000, kid's shoes of

6    $1,500,000, women's shoes of $300,000, and accessories of $300,000, offset partially by an

7    increase in apparel revenue of approximately $1,600,000 and e-commerce revenue of

8    approximately $1,500,000.

9          24.      In the Debtor's financial statements, revenue from retail stores and costs of sales

10   are recognized at the point of sale when the product is delivered to customers.  Internet sales

11   revenue and cost of sales are recognized upon shipment of the product to the customer.  Sales

12   revenue includes sales of merchandise, net of returns and any promotional discounts given to the

13   customer, and exclude sales taxes.  The Debtor also sells gift cards to its customers, which do not

14   have expiration dates, and recognizes revenue when the gift cards are redeemed by the

15   cardholders.  Unredeemed gift cards are recorded as a current liability.

16   **The Debtor's Cash Management**

17         25.      Prior to formation of the Debtor, the bank accounts used to operate Shiekh Shoes's

18   business were maintained in my name.  At or about the Debtor's formation, those bank accounts

19   were transferred to the Debtor such that they were held in the Debtor's name.  Maintenance of the

20   accounts in the Debtor's name as business accounts resulted in the bank assessing bank charges

21   and fees at substantially higher amounts than when the same accounts were maintained in my

22   name.  In fact, the bank charges and fees assessed on the accounts as maintained by the Debtor

23   were in the aggregate approximately $300,000 to $400,000 per year.

24         26.      As a result, in an effort to provide significant cost savings to the Debtor, in or about

25   2015, I caused these bank accounts to be transferred back to my individual name as they were

26   prior to the Debtor's formation.  The Debtor's accounts with the Prepetiton Senior Lender (defined

27   below), including the Debtor's primary operating account, are in the Debtor's name.  This has

28   resulted in a substantial reduction of bank charges and fees.  These accounts are used solely and

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    strictly by the Debtor and for the Debtor's business and operations, and, for all intents and

2    purposes, are treated as accounts belonging to, and maintained by, the Debtor alone.  Therefore, all

3    the bank accounts described below and in the Debtor's concurrently-filed Cash Management

4    Motion (defined below) as part of the Debtor's cash management system are treated and discussed

5    as the Debtor's account (even if currently held in my individual name).  Those accounts include

6    accounts with the Prepetition Senior Lender, Bank of America ("BOFA"), and Cathay Bank

7    ("Cathay").[3]  A list of the accounts the Debtor maintains at these various banking institutions

8    (collectively, the "Debtor Accounts"), together with the approximate balance for each account as

9    of the date identified in the attached list, and an identification of the holder of each account, is

10    attached to the Cash Management Motion (defined below) as Exhibit "1".  The balances in the

11    Debtor's various BOFA accounts, however, fluctuate based on sales and overall operations.

12      27. Pre-petition, the Debtor's cash management system generally ran as follows:  All

13    cash sales are deposited by stores into its assigned BOFA depository account.  Multiple stores are

14    assigned to any given BOFA depository account.  This cash gets transferred out to either the

15    Debtor's payroll account (the "BOFA 5000" account)[4] to pay payroll, the Debtor's ACH payables

16    account (the "BOFA 1402" account) to make ACH payments, or to another BOFA account from

17    where the cash will get transferred to the Debtor's Alostar depository account (the "Alostar 5182"

18    account).

19      28. All sales made through PayPal and Amazon travel through the Debtor's cash

20    management system in a manner similar to cash.

21      29. All credit card sales are deposited by the Debtor's processors First Data and

22    American Express to the Debtor's Alostar depository account ("Alostar 5182" account).  On a

23    _____

24    [3] Another account at Cathay that formerly served as the Debtor's primary operating account currently
25    remains open, but is not active.  The Debtor is in the process of closing that account.  Although a handful of
   checks drawn against that account remain outstanding, those checks are over 180 days old and, as a result,
26    are void or otherwise would no longer be honored by the bank.

27    [4] References to accounts by banking institution and 4-digit number correspond to the references in the
   schedule of Debtor Accounts attached as Exhibit "1" to the Cash Management Motion.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    daily basis, the balance is used to pay down the Debtor's Alostar revolving line of credit (*see*

2    below for more details regarding the Alostar line of credit).

3         30.      With regard to payments: (a) payments the Debtor makes by ACH are processed

4    through the Debtor's ACH payables account (the "BOFA 1402" account) or the Debtor's primary

5    operating account with Alostar (the "AloStar 5190" account); (b) the Debtor also occasionally

6    uses its payroll account with BOFA (the "BOFA 5000" account) to make ACH worker's

7    compensation claim payments; (c) credit card payments also are made from the ACH payables

8    account ("BOFA 1402"); (d) sales tax payments are processed through the primary operating

9    account with Alostar ("Alostar 5190" account); and (e) payments the Debtor makes by check also

10   are processed through the this primary operating account.  To fund the Debtor's Alostar operating

11   account, the Debtor requests an advance from Alostar against its revolving line of credit with

12   AloStar every day to cover the checks deposited that day.

13        31.      Finally, restricted cash in the Cathay Bank CD accounts, which accrue interest, are

14   for the letters of credit for worker's compensation insurance.

15        32.      However, as discussed in the Cash Management Motion, consistent with the

16   Postpetition Facility and related Postpeition Loan Agreement (both terms defined below), I intend

17   to cause the Debtor to modify its cash management system in the following manner (the "DIP

18   Financing Cash Management Modifications"):[5]

19             a.      Whereas the Debtor's deposit accounts currently are held in my individual

20   name, the Debtor shall transfer all such accounts to the Debtor's name (or, if necessary to

21   effectuate such transfer, close the current accounts and reopen them in the Debtor's name) by no

22   later than December 1, 2017;

23             b.      Whereas the Debtor's credit card receipts currently are swept into an

24   account maintained with the Prepetition Senior Lender on a daily basis, the Debtor will alter its

25   _____

26   [5] The following is a summary of the modifications to the cash management system.  The actual and more
specific terms and conditions regarding the Debtor's cash management system as required by, and laid out

27   in, the Postpetition Loan Documents (as defined in the DIP Financing Motion), as well as the related
Interim Order on the DIP Financing Motion, control.

28

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    cash management system such that the Debtor will maintain a single account with the Postpetition

2    Lender (defined below) into which all of the Debtor's collections will be swept on a daily basis for

3    the Postpetition Lender (the "Sweep Account") for application, first, to obligations under the pre-

4    petition revolver credit facility with the Prepetition Senior Lender, and, then, to the Postpetition

5    Facility, which Sweep Account may be the current deposit account the Debtor maintains with the

6    Prepetition Senior Lender; and

7            c.        Whereas the Debtor currently maintains multiple deposit accounts with

8    BOFA, the Debtor shall consolidate its bank account structure such that it maintains a single

9    deposit account for collections by no later than December 1, 2017.

10                    **The Debtor's Retail Store Locations And Related Leases**

11            33.        As noted above, as of the Petition Date, the Debtor operates 124 specialty retail

12    stores across ten states:  California, Nevada, Arizona, Texas, New Mexico, Oregon, Washington,

13    Illinois, Michigan, and Tennessee.

14            34.        All of the Debtor's locations are leased.  Attached hereto as Exhibit 1 is a list of the

15    Debtor's current leased locations.  The store leases expire at various dates through January 31,

16    2028.  There are five leases that currently are on a month-to-month basis, and 8 active leases with

17    lease payments based upon a percentage of revenue (rather than a fixed monthly sum).

18            35.        The majority of the leases are with independent third parties.  However, I am the

19    lessor under six of the leases (relating to store numbers 11, 60, 88, 95, 98, and 139), and two other

20    leases (relating to store numbers 103 and 403) are with D&S LP as lessor, of which I am a partner.

21            36.        As explained above, prior to the Debtor's formation, I operated the Debtor as a sole

22    proprietorship.  During that time, I personally entered into a number of leases with various

23    landlords.  These include leases relating to the Debtor's store numbers 6, 9, 10, 11, 14, 15, 16, 19,

24    21, 24, 25, 26, 29, 30, 31, 33, 36, 39, 40, 42, 43, 51, 53, 58, 73, 83, 84, 87, 91, 92, 94, 97, 99, 101,

25    102, 105, 108 through 113, 115, 116, 117, 119, 121, 123, 142, 144, 145, and E03.  In January

26    2014, when the Debtor was formed, I transferred all assets of this sole proprietorship to the newly-

27    formed Shiekh Shoes, LLC.  This included all the leases I had entered into prior to the formation

28    of the Debtor.  Shortly thereafter, I caused a letter to be mailed to each lessor of the various leases

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    at the notice address in the particular lease notifying the lessor of the transfer and assignment of

2    the particular lease interest from the sole proprietorship to the Debtor.  Since the date of this

3    assignment, each lessor has accepted lease payments from the Debtor and no lessor has objected to

4    the assignment.

5         37.    As set forth in the Debtor's separately-filed motion for approval of a consulting

6    agreement with Gordon Brothers Retail Partners, LLC and authorization to conduct inventory

7    clearance sales at 31 retail locations, the Debtor has determined that 31 of its retail stores should

8    be closed after conducting those sales.  The Debtor will move to reject the leases of these affected

9    stores, effective following the conclusion of the store closing sales, by regularly-noticed motion.  I

10   currently anticipate that the store closing sales will be completed in January 2018.

11                          **The Debtor's Online Platforms**

12        38.    As reflected above, the Debtor also generates significant revenue through online

13   sales.  Shiekh Shoes started selling online in 2009, and the Debtor currently operates four websites

14   under the domain names Karmaloop (which includes linked e-commerce sites karmaloop.com,

15   plndr.com, and kazbah.com), TiltedSole.com, ShiekhShoes.com, Shiekh.com, and

16   FBRKclothing.com.  A brief description of each platform follows:

17   **Karmaloop**

18        39.    The Debtor acquired certain assets of Karmaloop identified more particularly in,

19   and pursuant to the terms of, that certain "Asset Acquisition And Contribution Agreement" (the

20   "Karmaloop Asset Purchase Agreement"), dated March 15, 2016, by and among the Debtor (as

21   buyer), Karmaloop (as seller), and, for limited purposes, Ellahi, Comvest Karmaloop Holdings,

22   LLC ("Comvest Holdings"), and CapX Fund IV, LP ("CapX") (the "Karmaloop Acquisition").[6]

23   The Karmaloop Acquisition closed on March 17, 2016.

24        40.    As consideration for its acquisition of the Karmaloop assets, the Debtor agreed to

25   issue to Karmaloop, preferred membership interests in the Debtor with a $10,000,000 priority

_____

26

27   [6] Comvest Holdings and CapX were identified as the owners of Karmaloop.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  liquidation preference (the "Karmaloop Preferred Interests") and warrants to acquire, in the

2  aggregate, a 4% membership interest in the Debtor.

3      41.    As more particularly set forth in that certain "Investor Rights Agreement"

4  ("Karmaloop Investor Agreement") entered in conjunction with the Karmaloop Acquisition, the

5  Karmaloop Preferred Interests were mandatorily redeemable by the Debtor within one year from

6  the close of the Karmaloop Acquisition for $10,000,000, and, if unpaid, converted to a secured

7  term loan (discussed below).

8      42.    Karmaloop's main area of focus is streetwear branding with the majority of sales in

9  men's and women's clothing supplied by various dropship vendors.  Karmaloop also offers

10  accessories and footwear product lines.  As of May 2017, revenues from Karmaloop represent

11  approximately 61% of the Debtor's total ecommerce revenues.

12  **Titled Sole**

13      43.    Titled Sole was founded in 2012.  The Debtor purchased it in 2013.

14      44.    Tilted Sole offers a different type of marketing effort and is more focused on the

15  latest trend in shoes.  This site also offers accessories, including handbags, socks, sunglasses, and

16  shoe care products.  As of May 2017, revenues from Tilted Sole represent approximately 2% of

17  total ecommerce revenues.

18  **Shiekh Shoes**

19      45.    Shiekh Shoes is the original website for the Debtor.  This site's main area of focus

20  is centered around name brand shoes.  It also offers the Debtor's brand of women's shoes and

21  offers discounts on these brands and daily deals.  As of May, 2017, revenues from this site

22  represent approximately 25% of total ecommerce revenues.

23  **Shiekh.com**

24      46.    The Debtor launched Shiekh.com in November, 2016.  It does not offer the

25  discounts available on Shiekhshoes.com.  This site also offers the Nike brand not available on the

26  Debtor's other sites.  Shoe product lines on this site includes men's, women's, and children's

27  products, as well as a limited selection of women's and men's apparel and accessories.  As of

28  May, 2017, revenues from Shiekh.com represent approximately 12% of total ecommerce

2611572                                11

1    revenues.

2    **FBRKclothing.com**

3    　　47.　　FBRK is an apparel line that offers high fashion at a reasonable price.  The brand's

4    evolution was inspired by the diverse culture of America's youth and continues to represent their

5    unique differences.

6    **The Debtor's Assets**

7    　　48.　　The Debtor's primary assets  include: (1) inventory, which, as of at or about the

8    Petition Date, had a current retail value in the aggregate of approximately $65,918,224.35 (with an

9    original retail value of approximately $80,987,971.96 and cost value of approximately

10   $35,113,347.33; (2) fixtures, furniture, and equipment with an aggregate estimated book value of

11   approximately $11,311,083 (as of October 2017); and (3) trademarks and various intellectual

12   properties with an estimated value of approximately $250,000.  In addition, as more specifically

13   set forth in Exhibit "1" to the Cash Management Motion, the Debtor's cash account balances as of

14   about the Petition Date, were in the aggregate of approximately $4,881,357.14..

15   **The Debtor's Debt Structure**

16   **Secured Debt**

17   　　49.　　As of at or about the Petition Date, the Debtor has secured debt in the aggregate

18   amount of approximately $17,169,546.65 held by two parties, the Prepetition Senior Lender and

19   Comvest Capital II, L.P., as administrative agent and collateral agent for itself and certain other

20   lenders (collectively, "Comvest" and, together with the Prepetition Senior Lender, the "Prepetition

21   Secured Parties").[7]

22   　　State Bank

23   　　50.　　Pursuant to that certain Loan and Security Agreement, dated as of March 17, 2017

24   (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition

25   Senior Loan Agreement"), among the Debtor and State Bank (in such capacity, the "Prepetition

26   

27   [7] Comvest's claim is disputed in its entirety as discussed below.

28   

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    Senior Lender"), the Prepetition Senior Lender agreed to extend loans to, issue letters of credit for,

2    and provide services and other credit accommodations to, the Debtor.  The Prepetition Senior

3    Loan Agreement, along with any other agreements and documents executed or delivered in

4    connection therewith, including, without limitation, the "Loan Documents" as defined therein, are

5    collectively referred to herein as the "Prepetition Senior Loan Documents" (as the same may be

6    amended, restated, supplemented or otherwise modified from time to time).  True and correct

7    copies of what I believe are the "core" Prepetition Senior Loan Documents are attached to the

8    concurrently-filed DIP Financing Appendix.[8]

9        51.    Pursuant to the Prepetition Senior Loan Agreement, the Security Documents (as

10    defined in the Prepetition Senior Loan Agreement), and all other Prepetition Senior Loan

11    Documents that purport to create a Lien (as defined in the Prepetition Senior Loan Agreement) in

12    favor of Prepetition Senior Lender (as such documents are amended, restated, supplemented or

13    otherwise modified from time to time, the "Prepetition Senior Security Documents"), the Debtor

14    granted to the Prepetition Senior Lender, to secure the Prepetition Senior Obligations, a first

15    priority security interest in and continuing lien (the "Prepetition Senior Liens") on substantially all

16    of the Debtor's assets and property, and all proceeds, products, accessions, rents and profits

17    thereof, in each case whether then owned or existing or thereafter acquired or arising.  All

18    collateral granted or pledged by the Debtor pursuant to any Prepetition Senior Security Document

19    or any other Prepetition Senior Loan Document, including, without limitation, the "Collateral" as

20    defined in the Prepetition Senior Loan Agreement, and all pre-petition and post-petition proceeds

21    thereof shall collectively be referred to herein as the "Prepetition Senior Collateral".  In addition,

22    the Prepetition Senior Lender holds a second priority deed of trust on real property at 609

23    Palisades Beach Road, Santa Monica, CA 90402, that I own.

24    _____

25    [8] All obligations of the Debtor arising under, or in connection with, the Prepetition Senior Loan Agreement
(including, without limitation, the "Obligations" and "Bank Product Obligations", each as defined therein),
26    any other Prepetition Senior Loan Document, and/or any agreement evidencing any Bank Products (as
defined in the Prepetition Senior Loan Agreement) shall collectively be referred to herein as the
27    "Prepetition Senior Obligations."

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

52.     As of at or about the Petition Date, (i) the Debtor was indebted to the Prepetition Senior Lender pursuant to the Prepetition Senior Loan Documents, in the aggregate principal of approximately $7,169,546.65 in respect of loans made and letters of credit issued by the Prepetition Senior Lender, plus all accrued and hereafter accruing and unpaid interest thereon and any additional fees and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Senior Loan Documents) now or hereafter due under the Prepetition Senior Loan Agreement and the other Prepetition Senior Loan Documents, and (ii) as noted above, the value of the Prepetition Senior Collateral exceeded the amount of Prepetition Senior Obligations.

The Prepetition Second Lien Lenders (Comvest)

53.     On March 17, 2017 (one year after close of the Karmaloop Acquisition), the Debtor (as borrower), Karmaloop (as lender), and Comvest Capital II, L.P. (as administrative and collateral agent for itself and Karmaloop) entered that certain "Credit Agreement" (the "Prepetition Second Lien Credit Agreement"), pursuant to which the lender Prepetition Second Lien Lenders agreed to extend a term loan to the Debtor in an aggregate principal amount of $10,000,000.  The Prepetition Second Lien Credit Agreement was entered for the purpose of converting the Karmaloop Preferred Interests from equity to the secured term loan that is the subject of the Prepetition Second Lien Credit Agreement (the "Prepetition Second Lien Term Loan").  No consideration was received by the Debtor at the time of the conversion of this equity to secured debt.

54.     The Prepetition Second Lien Term Loan is payable in equal monthly installments of $166,666.00 beginning March 18, 2018, with the final installment on the outstanding balance due March 17, 2022.  The Prepetition Second Lien Term Loan bears regular interest at 5.0% per annum, and default interest at an additional 3.0%.

55.     Comvest asserts that the Prepetition Second Lien Term Loan is secured by a second priority lien on (as more particularly set forth in a "Collateral Agreement" between the Debtor and Comvest) substantially all of the Debtor's assets.  Comvest does not have any deposit account control agreement with the Debtor.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

56.     As of the Petition Date, the Debtor believes the asserted claim of Comvest under the Prepetition Second Term Loan is $10,000,000.  However, for the reasons discussed below, the Debtor disputes the Comvest claim in its entirety.  Further, the Debtor is evaluating the avoidability of Comvest's security interest.

Intercreditor Agreement

57.     On March 17, 2017, the Prepetition Senior Lender and Comvest entered into an "Intercreditor Agreement" (the "Intercreditor Agreement"), pursuant to which I understand the parties confirm their relative priority of their respective liens and security interests in the Debtor's assets.

58.     I also understand that the Intercreditor Agreement dictates the parties' respective rights and obligations in the event of a bankruptcy filing by the Debtor.  For example, I understand that pursuant to the Intercreditor Agreement, in the event the Prepetition Senior Lender consents to the Debtor's use of cash collateral or procuring of DIP financing, subject to certain conditions set forth in the Intercreditor Agreement, Comvest is obligated to consent to use of cash collateral or not oppose the DIP financing.  I further understand that the Intercreditor Agreement also includes certain requirements and obligations as between the Prepetition Senior Lender and Comvest regarding the appropriate forms of adequate protection.  A true and correct copy of the Intercreditor Agreement is attached to the DIP Financing Appendix as Exhibit "D".

Karmaloop Transaction And Comvest Claim Dispute

59.     The Debtor's decision to acquire Karmaloop was based on Comvest's representation that it had accumulated approximately 6 million unique customer email addresses, 3.7 million of which were alleged to be responsive/active consumers.  After the acquisition was finalized in March of 2016, however, the Debtor found out that more than 80% of these emails were no longer valid and the overall health status of the Karmaloop email database/system was in very poor condition.  The Debtor initially was unsure if the problems it was encountering with respect to the e-mail database/system was the result of technical difficulties stemming from, for example, its efforts to integrate its system with the Karamaloop system.  The Debtor's conclusion that this actually was the product of misconduct on Comvest's part and that Comvest had made

2611572

1    material omissions and misrepresentations in connection with the Karmaloop transaction was

2    reached in or about April/May 2017 based on the Debtor's investigation over time.

3          60.      The evidence discovered by the Debtor's CTO and E-Commerce Director further

4    indicated a concerted effort by Comvest/Karmaloop executives, and third party email ecommerce

5    marketer, Klaviyo, to conceal the poor condition of the email list to give the appearance to

6    prospective buyers that Comvest had "stabilized" losses and "grown" the business since taking

7    over after Karmaloop's prior bankruptcy in 2015 (out of which Comvest purchased Karmaloop).

8    This was achieved by, among other means, constantly switching IP addresses so the company

9    would not be blacklisted, as well as changing the code on both the Karmaloop and PLNDR sites to

10    double-count traffic on the websites.

11          61.      Interestingly, the "double-pixel" (the means through which Karmaloop was double-

12    counting traffic on the websites to create the appearance the websites were experiencing increased

13    traffic) was removed from Karmaloop's website shortly before the Debtor took over and site

14    traffic quickly nosedived.  Thus, the Debtor has reason to believe Comvest knew the

15    representations it made in the offering memoranda were false and it took affirmative steps to cover

16    it up.

17          62.      Subsequently, in or around December, 2016, the Debtor began noticing one of its

18    vendors (Threadhitter) was sending marketing emails to many of the same customers on

19    Karmaloop's "confidential" email list.  After I met with Threadhitter's owner, Vahe (Fletch)

20    Estepanian, he admitted to possessing a copy of the complete email list, which he contends was

21    lawfully obtained as part of a settlement agreement finalized in April 2016 (See *Cat3, LLC v.*

22    *Black Lineage, Inc.*, 2015 U.S. Dist. (S.D.N.Y. Sept. 21, 2015), Case No. 14-cv-5511).  He has

23    since turned over the full list and 99.9% of the emails match the list the Debtor acquired from

24    Comvest.

25          63.      I presented this evidence to Comvest's representative, Justin Chen, during a phone

26    call in early August, 2017.  Surprisingly, Mr. Chen implied having knowledge of the lawsuit

27    brought by The Collective against Karmaloop founder, Greg Selkoe and Karmaloop in New York

28    Supreme Court, around 2014/15, wherein the email list was first turned over as part of the

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  settlement.  Seth Gerzber was behind The Collective, as well as the owner of Plaintiff, Cat3,

2  which brought suit against Mr. Estepanian over a trade name dispute.

3        64.    The Debtor and I believe Mr. Chen and Comvest had knowledge of both of these

4  lawsuits as well as the fact that the email list had been severely compromised.  Thus, it should

5  have been disclosed during the due diligence period as I believe such omissions and

6  misrepresentations caused a material adverse effect on the financial condition of Karmaloop and

7  the Debtor.

8        65.    As a result of the foregoing, among other things, both the traffic to and revenues

9  from the Debtor's various online websites decreased significantly.  And while the Debtor

10  continues to rebuild all segments of its email programs across all websites, the Debtor has yet to

11  regain the momentum it has prior to the Karmaloop Acquisition.  This is not intended to be an

12  exhaustive recitation of the harm the Debtor has suffered as a result of the Karmaloop Acquisition

13  and, in particular, the related omissions and misrepresentations discussed above.  Therefore, the

14  Debtor disputes the Comvest claim in its entirety.

15  **Unsecured Debt**

16      <u>Nike</u>

17        66.    Nike holds the largest unsecured claim against the Debtor.  As of the Petition Date,

18  the Debtor believes Nike asserts a general unsecured claim in the sum of approximately

19  $16,040,021.01 on account of products and goods supplied to the Debtor.  A more detailed

20  discussion of the Debtor's relationship with Nike appears below.

21      <u>Other Unsecured Debt</u>

22        67.    Including Nike, as of at or about the Petition Date, the Debtor's top 20 general

23  unsecured creditors hold claims in the aggregate of approximately $23,071,878.70  owed to

24  various trade vendors, suppliers, and other parties (although certain claims of which are disputes,

25  contingent, and unliquidated).

26                             **The Debtor's Equity Interests**

27        68.    I hold 99% of the Debtor's equity interests.  The balance of the Company's equity

28  interests are held by Amir Shiekh (0.5%) and Abdul Haleem (0.5%).

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**The Debtor's Employees**

69.    As of the Petition Date, the Debtor has approximately 1,743 employees.  Of this amount, approximately 519, or 30%, are full time employees.  Approximately 1,163, or 67%, are part time employees.  Approximately 61, or 3%, are seasonal employees.  Approximately 37 of the Debtor's employees are salaried.  The remainder are paid by the hour, with rates in the range of approximately $8.00 per hour to $22.00 per hour.

70.    For salaried and hourly employees, payday is every other Friday covering the prior two weeks.  The most recent payday was November 24, 2017, with the next payday set for December 8, 2017.  The average amount the Debtor needs for any given payroll period is $1,655,855.14 (wages only and not including benefits or employer taxes).  The Debtor also offers various employee health plans, including, for example, medical, vision, and dental insurance.

71.    A more detailed discussion of the Debtor's employee wage obligations, employee benefits, and other related information is set forth below and is accurately set forth in the concurrently-filed motion to authorize payment of certain pre-petition wages and maintenance of employee benefit programs.

**Nike**

72.    Nike's products (Nike and Jordan brands) account for more than 60% of the Debtor's gross revenues.  As such, the Debtor has expended considerable resources over the years in order to maintain its relationship with Nike, including constructing specially-branded space in each of its stores for Nike product, developing special marketing campaigns and launch events, providing dedicated training of store managers and sales associates on all Nike product, as well as executing on Nike's biggest initiative to date requiring the remodeling all the Debtor's Shiekh Shoes stores beginning in 2015.

73.    For approximately 25 years, Nike shipped product to the Debtor on credit (like most vendors), which the Debtor paid down monthly.  Nike historically has required me to personally guarantee credit it extended to the Company.  My personal guarantee was permitted to expire, however, when I contributed my personal funds to substantially pay down the Nike line at the end of 2016.  Nike continues to be the Debtor's biggest unsecured creditor with approximately

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    $16,095,465.60 outstanding on invoices, approximately half of which is currently past due.

2    74.    In recent years, given the importance of Nike product to the Debtor's overall

3    business model, the Debtor invested substantial funds to remodel stores in a manner geared

4    towards the marketing and sale of Nike premium product.  This has already been done at 61 of the

5    Debtor's stores at a cost, as indicated above, of approximately $30 million.

6    75.    Nike has refused to ship product to the Debtor even on a cash in advance payment

7    basis.  Prior to the commencement of the Debtor's chapter 11 case, the Debtor and its counsel

8    participated in discussions and negotiations with Nike and its counsel with the goal of obtaining

9    Nike's commitment to resume shipping.

10    **Summary of Loans by Shiekh Ellahi to The Debtor**

11    76.    In the past three years, I have made a loan to the Company, along with various

12    capital contributions.  In order to fund Nike's store remodel initiative, I extended a $15 million

13    credit facility to the Company in January 2015.  Additionally, I have made approximately $15

14    million in capital contributions to cover various expenses of the Debtor in the last three years

15    alone.

16    **FACTORS PRECIPITATING CHAPTER 11 FILING**

17    77.    In early 2012, the Debtor was looking for opportunities to expand its business into

18    the Midwest.  At the time, Sportsland, Inc., was operating a franchised chain of 45 Athlete's Foot

19    stores, principally located in the metropolitan areas of Chicago and Detroit.  The franchisor,

20    however, had recently lost its biggest and most profitable supplier, Nike.  Initially, the Debtor

21    considered acquiring all 45 stores, but as negotiations progressed only 34 of the most promising

22    locations were acquired.  Once the acquisition was final in late 2012, the Debtor began directing

23    significant resources to transitioning the 34 new stores, during which time I continued to work on

24    solidifying approval from Nike's Midwest team.

25    78.    Unfortunately, by the end of 2014, as construction was nearing completion, Nike's

26    Midwest team refused to support the expansion.  The Debtor immediately pivoted and began

27    developing a store-closure plan to get out of the Midwest.  And as of today, only four of the

28    original 34 Midwest stores remain in operation.

2611572

79.     By early 2018, the Debtor hopes to complete the closure of all of its Midwest stores.  The financial repercussions of the failed entry into the Midwest marketplace, coupled with declining store revenues due to the rise of e-commerce, has made it increasingly difficult for the Debtor to turn a profit in recent years.

80.     In early 2015, to ensure it retained its most critical vendor, the Debtor commenced store remodels according to various Nike designs and specifications.    Those store remodels initially were funded by a $15 million loan I provided to the Debtor.  As mentioned above, to date, the Debtor has remodeled 61 stores at a cost of approximately $30 million, with the hope that the return on its investment would be realized in years to come.

81.     In October 2017, Nike finance indicated the line of credit extended to the Debtor needed to be paid down significantly and relegated the Debtor to pre-pay all orders before being shipped.  Subsequently, Nike has declined to ship new product to the Debtor, except pursuant to the Nike Agreement (described below).

82.      The above challenges described above and, in the general retail environment, have negatively impacted the Debtor's profitability.

## THIS CHAPTER 11 CASE

83.     The Debtor's operations have not been profitable in recent years.  The Debtor commenced this reorganization case in order to pursue implementation of a restructuring of its operations, leases, and debt.  The Debtor believes that a successful overall reorganization would maximize the value of the Estate, provide for payment to unsecured creditors, and allow the Debtor to emerge from chapter 11 with a reorganized and viable ongoing business.  However, a successful restructuring may likely require cooperation of certain stakeholders in the Debtor, including the Debtor's senior secured creditor, certain suppliers, and landlords.  And a successful reorganization that would maintain the Debtor's current business model and without a significant alteration in the Debtor's operations will require the cooperation of Nike.

84.     In order to protect the interests of the Estate, the Debtor also is exploring other alternatives that may be implemented in the event that a restructuring through a reorganization plan is determined not to be a viable approach, including liquidation options that might, if

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  necessary, be utilized to maximize the value of the Estate.

2  85.    In any event, the Debtor intends, subject to court approval, to conduct inventory

3  clearance/store closing sales (with the assistance of Gordon Brothers Retail Partners, LLC, an

4  outside consultant expert at conducting such sales) at 31 of its stores through the holiday season.

5  These are the stores the Debtor has determined, as of this time, need to be closed, following the

6  inventory clearance sales, under any scenario.  The Debtor believes that under any scenario such

7  inventory clearance sales will advance the goal of maximizing the value of the Estate and benefit

8  creditors.  It may become necessary for additional stores to be closed, but as of now 31 of the

9  Debtor's stores have been identified for closure.

10  **FACTS IN SUPPORT OF "FIRST DAY" MOTIONS**

11  **Motion for Order Authorizing Payment and/or Honoring of Prepetition Employee**

12  **Compensation Benefits, Reimbursements, Withholding Taxes, Accrued Vacation, and**

13  **Related Employee Claims (the "Employee Claims Motion")**

14  86.    As of the Petition Date, as stated above, the Debtor has approximately 1,743

15  employees.  A true and correct list of the Debtor's current employees ("Employees"), including

16  approximate wages, is attached to the Employee Claims Motion as Exhibit "1".  The Debtor's

17  employees in its retail stores are mostly part-time and paid hourly wages along with various

18  commission components of their compensation, while employees in the Debtor's corporate

19  office (approximately 250 employees) are a mix of full and part-time employees compensated

20  either on a salaried basis or hourly.  The Debtor also offers its full-time employees various

21  employee health plans, including, for example, medical, vision, and dental insurance.

22  87.    Of the Employees, approximately 519, or 30%, are full time employees.

23  Approximately 1,163, or 67%, are part time employees.  Approximately 61, or 3%, are seasonal

24  employees.  Approximately 37 of the Employees are salaried.  The remainder are paid by the hour,

25  with rates in the range of approximately $8.00 per hour to $22.00 per hour.  None of the

26  Employees identified on Exhibit "1" to the Employee Claims Motion are insiders of the Debtor, as

27  that term is defined in 11 U.S.C. § 101(31).

28  88.    The Debtor pays its Employees every other Friday for the two-week period ending

the prior Saturday.  The Debtor's first payroll due post-petition--December 8, 2017 (a Friday)--will cover the time period of November 19, 2017 (a Sunday), through December 2, 2017 (a Saturday).  Annual salaries are divided equally over the same pay dates each year.  The average amount the Debtor pays to its employees every two-week pay period is, in the aggregate, $1,655,855.14.  This is for wages only, and does not include benefits, and does not account for employer taxes.

89.    The Debtor uses ADP to process its payroll.  Payroll and payroll taxes are wired out of the Debtor's payroll bank account at Bank of America, Account No. x5000 by ADP on the Thursday before each pay date.

90.    In addition to salary and wages, all of the Debtor's retail store employees are eligible to receive additional compensation in the form of sales commissions.  For Assistant Managers, Third-Key Managers, and Sales Associates, when their total net sales commissions are greater than their total gross hourly wages during the same pay period, the employee receives the difference in commission pay, plus all of the Employees' earned hourly wages.  If the commission is less than gross hourly wages, the Employee receives only the earned hourly wages and no commission pay.  A chart of the commission amounts for each of these Employees is as follows:

| Merchandise Commission Table | | | | |
|---|---|---|---|---|
| Dept. | Class | Asst. Mgr. | Third-Key | Sales Associate |
| 01 | Shiekh Women's FW | 15% | 14% | 13% |
| 02 | Men | 5% | 4% | 3% |
| 03 | Kids | 15% | 14% | 13% |
| 04 | Apparel | 5% | 4% | 3% |
| 05 | Accessories | 5% | 4% | 3% |

91.    The Debtor provides additional bonus programs for Store Managers and Assistant Managers, in the form of (1) a Key Performance Indicator ("KPI") Bonus, (2) a Weekly Bonus, and (3) a Monthly Bonus.  The KPI Bonus compares two key indicators in each store, to determine the "winning store" in a store-to-store comparison: (a) the percentage of apparel units sold versus

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  footwear units sold; and (b) percentage of shoe cleaner versus footwear in a particular store

2  location.  The winning store in each bracket is awarded $350 total.

3      92.      If a store beats its weekly sales goal, the Store Manager receives an extra $100

4  added to his or her wages.  Monthly Bonuses are based off either the stores previous year's sales

5  (if the Debtor has operated the store for at least one year) or the store's sales goal or last year's

6  sales.  If the store beats it goal, the Store Manager receives 2% of the delta, and the Assistant

7  Manager receives 2% of the delta plus an additional $250.00.

8      93.      The Debtor offers medical, vision, and dental insurance plans to all full-time

9  employees.  The enrollment date is every September 1, though some exceptions are allowed.

10 Employees accrue paid vacation after one year from the beginning of employment as full-time

11 employees.  Employees accrue paid sick leave beginning on the 120th day of employment

12 (California only).  Twenty-four hours of such sick leave is available to every California employee

13 starting every July 1.  These sick leave days do not carry over to the next period, and unused hours

14 are not paid out upon termination.

15     94.      Certain employees are entitled to reimbursement of certain personal expenses.

16 Employees seeking such reimbursement submit mileage and expense reimbursements to the

17 Debtor's Accounts Payable department.  The Debtor then verifies receipts and organizes data.  A

18 report is then generated and delivered to the Debtor's Vice President of Operations, Amir Shiekh,

19 to approve.  If approved, the report is given to the Debtor's Director of Logistics/Head of

20 Accounting to approve.  Fully-approved reports are then given to Human Resources to process

21 payments through ADP.

22     95.      I estimate that some of the Employees will not have timely submitted receipts

23 and/or other documentation for a minimal amount of reimbursement of business expenses as of the

24 Petition Date.  Further, some checks that were issued prior to the Petition Date will likely not have

25 been cashed before the bankruptcy was filed.  I estimate that the total of both the unpaid expenses

26 and outstanding checks for expenses already paid will total less than $10,000.

27     96.      As a result of the Debtor's commencement of this case, absent Court order, the

28 Debtor will be restricted from paying and/or honoring accrued and unpaid wages, salaries,

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  vacation, and other forms of employee compensation and benefits attributable to the pre-petition

2  period.

3      97.    The Debtor's payroll to be made on December 8, 2017, will compensate

4  Employees for working prior to the Petition Date for the period from November 19, 2017, through

5  November 28, 2017—a total of 10 working days.  Thus, approximately 71% of the expected

6  payroll of approximately $1.65 million the Debtor anticipates paying in payroll on December 8,

7  2017--that is, approximately $1,183,000--relates to work performed by the Employees prior to the

8  Petition Date.

9      98.    In large part, the Debtor's ongoing operations, the opportunity for the Debtor to

10  maximize the value of the Estate, and the Debtor's ability to meet its obligations is dependent

11  upon a stable and productive work force.  Many of the Employees simply cannot afford to miss a

12  pay period or be deprived of benefits they receive in the ordinary course of their employment.

13  And, to the extent the Debtor is not authorized to make a full payroll payment to them on

14  December 8, 2017, I believe that some of the Employees will suffer extreme personal hardship and

15  in many cases may be unable to pay basic living expenses.

16      99.    The stability of the employee pool is tenuous.  The labor pool is mobile.  At the

17  same time, it could be difficult for the Debtor to find qualified replacement employees with the

18  unfavorable publicity of disrupted pay or benefits.  Even if replacements could be hired, it could

19  take significant time before they could be fully trained and qualified for the jobs, resulting in

20  further disruption and harm to the Debtor's business, and the Debtor's ability to maximize the

21  value of the Estate.

22      100.    Each of the Employees for whom the Debtor requests the relief in the Employee

23  Claims Motion is currently employed by the Debtor.  The Debtor will not pay pre-petition wages

24  or claims to employees who are no longer employed by the Debtor, to those employees who have

25  provided notice to the Debtor that they will be leaving.

26      101.    The Debtor is not seeking to pay out the vacation pay to the Employees, but only

27  to honor accrued vacation days in the ordinary course of its business.  The Debtor will not pay any

28  Employee any amount for pre-petition claims in excess of $12,850.

2611572                    24

102.    I anticipate that the Debtor's payroll on December 8, 2017, will be approximately $1.65 million.  Subject to Court authorization to use cash collateral, the Debtor has sufficient funds to make this payment—of which amount approximately $1,183,000 will relate to work performed by the Employees prior to the Petition Date.  Pursuant to the budget for the DIP Financing Motion (defined below), the Debtor has the ability to continue to operate its business without rendering the Estate administratively insolvent.

**Motion for Order (1) Deeming Utility Companies Adequately Assured of Future Performance, (2) Establishing Procedures for Requests for Additional Assurance, and (3) Restraining Utility Companies From Discontinuing Alternating or Refusing Service (the "Utilities Motion")**

103.    In connection with the operation of its business, the Debtor obtains electricity, natural gas, water/sewage, trash removal/waste, telephone and other similar services from a number of different utility suppliers (the "Utility Providers").[9]  The Utility Providers are identified to the best of the Debtor's ability in the chart attached to the Utilities Motion as Exhibit "1".  This Exhibit "1" details the name and address of the Utility Providers, the type of service provided, the Debtor's location (store number) for which the service is provided, the amount of Deposit, if any, made by the Debtor to each Utility Provider, the amount of the Debtor's average one month expense, calculated from the Debtor's expenses from May, 2017, through October, 2017, and (4) the actual charges by each utility on the months of May, 2017 through October, 2017.  The Debtor's phone and internet expenses average $72,000 per month.  The Debtor's other utility expenses average $140,000 per month.

104.    The Debtor has not been in default of any of its obligations to the Utility Providers. I do not anticipate the Debtor will have any problems in honoring its utility obligations.

---

[9]  The Debtor leases all of the locations where it conducts its business.  Pursuant to certain of the Debtor's leases, certain utility services may be provided to the Debtor under its leases.  In such situations, the Debtor may not have any contractual relationship with the utility provider and the utility provider may not have any claim against the Debtor.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**Motion for Order Directing Credit Card Processor and Honor Agreements with the Debtor**

**Pending Assumption or Rejection (the "Credit Card Motion")**

105.    In the ordinary course of business, the Debtor accepts credit card payments from customers.  Approximately 60% of all customer purchases are made by credit card.  First Data Merchant Services Corporation ("FDMS") handles the Debtor's credit card processing for all store locations and all of its retail websites, with three exceptions:  karmaloop.com, plndr.com, and kazbah.com.  For those three websites, Braintree processes credit card transactions pursuant to an agreement that the Debtor assumed when it acquired Karmaloop, Inc.—the original agreement is between Karmaloop, Inc. and PayPal, Inc., dba PayPal Braintree ("Braintree").  The Debtor's agreement with FDMS (and Amendment No. 1 to that agreement) is attached as to the Credit Card Motion as Exhibit "1".  Attached to the Credit Card Motion as Exhibit "2" is an amendment to processing agreement between Karmaloop, Inc., and Braintree, which the Debtor assumed in connection with its purchase of Karmaloop, and the underlying processing agreement.  These agreements are referred to collectively as the "Processing Agreements".

106.    Granting the Debtor the relief requested in the Credit Card Motion is crucial to the Debtor's ability to continue to operate the Business during this chapter 11 case without interruption.  Any interruption in the Debtor's ability to handle credit card transactions or online purchases would have a devastating impact on the Business, and customer support and loyalty, the value of the Estate, and the interests of creditors in this case.

107.    A snapshot of the Debtor's receipts during a representative month--September, 2017--is as follows:

- $4,730,574.17 in cash (38.46% of total receipts)
- $7,176,543.42 in credit card transactions (58.35% of total receipts)
- $270,127.12 from PayPal (2.2%)
- $13,300.21 from Amazon (0.11%)
- $53,277.68 from Shopify (0.43%)
- $56,127.99 from gift cards / store credit (0.46%)

To facilitate credit card transactions and online purchases, the Debtor entered into the

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    Processing Agreements.  Under the Processing Agreements, the Debtor's credit card transactions,

2    including both charges and credits, are processed for payment.

3    **Motion for Order Authorizing Debtor to Maintain Bank Accounts and Cash Management**

4    **System and Continue Use of Its Existing Business Forms (the "<u>Cash Management Motion</u>")**

5        108.    As of the Petition Date, the Debtor utilizes 51 bank accounts (not including the

6    former operating account at Cathay the Debtor is in the process of closing) for use in its business

7    operations.  As noted above, a schedule of the Debtor Accounts, together with the approximate

8    balance for each account as of the Petition Date, is attached to the Cash Management Motion as

9    Exhibit "1" and is incorporated herein by this reference.  The Debtor's primary operating account

10   is maintained at State Bank, which bank also is the Debtor's senior secured lender.  The large

11   majority of the Debtor Accounts are depository and other types of accounts with BOFA, with a

12   handful of CD accounts maintained at Cathay.  The Debtor maintains multiple deposit accounts

13   for cost and convenience purposes.

14       109.    As set forth in more detail in the Cash Management Motion, one form of relief

15   sought through that motion is authority for the Debtor to maintain its existing cash management

16   system.  A detailed description of the Debtor's general cash management system is set forth above

17   under the heading "The Debtor's Cash Management."  If the Debtor is required to close its

18   existing accounts, open all new bank accounts and substantially alter its existing cash management

19   system, there likely would be a significant disruption in the Debtor's ability to collect and disburse

20   funds in the ordinary course of its operations.  Such a disruption would negatively impact the

21   Debtor's ability to make a smooth transition into chapter 11.  Accordingly, in the Cash

22   Management Motion, the Debtor requests that the Court enter an order authorizing (but not

23   directing) the Debtor's continued use of the Debtor's Accounts, rather than opening new debtor in

24   possession accounts.

25       110.    Concurrently herewith, the Debtor is the filing the DIP Financing Motion.  I

26   understand that the DIP facility that is the subject of that motion and related postpetition loan

27   agreement sets certain requirements regarding the Debtor's cash management system.  Although

28   the Debtor seeks authority to maintain its current cash management system (described above) to

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  avoid any disruption to its ongoing business, consistent with the DIP Facility and related

2  Postpetition Loan Agreement, the Debtor intends to modify its cash management system to

3  effectuate the DIP Financing Cash Management Modifications.  Notwithstanding anything to the

4  contrary in the Cash Management Motion, the Debtor seeks to effectuate the DIP Financing Cash

5  Management Modifications, and to otherwise maintain a bank account structure and overall cash

6  management system consistent with the DIP Facility and any orders on the DIP Financing Motion.

7       111.    Additionally, as a way of minimizing expense to the Estate, I believe the Debtor

8  should be permitted to continue to use its correspondence and business forms including, but not

9  limited to, invoices, purchase orders, checks, letterhead, envelopes and other business forms

10  (collectively, the "Business Forms"), substantially in the form existing immediately before the

11  commencement of this chapter 11 case, without reference to the Debtor's status as a debtor in

12  possession.  The Debtor proposes that, in the event it needs to purchase or print new Business

13  Forms during the pendency of this chapter 11 case, such forms will include a legend referring to

14  the Debtor's status as a debtor in possession.

15       112.    If the Debtor is not permitted to maintain and utilize its cash management and

16  banking system (with certain modifications described below), and is not permitted to continue to

17  use its existing Business Forms, I believe the Debtor, the Estate, and creditors will be prejudiced

18  by: (a) the resulting disruption in the ordinary financial affairs and business operations of the

19  Debtor; (b) potential delay in the administration of the Estate; and (c) the unnecessary cost to the

20  Estate to set up new accounts and new systems and purchase/print new business forms.  In order to

21  prevent the inadvertent cashing of outstanding prepetition checks by the Debtor's bank, the Debtor

22  will provide the institutions where the Debtor Accounts are maintained with notice of the

23  commencement of the chapter 11 case and direction that outstanding prepetition checks are not to

24  be honored, unless and until a court order (if any) is entered authorizing payment of such

25  obligations.  If such an order or orders of the Court are entered, the Debtor's banks will be directed

26  to honor checks for prepetition obligations only to the extent the Court has authorized payment of

27  such obligations.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**Motion for Order Limiting Extent of Notice Required for Administrative Matters and**

**Authorizing Service by Email (the "Limiting Notice Motion")**

113.    The Debtor has in excess of 550 creditors and other parties in interest (including landlords and utility providers for its 124 retail locations) on in its Master Mailing List.  Further, the Debtor contemplates that it may be required to bring numerous administrative matters before the Court in this case.  I believe that limiting the extent of notice required for such matters will greatly reduce the substantial burden and expense that would be imposed upon the Estate if the Debtor is required to provide notice of all administrative matters in this case to all of its creditors and various other parties.

114.    At the same time, a creditor, shareholder, or other party in interest desiring to receive notice of administrative matters can ensure that notice will be received by filing and serving a request for special notice.  Moreover, in order to save the Estate substantial expense in postage and copying costs, and to make receipt of documents more convenient and expedient for various interested parties, the Debtor also requests that the Court authorize the Debtor to serve notices, pleadings, and other documents filed in this case by email on those parties who consent in advance to receiving service of such documents by email.

115.    The Debtor seeks to reduce the burden and expense of providing notice of all administrative matters in this case.  Service of notices, pleadings, and other documents filed with the Court by email on parties who consent, in advance, to receiving service of documents by email will dramatically reduce postage and copying expenses in this case and will expedite service in a manner that many parties will likely find preferable to the other more costly alternatives.  Further, I believe that the Court's approval of the Limiting Notice Motion will eliminate the necessity and expense of the Debtor requesting limited notice separately in each administrative matter as it arises.

**Motion re Store Closings and Going Out of Business Sales (the "Store Closing Motion")**

116.    Upon entry of the Interim Order and Approval Order (as defined in the Store Closing Motion), the Debtor intends to sell its merchandise at the retail stores identified in the Store Closing Motion as the "Closing Stores", free and clear of all liens, claims, and

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

encumbrances pursuant to Bankruptcy Code Sections 363(b) and 363(f) through the conduct of the sale as a "going out of business sale," "store closing", "sale on everything", "everything must go", "inventory liquidation" or similar themed sale (the "Closing Sales"), in accordance with the terms of (i) that certain Consulting Agreement (attached to the Store Closing Motion as Exhibit 3, the "Consulting Agreement") entered into prepetition between the Debtor and Great American Group, LLC ("Consultant"), (ii) the Interim Order, (iii) the sale guidelines attached to the Store Closing Motion as Exhibit 4 (the "Sale Guidelines"), and (iv) applicable general laws, but without complying with applicable liquidation sale laws or the terms of the Debtor's leases pending a final hearing on the Debtor's request for authority to assume the Consulting Agreement.

117.    The Closing Stores are identified below:

| Store Number | Location Name | Address |
|---|---|---|
| 10 | Coronado Mall | 6600 Menaul NE, #G-4, Albuquerque, NM 87110 |
| 12 | Del Amo Fashion Center Mall | 21880 Hawthorne Blvd., #334, Torrance, CA 90503 |
| 24 | Cielo Vista | 8401 Gateway Blvd West, #A01B, El Paso, TX 79925 |
| 39 | Merced Mall | 740 Merced Mall, Merced, CA 95340 |
| 67 | Paradise Valley Mall | 4568 E. Cactus Road, #C048, Phoenix, AZ 85032 |
| 70 | WFS North County Mall | 200 East Via Rancho, #419, Escondido, CA 92025 |
| 77 | Westside Pavilion | 10800 West Pico Boulevard, Los Angeles, CA 90064 |
| 80 | Capitola Mall | 1855 41st Ave. #J06, Capitola, CA 95010 |
| 81 | Otay Ranch Town Center | 2015 Birch Rd., Suite 1001, Chula Vista, CA 91915 |
| 83 | Park Place Mall | 5870 East Broadway Blvd., #110, Tucson, AZ 85711 |
| 84 | Tucson Mall | 4500 North Oracle Rd., Suite #327, Tucson, AZ 85705 |

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

| 85 | Baybrook Mall | 500 Baybrooke Mall, #1374, Friendswood, TZ 77546 |
| 90 | First Colony Mall | 16535 Southwest Freeway, #620 Sugarland, TX 77479 |
| 93 | Topanga Plaza | 6600 Topanga Canyon Blvd., #1070A, Canoga Park, CA 91303 |
| 101 | Cottonwood Mall | 10000 Coors Bypass NW, #C-13, Albuquerque, NM 87114 |
| 108 | Tacoma Mall | 4502 S. Steele St., #331A, Tacoma, WA 98409 |
| 110 | Northgate Mall | 401 NE Northgate Way, #527, Seattle, WA 98125 |
| 111 | Westfield Capital | 625 Black Lake Blvd., #E14, Olympia, WA 98502 |
| 113 | Galleria Dallas | 13350 Dallas Parkway, #3600, Dallas, TX 75240 |
| 117 | Alderwood Mall | 3000 184th Street, #552, Lynnwood, WA 98037 |
| 118 | SouthCenter Mall | 1031 SouthCenter Mall, Tukwila, WA 98188 |
| 121 | The Parks @ Arlington | 3811 S. Cooper Street, #1096, Arlington, TX 76120 |
| 122 | Imperial Hwy | 700 W. Imperial Highway, #108, Los Angeles, CA 90044 |
| 123 | River Oaks Center | 96 River Oaks Center #0A15, Calumet City, IL 60409 |
| 125 | Highland Plaza | 1631 East Highland Ave., Suite B-D, San Bernardino, CA 92404 |
| 129 | Ford City Mall | 7601 South Cicero Avenue, #1364, Chicago, IL 60652 |
| 132 | SouthLand Mall | 1215 SouthLand Mall, #264 & #268, Memphis, TN 38116 |
| 142 | EastLand Center | 18000 Vernier Rd., #840, Harper Woods, MI 48225 |
| 148 | Long Beach Store | 248 Pine Ave., Long Beach, CA 90802 |
| 501 | Topanga Sole | 6600 Topanga Canyon Blvd., #11, Canoga Park, CA 91303 |
| 502 | Southcenter Sole | 984 Southcenter Mall, Tukwila, WA 98188 |

118.    I believe that conducting the Closing Sales in the manner set forth in the Store Closing Motion is the best way to maximize the value of the merchandise at the Closing Stores, and that the Debtor requires the assistance of Consultant to maximize that value.

119.    I believe that the terms of the Consulting Agreement are typical, customary, and

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  reasonable.  I also believe that the Consulting Agreement substantially benefits the Estate and is

2  necessary in order to avoid significant harm—the harm of delaying liquidation sales past the

3  Debtor's most profitable season, holiday season which has already commenced.

4    120.    Due to its financial and operational challenges, I have determined that the Debtor

5  cannot conduct its Business at the Closing Stores profitably.  I also determined that, given the

6  current holiday season, time is of the essence to preserve and maximize the value of the Debtor's

7  assets and to minimize its expenses.  Accordingly, I have determined that liquidating the Debtor's

8  merchandise located at the Closing Stores is in the best means of maximizing the recovery from

9  the Debtor's assets for the benefit of the Estate and the Estate's creditors.  The Debtor respectfully

10  requests that the Court authorize the Debtor to conduct the Closing sales immediately upon entry

11  of the Interim Order to enable the Estate to recover as much as possible from the Closing Sales.

12    121.    As far as I am aware, each of State Bank and Comvest asserts liens on the Debtor's

13  merchandise.  I believe that State Bank has consented to the Closing Sales and, particularly, to the

14  sale of the merchandise free and clear of liens, claims and encumbrances, with all such obligations

15  to attach to the amounts due to the Debtor from the Consulting Agreement with the same validity,

16  and priority that such liens, claims, encumbrances, or interests had against the assets.

17    122.    I believe that the Sale Guidelines are based upon similar guidelines approved in

18  other chapter 11 retail cases in the Ninth Circuit.

19    123.    While the Debtor intends to pay its terminated employees as expeditiously as

20  possible, the requirements imposed by these state laws and regulations are unworkable in light of

21  these extraordinary circumstances.  If the Debtor is required to comply with these state laws and

22  regulations, its efforts to wind down their operations and mitigate unnecessary payroll costs will

23  be hampered.  Indeed, if forced to comply, the Debtor will face the choice of (a) having to incur

24  the costs of keeping employees employed after the conclusion of the Closing Sale while payroll is

25  being prepared, or (b) staging terminations to the detriment of the Estate.  Both of these options

26  will provide no benefit to the Estate and will only increase the administrative costs of conducting

27  the Closing Sales.

28    124.    Many states in which the Debtor operates have laws and regulations that require the

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  Debtor to pay an employee substantially contemporaneously with his or her termination.  In many

2  cases, these laws require the payment to occur either immediately or within a period of only a few

3  days from the date such employee is terminated.  The nature of the Closing Sales contemplated by

4  the Store Closing Motion will result in a substantial number of employees being terminated during

5  the Closing Sales.  The Debtor's payroll systems may be unable to process the payroll information

6  associated with these terminations in a manner that will be compliant with these state laws and

7  regulations.  While the Debtor intends to pay its terminated employees as expeditiously as

8  possible, the requirements imposed by these state laws and regulations are unworkable in light of

9  these extraordinary circumstances.  If the Debtor is required to comply with these state laws and

10  regulations, its efforts to wind down its operations and mitigate unnecessary payroll costs will be

11  hampered.

12      125.    The Closing Stores are located in eight different states and numerous

13  municipalities. Certain state statutes and local ordinances in which the Closing Stores are located

14  may have licensing or permit requirements, statutory or regulatory waiting periods, signage

15  restrictions, and/or time limits which would normally affect the conduct of liquidation or other

16  similar closing sales.  Some localities also have statutes or regulations requiring creditor

17  notification before bulk sales are conducted.

18  **Motion for Order Authorizing Debtor to Honor and Comply with Customer Programs and**

19  **Obligations (the "Customer Motion")**

20      126.    The Debtor is a retailer selling directly to the consumer.  If the Debtor is not

21  authorized to honor certain customer obligations, the patronage, confidence and loyalty of the

22  Debtor's customers will be severely harmed.  The requested relief is essential to the Debtor's

23  ongoing business operations, the maintenance of customer confidence, and maximizing the value

24  of the Estate.  Without such relief, I believe the Estate could suffer post-petition damages that

25  would prejudice creditors and harm the value of the property of the Estate.

26      127.    The success of the Debtor's operations and the maximizing of the value of property

27  of the Estate are dependent upon the patronage, confidence, and loyalty of the Debtor's customers.

28  I believe that the support and confidence of the Debtor's customers will be severely harmed if the

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  Debtor is not able to honor and comply with certain existing customer obligations.  Honoring and

2  complying with certain of the Debtor's existing customer obligations is essential in order for the

3  Debtor to (a) meet competitive pressures in its retail business operations, (b) preserve the going

4  concern value of its business, (c) ensure customer satisfaction and generate goodwill,

5  (d) maximize the value of the estate, and (e) maintain existing customers and attract new

6  customers.

7          128.    Accordingly, I believe it is imperative that the Court approve the Customer Motion

8  and authorize the Debtor to honor and comply with its customer obligations and customer

9  programs in the ordinary course of business in order to avoid damage to the Debtor's business

10  operations and customer confidence that would result in postpetition damages prejudicing

11  creditors and harming the Estate.

12          129.    The Debtor has the following customer programs in place and/or outstanding

13  obligations to customers:

14          a.    Gift Cards:  The Debtor has two forms of "gift cards."  The first form are

15  traditional gift cards -- physically-issued cards purchased by the customer loaded with a certain

16  dollar value selected by the customer.  The second form of cards are the "Mystery" or promotional

17  gift cards.  These are cards the Debtor typically uses as giveaways at promotional events.  They

18  are randomly loaded with anywhere between approximately $5.00 to $50.00.  No fee is required or

19  paid by the recipient to receive a "Mystery Gift" card.  The recipient must go to a store or online

20  to discover the value of the card.  As of the Petition Date, the Debtor has outstanding gift cards

21  (including "Mystery Gift" cards) worth approximately $357,644.52, with approximately $325,644

22  for traditional gift cards and approximately $32,000 for Mystery gift cards.

23          b.    Customer Refunds:  The Debtor's policy is to allow refunds upon returns of

24  items purchased within 30 days of purchase.  Refunds are provided to customers by way of

25  original tender.  Additional details regarding refunds are set forth below.

26          c.    Customer Credits And General Return Policies:  The Debtor's policy is to

27  provide customers with store credit upon the customer's return of a product under certain

28  circumstances.  As of the Petition Date, the Debtor has outstanding store credit issued to

1   customers in the approximate amount of $72,726.63.  The Debtor has standing return policies for

2   each of in-store purchases and online purchases.  For in-store purchases, the policies (printed on

3   every store receipt) are as follows:

4           • All transactions must have the original receipt;

5           • All receipts dated within 30 days are required for all returns and exchanges;

6           • All returns and exchanges must be new, unused, and contain all original

7   packaging and accessories;

8           • Defective items shall be exchanges for the same items within 30 days from

9   original day of purchase accompanied by a store receipt.  Defective stealthboards must be returned

10  to the manufacturer by contacting Stealthboard at info@stealthboard.com, layaways are subject to

11  a $10 cancellation fee (30 day max layaway period).  The deposited amount will become store

12  credit after to expiration period.  All returned items purchased under the layaway plan will be

13  charged a $10 return fee;

14          • All clearance items are final sale;

15          • Other restrictions may apply on special offers, promotions, and special

16  discounts;

17          • All raffle items are non-refundable.  Exchange or store credit within 15 days of

18  purchase.

19      For on-line purchases:

20          • <u>Refunds</u>:  30-day return policy with full refund (by way of original tender)

21  provided products are in the condition received with the original box and/or packaging.  If

22  merchandise is not return in its original box, or the box is taped and used to return the

23  merchandise, a $3 restocking fee will be deducted from customer's refund.  Clothing and hats

24  must be unworn, unwashed and undamaged with original tags intact.

25          • <u>Exchanges</u>:  The Debtor allows exchanges provided the product is returned in

26  the same condition received.  Customer contacts the Debtor's Customer Service Department to

27  check the availability of the replacement item and Customer Service Department further explains

28  the steps needed to make the exchange.  Merchandise that is exchangeable can be returned by

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    either mailing to the warehouse or by bringing it into one of the Debtor's store locations.

2    Exchanges are subject to a $7.95 processing and handling fee.  Once the original item is received,

3    the replacement merchandise will arrive to the customer within 7-10 business days.

4                    d.        Drop Ship Program:  One of the Debtor's competitive advantages is its

5    ability to offer its customers leading edge fashion and new trends.  This is achieved primarily

6    through agreements Debtor has reached with various "drop ship" vendors across all of its

7    ecommerce platforms.  Drop shipping is a supply chain management method in which the retailer

8    does not keep goods in stock, but instead transfers customer orders placed online and related

9    shipment details to either the manufacturer, another retailer, or a wholesaler, who then ships the

10   goods directly to the customer.  Although the drop ship vendor actually fills and ships the order to

11   the customer, the customer places the order with the Debtor, tenders payment for the product and

12   shipping to the Debtor, and otherwise interfaces only with the Debtor (not the drop ship vendor).

13   At the end of each month, the drop ship vendor sends the Debtor an invoice for the merchandise

14   sold, which also includes a reconciliation on the shipping charges (the difference between the

15   shipping charge the customer paid to the Debtor and the actual shipping charge).  In the Debtor's

16   case the drop ship vendors are mostly all smaller apparel manufacturers offering some of the

17   hottest styles and current trends.  This allows the Debtor to stay ahead of ever changing trends and

18   new fashions without the normal downtime or capital outlay required if the product was kept on

19   hand.  Hence, continued maintenance of this feature is extremely vital to the profitability of the

20   Debtor's ecommerce platforms and critical to continued patronage of customer on its websites.

21   The need for authority to maintain this program manifests in two ways: (1) customers may have

22   placed and paid the Debtor for orders pre-petition that need to be filled post-petition; and (2) drop

23   ship vendors may have filled orders pre-petition for which payment comes due post-petition,

24   absent which the vendor may not ship other pending customer orders or will stop providing this

25   service for the Debtor going forward.  To ensure all customer orders are properly filled and that

26   the Debtor is able to continue offering this service to its customers on an uninterrupted basis,

27   especially in light of the current holiday season, the Debtor seeks authority to fill customer orders

28   placed pre-petition, including all orders placed through the Debtor's "dropship vendor" program,

1    pay all associated drop ship vendor charges, and to otherwise take other actions to ensure the

2    uninterrupted function of this service.

3            e.        Other (e.g., Promotions/Discounts/Rewards/Points):  The Debtor offers

4    various discounts and other promotions from time to time, including for online sales.  For

5    example, the Debtor's original website, ShiekhShoes.com, which offers the Shiekh brand of

6    women's shoes, offers discounts on these brands and daily deals.

7            130.    The continued patronage, confidence, and loyalty of its customers is essential to the

8    ongoing vitality of the Debtor's business and the Debtor's ability to maximize the value of the

9    estate.  Pursuant to the Customer Motion, the Debtor seeks authorization on an emergency basis to

10   honor and comply with its customer obligations and programs because any delay or interruption in

11   honoring certain customer obligations, providing refunds, or in having the flexibility to resolve

12   customer claims in the ordinary course of business will seriously harm the Debtor's customer

13   relations at a time when customer confidence, loyalty, and patronage is critical.

14   **Motion for Extension of Time to File Bankruptcy Schedules, Statement of Affairs and Lists**

15   **(the "Schedules Extension Motion")**

16           131.    In the Schedules Extension Motion filed by the Debtor, the Debtor requests an

17   extension of time of thirty (30) days to file its bankruptcy schedules, statement of affairs, and lists

18   lists.

19           132.    The Debtor's accounting department consists of three full-time employees, none of

20   whom possess a CPA or other accounting certification.  They handle the general bookkeeping

21   duties for the Company, which include accounts payable and receivables and the employee

22   mileage and expense reimbursement programs.  Three part-time administrative assistants also help

23   with the filing, data entry, and related tasks.  This accounting department also must prepare for

24   annual audits, respond to various internal/external requests for company financial data and assist

25   in sales/use tax payment, quarterly reconciliations and audits.

26           133.    Upon commencement of this case, in order to continue its operations and avoid

27   irreparable harm to the estate, the Debtor was required, among other things, to file various "first

28   day" motions, including (among others) motions (i) to obtain authorization to pay and honor

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  priority prepetition wage and benefit claims owed to its employees, (ii) to provide adequate

2  assurance in accordance with Bankruptcy Code section 366 to utility providers, (iii) to obtain

3  authorization to honor and comply with certain customer obligations, (iv) to obtain authorization

4  to use cash collateral in the ordinary course of business and grant replacement liens, (v) to obtain

5  authorization to conduct inventory clearance sales, and (vi) in general, to avoid disruption to the

6  Debtor's business operations and potential harm to the estate.  These matters required the

7  immediate attention of the Debtor and its accounting personnel.

8        134.  The Debtor's accounting personnel are working diligently to compile and analyze

9  the information necessary to prepare the Debtor's schedules, statements, and lists.  However,

10  voluminous documentation and records must be reviewed.  Additional time is required to allow for

11  proper preparation of the Debtor's schedules, statements and lists.

12        135.  In this case, merely compiling and preparing the information required by the Office

13  of the United States trustee under its initial requirements will require many hours attention of the

14  Debtor's accounting personnel.

15        136.  For these reasons, especially given the Debtor's relatively small accounting

16  department and limited accounting personnel who have been and will continue to be tasked with

17  searching and compiling the information for the Debtor's schedules and initial bankruptcy

18  commencement papers, the Debtor needs additional time to prepare and finalize the Debtor's

19  schedules, statements, and lists as set forth in the Schedules Extension Motion.

20  **Motion for Interim And Final Orders Authorizing Debtor to Obtain Post-Petition Financing**

21  **And Related Relief (the "DIP Financing Motion")[10]**

22        137.  Through the DIP Financing Motion, the Debtor seeks to obtain post-petition

23  financing from the Postpetition Lender, as well as additional related relief.  A true and correct

24  copy of the related DIP financing agreement with the Postpetition Lender (the "Postpetition Loan

25  Agreement") is attached to the DIP Financing Motion as Exhibit "A".  A summary of the key

26  _____

27  [10] Capitalized terms in this section of this Declaration not otherwise defined shall have the meaning
ascribed to them in the DIP Financing Motion.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

terms of the Postpetition Loan Agreement is set forth in the DIP Financing Motion.  I understand
that a recently updated budget currently remains subject to approval of the Postpetition Lender,
and will be filed with the Court before the hearing on the DIP Financing Motion.

138.    The Debtor's access to the financing to be provided under the proposed DIP facility
from the Postpetition Lender (the "Postpetition Facility" or the "DIP Facility") is absolutely
critical to the continued operation of the Debtor's retail stores, online sites, and overall business,
conducting the inventory clearance/store closing sales discussed above (the "Store Closing Sales")
-- which are set to begin promptly and continuing through the holiday season -- and to otherwise
maximize the value of the Estate.  As discussed in more detail below, the Debtor has been unable
to procure any alternate financing on more favorable terms, within the necessary expedited
timeframe, and with sufficient availability to meet its cash needs.  Without immediate access to
the funding provided under the DIP Facility, the Debtor would not have access to sufficient cash
to pay ordinary and necessary expenses essential to continuing its operations, including the cash
necessary to buy product needed for this current, extremely critical holiday shopping season.

139.    As a result, an interim order approving the DIP Facility and other forms of related
relief identified in the DIP Financing Motion, on an expedited basis, followed by a final order, is
necessary to avoid immediate and irreparable harm to the Debtor.  Absent an immediate hearing
and entry of an order granting the DIP Financing Motion, I believe the Debtor would be unable to
fund continuing business operations, which, in turn, would significantly jeopardize the Debtor's
prospects for a successful reorganization and/or its efforts to maximize the value of the Estate for
the benefit of creditors.

140.    The Debtor has an immediate and critical need to obtain post-petition financing
under the Postpetition Facility and to use cash collateral in order to, among other things, finance
the ordinary costs of its operations, make payroll, and satisfy other working capital and
operational needs.  The Debtor's access to sufficient working capital and liquidity through the
incurrence of post-petition financing under the Postpetition Facility and the use of cash collateral
under the terms laid out in the proposed interim order on the DIP Financing Motion attached to the
DIP Financing Motion as Exhibit "B" (the "Interim Order") is vital to the preservation and

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  maintenance of the value of the Estate.  Moreover, the lender has informed the Debtor that the

2  Debtor may not use any cash after the filing of this case until an order authorizing the Postpetition

3  Facility is entered.  Consequently, without access to the Postpetition Facility and the use of cash

4  collateral, the Debtor and its Estate would suffer immediate and irreparable harm.

5      141.    The use of cash collateral alone would be insufficient to meet the Debtor's post-

6  petition liquidity needs.  Given the Debtor's current financial condition and capital structure, the

7  Debtor is unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b)

8  and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii)

9  adequate credit secured by (x) a senior lien on unencumbered assets of its estate under section

10  364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets under section

11  364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the

12  Bankruptcy Code, from sources other than the Postpetition Lender on terms more favorable than

13  the terms of the Postpetition Facility.  The only source of secured credit available to the Debtor,

14  other than the use of cash collateral, is the Postpetition Facility.  The Debtor requires both

15  additional financing under the Postpetition Facility and the use of cash collateral under the terms

16  of the Interim Order in order to satisfy its post-petition liquidity needs.  After considering all of its

17  alternatives, the Debtor has concluded, in an exercise of its sound business judgment, that the

18  financing to be provided by the Postpetition Lender pursuant to the terms of the Interim Order and

19  the Postpetition Loan Documents represents the best financing presently available to the Debtor.

20      142.    The Postpetition Lender has indicated a willingness to provide the Debtor with

21  certain financing commitments, but solely on the terms and conditions set forth in the Interim

22  Order and in the Postpetition Loan Documents.

23      143.    Ā| e to the Debtor's current financial condition, the Debtor requires funding to

24  maintain its business and preserve the value of its assets and to otherwise operate its business.

25  The need for financing at this time is particularly important given the current holiday season and

26  the need to purchase product to ensure sufficient inventory exists to fulfill customer orders placed

27  online and to offer customers who patronize the Debtor's retail stores during this season, and

28  while the Debtor pursues the Store Closing Sales with respect to the 31 stores set to begin

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

2611572

1  promptly.

2      144.    The Debtor also requires the DIP Facility to fund its immediate purchase of

3  essential Nike product.  As discussed in more detail in the Nike Critical Vendor Motion (defined

4  below), Nike product is extremely important to the Debtor's current business model and the need

5  for this product is critical to the Debtor's business, in general, and for this holiday season, in

6  particular.  Pursuant to the Nike Agreement, Nike agreed to resume shipping premium product to

7  the Debtor, but only on a cash-in-advance basis, concurrent pay down of Nike's pre-petition debt,

8  and otherwise pursuant to the terms of the Nike Agreement.  This agreement requires the Debtor

9  to tender to Nike $4,000,000 for every $3,000,000 in product it purchases (with $1,000,000 of the

10  $4,000,000 going to pay down Nike's pre-petition debt).  This product is essential to the Debtor's

11  current business, maintenance of its going concern value, and overall profitability, especially

12  given the Debtor's significant investment in aligning its stores and business model with the Nike

13  brand.

14      145.    The Debtor's use of cash collateral alone would be insufficient to meet the Debtor's

15  post-petition liquidity needs or to otherwise operate its business.  Rather, the Debtor needs the DIP

16  Facility to pay, in the ordinary course, among others, its employees, landlords, shippers, vendors,

17  utility providers, and other suppliers of goods, and to otherwise sustain its operations.   In light of

18  the foregoing, the Postpetition Lender agreed to provide the Debtor with the DIP Facility of up to

19  $16.0 million pursuant to the Postpetition Loan Agreement (Exhibit "A" to the DIP Financing

20  Motion), to be used as set forth in and in accordance with, the Approved Budget.

21      146.    Based on the Approved Budget, which sets forth the Debtor's projected cash

22  receipts and cash disbursements for the 13-week period following the Petition Date, I believe that

23  the DIP Facility will provide the Debtor with sufficient funds to maintain operations for such

24  period and, at least, until the Debtor is able to conclude the Store Closing Sales and make it

25  through the holiday season.

26      147.    The terms and conditions of the DIP Facility are set forth in detail in the

27  Postpetition Loan Agreement and the Interim Order.  A summary of its key terms are set forth in

28  the DIP Financing Motion.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

148. Based on the Approved Budget, which sets forth the Debtor's projected cash receipts and cash disbursements for the 13-week period following the Petition Date, the Debtor believes that the DIP Facility will provide it with sufficient funds to maintain operations for such period and, at least, until the Debtor is able to conclude the Store Closing Sales and make it through the holiday season.

149. In the lead up to the filing of this case, the Debtor and the Postpetition Lender engaged in intensive discussions and negotiations regarding the Debtor's cash position, financial condition, cash needs, and the Debtor's overall need for financing. I participated in those discussions and negotiations, together with my in-house counsel, outside bankruptcy counsel, and outside financial advisors. At various points during this process, the negotiations and potential financing arrangements fell through, with the Prepetition Senior Lender freezing the Debtor's line of credit and precluding it from accessing much-needed cash.

150. With the holiday season then fast-approaching, the Debtor in need of cash, among other things, to purchase Nike product in advance of Thanksgiving, and, at the time, no post-petition financing arrangement acceptable to the Debtor reached with the Postpetition Lender, I reached out to other potential lenders and considered other potential alternative funding sources. I was unable to obtain sufficient interim or long-term financing from sources other than the Postpetition Lender on terms and subject to conditions more favorable than under the Postpetition Loan Agreement, or that I believed could realistically close within the necessary expedited timeframe or that provided sufficient availability of funds.

151. Based on my attempts to locate alternative financing, in my opinion, other potential funding options from other parties offered very high interest rates and fees, did not have sufficient availability of funds (and potentially during the period when payments to Nike under the Nike Agreement would be most concentrated), and included long lists of conditions precedent and open items that likely would drag the process out beyond an acceptable period of time to meet the Debtor's cash needs during the holiday season.

152. Further, none of the sources of funding were willing to provide junior financing. For example, a proposal the Debtor received from an alternate source, was not on more favorable

1    terms than the current proposed DIP Facility, would not have been on an unsecured,

2    administrative, or junior secured basis, but rather secured by a senior priming lien against the

3    Debtor's assets, and simply was not feasible given various contingencies and related issues and the

4    exigencies of the Debtor's cash position.

5        153.    Moreover, given the secured positions of each of the Prepetition Senior Lender and

6    Comvest, and the combined amounts of their secured debt, I do not think it would have been

7    realistic for any lender to be willing to provide the Debtor with unsecured financing or even

8    secured financing on a junior lien basis.

9        154.    In addition, it is my understanding that the Intercreditor Agreement between the

10   Prepetition Senior Lender and Comvest potentially posed difficult hurdles to the Debtor's ability

11   to obtain funding from sources other than the Postpetition Lender.

12       155.    As noted above, the Postpetition Lender has indicated a willingness to provide the

13   Debtor with certain financing commitments, but solely on the terms and conditions set forth in the

14   Interim Order and in the Postpetition Loan Documents.  In other words, among other terms set

15   forth in such documents, the Debtor was unable to obtain credit from the Postpetition Lender

16   without providing it with various protections, including the granting of security interests, liens,

17   and superpriority claims (including a superpriority administrative claim pursuant to section

18   364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the

19   Bankruptcy Code (the "Postpetition Liens"), and priming liens pursuant to section 364(d) of the

20   Bankruptcy Code) to the Postpetition Lender to secure all obligations of the Debtor under and with

21   respect to the Postpetition Facility.

22       156.    After considering alternatives, I have concluded that the proposed DIP Facility,

23   coupled with the considerations discussed above in respect of timing and potential hurdles posed

24   by the Intercreditor Agreement, represents the best financing presently available to the Debtor and

25   reflects an exercise of the Debtor's sound business judgment.

26       157.    In addition, the terms of the Postpetition Loan Agreement are the result of

27   intensive, arms-length negotiations between the Debtor and the Postpetition Lender, together with

28   their respective experienced and sophisticated counsel and financial consultants.  Thus, I believe

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   that any credit extended, loans made, and other financial accommodations extended to the Debtor

2   by the Postpetition Lender have been extended, issued or made, as the case may be, in "good

3   faith" within the meaning of section 364(e) of the Bankruptcy Code as I understand it.Under the

4   present circumstances of this case, the DIP Facility provides the Debtor with critically necessary

5   emergency funding, without which the Debtor would be unable to reorganize its affairs and

6   emerge as a reorganized debtor, but instead would be forced to liquidate. The Debtor is a retail

7   business, and without continuity of its operations, and an uninterrupted delivery of inventory to

8   stores, the Debtor could face a significant customer defection, which would have immediate and

9   devastating effect upon the Debtor's future revenues and opportunity to maximize the value of the

10  Estate.  For these and all other reasons discussed above and set forth in the DIP Financing Motion,

11  I believe that granting the Postpetition Lender Postpetition Liens (as well as the other protections

12  being provided under the DIP Credit Agreement) is warranted, appropriate, and necessary.

13         158.    I also believe that the terms of the proposed DIP Facility are fair, reasonable, and

14  adequate.  Aside from being extensively negotiated, given that Postpetition Lender likely is aware

15  of the fact that the Debtor would have very little chance of avoiding liquidation if not for the DIP

16  Facility, and that the DIP Facility will assist the Debtor in preserving the going-concern value of

17  its business and facilitate the successful consummation of the Store Closing Sales and eventual

18  reorganization, I believe that the benefits afforded to the Debtor by the DIP Facility justify the

19  protections being afforded under the terms of the Postpetition Loan Agreement.  The DIP Facility

20  offers the Debtor its best and, likely, only opportunity to maintain and preserve the value of its

21  assets while pursuing the Store Closing Sales and restructuring of its debts to emerge a healthy

22  reorganized debtor, which will benefit all creditors and parties in interest in this case.

23         159.    Attached to a separately-filed Appendix of Exhibits to the DIP Financing Motion

24  are true and correct copies of the following: (A) The Prepetition Senior Loan Agreement (Exhibit

25  "A"); (B) The prepetition Revolver Note (Exhibit "B"); (C) The UCC-1 Financing Statement in

26  favor of the Prepetition Senior Lender (Exhibit "C"); and (D) The Intercreditor Agreement

27  (Exhibit "D").

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**Motion for Order Authorizing Payment Of Certain Prepetition Taxes (the "Sales Tax Motion")**

160.    In the ordinary course of its business, the Debtor collects, withholds and incurs Taxes (as that term is defined in the Sales Tax Motion) that include sales and use, business and regulatory fees, and other taxes and fees.  The Debtor is required to remit the sales and use taxes collected in connection with the sale of goods at its stores to the applicable Taxing Authorities (as that term is defined in the Sales Tax Motion) on a periodic basis, usually monthly in arrears for the prior month.  Many governmental authorities where the Debtor operates its business require that the Debtor obtain a business license and pay corresponding occupational fees and/or fees associated with the filing of an annual report with such jurisdictions.  The requirement for a company to obtain a business license varies according to the tax law of the jurisdictions, and depends on many factors, including gross receipts.

161.    The Debtor operates in 10 states, which each impose different tax obligations on the Debtor in connection with its business and operations.  The Debtor remits the Taxes to various federal, state and local government authorities in the ordinary course of business.  Taxes are remitted by the Debtor through checks and electronic transfers that are processed through its banks and other financial institutions.

162.    Since the Taxes generally are paid in arrears, the Debtor holds the Taxes for a period of time before remitting them to the appropriate Taxing Authorities.  As such, some of the Taxing Authorities were not paid for all prepetition Taxes prior to the Petition Date.

163.    The Debtor has paid substantially all of its sales taxes relating to October, 2017.  However, there are two payments that the Debtor will need to make at the end of November, 2017, in the following amounts:  $37,481.88 relating to Nevada sales taxes, and $47,793.33 relating to Washington sales taxes.

164.    For sales occurring during the month of November, 2017, the Debtor anticipates paying these sales taxes largely by the end of December, although one payment (for Nevada) is due on January 1, 2018.  The Debtor does not know precisely how much it will be required to pay in sales taxes in December, 2017, relating to November, 2017, sales, but has budgeted $546,619 to

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  be paid on December 1, 2017, $85,275 to be paid on December 8, 2017, and $195,638 to be paid

2  on December 29, 2017.

3      165.    Other Taxing Authorities may have been sent checks with respect to Taxes that

4  may or may not have been presented or cleared as of the Petition Date.

5      166.    Paying the prepetition Taxes is essential to the Debtor's ongoing business

6  operations and successful reorganization.  If the Debtor fails to pay Taxes, I believe that the

7  Taking Authorities may take actions that could impact the Debtor's ability to operate without

8  interruption.  The Debtor also may incur, and would be obligated to pay, increased interest and

9  significant penalties if the Estate does not timely satisfy its ongoing tax obligations for the

10  prepetition period or thereafter.

11      167.    I also believe that some of the Taxing Authorities may cause the Debtor to be

12  audited if the Taxes are not paid promptly.  Such audits would further divert attention from the

13  reorganization process and increase the costs of administering this estate.

14      168.    In addition, many Taxing Authorities and State agencies impose personal liability

15  on the officers and directors of collecting entities, such as the Debtor, for Taxes collected by those

16  entities that are not paid to the appropriate Taxing Authority.  Thus, to the extent that any

17  prepetition Taxes are unpaid, the Debtor's officers and directors may be subject to audits and/or

18  lawsuits on account of nonpayment during the pendency of these chapter 11 cases.

19  **Motion For Interim/Final Orders Authorizing Debtor to: (1) Pay Prepetition Claim of Nike**

20  **USA, Inc., as Critical Vendor; (2) Incur Postpetition Indebtedness on Superpriority Basis;**

21  **And (3) Perform Under Agreement With Nike USA, Inc. ("<u>Nike Critical Vendor Motion</u>")**

22      169.    As noted above, a successful restructuring that would maintain the Debtor's

23  current business model and without a significant alteration in the Debtor's operations will require

24  the cooperation of Nike.

25      170.    Nike is the Debtor's key, and most critical, vendor.  As noted above, Nike's

26  products account for more than 60% of the Debtor's gross revenues.  In addition, the Nike

27  product: (a) is premium product that the Debtor is able to sell at a relatively high margin

28  generating substantially more than the cost of the product; (b) sells quickly; and (c) drives more

2611572                                          46

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   traffic to the Debtor's stores and websites.

2   171.    Nike product is also critical to the Debtor's current overall business model.  As

3   explained above, in late 2014/early 2015, recognizing the significance of Nike product to the

4   Debtor's business, the Debtor expended substantial funds and resources remodeling retail stores in

5   a manner geared towards Nike product, with 61 of its 124 stores already remodeled at a cost of

6   approximately $30 million.

7   172.    In October 2017, Nike finance indicated the line of credit extended to the Debtor

8   needed to be paid down significantly and relegated the Debtor to pre-pay all orders before being

9   shipped.  I do not believe the Debtor would be in a position to successfully reorganize its affairs in

10   a manner that maintains its current product presentation, product mix, and overall business

11   concept and operations absent Nike's continued supply of products and its cooperation in this

12   case.  Moreover, the very important holiday shopping season has already commenced and the

13   Debtor must gear up for this season by, among other things, preparing for various inventory

14   liquidation sales.  As a result, the Debtor needs Nike to resume shipping the Debtor products

15   immediately to ensure the Debtor has sufficient time to receive, catalogue, and properly display

16   the products at the Debtor's various stores and to otherwise be in a position to leverage and take

17   full advantage of the holiday season.

18   173.    In anticipation of the filing of the present bankruptcy case, the Debtor and Nike

19   engaged in extensive negotiations to reach an agreement under which Nike would agree to

20   continue supplying the Debtor with product immediately.  Those negotiations were successful.

21   More specifically, the parties agreed to the terms and conditions summarized in the Nike Motion

22   under which the Debtor will commence payments to Nike on account of its pre-petition debt as a

23   critical vendor, in exchange for Nike's resumption of shipments to the Debtor on credit terms,

24   with all post-petition indebtedness granted superpriority administrative status (the "Nike

25   Agreement").  A true and correct copy of the Nike Agreement is attached to the Nike Motion as

26   Exhibit "1."

27   174.    The Debtor informed State Bank of the terms of the Nike Agreement.  I understand

28   that, conditioned on approval of the DIP Financing Motion, the Nike Agreement is acceptable to

1  State Bank.  I also understand that the Approved Budget accounts for the various payments to be

2  made to Nike on the present arrangement and otherwise factors the terms and conditions of the

3  Nike Agreement into the Approved Budget.

4         175.    The Nike Agreement was reached only after extensive arms-length negotiations

5  between the parties, their representatives and counsel.  Absent these terms and conditions,

6  including the Court's approval of this Nike Agreement, Nike indicated it will refuse to resume

7  supplying the Debtor with any product.  This would force the Debtor to completely shift its

8  business focus and otherwise alter its business model and operations in order to achieve a

9  successful reorganization in this case.  Therefore, and given the critical role Nike and its product

10  play in the Debtor's entire business concept, I believe the Nike Agreement, and its terms and

11  conditions, are essential to this case and are in the best interests of the Estate and its creditors.

12  **Motion Order Approving Debtor's Rejection Of Unexpired Leases Of Nonresidential Real**

13  **Property At:  (1) 953 Fifth Avenue, San Diego, CA 92101, And (2) 5020 N.E. Martin Luther**

14  **King Blvd., Portland, OR 97211 ("Reject Leases Motion")**

15         176.    Prior to the Petition Date, the Debtor operated a retail store at each of the

16  following locations:

17        ●    Store No. 35, located at 953 Fifth Avenue, San Diego, CA 92101 ("Store

18  No. 35")

19        ●    Store No. 133, located at 5020 NE Martin Luther King Blvd., Portland,

20  OR 97211 ("Store No. 133", and together with Store No. 35, the "Closed Stores").

21         177.    The Debtor closed Store No. 35 on November 6, 2017.  The Debtor closed Store

22  No. 133 on November 8, 2017.  All of the Debtor's inventory has been removed from the Closed

23  Stores, and the Debtor has relinquished possession of the Closed Stores to the landlords of the

24  Closed Stores.  No revenue is currently being generated from the Closed Stores, and I anticipate

25  that no revenue will be generated from these stores in the future.

26  / / /

27  / / /

28  / / /

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

178.    The baseline rent on Store No. 35 is currently $7,500 per month.  The baseline rent on Store No. 133 is approximately $6,500 per month.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on November 28, 2017, at Los Angeles, California.



Shiekh S. Ellahi

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

# EXHIBIT 1

| Location Name | Address | City | State | ZIP | Lessors Name | Lessor Contact Info | Lessee | Rent Terms | Lease Expiration Date of Term |
|---|---|---|---|---|---|---|---|---|---|
| Shiekh Shoes Warehouse/Ecom | 1777 S. Vintage Ave. | Ontario | CA | 91761 | 1777 S. Vintage Avenue Investors, LLC | | Shiekh Shoes, LLC | Base | 31-May-22 |
| | | | | | | 1777 S. Vintage Avenue Investors, LLC, c/o Cushman & Wakefield – PM Dept., 655 N. Central Ave. Suite 100, Glendale, CA 91203 | | | |
| Willowbrook Mall | 1590 Willowbrook Mall | Houston | TX | 77070-5715 | Willowbrook Mall (TX), LLC | Willowbrook Mall (TX), LLC, c/o Willowbrook Mall TX, 110 N. Wacker Dr., Chicago, IL 60606, Attn: Law/Lease Administration Department; With a Copy to: Willowbrook Mall TX, 2000 Willowbrook Mall, Houston, Texas 77070-5715, Attn: General Manager | Shiekh Shoes, LLC | Base + % | 31-Dec-27 |
| Westfield Topanga | 6600 Topanga Canyon Blvd, #1016 | Canoga Park | CA | 91303 | Westfield Topanga Owner LLC | Westfield Topanga Owner LLC, 2049 Century Park East, 41st Flr., Los Angeles, CA 90067, Attn: Legal Dept. | Shiekh Shoes, LLC | Base + % | 1/31/2025 |
| Westfield North County | 200 East Via Rancho, #461 | Escondido | CA | 92025 | EWH Escondido Associates, L.P. (Westfield) and North County Fair LP | EWH Escondido Associates, L.P., 2049 Century Park East, 41st Flr., Los Angeles, CA 90067, Attn: Legal Dept. | Shiekh Shoes, LLC | % | 1/31/2025 |
| Newpark Mall | 1240 Newpark Road #1240 | Newark | CA | 94560 | Alameda Mall Associates (50% co-tenant) & GGP- Newpark, L.L.C. (50% co-tenant) - as assigned to NewPark Mall, LP | Notice: NewPark Mall, L.P., 1114 Avenue of the Americas, Suite 2800, New York, NY 10036, Attn: General Counsel; With Copy to: NewPark Mall, L.P., 2086 NewPark Mall, Newark, CA 94560, Attn: General Manager; Payment Address: Rouse Properties, Inc- New Park Mall, SDS-12-3050, PO Box 86, Minneapolis, MN 55486-3050 | Shiekh Shoes, LLC | Base + % | 31-Aug-19 |
| Southland Mall | B-396 Southland Mall, #82 | Hayward | CA | 94545 | Southland Mall, LP | Southland Mall, LP, 1114 Avenue of the Americas, Suite 2800, New York, New York 10036, Attn: General Counsel; With a copy to: Southland Mall, 1 Southland Mall Dr., Hayward, California 94545, Attn: General Manager; Southland Mall, LP, SDS-11-1150, PO Box 86, Minneapolis, Minnesota 55486-1150 | Shiekh Shoes, LLC | Base + % | 30-Jun-27 |
| Sherwood Mall | 5308 Pacific Ave #33, #8 | Stockton | CA | 95207 | Brixton Sherwood LLC | Brixton Sherwood, LLC, c/o Brixton Capital, 120 South Sierra Ave, Solana Beach, CA 92075, Attn: Property Manager | Shiekh Shoes, LLC | Base + % | MTM |
| WFS Solano Mall | 1350 Travis Blvd, #125 | Fairfield | CA | 94533 | Solano Mall LP | Solano Mall, LP, c/o Westfield Corporation, Inc., 11600 Wilshire Blvd., 11 th floor, Los Angeles, CA 90025, Attn: Legal Department | Shiekh Shoes, LLC | Base + % | 30-Jun-22 |
| Coronado Mall | 6600 Menaul NE, #G-4 | Albuquerque | NM | 87110 | Coronado Center, L.L.C. | Notice: Coronado Center c/o Coronado Center, L.L.C., 110 N. Wacker Dr., Chicago, IL 60606, Attn: Law/Lease Administration Dept.; With Copy to: Coronado Center Mall, 6600 menaul Blvd., NE, Albuquerque, NM 871110, Attn: General Manager | Shiekh Shoes, LLC | Base + % | 30-Nov-18 |
| Compton Plaza | 1900 N Long Beach Blvd. #102 & #103 | Compton | CA | 90221 | 2565 Euclid Crescent East, Upland, CA 91784 | 2565 Euclid Crescent East, Upland, CA 91784 | Shiekh Shoes, LLC | Base + % | 12/31/2017 |
| Compton Community Center | 1900 N Long Beach Blvd. (Basement) | Compton | CA | 90221 | Ten Brothers Holding Co. | 2565 Euclid Crescent East, Upland, CA 91784 | Shiekh Shoes, LLC | Base + % | 12/31/2017 |
| Del Amo Fashion Center | 21880 Hawthorne Blvd. #334 | Torrance | CA | 90503 | Del Amo Fashion Center Operating Company, L.L.C. | Del Amo Fashion Center Operating Company, L.L.C., c/o M.S. Management Associates Inc., 225 West Washington Street, Indianapolis, Indiana 46204-3438 | Shiekh Shoes, LLC | Base + % | 31-Oct-18 |
| Fashion Fair | 563 East Shaw Ave #F01A | Fresno | CA | 93710 | Macerich Fresno Limited Partnership | Macerich Fresno Limited Partnership, 4841 N. 1st Street, Fresno, CA 93726, Attn: Center Manager; With copy to: Macerich Fresno Limited Partnership, c/o Macerich, PO Box 2172, 401 Wilshire Blvd., Suite 700, Santa Monica, CA 90407, Attn: Legal Dept. | Shiekh Shoes, LLC | Base + % | 31-May-24 |
| Somersville Towne Center | 2550 Somersville Rd. #65 | Antioch | CA | 94509 | The Macerich Partnership, LP | The Macerich Partnership, L.P., 2556 Somersville Road, Antioch, CA 94509, Attn: Center Manager; With copy to: The Macerich Partnership, L.P., c/o Macerich Company, PO Box 2172, 401 Wilshire Blvd, Suite 700, Santa Monica, CA 90407, Attn: Legal Dept. | Shiekh Shoes, LLC | Base + % | 31-Jul-17 |
| Hilltop Mall | 2200 Hilltop Mall Road, #C243 | Richmond | CA | 94806 | Richmond Associates LLC | Richmond Associates LLC, c/o M.S. Management Associates Inc., 225 West Washington Street, Indianapolis, Indiana 46204-3438 | Shiekh Shoes, LLC | Base + % | 6/30/2018 |
| Valley Plaza | 2701 Ming Ave. #150 | Bakersfield | CA | 93304 | Bakersfield Mall LLC | Notice: Valley Plaza Mall c/o Bakersfield Mall LLC, 110 N. Wacker Dr., Chicago, IL 60606, Attn: Law/Lease Administration Department; with copy to: Valley Plaza Mall, 2701 Ming Ave, Bakersfield, CA 93304, Attn: General Manager | Shiekh Shoes, LLC | Base + % | 31-Jan-26 |
| Santa Rosa Plaza | 1051 Santa Rosa Plaza #1051 | Santa Rosa | CA | 95401 | EMI Santa Rosa Limited Partnership | EMI Santa Rosa Limited Partnership, c/o M.S. Management Associates, Inc., 225 West Washington Street, Indianapolis, IN 46204-3438 | Shiekh Shoes, LLC | Base + % | 31-Oct-20 |
| West Valley Mall | 3200 N. Naglee Rd #254 | Tracy | CA | 95304 | Tracy Mall Partners, L.P. | Tracy Mall Partners, L.P., 114 Avenue of the Americas, Suite 2800, New York, New York 10036, Attn: General Counsel; With Copy to: West Valley Mall 3200 North Naglee Rd., Tracy, California 95304, Attn: General Manager | Shiekh Shoes, LLC | Base + % | 31-Mar-25 |
| WFS Fox Hills Mall | 6000 Sepulveda Blvd. #1701 | Culver City | CA | 90230 | Culver City Mall, LLC | Culver City Mall LLC, 2049 Century Park East, 41st Floor, Los Angeles, CA 90067, Attn: Legal Department | Shiekh Shoes, LLC | Base + % | 31-Jan-24 |
| Pacific View Mall | 3301 E. Main St. #1385 | Ventura | CA | 93003 | Macerich Buenaventura Limited Partnership | Macerich Buenaventura Limited Partnership, 3301-1 East Main Street, Ventura, California 93003, Attn: Center Manager; With a Copy to: Macerich Buenaventura Limited Partnership, c/o Macerich, PO Box 2172, 401 Wilshire Blvd., Suite 700, Santa Monica, CA 90407, Attn: Legal Dept. | Shiekh Shoes, LLC | Base + % | 30-Nov-20 |
| Sunvalley Mall | One Sunvalley Mall #128 | Concord | CA | 94520 | Sunvalley Shopping Center LLC | Sun Valley, 200 East Long Lake Road, PO Box 200, Bloomfield Hills, MI 48303-0200 | Shiekh Shoes, LLC | Base + % | 31-May-27 |
| Cielo Vista | 8401 Gateway Blvd West. #A01B | El Paso | TX | 79925 | Simon Property Group (Texas), L.P. | Simon Property Group (Texas), L.P., c/o M.S. Management Associates, Inc., 225 West Washington Street, Indianapolis, IN 46204-3438 | Shiekh Shoes, LLC | Base + % | 31-Aug-22 |
| Northridge Mall | 628 Northridge Mall, #F18 | Salinas | CA | 93906 | Macerich Bristol Associates and Northridge Fashion Center LLC | Macerich Bristol Associates and Northridge Fashion center LLC, 796 Northridge Mall, Salinas, CA 93906, Attn: Center Manager; With copy to: Macerich Bristol Associates and Northridge Fashion center LLC, c/o Macerich, PO Box 2172, 401 Wilshire Blvd, Suite 700, Santa Monica, CA 90407, Attn: Legal Dept. | Shiekh Shoes, LLC | Base + % | 14-Apr-20 |
| Great Mall of Bay Area | 447 Great Mall Dr. #164A | Milpitas | CA | 95035 | Milpitas Mills Limited Partnership | Milpitas Mills Limited Partnership, c/o M.S. Management Associates Inc., 225 West Washington Street, Indianapolis, Indiana 46204-3438 | Shiekh Shoes, LLC | Base + % | 30-Apr-19 |
| Vermont Ave | 5851 S. Vermont Avenue | Los Angeles | CA | 90044 | Sinai Properties, LLC and Stanklank Properties, LLC | Atlas Real Estate Corp., 296 S. Beverly Drive, #454, Beverly Hills, CA 90212, Attn: Property Manager | Shiekh Shoes, LLC | Base | 28-Aug-21 |
| Moreno Valley Mall | 22500 Towngate Cir. #1, #T159 | Moreno Valley | CA | 92553 | Moreno Valley, LP | Moreno Valley Mall, LP, c/o Moreno Valley Mall, 110 N. Wacker Dr., Chicago, IL 60606, Attn: Law/Lease Administration Department; With Copy to: Moreno Valley Mall, 2250 Town Circle, Suite 1206, Moreno Valley, CA 92553, Attn: General Manager | Shiekh Shoes, LLC | Base + % | 31-May-16 |
| Sunrise Mall | 6149 Sunrise Mall, #D-9 | Citrus Heights | CA | 95610 | Steadfast Sunrise V, LLC | Steadfast Commercial Management Co., Inc., Attn: Ana Maria Del Rio, Chief Administrative Officer, 4343 Von Karman, Suite 300, Newport Beach, CA 92660; With copy to: Steadfast Commercial Management Co., Inc., Attn: Lisa Whitney, VP, 4343 Von Karman, Suite 300, Newport Beach, CA 92660 | Shiekh Shoes, LLC | Base + % | 31-Jan-20 |
| Downtown L.A. | 434 East Washington Blvd. | Los Angeles | CA | 90015 | Eagle's Nest Property, LLC | Eagle's Nest Real Estate Corp., c/o Dennis Needleman, 813 Santee Street, Los Angeles, CA 90014 | Shiekh Shoes, LLC | Base | 31-Dec-21 |
| Visalia Mall | 2167 S Mooney Boulevard #1440 | Visalia | CA | 93277 | Visalia Mall, LP | Visalia Mall, L.P., c/o Visalia Mall, 110 N. Wacker Dr., Chicago, IL 60606, Attn: Law/Lease Administration Department; With copy to: Visalia Mall, 2031 South Mooney Blvd., Visalia, CA 93277, Attn: General Manager | Shiekh Shoes, LLC | Base + % | 31-Jan-18 |
| Crenshaw Plaza | 3650 W. MLK Blvd. #162 | Los Angeles | CA | 90008 | Capri Urban Baldwin, LLC | Primestor Development, Inc.; 201 South Figueroa Street, Suite 300, Los Angeles, California 90012; Attn: Arturo Sneider; with copy to Capri Capital Advisors, LLC, 875 North Michigan Avenue, Suite 3430, Chicago, Illinois 60611, Attn: Kenneth Lombard; Baldwin Hills Crenshaw Plaza, 3650 Martin Luther King, Jr. Boulevard Mall Office; Los Angeles, CA 90008, Attn: General Manager | Shiekh Shoes, LLC | Base + % | 30-Mar-24 |
| Chula Vista Center | 555 Broadway #1006 | Chula Vista | CA | 91910 | Chula Vista Center, LP | Chula Vista Center, LP, 1114 Avenue of the Americas, Suite 2800, New York, New York 10036, Attn: General Counsel; with copy to: Chula Vista Center, 555 Broadway Suite 1019, Chula Vista, California 91910, Attn: General Manager | Shiekh Shoes, LLC | Base + % | 31-Jul-27 |
| Gaslamp - CLOSED | 953 Fifth Ave. | San Diego | CA | 92101 | Rivera Family Restaurant, LLC | Randy Rivera, Capital Real Estate Ventures Inc., 815 J Street, Suite 202, San Diego, CA, 92101 | Shiekh Shoes, LLC | Base | 31-Jan-27 |
| Arden Fair | 1689 Arden Way #2182 | Sacramento | CA | 95815 | Arden Fair Associates, L.P. | Arden Fair Associates, L.P., 1689 Arden Way, Suite 1167, Sacramento, CA 95815; with copy to Arden Fair Associates, L.P., c/o The Macerich Company, P.O. Box 2172, 401 Wilshire Boulevard, Suite 700, Santa Monica, California 90401, Attention: Legal Department | Shiekh Shoes, LLC | Base + % | 31-Jan-28 |
| Hanford Mall | 1675 West Lacey Blvd. #G-5 | Hanford | CA | 93230 | WFM Glimcher, LLC | Hanford Mall, 1675 West Lacey Boulevard, Hanford, CA 93230, Attn: General Manager; with copy to PASSCO Property Management Services, LP, 2050 Main Street, Suite 650, Irvine, CA 92614, Attn: Asset Manager/ Hanford Mall | Shiekh Shoes, LLC | Base + % | 31-Jan-26 |
| WFS Parkway | 741 Parkway Plaza, #125 | El Cajon | CA | 92020 | Star-West Parkway Mall, LP | Starwood Retail Property Management, LLC, One East Wacker Drive, Suite 3700, Chicago, Illinois 60601, Attention: Lease Coordination; with copy to: Star-West Parkway Mall, LP, 415 Parkway Plaza, El Cajon, California 92020, Attention: General Manager | Shiekh Shoes, LLC | Base + % | 31-Jan-28 |
| Merced Mall | 740 Merced Mall | Merced | CA | 95340 | Merced Mall Ltd. | Merced Mall Ltd. P.O. Box 6655, Santa Rosa, California 95406 | Shiekh Shoes, LLC | Base + % | MTM |
| WFS Valley Fair | 2855 Stevens Creek Blvd. #B471 | Santa Clara | CA | 95050 | VF Mall LLC | VF Mall LLC, 11601 Wilshire Boulevard, 11th Floor, Los Angeles, California 90025, Attention: Legal Department | Shiekh Shoes, LLC | Base + % | 31-Jan-18 |
| The Shoppes at Carlsbad | 2525 El Camino Real. #142 | Carlsbad | CA | 92008 | RPI Carlsbad, L.P. | RPI Carlsbad, L.P., 1114 Avenue of the Americas, Suite 2800, New York, New York 10036, Attn: General Counsel; with copy to The Shoppes at Carlsbad, 2525 El Camino Real Suite 100, Carlsbad, California 92008, Attn: General Manager | Shiekh Shoes, LLC | Base + % | 30-Jun-27 |
| Mission Street | 2627 Mission St. | San Francisco | CA | 94110 | 2619 Mission LLP | 2619 Mission L.P. c/o The Prado Group, 150 Post Street, Suite 320, San Francisco, CA 94108 | Shiekh Shoes, LLC | Base | 24-Oct-21 |
| Sherwood Mall | 5308 Pacific Ave. #60 | Stockton | CA | 95207 | Brixton Sherwood, LLC (successor in interest to Sherwood Mall, LLC) | Brixton Sherwood, LLC, c/o Brixton Capital, 120 South Sierra Ave, Solana Beach, CA 92075, Attn: Property Manager | Shiekh Shoes, LLC | Base + % | 31-Dec-25 |
| Weberstown Mall | 4950 Pacific Ave Suite 317 | Stockton | CA | 95207 | WFM Glimcher, LLC | 180 East Broad Street, 21st Floor, Columbus, Ohio 43215, Attn: General Counsel | Shiekh Shoes, LLC | Base + % | 31-Dec-26 |
| Horton Plaza | 348 Horton Plaza #217 | San Diego | CA | 92101 | Horton Plaza, LLC | Horton Plaza LLC c/o Westfield, LLC, 2049 Century Park East, 41st Floor, Los Angeles, California 90067, Attn: legal Department | Shiekh Shoes, LLC | % | 30-Jun-18 |
| Inland Center | 500 Inland Center Dr. #140 | San Bernardino | CA | 92408 | WM Inland Investors IV LP LP | WM Inland Investors IV LP c/o Macerich, P.O. Box 2172, 401 Wilshire Boulevard, Suite 700, Santa Monica, CA 90407, Attn: Legal Department; with copy to David S. Joseph, II, Vice President, Director of Retail, 900 North Michigan Avenue, Suite 1900, Walton Street Capital, LLC, Chicago, IL 60611-6543 | Shiekh Shoes, LLC | Base + % | 30-Apr-26 |
| Montclair Plaza | 5010 E. Montclair Plaza Ln #5004 | Montclair | CA | 91763 | 5060 Montclair Plaza Lane Owner, LLC | 5060 Montclair Plaza Lane Owner, LLC, 4700 Wilshire Boulevard, Los Angeles CA 90010, Attn: Center Manager; with copy to 5060 E. Montclair Plaza Lane, Montclair, California 91763, Attn: General Manager | Shiekh Shoes, LLC | Base + % | 31-Jul-20 |
| WFS Main Place | 2800 N. Main St. #232 | Santa Ana | CA | 92705 | Mainplace Shoppingtown LLC | MainPlace Shoppingtown LLC, 11601 Wilshire Blvd., 12th Floor, Los Angeles, CA 90025, Attn: Legal Department | Shiekh Shoes, LLC | Base + % | 31-Jul-20 |
| Fashion Show | 3200 Las Vegas Blvd. Suite #2450 | Las Vegas | NV | 89109 | Fashion Show Mall LLC | Fashion Show Mall, LLC c/o Fashion Show, 110 N. Wacker Drive, Chicago, IL 60606, Attn: Law/Lease Administration Department | Shiekh Shoes, LLC | Base + % | 31-Jan-28 |
| Galleria at Tyler | 1327 Galleria at Tyler #D107 | Riverside | CA | 92503 | Tyler Mall, L.P. | Tyler Mall, L.P., c/o Galleria at Tyler, 110 N. Wacker Drive, Chicago, IL 60606, Attn: Law/Lease Administration Department | Shiekh Shoes, LLC | Base + % | 31-Jan-28 |
| Galleria at South Bay | 1815 Hawthorne Blvd. #366 | Redondo Beach | CA | 90278 | South Bay Center SPE, LLC | South Bay Center SPE, LLC, Terminal Tower, 50 Public Square, Suite 1100 Cleveland, Ohio 44113-2267, Attn: General Counsel | Shiekh Shoes, LLC | Base + % | 31-Jan-18 |
| Fashion Fair Mall (outside) | 711 East Shaw Ave. #20 | Fresno | CA | 93710 | Macerich Fresno Limited Partnership | Macerich Fresno Limited Partnership, 4841 North First Street, Fresno, CA 93726 Attn: Center Manager and copy to Macerich Fresno Limited Partnership c/o Macerich Company, P.O. Box 2172, 401 Wilshire Blvd, Suite 700, Santa Monica, CA 90407 Attn: Legal Dept | Shiekh Shoes, LLC | Base + % | 31-May-24 |
| Mission Valley Mall | 1640 Camino del Rio N. #218 | San Diego | CA | 92108 | Mission Valley Shoppingtown, LLC | Mission Valley Shoppingtown, LLC, 2049 Century Park East, 41st Floor, Los Angeles, CA 90067 | Shiekh Shoes, LLC | % | 30-Jun-18 |
| Antelope Valley Mall | 1233 Rancho Vista Blvd. #341 | Palmdale | CA | 93551 | Antelope Valley Mall, LLC | Antelope Valley Mall, LLC, Terminal Tower, 50 Public Square, Suite 1360, Cleveland, OH 44113-2267 | Shiekh Shoes, LLC | Base + % | 30-Apr-24 |
| Glendale Galleria | 2148 Glendale Galleria #0HU11 | Glendale | CA | 91210 | Glendale I Mall Associates, LP | Glendale I Mall Associates, LP, c/o Glendale Galleria, 110 N. Wacker Drive, Chicago, IL 60606, Attn: Law/Lease Admin. Dept. | Shiekh Shoes, LLC | Base + % | 31-Jan-28 |
| Northridge Fashion Center | 9301 Tampa Ave. #68 | Northridge | CA | 91324 | Formerly U.K.-American Properties, Inc.; currently GGP Northridge Fashion Center, LP | Northridge Fashion Center, 110 N. Wacker Dr., Chicago, IL 60606, Attn: Law/Lease Admin. Dept. | Shiekh Shoes, LLC | Base + % | 31-May-18 |

| Location Name | Address | City | State | ZIP | Lessors Name | Lessor Contact Info | Lessee | Rent Terms | Lease Expiration Date of Term |
|---|---|---|---|---|---|---|---|---|---|
| Inland Center | 764 Inland Center Drive | San Bernardino | CA | 92408 | Ten Brothers Holding Co. | 2565 Euclid Crescent East2565 Euclid Crescent East, Upland, CA 91784 | Shiekh Shoes, LLC | Base | 31-Mar-19 |
| Meadows Mall | 4300 Meadows Lane #1400 | Las Vegas | NV | 89107 | GGP Meadows Mall, LLC | GGP Meadows Mall, LLC, c/o Meadows Mall, 110 N. Wacker Drive, Chicago, IL 60606, Attn: Law/Lease Admin. Dept. | Shiekh Shoes, LLC | Base + % | 31-Mar-27 |
| Desert Sky Mall | 7611 West Thomas Road sp #F028 | Phoenix | AZ | 85033 | Desert Sky Mall LLC (Delaware) a Macerich Mall | Desert Sky Mall LLC, 7611 West Thomas Road, Phoenix, AZ 85033-5439, Attn: Center Manager and Desert Sky Mall LLC c/o Macerich, P.O.Box 2172, 401 Wilshire Blvd, Suite 700, Santa Monica, CA 90407, Attn: Legal Department | Shiekh Shoes, LLC | Base + % | 31-Jan-19 |
| Valencia Town Center | 24201 W. Valencia Blvd. #2520 | Valencia | CA | 91355 | Valencia Town Center Venture, L.P. (Delaware) a Westfield Lease | Valencia Town Center Venture, L.P., 2049 Century Park East, 41st Floor, Los Angeles, CA 90067, Attn: Legal Dept. | Shiekh Shoes, LLC | % | 31-Jan-19 |
| Valencia Town Center | 24201 W. Valencia Blvd. #2241 | Valencia | CA | 91355 | Valencia Town Center Venture, L.P. (Delaware) a Westfield Lease | Valencia Town Center Venture, L.P., 2049 Century Park East, 41st Floor, Los Angeles, CA 90067, Attn: Legal Dept. | Shiekh Shoes, LLC | | 31-Jul-17 |
| Valencia Town Center | 24201 W. Valencia Blvd. #1097 | Valencia | CA | 91355 | Valencia Town Center Venture, L.P. (Delaware) a Westfield Lease | Valencia Town Center Venture, L.P., 2049 Century Park East, 41st Floor, Los Angeles, CA 90067, Attn: Legal Dept. | Shiekh Shoes, LLC | Base + % | 31-Jan-29 |
| Metrocenter Mall | 9617 N. Metro Parkway #1144A | Phoenix | AZ | 85051 | Carlyle ER Metro, LLC (Delaware) by assignment from DVM Co. (AZ) A Simon Lease | Carlyle ER Metro, LLC, 2700 Westchester Ave, Suite 303, Purchase NY 10577-2532; Attn: Lease Administration with a copy to: Metrocenter Mall, 9617 N. Metro Parkway West, Suite 1001, Phoenix, AZ 85051-1409, Attn: General Manager | Shiekh Shoes, LLC | Base + % | 31-Dec-21 |
| Paradise Valley Mall | 4568 E. Cactus Road, #C048 | Phoenix | AZ | 85032 | Paradise Valley Mall SPE LLC (Delaware) (a Macerich Company) | Westday Associates Limited Partnership, 4568 East Cactus Road, Phoenix, AZ 85032 Attn: Center Manager and copy to: Westday Associates Limited Partnership c/o Macerich Company, P.O. Box 2172, 401 Wilshire Blvd, Suite 700, Santa Monica, CA 90407 Attn: Legal Department | Shiekh Shoes, LLC | Base + % | 31-May-17 |
| Arrowhead Towne Center | 7700 West Arrowhead Town Center, #1181 | Glendale | AZ | 85308 | Arrowhead Towne Center LLC (Macerich) | Arrowhead Towne Center LLC, 7700 W. Arrowhead Towne Center Drive, Glendale, AZ 85308, Attn: Center Manager and Arrowhead Towne Center LLC c/o Macerich, P.O. Box 2172, 401 Wilshire Blvd, Suite 700, Santa Monica, CA 90407, Attn: Correspondence Routing System/Legal Department | Shiekh Shoes, LLC | | 30-Jun-20 |
| Superstition Spring Center | 6555 East Southern Ave, #H20 | Mesa | AZ | 85206 | East Mesa Mall L.L.C. (Macerich) | East Mesa Mall L.L.C., 6555 East Southern Avenue, Mesa, AZ 85206 Attn: Center Manager; and to East Mesa Mall L.L.C. c/o Macerich, P.O. Box 2172, 401 Wilshire Blvd., Suite 700, Santa Monica, CA 90407 Attn: Correspondence Routing System/Legal Department | Shiekh Shoes, LLC | Base + % | 30-Jun-20 |
| WFS North County Mall | 200 East Via Rancho, #419 | Escondido | CA | 92025 | EWH Escondido Associates, L.P. (Westfield) | EWH Escondido Associates, L.P., 11601 Wilshire Blvd., 11th Floor, Los Angeles, CA 90025 Attn: Legal Dept.; | Shiekh Shoes, LLC | % | 1/1/2018 |
| Chandler Fashion Center | 3111 West Chandler Blvd #118 | Chandler | AZ | 85226 | TWC Chandler LLC (Macerich) | TWC-Chandler, L.L.C., Suite 214, 3111 West Chandler Blvd., Chandler, AZ 85226 Attn: Center Manager and TWC-Chandler, L.L.C. c/o Macerich Company, P.O. Box 2171, 401 Wilshire Blvd., Suite 700, Santa Monica, CA 90407 attn: Legal Dept. | Shiekh Shoes, LLC | Base + % | 31-Dec-17 |
| The Galleria | 5135 West Alabama Road #7290 | Houston | TX | 77056 | SA Galleria IV, L.P. (Simon Property) | SA Galleria IV, L.P., c/o M.S. Management Associates Inc., 225 West Washington St., Indianapolis, IN 46204-3438 | Shiekh Shoes, LLC | Base + % | 31-Oct-22 |
| Arizona Mills | 5000 Arizona Mills Circle #158 | Tempe | AZ | 85282 | Arizona Mills Mall, LLC, c/o M.S. Management Associates Inc. | Arizona Mills Mall, LLC, c/o M.S. Management Associates Inc., 225 West Washington St., Indianapolis, IN 46204-3438 | Shiekh Shoes, LLC | Base + % | 30-Sep-25 |
| WFS Palm Desert | 72840 Highway 111 #E181 | Palm Desert | CA | 92260 | Palm Desert LLC | Westfield LLC, 2049 Century Park East 41st Floor Los Angeles, CA 90067 | Shiekh Shoes, LLC | Base | 31-Jan-28 |
| West Side Pavillion | 10800 West Pico Blvd #372 | Los Angeles | CA | 90064 | Macerich Westside Pavilion Property LLC | Macerich Westside Limited Partnership, Suite 312, 10800 West Pico Boulevard, Los Angeles, California 90064, Attention: Center Manager; with copy to Macerich Westside Limited Partnership c/o Macerich Company, P.O. Box 2172, 401 Wilshire Boulevard, Suite 700, Santa Monica, California 90407, Attention: Legal Department | Shiekh Shoes, LLC | % | 31-Dec-17 |
| West Oaks Mall | 1000 West Oaks Mall Sp #304 | Houston | TX | 77082 | West Oaks Mall Owner, LP | West Oaks Owner LLC, 100 North Sepulveda Blvd., Suite 1925, El Segundo, CA 90245, Attn: Managing Principal; with copy to West Oaks Mall, 1000 West Oaks Mall, Houston, Texas 77082, Attn: Mall Manager | Shiekh Shoes, LLC | Base + % | 31-Jan-28 |
| Northridge Fashion Center | 9301 Tampa Ave., #17 | Northridge | CA | 91324 | GGP Northridge Fashion Center, LP | GGP Northridge Fashion Center, LP c/o Northridge Fashion Center, 1100 N. Wacker Dr., Chicago, IL 60606, Attn: Law Lease Administration Department; with copy to Northridge Fashion Center, 9301 Tampa Ave., Northridge, CA 91324, Attn: General Manager | Shiekh Shoes, LLC | Base + % | 31-Jul-26 |
| Capitola Mall | 1855 41st Ave #J06 | Capitola | CA | 95010 | MGP XI Capitola, LLC | MGP XI Capitola, LLC Re: Capitola Mall, Unit #727-306, 425 California Street, San Francisco, CA 94104-2113, Attn: Lease Administration | Shiekh Shoes, LLC | Base | 30-Sep-19 |
| Otay Ranch Town Center | 2015 Birch Rd Ste 1001 | Chula Vista | CA | 91915 | GGP-Otay Ranch, L.P. | GGP-Otay Ranch, L.P. c/o Otay Ranch Town Center, 110 N. Wacker Dr., Chicago, IL 60606, Attn: Law/Lease Administration Department; with copy to Otay Ranch Town Center, 2015 Birch Road, Suite 500, Chula Vista, CA 91915, Attn: General Manager | Shiekh Shoes, LLC | Base + % | 30-Sep-19 |
| Victorvalley Mall | 14400 Bear Valley Rd #241 | Victorville | CA | 92392 | Macerich Victor Valley LP | Macerich Victor Valley LP c/o Macerich P.O. Box 2172, 401 Wilshire Boulevard, Suite 700, Santa Monica, California 90407 Attn: Legal Dept; Macerich Victor Valley LP, 14400 Bear Valley Rd., Suite 715, Victorville, CA 92392, Attn: Center Manager | Shiekh Shoes, LLC | Base + % | 31-Jul-26 |
| Park Place Mall | 5870 East Broadway Blvd. #110 | Tucson | AZ | 85711 | Park Mall L.L.C. | Park Place Mall c/o Park Mall L.L.C., 110 N. Wacker Dr., Chicago, IL 60606, Attn: Law/Lease Administration Department | Shiekh Shoes, LLC | Base + % | 31-Dec-17 |
| Tucson Mall | 4500 North Oracle Rd, Suite #327 | Tucson | AZ | 85705 | GGP-Tucson Mall L.L.C. | Tucson Mall c/o GGP-Tucson Mall L.L.C., 110 N. Wacker Dr., Chicago, IL 60606, Attn: Law/Lease Administration Department; with copy to Tucson Mall, 4500 N. Oracle Rd., Tucson, AZ 85705, Attn: General Manager | Shiekh Shoes, LLC | % | 31-Jan-19 |
| Baybrook Mall | 500 Baybrook Mall #1374 | Friendswood | TX | 77546 | BAYBROOK MALL, LLC c/o Baybrook Mall 110 N. Wacker Dr., Chicago, IL 60606, Attn: Law/Lease Administration Department; Baybrook Mall 500 BAYBROOK MALL | BAYBROOK MALL, LLC c/o Baybrook Mall, 110 N. Wacker Dr., Chicago, IL 60606, Attn: Law/Lease Administration Department; Baybrook Mall 500 BAYBROOK MALL, FRIENDSWOOD, Texas 77546, Attn: General Manager. | Shiekh Shoes, LLC | Base + % | 12/31/2017 |
| Stonewood Mall | 139 Stonewood St. #G33 | Downey | CA | 90241 | Macerich Stonewood, LLC | Macerich Stonewood, LLC, 251 Stonewood Street, Management Office, Downey, California 90241-3934, Attn: Center Manager; with copy to Macerich Stonewood, LLC c/o Macerich, P.O. Box 2172, 401 Wilshire Boulevard, Suite 700, Santa Monica, California 90407, Attn: Legal Department | Shiekh Shoes, LLC | Base + % | 30-Sep-21 |
| Lakewood Center Mall | 500 Lakewood Center Mall #021 | Lakewood | CA | 90712 | Macerich Lakewood, LLC | Macerich Lakewood, LLC, 500 Lakewood Center Mall, Lakewood, California 90712, Attn: Center Manager; with copy to Macerich Lakewood, LLC c/o Macerich, P.O. Box 2172, 401 Wilshire Boulevard, Suite 700, Santa Monica, California 90407, Attn: Legal Department | Shiekh Shoes, LLC | Base + % | 30-Sep-21 |
| Deerbrook Mall | 20121 Eastex Freeway | Humble | TX | 77338 | Ten Brothers Holding Co. | 2565 Euclid Crescent East, Upland, CA 91784 | Shiekh Shoes, LLC | Base | 5/31/2021 |
| Galleria at Sunset | 1300 Sunset Road Suite #1370 | Henderson | NV | 89014 | BPC HENDERSON, LLC | BPC Henderson, LLC, Terminal Tower, 50 Public Square, Suite 1360, Cleveland, OH 44113 | Shiekh Shoes, LLC | Base + % | 31-Aug-18 |
| First Colony Mall | 16535 Southwest Freeway, #620 | Sugarland | TX | 77479 | First Colony Mall, LLC | First Colony Mall c/o GGP Sugar Land Mall, L.P. 110 N. Wacker Dr. Chicago, IL 60606 | Shiekh Shoes, LLC | Base + % | 31-Oct-17 |
| First Colony Mall | 16535 Southwest Freeway, #0120 | Sugarland | TX | 77479 | First Colony Mall, LLC | First Colony Mall LLC c/o First Colony Mall, L.P. 110 N. Wacker Dr. Chicago, IL 60606, Attn: Law/Lease Admin. Dept.; First Colony Mall 16535 Southwest Freeway, Ste. 1, Sugarland TX 77479, Attn: GM | Shiekh Shoes, LLC | Base | 31-Dec-27 |
| Vintage Faire Mall | 3401 Dale Rd, #R06 | Modesto | CA | 95356 | Macerich Vintage Faire Limited Partnership | CLOSED STORE | Shiekh Shoes, LLC | Base + % | 30-Nov-23 |
| Boulevard Mall | 3582 S. Maryland Parkway, #122 | Las Vegas | NV | 89169 | Boulevard Associates | The Boulevard Mall c/o Boulevard Associates, 110 N. Wacker Dr., Chicago, IL 60606, Attn: Law/Lease Administration Department | Shiekh Shoes, LLC | Base + % | 30-Nov-21 |
| Topanga Plaza | 6600 Topanga Canyon Blvd, #1070A | Canoga Park | CA | 91303 | Westfield Topanga Owner LLC | Westfield Topanga Owner, L.L.C., 2049 Century Park East, 41st Flr., Los Angeles, CA 90067, Attn: Legal Department. | Shiekh Shoes, LLC | % | 1-Jan-18 |
| Memorial City Mall | 303 Gessner Road #340 | Houston | TX | 77024 | Memorial City Mall, LP | Memorial City Mall, L.P. c/o Metro National Corporation, Attn: Legal Department, P.O. Box 195909, Houston, Texas 77224-9509 (alternate non-PO Box address also provided); with copy to Memorial City Mall, L.P., Attn: Mall Manager, 303 Memorial City, Houston, Texas 77024 (AM01) | Shiekh Shoes, LLC | Base + % | 30-Nov-21 |
| SF Flagship | 929 Market Street, S-200 S-100 & Basement | San Francisco | CA | 94103 | Ten Brothers Holding Co. | 2565 Euclid Crescent East, Upland, CA 91784 | Shiekh Shoes, LLC | Base | 11/30/2018; |
| Hollywood Store | 6542 & 6544 Hollywood Blvd | Los Angeles | CA | 90028 | Robert Barefield D/B/A Hollywood Hudson | 515 Ocean Ave. #708 S., Santa Monica, CA 90402 | Shiekh Shoes, LLC | Base | 31-Mar-21 |
| Oakland | 3422 International Blvd | Oakland | CA | 94601 | Ten Brothers Holding Co. | 2565 Euclid Crescent East, Upland, CA 91784 | Shiekh Shoes, LLC | Base | 31-Jul-20 |
| Bay Fair Mall | 310 Bayfair Mall | San Leandro | CA | 94578 | MM/PG (Bayfair) Properties LLC | c/o Madison Marquette Retail Services Inc., 1850 M Street NW, 12th Floor, Washington, DC 20036, Attn: Chief Financial Officer; with copy to c/o Madison Marquette Retail Services Inc., 248 Bay Fair Mall Drive, San Leandro, California 94578, Attn: General Manager; Bayfair Center 15555 East 14th St., Ste. 350, San Leandro, CA 94578; MM/PG Properties LLC c/o Wells Fargo Bank, N.A., NW 5849, P.O. Box 1450, Minneapolis, MN 55485-5849 | Shiekh Shoes, LLC | Base + % | 31-Dec-24 |
| Huntington Park | 6805 Pacific Blvd. | Huntington Park | CA | 90255 | 6805 Pacific L.P. | 6805 Pacific L.P.; c/o Triumph Management Company; 8370 Wilshire Blvd, Ste 209, Beverly Hills, CA 90211 | Shiekh Shoes, LLC | Base + % | 31-Dec-24 |
| Cottonwood Mall | 10000 Coors Bypass NW, #C-13 | Albuquerque | NM | 87114 | Simon Property Group, L.P. | Simon Property Group, L.P.; M.S. Management Associates Inc.; 225 West Washington Street; Indianapolis, Indiana 46204-3438 | Shiekh Shoes, LLC | Base + % | 30-Nov-18 |
| The Shops at Tanforan | 1150 El Camino Real, #115 | San Bruno | CA | 94066 | Tanforan Park Shopping Center LLC | Tanforan Park Shopping Center LLC; 3600 Birch Street, Suite 250; Newport Beach, CA 92660; Attn: Senior Vice President - Tanforan; copy to: General Growth Management, Inc.; 110 North Wacker Drive, Chicago, IL 60606; Attn: Managed Property/Legal | Shiekh Shoes, LLC | Base + % | 30-Nov-18 |
| Florin Mall | 7215 Stockton Blvd Suite A | Sacramento | CA | 95823 | D&S Retail Properties, LLC | David Hashwa/ D N S #403, 8701 Casa Del Rio Lane, Fair Oaks, CA 95628 | Shiekh Shoes, LLC | Base | MTM |
| Burbank Town Center | 201 East Magnolia Blvd. Suite 294 | Burbank | CA | 91502 | CAPREF Burbank LLC | Burbank Mall Associates, LLC c/o Crown Realty & Development Corp., 18201 Von Karman Avenue, #950, Irvine, CA 92612; with copy to Burbank Town Center, 201 East Magnolia Boulevard, Suite 151, Burbank, CA 91501, Attn: General Manager and copy to General Growth Management, Inc., 110 North Wacker Drive, Chicago, IL 60606, Attn: Management Services/Burbank Town Center | Shiekh Shoes, LLC | | 31-Aug-20 |
| Ontario Mills Mall | 1 Mills Circle, #355 | Ontario | CA | 91764 | Ontario Mills Limited Partnership | Ontario Mills Limited Partnership; c/o M.S. Management Associates Inc.; 225 West Washington Street; Indianapolis, Indiana 46204-3438 | Shiekh Shoes, LLC | Base + % | |
| WSF West Covina | 454 Plaza Drive | West Covina | CA | 91790 | Plaza West Covina, LP | Plaza West Covina, LP, 112 Plaza Drive, West Covina, CA 91790; with copy to: Starwood Retail Partners, LLC; 1 East Wacker, Suite 3700; Chicago, IL 60601; Attn: Specialty Leasing | Shiekh Shoes, LLC | Base + % | 31-Jan-18 |
| WSF West Covina_Storage | 454 Plaza Drive | West Covina | CA | 91790 | Plaza West Covina, LP | Plaza West Covina, LP, 112 Plaza Drive, West Covina, CA 91790; with copy to: Starwood Retail Partners, LLC; 1 East Wacker, Suite 3700; Chicago, IL 60601; Attn: Specialty Leasing | Shiekh Shoes, LLC | Base | MTM |
| Tacoma Mall | 4502 S. Steele St Suite 331A | Tacoma | WA | 98409 | Tacoma Mall Partnership | Tacoma Mall Partnership c/o M.S. Management Associates Inc.; 225 West Washington Street; Indianapolis, Indiana 46204-3438 | Shiekh Shoes, LLC | Base + % | 30-Nov-19 |
| Greenspoint Mall | 242 Greenspoint Mall, #242 | Houston | TX | 77060 | GPM Houston Properties, LTD | GPM Houston Properties, LTD; Gpm Houston Properties, Greenspoint Mall, 12300 North Freeway, Suite#208, Houston, TX 77060 | Shiekh Shoes, LLC | Base + % | 30-Sep-22 |
| Northgate Mall | 401 NE Northgate Way #527 | Seattle | WA | 98125 | Northgate Mall Partnership | Northgate Mall Partnership c/o M.S. Management Associates Inc.; 225 West Washington Street; Indianapolis, Indiana 46204-3438 | Shiekh Shoes, LLC | Base + % | 31-Oct-19 |
| Westfield Capital | 625 Black Lake Blvd #E14 | Olympia | WA | 98502 | Capital Mall Company | Capital Mall Company; 11601 Wilshire Boulevard, 11th Floor, Los Angeles, California 90025; attention: Legal Department | Shiekh Shoes, LLC | Base + % | 30-Nov-20 |
| Northgate Mall San Rafael | 5800 Northgate Mall #107 | San Rafael | CA | 94903 | Northgate Mall Partnership | Northgate Mall Partnership; M.S. Management Associates Inc.; 225 West Washington St., San Rafael, CA 94903; and/or Northgate Mall Associates c/o Macerich; PO Box 2172; 401 Wilshire Boulevard, Suite 700, Santa Monica, CA 90407; Attention: Legal Department | Shiekh Shoes, LLC | Base + % | 31-Jan-22 |
| Galleria Dallas | 13350 Dallas Parkway #3600 | Dallas | TX | 75240 | Galleria Mall Investors LP | Galleria Mall Investors LP c/o M.S. Management Associates, Inc.; 225 W. Washington Street; Indianapolis, Indiana 46204-3438; and to US Realty Investors Inc.; 12001 North Central Expressway, Suite 650; Dallas, TX 75243-3735 | Shiekh Shoes, LLC | Base + % | |
| Eastmont Town Center | 7200 Bancroft Ave. Suite 107 | Oakland | CA | 94605 | Eastmont Oakland Associates, LLC | The Praedium Group LLC; 825 Third Avenue, 36th Floor; New York, NY 10022, Attn: Asset Manager; Fax: 212-224-6498; with copy to: ScanlanKemperBard Companies, LLC; 2600 Paceset Center, 1211 S.W. Fifth Avenue; Portland, OR 97204; Attn: Asset Manager; Fax: 503-220-2648 | Shiekh Shoes, LLC | | 31-Jan-20 |
| Los Cerritos Center | 150 Los Cerritos Center #A15 | Cerritos | CA | 90703 | Macerich Cerritos, LLC | Macerich Cerritos, LLC Management Office; 239 Los Cerritos Center, Cerritos, CA 90703-5422; Attention: Center Manager; w/ copy to: Macerich Cerritos, LLC c/o Macerich; PO Box 2172; 401 Wilshire Boulevard, Suite 700, Santa Monica, CA 90407; Attention: Legal Department | Shiekh Shoes, LLC | Base + % | 31-Jan-20 |

| Location Name | Address | City | State | ZIP | Lessors Name | Lessor Contact Info | Lessee | Rent Terms | Lease Expiration Date of Term |
|---|---|---|---|---|---|---|---|---|---|
| Alderwood Mall | 3000 184th Street #522 | Lynnwood | WA | 98037 | Alderwood Mall L.L.C. | Alderwood Mall c/o Alderwood Mall L.L.C.; 110 N. Wacker Dr. Chicago, IL 60606; Attn: Law/Lease Administration Department; with copy to Alderwood Mall; 3000 184th St. S.W. Room 127; Lynnwood, WA 98037; Attention: General manager | Shiekh Shoes, LLC | Base + % | 30-Apr-20 |
| SouthCenter Mall | 1031 Southcenter Mall | Tukwila | WA | 98188 | WEA Southcenter LLC | WEA Southcenter LLC; 11601 Wilshire Boulevard, 11th Floor; Los Angeles, CA 90025; Attention: Legal Department | Shiekh Shoes, LLC | Base + % | 31-Jan-25 |
| Sharpstown Center | 132 Sharpstown Center, B-19 | Houston | TX | 77036 | Sharpstown Mall Texas, L.L.C. | Sharptown Mall Texas, L.L.C.; 720 North Post Oak Road, Suite 500; Houston, Texas 77024 | Shiekh Shoes, LLC | Base + % | 30-Jun-20 |
| Lloyd Center | 951 Lloyd Center, #C204/C208 | Portland | OR | 97232 | CAPREF Lloyd Center LLC | CAPREF Lloyd Center LLC, 2201 Lloyd Center, Portland, Oregon 97232; Attn: Lease Administration, wanda.rosenbarger@lloydcenter.com; with copy to Patras Williams, LLC, 14 Countryside Lane, Suite 100, Ringwood, New Jersey 07456, Attn: Amy M. Williams, awilliams@pwjlaw.com | Shiekh Shoes, LLC | Base + % | 31-Jan-27 |
| The Parks @ Arlington | 3811 S. Cooper St. #1096 | Arlington | TX | 76120 | Parks at Arlington, LLC | Parks at Arlington, LLC c/o The Parks at Arlington; 110 N. Wacker Drive; Chicago, IL 60606; Attn: Law/Lease Administrative Department; with copy to: The Parks at Arlington; 3811 South Cooper Street; Arlington, TX 76015; Attn: General Manager | Shiekh Shoes, LLC | Base + % | 30-Nov-20 |
| Imperial Highway | 700 W. Imperial Highway #108 | Los Angeles | CA | 90044 | 3829 South Broadway LLC | 3829 Broadway LLC, Reliant Real Estate Management, Inc., c/o The REMM Group 15991 Red Hill Ave., Suite 200, Tustin, CA 92780 | Shiekh Shoes, LLC | Base | 31-Dec-22 |
| River Oaks Center | 96 River Oaks Center #0415 | Calumet City | IL | 60409 | Valley/River Oaks Partnership | Fox Valley/River Oaks Partnership c/o M.S. Management Associates Inc.; 225 West Washington Street; Indianapolis, Indiana 46204-3438 | Shiekh Shoes, LLC | Base + % | 31-Jul-22 |
| Highland Plaza | 1631 East Highland Ave Suite B-D | San Bernardino | CA | 92404 | HM Suns Investment, Inc. | HM SUNS INVESTMENT, INC. 5681 Beach Blvd., Suite 200, Buena Park, CA 90621 | Shiekh Shoes, LLC | Base | 31-Dec-17 |
| Ford City Mall | 7601 S. Cicero Ave. #1364 | Chicago | IL | 60652 | SFI Ford City - Chicago LLC | Mid-America Asset Management, Inc., One Parkview Plaza, 9th Floor, Oakbrook Terrace, IL 60181 | Shiekh Shoes, LLC | Base + % | MTM |
| Town Square Mall | 6671 Las Vegas Blvd South #A-133 | Las Vegas | NV | 89119 | TSLV LLC | TSLV LLC c/o Forest City Real Estate Services, LLC, 6605 Las Vegas Blvd., South, Suite 201, Las Vegas, Nevada 89119, Attn: Property Manager; with copy to TSLV, LLC c/o NexBank SSB, 2515 McKinney Avenue, Suite 1100 Dallas, TX 75201 | Shiekh Shoes, LLC | Base + % | 31-Jan-26 |
| SouthLand Mall | 1215 SouthLand Mall, #264 & #268 | Memphis | TN | 38116 | East Shelby Drive Holdings, LLC | 1215 East Shelby Drive Holdings, AH137LLC c/o CW Capital Asset Management LLC, 7501 Wisconsin Avenue, Suite 500, West Bethesda, MD 20814, Attn: Legal Department; with copy to management company, 1215 Southland Mall, Memphis, TN 38116 | Shiekh Shoes, LLC | % | 31-Oct-19 |
| Portland - CLOSED | 5020 NE Martin Luther King Blvd. | Portland | OR | 97211 | Dozer Construction LLC | 126 NE Alberta, Suite 206, Portland, OR 97211 | Shiekh Shoes, LLC | Base | 31-Dec-19 |
| Visalia | 1100 S. Mooney Blvd | Visalia | CA | 93277 | Ten Brothers Holding Co. | 2565 Euclid Crescent East, Upland, CA 91784 | Shiekh Shoes, LLC | Base | 31-Mar-18 |
| EastLand Center | 18000 Vernier Rd. #840 | Harper Woods | MI | 48225 | New Eastland Mall Developer, LLC | c/o Ashkenazy Acquisition Corp.; 150 East 58th Street, Penthouse; New York, NY 10015; Attn: Lease Administration; with copy to General Counsel | Shiekh Shoes, LLC | Base | 31-May-19 |
| South Bay Pavillion | 20700 S. Avalon Blvd. #B-16 | Carson | CA | 90746 | VCG-Southbay Pavilion, LLC | VCG-Southbay Pavilion, LLC; 11611 San Vincente, Boulevard, Suite 1000; Los Angeles, CA 90049; Attention: Vice President, Asset Management; and SouthBay Pavilion; Mall Management Office, 20700 Avalon Boulevard, Suite 620, Carson, CA 90746; Attn: General Manager | Shiekh Shoes, LLC | Base + % | 31-Jan-23 |
| Plaza Bonita | 3030 Plaza Bonita RD. #2530 | National City | CA | 91950 | Plaza Bonita LLC | Plaza Bonita LLC; 11601 Wilshire Boulevard, 11th Floor; Los Angeles, CA 90025; Attn: Legal Department | Shiekh Shoes, LLC | Base + % | 31-Jan-23 |
| Montebello Town Center | 1171 Montebello TownCenter, #D18-A | Montebello | CA | 90640 | Montebello Town Center Investors LLC | Montebello Town Center Investors LLC c/o M.S. Management Associates Inc.; 225 West Washington Street; Indianapolis, Indiana 46204-3438 | Shiekh Shoes, LLC | Base + % | 30-Nov-26 |
| Long Beach Store | 248 Pine Ave. | Long Beach | CA | 90802 | Devinder Mavi and Janet Mavi (as individuals) | 4051 Ondine Circle, Huntington Beach, CA 92649 | Shiekh Shoes, LLC | Base | 31-Aug-24 |
| Pico LA | 5001 W. Pico Blvd. | Los Angeles | CA | 90019 | Botach Management | Botach Management 5011 W. Pico Boulevard; Los Angeles, CA 90019 | Shiekh Shoes, LLC | Base | 30-Sep-17 |
| Broadway LA | 745 S. Broadway | Los Angeles | CA | 90014 | SUBLESSOR - 745 Emerald LLC | 1000 Pennsylvania Avenue, Brooklyn, New York 11207 | Shiekh Shoes, LLC | Base | 31-Jan-25 |
| Florin Outlet | 764 Inland Center Drive | San Bernadino | CA | 92408 | Ten Brothers Holding Co. | 2565 Euclid Crescent East, Upland, CA 91784 | Shiekh Shoes, LLC | Base | 28-Feb-21 |
| Inland Center Outlet | 7215 Stockon Blvd | Sacramento | CA | 95823 | D&S Retail Properties, LLC | David Hashwa/ D N S #403, 8701 Casa Del Rio Lane, Fair Oaks, CA  95628 | Shiekh Shoes, LLC | Base | 31-Mar-22 |
| Topanga Sole | 6600 Topanga Canyon Blvd. #11 | Canoga Park | CA | 91303 | Westfield Topanga Owner LLC | Westfield Topanga Owner, LP, 2049 Century Park E 41st Floor, Los Angeles, California 90067, Attn: Legal Department | Shiekh Shoes, LLC | Base + % | 1-Jan-18 |
| Southcenter Sole | 984 Southcenter Mall | Tukwila | WA | 98188 | WEA Southcenter LLC | WEA Southcenter LLC; 2049 Century Park East; 41st Floor; Los Angeles, California 90067; Attention: Legal Department | Shiekh Shoes, LLC | Base + % | 31-Jan-25 |
| Irvine Spectrum | 643 Spectrum Center Dr | Irvine | CA | 92618 | Licensor - Irvine Company, LLC | Irvine Company LLC, 110 Innovation, Irvine, CA 92617, Attn: General Counsel; with copy to Irvine Spectrum Center, 670 Spectrum Center Drive, Irvine, CA 92618 | Shiekh Shoes, LLC | Base + % | 31-Jul-18 |
| Beverly Center | 8500 Beverly Blvd. Suite 692 | Los Angeles | CA | 90048 | LA CIENEGA PARTNERS LIMITED PARTNERSHIP, a Delaware limited partnership | La Cienega Partners Limited Partnership, 200 East Long Lake Road Bloomfield Hills, MI 48304 | Shiekh Shoes, LLC | Base + % | 31-Jan-24 |